Page 102

1  A  Yes, ma'am.
2  Q  And then he would consider you for an outside
3  maintenance position after, is that correct?
4  A  Yes, ma'am.
5  Q  Did you apply for any other outside maintenance
6  positions after the plumber position?
7  A  I didn't apply for any other position at all after
8  that one.
9  Q  Why not? Why didn't you apply for any other
10 positions after the plumber position?
11 A  All the ones I applied for, I never got. So I felt
12 that it wouldn't do me any good to apply for anything else.
13 Q  Did any other positions in outside maintenance
14 become available after the plumber position?
15 A  I don't know. I didn't pay any attention to it. I
16 wasn't looking for any other transfers.
17 Q  Okay. And then you are currently out on disability
18 leave?
19 A  Yes, ma'am, I am.
20 Q  From Dover Downs?
21 A  Yes, ma'am, I am.
22 Q  And why are you out on leave?
23 A  I hurt my neck. I had an operation from the car
24 wreck and I hurt my neck there at the time.

Page 103

1  Q  Your neck, you hurt your neck during the car
2  accident?
3  A  Yes, ma'am. Pulled the nerves out from under the
4  plate that I have in my neck.
5  Q  Okay. And did you reinjure your neck?
6  A  Yeah, at that time.
7  Q  And when did you go out on disability leave from
8  Dover Downs?
9  A  September 9th. I remember that well. That's
10 when -- no, excuse me. Excuse me. I'm wrong.
11    That was April or March. April or March of
12 2004.
13 Q  2004?
14 A  Five. Five. Yes.
15 Q  Why are you out on leave?
16 A  Because of my neck. The nerves was stretched.
17 Q  You said you hurt your neck during your car
18 accident, is that correct?
19 A  In the first time.
20 Q  And then you re-injured it last year, your neck?
21 A  Yes, ma'am.
22 Q  Did you injure your neck while you were working at
23 Dover Downs?
24 A  Yes, ma'am.

Page 104

1  Q  And who is the doctor you're seeing for your neck
2  injury?
3  A  I have seen so many. I know I have seen nine. I
4  can't give you all the names. If they have to be faxed to
5  you, I can get them for you.
6  Q  Are you seeing a Dr. Rudin? Is that one of the
7  doctors you're seeing?
8  A  Not anymore. Dr. Verapoppa is the one I'm seeing
9  now.
10 Q  When did you start seeing Verapoppa?
11 A  When I -- Dr. Rudin was the one that recommended me
12 to Dr. Varapoppa.
13 Q  Okay.
14    MS. FRIEL: Okay. Tim I'm going to ask that
15 you just update your answer to interrogatories to the list
16 of doctors on list two. It lists doctors and it just lists
17 two. He said he is seeing more now. We can deal with that
18 later.
19    THE WITNESS: Yeah, they sent me to so many,
20 it's pathetic.
21 BY MS. FRIEL:
22 Q  Have any of the doctors given you the okay to come
23 back to work?
24 A  They give me the okay to go back to work as far as

Page 105

1  light duty. They said I was able to lift from ten to
2  15 pounds. No more than that.
3  Q  And when were you released to go on light duty?
4  A  I have been released a couple times now. I'm just
5  trying to think of his darn name. I can't think of it now.
6  In human resources. They knew of it. And he said -- I got
7  a letter and everything if you need that faxed to you, too.
8  I can give it to my attorney from them. Stating about the
9  ten percent work and they said that they didn't have a light
10 duty for that.
11 Q  A light duty where you're restricted you said to ten
12 to 15 pounds, is that correct?
13 A  Yes, ma'am.
14 Q  And do you believe you could perform a Maintenance
15 Mechanic I position with that restriction?
16 A  No, ma'am, I can't.
17 Q  As we sit here today, are you released to go back on
18 light duty to Dover Downs?
19 A  Yes, ma'am, I am.
20 Q  Okay. Do you know when you were released to go back
21 on light duty?
22 A  Like I say, I have it in my papers where I was
23 released and everything. That's all I can tell you.
24 Q  And the restriction still is, you cannot lift more

A0016

27 (Pages 102 to 105)

Thompson
Brance F. Thompson
v.
C.A. # 05-0274 (GMS)
Dover Downs
April 5, 2006

Page 146

1  A  No, I didn't.
2  Q  Did you lose any job opportunity because of this
3  November 16, 2004?
4  A  No, I didn't.
5  Q  Did your job change in any way because of this
6  verbal warning dated November 16, 2004?
7  A  No, ma'am.
8     MS. FRIEL: Exhibit 20.
9     (Thompson Deposition Exhibit No. 20 was marked
10 for identification.)
11 BY MS. FRIEL:
12 Q  Exhibit 20 is Bates labeled D 0068 through 0069.
13    Mr. Thompson, do you recognize Exhibit 20?
14 A  Yes, ma'am. Disciplinary warning notice.
15 Q  And what's the date of this notice?
16 A  Date of notice was 11/29/04.
17 Q  And when did you first receive this notice dated
18 November 29, 2004?
19 A  12/06/04.
20 Q  And who gave you this warning dated November 29th,
21 2004?
22 A  Marie Isenberg.
23 Q  Did you meet with anyone else besides Ms. Isenberg
24 about this warning?

Page 147

1  A  Just at the time, yes. Rich Wertz. Mr. Wertz.
2  Q  Was Mr. Wertz at the meeting with Ms. Isenberg and
3  yourself?
4  A  No. I spoke to him earlier and that's when I signed
5  it and it was sent to Marie Isenberg and she evidently
6  edited it and she signed her name to it.
7  Q  What do you mean she edited it, Mrs. Isenberg edited
8  it?
9  A  I guess she just looked at it to see. I don't know.
10 All I know, she seen it and signed it after we did.
11 12/10/04. We signed it 12/06/04.
12 Q  So did you ever speak with Ms. Isenberg personally
13 about this warning dated November 29th?
14 A  No.
15 Q  Tell me about your discussion with Mr. Wertz about
16 this notice dated November 29th?
17 A  I don't remember the discussion. I know it was late
18 with no doctor's excuse but I do have doctors' excuses.
19 Q  Okay. It says, underneath nature of incident on
20 this warning, it says, left work early due to illness. No
21 doctor's excuse was supplied upon return.
22 A  Yes. He was the one that sent me home.
23 Q  And the date of the incident says November 17th,
24 2004?

Page 148

1  A  Right.
2  Q  Did you leave work early on November 17th, 2004?
3  A  Yes, I did.
4  Q  And did you provide a doctor's excuse after, when
5  you returned to work?
6  A  Yes, I did. I went to outpatient. It's an
7  emergency thing. I was pretty sick that day.
8  Q  Okay. And did you provide Dover Downs with a
9  doctor's note?
10 A  Yes, I did. It came up. Nobody has seen it. But I
11 still have a copy of it.
12 Q  Did you have sick time accrued at the time of
13 November 29, 2004?
14 A  I don't remember. I don't remember how much time I
15 had, or sick time, vacation time. I don't remember, ma'am.
16 Sorry.
17 Q  Well, if you had no sick time accrued, even with a
18 doctor's note, that would still be counted as an occurrence,
19 wouldn't it?
20 A  No. I think we went through that before, that where
21 Mr. Duncan said to everyone at a meeting that they can use
22 their vacation time as well as their sick time to cover up
23 for their time that they missed. And I'm not saying that I
24 had enough time because I don't know.

Page 149

1  Q  Did you have any vacation time as of November 29th?
2  A  That's what I'm saying, ma'am, I don't remember.
3  Q  You testified earlier, though, that Mr. Duncan told
4  you and others in the department that he was no longer
5  allowing employees to use their vacation time?
6  A  Yeah. This is after all these writeups and
7  everything that I received. Then everybody was told that.
8  Q  Well, you told me you met with Rich Wertz regarding
9  this warning?
10 A  Yes, ma'am.
11 Q  Did you tell Rich Wertz, you know, hey, I have
12 vacation time?
13 A  No, ma'am, I didn't.
14 Q  Why didn't you tell Mr. Wertz that?
15 A  Because I figured the vacation time and the sick
16 time would cover the time that I was off. I didn't have to
17 tell him.
18 Q  Well, you know it didn't cover it when you received
19 this warning, didn't you?
20 A  No, I didn't. Like all the other warnings I've got,
21 that I didn't deserve them.
22 Q  Okay. Well, you received this warning at some
23 point, didn't you?
24 A  Yes, ma'am, I did receive it.

A0017

38 (Pages 146 to 149)

Thompson
Brance F. Thompson

v.

C.A. # 05-0274 (GMS)

Dover Downs
April 5, 2006

Page 158

1  A  Anybody that gets written up don't get paid for a
2  day.
3  Q  I'm asking you, why do you believe that? Is there a
4  policy that says that?
5  A  No.
6  Q  Why do you believe, if you get a writeup, you don't
7  get paid for that day?
8  A  I don't believe it.
9  Q  You don't believe it?
10  A  No.
11  Q  If an employee receives a writeup, do they get paid
12  for that day?
13  A  Being I'm confused, I'm just saying I don't know
14  nothing.
15  Q  So you don't know if an employee gets paid for
16  writeups they receive?
17  A  No, I don't.
18  Q  Did you lose any job opportunities because of this
19  written warning dated January 4th, 2005?
20  A  No, ma'am.
21  Q  Did your job change in any way us because of this
22  written warning dated January 4th, 2005?
23  A  No, ma'am.
24      MS. FRIEL: Exhibit 22.

Page 159

1      (Thompson Deposition Exhibit No. 22 was
2  marked for identification.)
3  BY MS. FRIEL:
4  Q  This is Bates labeled D 0064 through D 0065.
5      Mr. Thompson, do you recognize this document?
6  A  Yes. Disciplinary warning.
7  Q  Did you ever receive this disciplinary warning?
8  A  No.
9  Q  What's the date of this notice?
10  A  The notice is 1/12/05.
11  Q  And did you receive a final written warning as a
12  result of this?
13  A  Evidently I did receive it.
14  Q  So you did receive this written warning, final
15  written warning?
16  A  I don't remember. I don't remember.
17  Q  Well, did you know you were placed on final written
18  warning?
19  A  No.
20  Q  You never knew that you were placed on final written
21  warning during your employment at Dover Downs?
22  A  I was told that at one time. But that wasn't with
23  Marie Isenberg. She had nothing to do with it.
24  Q  Who told you you were placed on final written

Page 160

1  warning?
2  A  Richard Duncan.
3  Q  Did Mr. Duncan show you this written warning,
4  Exhibit 22?
5  A  Yes, he did.
6  Q  So you did see this written warning before?
7  A  Yes. Yes. Now that -- yes, I did.
8  Q  Okay. Do you see under it, it says, employee's
9  printed name, it says, Brance Thompson? Do you see that?
10  A  Yes, ma'am.
11  Q  Underneath it says, check here if employee refuses
12  to acknowledge receipt of this notice.
13      And that is checked. Do you see that?
14  A  Um-hmm.
15  Q  And do you see where it says, next to your printed
16  name, it says, employee's signature?
17  A  Um-hmm.
18  Q  And employee's signature is blank, isn't it?
19  A  And I refused it.
20  Q  You just testified that any warning that you didn't
21  sign, you never had seen before, is that correct?
22  A  That's correct. But I did refuse this one.
23  Q  So now your testimony is changing?
24  A  Is that I refused this one.

Page 161

1  Q  You have seen this one before and you have refused
2  to sign it, is that correct?
3  A  Right.
4  Q  Okay. It says, Mickey, you did not report to work
5  on 1/12/05 due to illness.
6      Were you absent from work on January 12th,
7  2005?
8  A  I probably was. I don't remember.
9  Q  It says, this is the sixth indent of illness without
10  a doctor's excuse or accrued sick time.
11      Is that statement accurate?
12  A  I believe it is.
13  Q  Do you speak to anyone regarding this final written
14  warning?
15  A  Just Rich Duncan and --
16  Q  Did you speak to Rich Wertz?
17  A  No. It was the one over Rich Duncan and I can't
18  think of his darn name. Excuse my French.
19  Q  He was above -- I'm sorry. He was above Rich
20  Duncan?
21  A  Yes, he was above Rich Duncan. That's correct.
22  Q  Jerry Dunning?
23  A  Dunning. Yes, ma'am.
24  Q  Were you at a meeting with Mr. Dunning regarding the

Wilcox & Fetzer, Ltd.    Professional Court Reporters

41 (Pages 158 to 161)

(302)655-0477

Page 170

1 to Mr. Duncan about applying to come to find out that it was
2 already given out.
3  Q   Okay. So my question to you is, did you apply for
4 this?
5  A   I didn't apply in writing, no. I made that
6 statement earlier I didn't apply in writing.
7  Q   How did you apply? Now you're saying you applied
8 verbally?
9  A   Yes, I did.
10 Q   How did you apply verbally?
11 A   I spoke to Mr. Duncan about it.
12 Q   To apply for a job at Dover Downs, don't you just
13 submit an upgrade transfer form?
14 A   Yes, ma'am.
15 Q   And you never submitted an upgrade transfer form for
16 this?
17 A   No. Because I talked to Mr. Duncan about it and he
18 told me to apply for it.
19 Q   Okay.
20 A   But it was already given out to somebody else. So
21 why should I apply for it? He just lied to me.
22 Q   So the question I'm asking, did you apply for this
23 position?
24 A   No, ma'am, I didn't.

Page 171

1  Q   Going back to Exhibit 23. In the next sentence, it
2 says, on one occasion, respondent hired a younger, far
3 lesser experienced individual as a supervisor.
4      Who were you referring to then?
5  A   Al Baldwin.
6  Q   Okay. Go down to the paragraph that says,
7 comparators or other specific reasons for alleging
8 discrimination.
9      Do you see where it says that?
10 A   Yes, ma'am.
11 Q   And it says, the last time I applied for a
12 supervisory position and denied, respondent hired a younger
13 individual who was younger than 40 years of age.
14     Who were you talking about there in that
15 sentence?
16 A   It had to be Al Baldwin.
17 Q   The next sentence says, respondent violated their
18 policy by hiring someone with a relative in the same
19 department?
20     Did Al Baldwin have a relative in the same
21 department.
22 A   No.
23 Q   So what's this paragraph referring to?
24 A   Evidently it was written wrong.

Page 172

1  Q   How should it have been written?
2  A   The one with the relative was the one that I filed
3 for the outside maintenance for the plumbing job. And the
4 supervisor, there was never a supervisor's job there on that
5 one. The supervisor's job was the midnight shift.
6  Q   So that paragraph is not accurate?
7  A   Evidently not, no, ma'am.
8  Q   In your complaint, you allege that Dover Downs
9 discriminated against you because of your age, is that
10 right?
11 A   Yes, ma'am.
12 Q   What acts do you think were discriminatory?
13 A   Well, when I put out for a supervisor's job, hiring
14 somebody younger than I am. When I put out for the plumbing
15 job, hiring somebody younger than I am. In both incidents,
16 as far as the supervisor's job.
17 Q   And these are jobs we already talked about earlier
18 today?
19 A   Yes, ma'am.
20 Q   And you believe that it was discriminatory because
21 Dover Downs hired someone younger than you to fill these
22 positions?
23 A   Yes, I do.
24 Q   Any other reason you think it was age

Page 173

1 discrimination?
2  A   No.
3  Q   Besides the position we already talked about today,
4 is there any other acts of discrimination you allege against
5 Dover Downs?
6  A   Yeah, for harassment.
7  Q   You're alleging a claim of harassment?
8  A   Oh, yes.
9  Q   On what basis? What was harassment?
10 A   For all the writeups that I received after I took
11 Bob Morrison to human resources.
12 Q   Do you think these writeups were based on your age?
13 A   No.
14 Q   What's your complaint about these writeups?
15 A   That they were harassments toward me going to the
16 Labor Board on Dover Downs. Because up to that point -- up
17 to that point, I never did have a writeup. Then all of a
18 sudden after I took them to the Labor Board, I get writeups.
19 Q   So your claim is retaliation; is that what you're
20 referring to?
21 A   Oh, yes. Yes.
22 Q   You just said, before I interrupted, was they didn't
23 have any writeups before you filed your claim of
24 discrimination?

A0019

Page 174

1  A    That's right.
2  Q    But we went through about ten minutes ago that you
3  had received writeups before your charge?
4  A    I didn't receive any writeups until I took Bob
5  Morrison to human resources. At that point and then from
6  then on, I received writeups. But before that, I never
7  received any.
8  Q    Okay. Now, the writeups you're claiming are
9  retaliation?
10 A    Yes, ma'am.
11 Q    But you're not basing your discrimination claim on
12 the writeups, is that correct?
13 A    No, ma'am.
14 Q    Let's just focus on the discrimination for one
15 second. Are there any other acts that we didn't go over
16 that you think were discrimination?
17 A    No, ma'am.
18 Q    Did you ever hear anyone make any comments about
19 your age while you worked at Dover Downs?
20 A    Jokingly. Never nothing serious.
21 Q    Okay. Tell me the jokes. Tell me what jokes you
22 heard?
23 A    Just, you know, they talk about old man and stuff
24 like that. They did that to a lot of people. So I'm not

Page 175

1  saying that it was against me.
2  Q    It wasn't against you? I'm sorry?
3  A    No. I'm just saying that they say that to a lot of
4  people that's elderly, old man. You know, it's just
5  something that -- a slang word that they use.
6  Q    Did anyone call you old man?
7  A    Oh, yes. A lot of people.
8  Q    Who called you old man?
9  A    I can't say all the people that called me old man.
10 Q    All right.
11 A    Right.
12 Q    Right. Name for me the ones that you can remember
13 that called you old man?
14 A    Nate Whitcomb. The ones that you have written down.
15 Q    Well, Nate you're friends with, isn't that right?
16 A    Yeah. We have been close friends.
17 Q    So do you think Nate Whitcomb was making comments
18 about your age, that was negative?
19 A    I said none of them was making it concerning the
20 suit or anything. It's just a slang word that the majority
21 of the people use if you're old, it's old man. That's it.
22 Q    Who besides Nate Whitcomb used that term?
23 A    I can't name them all.
24 Q    Can you name anyone else, that you can remember,

Page 176

1  that called you old man?
2  A    No.
3  Q    Did you take these comments in a negative way?
4  A    Yes. No. No. They weren't against me in any way.
5  Q    So were you offended by these comments?
6  A    No.
7  Q    Beside the old man comment that you remember Nate
8  Whitcomb saying, can you remember any other comments that
9  you believe were based on your age?
10 A    No.
11 Q    Okay. We also talked about the retaliation claim.
12 And you believe your writeups were retaliation?
13 A    Definitely.
14 Q    And what were they retaliation for?
15 A    Taking Bob Morrison to human resources.
16 Q    Okay. And besides the writeups, were there any
17 other acts that you think were retaliatory?
18 A    No.
19 Q    Do you know if Mr. Duncan knew about your
20 conversation with HR about Bob Morrison?
21 A    Oh, yes.
22 Q    How do you know Mr. Duncan was aware of your
23 conversation?
24 A    Because I told him I was going up there to tell them

Page 177

1  that I wanted to bring charges against Bob Morrison.
2  Q    Did you mention age discrimination during your
3  conversation with Mr. Duncan?
4  A    No. Because Mr. Duncan and Marie Isenberg got
5  together talking and that's how he come up to know
6  everything concerning Bob Morrison and stuff.
7  Q    Tell me, during your meeting with HR on August 23rd,
8  2004, Mr. Morrison was at that meeting as well?
9  A    No, ma'am, he wasn't.
10 Q    Oh, it was just you and Marie Isenberg. I'm sorry.
11 A    Marie Isenberg and Carolyn and Bob Morrison.
12 Q    Bob Morrison was there?
13 A    That is just us four, yes.
14 Q    And during that meeting, you never used the word
15 discrimination, did you?
16 A    Yes, I did.
17 Q    What did you say during that meeting?
18 A    I asked him if the guy was younger than I was that
19 he hired. And he said, yes. And I said, you know, that's
20 age discrimination.
21 Q    Do you know if Mr. Duncan was aware that you
22 mentioned age discrimination during your discussion on
23 August 23rd?
24 A    I'm sure he was. Because Marie Isenberg and all of

Page 182

1  As a consequence, the August 24, 2004 writeups for the
2  alleged previous violations were not in compliance with the
3  employee handbook and, therefore, invalid; is that statement
4  not true?
5     A   I'd have to read the whole handbook to find out. I
6  don't know.
7     Q   But as we sat here today, you couldn't find a
8  provision dealing with that?
9     A   Right. I couldn't find it.
10    Q   Go to paragraph 41 of the complaint.
11    A   Okay.
12    Q   It says, on or about August 24th, 2004, with no
13 administrative remedy available to him, plaintiff filed a
14 charge of discrimination against defendants with the
15 Delaware Department of Labor and the United States Equal
16 Employment Opportunity Commission alleging age
17 discrimination. Do you see that?
18    A   Yes, ma'am.
19    Q   We just went over Exhibit 23. And you can put it
20 out in front of you. And you testified that this was your
21 charge of discrimination you filed. And that's dated
22 September 24th, 2004, is that correct?
23    A   Yeah, 9/24/04.
24    Q   So paragraph 41 of your complaint is inaccurate, is

Page 183

1  that right?
2     A   I believe it is.
3     Q   The date on paragraph 14 should read September 24th,
4  on or about September 24, 2004, instead of August 24, 2004,
5  is that correct?
6     A   Yes, ma'am.
7     Q   Turn to the next page, paragraph 44. And that
8  paragraph says, on or about January 10th, 2005, Mr. Thompson
9  found a hidden camera the size of a pencil in his paint
10 shop. Is that what that says?
11    A   Yes, it is.
12    Q   Do you know why the camera was in the paint shop?
13    A   No other reason why it should be there outside of
14 seeing what I'm doing.
15    Q   Okay. Prior to you learning about the camera, had
16 you complained to anyone at Dover Downs that your paint
17 supplies were being stolen or tampered with?
18    A   That was a long time before that.
19    Q   Okay. Well, tell me about it?
20    A   That was when it -- let me see. Yeah, I said it was
21 being tampered with, yes.
22    Q   Who did you tell your supplies were being tampered
23 with?
24    A   Richard Duncan.

Page 184

1     Q   Did you tell anyone else besides Mr. Duncan?
2     A   No.
3     Q   And when did you tell Mr. Duncan that your paint
4  supplies were being tampered with?
5     A   That was before the camera was ever put in there.
6  But that was several months before that.
7     Q   Do you think it was several month before the camera
8  was put in?
9     A   Yeah. I would say it was even before I had these
10 writeups.
11    Q   Okay. So what year was it in that you remember
12 complaining to Rich Duncan about your paint supplies being
13 tampered with?
14    A   2004. Before August.
15    Q   And you don't remember speaking to Mr. Duncan after
16 that one time you complained about your paint supplies being
17 tampered with?
18    A   No. I didn't find the camera in there. But the
19 camera was there because I seen the camera.
20    Q   Okay. Who found this camera in the paint shop?
21    A   Jim Shreves.
22    Q   And did Mr. Shreves tell you about the camera?
23    A   Yes, he did. He called me on the phone and told me.
24    Q   Beside Jim Shreves, have you ever spoken to anyone

Page 185

1  else at Dover Downs about the camera?
2     A   Yes. Nate Whitcomb, Wally Graham, Donald Straw.
3  Just about everybody in maintenance.
4     Q   Did you ever talk to Mr. Duncan about the camera?
5     A   No.
6     Q   Did you ever talk to Mr. Wertz about the camera?
7     A   No.
8     Q   Do you know who placed the camera in the paint shop?
9     A   Yes, I do.
10    Q   Who placed it there?
11    A   Mr. Duncan.
12    Q   And how do you know Mr. Duncan placed the camera?
13    A   Because Mr. Duncan told Donald Straw about the
14 camera that was in the paint shop because Donald approached
15 him about it, that I had seen that camera in there. And he
16 said, well, this is going to come back and bite me now,
17 ain't it?
18    Q   So did Mr. Duncan tell Mr. Straw, to your knowledge,
19 why he put the camera in the paint shop?
20    A   Not that I know of.
21    Q   Do you know if the camera was placed in the paint
22 shop to see if anyone was tampering with the paint supplies?
23    A   I can't say that it was. But it's never been there
24 before.

A0021

Page 194

1  A   They had another job there that he could have, yes.
2  Q   Did Mr. Daniels apply for another job within Dover
3  Downs?
4  A   No. He said he couldn't do it because he wouldn't
5  be getting the kind of pay that he was getting.
6  Q   So then Mr. Daniels didn't get a job at Dover Downs
7  after his leave?
8  A   Yes, he did. He went back to his doctor and got his
9  doctor to release him of the light duty so he could keep his
10 job.
11 Q   Okay. But you were never released from your light
12 duty, isn't that correct?
13 A   No.
14 Q   I thought you testified earlier that your doctors
15 released you to perform light duty?
16 A   He did. To light duty.
17 Q   Well, Mr. Daniels, you just said, was released to
18 come back, not only light duty.
19 A   Because he went back to his doctor and told him the
20 only way he could go and do his job is to be released of the
21 light duty job.
22 Q   So Mr. Daniels was released of light duty?
23 A   Yes. From his doctor in order to keep his job.
24 Q   Were you released from your doctor to get off of

Page 195

1  light duty?
2  A   No. Because I wasn't going to go through the pain
3  to get released in that order just to work for Dover Downs.
4  Q   So you chose not to try to get off light duty?
5  A   My doctors chose not to. Not me.
6  Q   I'm confused, then. Then how could Mr. Daniels be
7  similarly situated to you?
8  A   He was identical situated to me. He was on light
9  duty. But in order to keep his job, he had to go back to
10 his doctor and have his doctor take him off of light duty.
11 Q   Okay.
12 A   And then he went back to Dover Downs. Not being on
13 light duty, they let him have his job back.
14 Q   But Mr. Daniels came back with no restriction, isn't
15 that right?
16 A   Yeah. After he had to approach his doctor in order
17 to get it.
18 Q   But you never got released off of light duty, isn't
19 that right?
20 A   You're right.
21 Q   I'm asking. Mr. Daniels' situation is different
22 than your situation, isn't that correct?
23 A   No.
24 Q   Well, you already testified your doctor released you

Page 196

1  for light duty at some point, is that correct?
2  A   Right.
3  Q   But Mr. Daniels, you're saying, was released without
4  any light duty?
5  A   Because he told his doctor to release him. It
6  wasn't that his doctor released him for that. He went to
7  his doctor and had his doctor release him.
8  Q   But he still had his doctors release him, isn't that
9  correct?
10 A   He had him release him, yes.
11 Q   But you never got the release from your doctor,
12 isn't that correct?
13 A   Because I wasn't going to have my doctor do it for
14 me like he did in order to have his job. I'd stay in pain
15 and I wasn't going to stay in pain.
16 Q   Then you're different than Mr. Daniels?
17 A   Yes.
18 Q   Because Mr. Daniels got released?
19 A   Yes.
20 Q   So my question is, is your situation different than
21 Mr. Daniels?
22 A   Now it is, yes.
23 Q   Going to paragraph 66 on page 13. It says, as a
24 result of defendant's -- is that the one I want?

Page 197

1      I'm sorry. Paragraph 65. On page 12. Okay.
2  Says, such retaliation includes, but is not limited to, and
3  part B is, increasing his workload.
4      When was your work load increased?
5  A   After the writeups. Disciplinary actions.
6  Q   I'm asking you, let's focus on when your work load
7  was increased. When did that occur?
8  A   I don't know the time or the date.
9  Q   In what way was your work load increased?
10 A   I had more painting to do that I couldn't get done
11 in one day. More work orders to complete.
12 Q   And did anything happen if you didn't complete these
13 work orders?
14 A   No.
15 Q   You weren't written up, is what I'm asking, for poor
16 performance during these times?
17 A   No. Because he didn't think he could get away with
18 it.
19 Q   Let's go to Exhibit 4. It's plaintiff's answers to
20 defendant's interrogatories. It is interrogatory number
21 nine. Do you see where it says, the answer?
22 A   Yes, ma'am.
23 Q   It's question nine. I'm going to read you the
24 answer.

A0022

| Thompson<br>Brance F. Thompson | v.<br>C.A. # 05-0274 (GMS) | Dover Downs<br>April 5, 2006 |

Page 214

1  doing the job. Put it that way. And I spoke to him and
2  everything and he agreed about my past being as bad as it
3  was and everything and I needed a chance. So he said, just
4  put no.
5  Q   I'm sorry. Did you say it was a police officer?
6  A   Yeah. When I got hired.
7  Q   Was it a Dover Downs employee that you spoke to?
8  A   No. No. No. Because once you get these, then you
9  take it back to Dover Downs.
10 Q   Once you get what? I'm sorry.
11 A   Your application signed and everything, then you
12 take it back to Dover Downs.
13 Q   Okay. But sitting here today, your answer, no, to
14 this question that we just went over is inaccurate, isn't
15 it?
16 A   Yes, it is inaccurate in the application.
17 Q   And it's a misrepresentation, isn't it?
18 A   It's what I was told to do, yes.
19 Q   I'm asking you, is it a misrepresentation of the
20 facts?
21 A   Yes.
22 Q   And we had already gone over this earlier today.
23 But turn to the second page. Above your signature, it says,
24 the second sentence, I understand that misrepresentation or

Page 215

1  omission of facts called for is cause for dismissal.
2  A   Correct.
3      MR. WILSON: Objection.
4  BY MS. FRIEL:
5  Q   So you already testified that this, where you
6  answered no to any convictions, was a misrepresentation, is
7  that correct?
8  A   Yes.
9  Q   So wasn't it your understanding that you could be
10 terminated for making this misrepresentation on your job
11 application?
12 A   They could have done that a long time ago when they
13 first hired me. But they didn't. They didn't do it.
14 Q   Do you know that Dover Downs has fired employees in
15 the past for lying on their job applications?
16 A   No, ma'am, I don't.
17 Q   Do you believe that Dover Downs could fire you today
18 for lying on your job application?
19 A   They would fire me in a heartbeat on anything
20 because of this here suit that I put against them.
21 Q   But you already testified that you misrepresented
22 facts on your job application, isn't that correct?
23 A   Yeah, and I also stated that they would fire me
24 anyway.

Page 216

1  Q   Okay. That's not my question.
2  A   Because of this.
3  Q   That's not my question.
4  A   Okay. You're right.
5  Q   And the job application also says, any
6  misrepresentation on your job application can be cause for
7  dismissal, isn't that correct?
8      MR. WILSON: Objection. We have already been
9  over this two or three times.
10     THE WITNESS: Yes.
11     MS. FRIEL: Just answer my question.
12 BY MS. FRIEL:
13 Q   Okay. Mr. Thompson, have you ever been fired from a
14 job?
15 A   No.
16 Q   Have you ever been disciplined by any employer other
17 than Dover Downs?
18 A   No.
19 Q   Do you believe that any other employees were
20 discriminated against because of their age at Dover Downs?
21 A   Yes. I seen it in the newspaper.
22 Q   And who do you believe was discriminated against?
23 A   I don't know their names, ma'am.
24 Q   And you believe this just because of something you

Page 217

1  read in the newspaper, is that correct?
2  A   Yes, it was in the newspaper.
3  Q   So you have no firsthand knowledge of these
4  discriminations against these people?
5  A   No, I don't.
6  Q   Let's go over just a couple more questions.
7      Let's go back to your complaint, Exhibit 6.
8  Look at paragraph 27.
9  A   Okay.
10 Q   It says, Mr. Thompson did apply for the job. But
11 upon information and belief, the position had already been
12 awarded to Jim Shreves on March 4th, 2004, the day the job
13 was posted.
14     Is that what that says?
15 A   Yes, ma'am.
16 Q   Now, go to Exhibit 4, your answers to defendant's
17 interrogatories. It is probably around page nine again.
18 Interrogatory number four we are going to focus on again.
19 Going down to answer number four, part three. And go to the
20 next page where it's 3. D). On the fourth line there, it
21 says, claimant found out later that same day that a position
22 had been filled by Jim Shreves on March 2nd, 2004.
23     Do you see that?
24 A   Yeah.

A0023

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,         )
                                 )
            Plaintiff,           )
                                 )
v.                               )   Civil Action No.
                                 )     05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS   )
GAMING & ENTERTAINMENT INC.,     )
DOVER DOWNS GAMING MANAGEMENT    )
CORP., DOVER ENTERPRISES, INC.   )
and DOVER DOWNS PROPERTIES,      )
INC.,                            )
                                 )
            Defendants.          )

       Deposition of RICHARD R. DUNCAN taken pursuant to notice at the law offices of Margolis Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware, beginning at 9:30 a.m. on Tuesday, April 11, 2006, before Kathleen White Palmer, Registered Merit Reporter and Notary Public.

APPEARANCES:

    TIMOTHY J. WILSON, ESQUIRE
    MARGOLIS EDELSTEIN
      1509 Gilpin Avenue
      Wilmington, Delaware  19899
      for the Plaintiff

    EDWARD T. ELLIS, ESQUIRE
    MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
      123 South Broad Street
      Philadelphia, Pennsylvania  19109
      for the Defendants

-----------------------------------------------

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

**A0024**

| Thompson | | Dover Downs |
|---|---|---|
| Richard R. Duncan | v.<br>C.A. # 05-274 (GMS) | April 11, 2006 |

Page 14

1  capacity over the Mechanic II's and Mechanic III's?
2      A.  Well, if Mechanic I would be your technical
3  person and if he needed help, he would say I need help.
4  And if the supervisor wasn't there at night, he would
5  have expected to take over and take care of the log and
6  all that. We do a log, daily and nightly log, so --
7      Q.  So he would essentially do the supervisory
8  functions if there was no official supervisor on that
9  shift?
10     A.  Yes.
11     Q.  You said he would do the, I believe you said,
12 technical functions on the shift? What does that mean?
13     A.  Well, in Mickey's case, he was the faux painter
14 and he knew faux painting and that's why he was on that
15 shift at night, because the casino was closed and he was
16 to teach the other guys how to faux paint.
17     Q.  That was his primary responsibility?
18     A.  Primary responsibility, yes. That's one of the
19 reasons I hired him, is because of his painting
20 abilities.
21     Q.  Did he have any other maintenance-type
22 responsibilities other than the faux painting on third
23 shift?
24     A.  Not that I wanted him to do, no. Well, if you

Page 15

1  had a leak somewhere, he would take care of that or if --
2  something of that nature, but no. Primarily he was to
3  paint. Something always pops up, clogged toilet or
4  something like that, light out.
5      Q.  He was capable of addressing those issues?
6      A.  Oh, yes.
7          MR. WILSON:  Okay. I'd like to have
8  another document marked. This would be Duncan 3.
9          (Duncan Exhibit 3 was marked for
10 identification.)
11     A.  (The witness reviews the document.) Yeah, I
12 remember this.
13 BY MR. WILSON:
14     Q.  For the record, can you state what this is?
15     A.  It's a letter that I had to write to get Mickey
16 a pay increase above the normal pay increase. He had
17 said that we had promised him more money than it was, and
18 to do that we had to write this letter to justify to the
19 president of the company for final approval.
20     Q.  In the third sentence it states: "He ran the
21 2300-0730 shift completely by himself for at least
22 9 months of that time." Is that a true statement?
23     A.  If that was the time he was on there by himself,
24 I don't know. It could be. It is a true statement, but

Page 16

1  I don't know if that was when he was there by himself or
2  not. I don't know without looking at the dates.
3      Q.  Okay.
4      A.  He was on the shift by himself for a while. I
5  don't know how long.
6      Q.  In this letter you requested a total of an
7  8.5 percent pay increase?
8      A.  Un-huh.
9      Q.  Yes?
10     A.  Yes.
11     Q.  Is that higher than is normally given at Dover
12 Downs for --
13     A.  Oh, yes, very much, very much.
14     Q.  Can you give an indication as to what a normal
15 pay increase is for a maintenance mechanic, or a range?
16     A.  The normal would be about 3 percent, what he got
17 on -- yes, 3 percent is normal.
18     Q.  So what you requested was at least two times and
19 close to three times what a normal pay increase would be?
20     A.  Yeah.
21     Q.  I'd like to show you a series of documents.
22         MR. WILSON:  Can we go off the record for a
23 second?
24         (Discussion off the record.)

Page 17

1          (Duncan Exhibit 4 was marked for
2  identification.)
3  BY MR. WILSON:
4      Q.  Mr. Duncan, can you identify what these
5  documents are?
6      A.  Yes. These are disciplinary warnings.
7      Q.  Are these what you referred to earlier as
8  discrepancy reports?
9      A.  Yes. I do apologize for that. I lost my train
10 of thought there.
11     Q.  For the record, they are dated August 17th,
12 2004; August 11th, 2004; June 17th, 2004; and
13 February 4th, 2004; is that correct?
14     A.  Yes, that's correct.
15     Q.  According to the signature on the bottom of the
16 page, Steven Homlish prepared this document; is that
17 correct?
18     A.  Yes. The coaching ones he prepares, yes.
19     Q.  What does "coaching" mean?
20     A.  Coaching is just a document we put in the
21 individual's file as a -- to refer back to. You don't
22 need -- according to company policy, you don't need to
23 inform the individual of coaching. If he's late for
24 work, then he should know it by the company handbook. So

5 (Pages 14 to 17)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,        )
                                )
            Plaintiff,          )
                                )
v.                              )   Civil Action No.
                                )      05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS  )
GAMING & ENTERTAINMENT INC.,    )
DOVER DOWNS GAMING MANAGEMENT   )
CORP., DOVER ENTERPRISES, INC.  )
and DOVER DOWNS PROPERTIES,     )
INC.,                           )
                                )
            Defendants.         )

        Deposition of KEVIN EDWARD GORLICH taken pursuant to notice at the law offices of Margolis Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware, beginning at 11:40 a.m. on Tuesday, April 11, 2006, before Kathleen White Palmer, Registered Merit Reporter and Notary Public.

APPEARANCES:

        TIMOTHY J. WILSON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware   19899
          for the Plaintiff

        EDWARD T. ELLIS, ESQUIRE
        MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
          123 South Broad Street
          Philadelphia, Pennsylvania   19109
          for the Defendants

---------------------------------------------------------

                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

A0026

| Thompson | | v. | Dover Downs |
|---|---|---|---|
| Kevin Edward Gorlich | | C.A. # 05-274 (GMS) | April 11, 2006 |

Page 10

1  BY MR. WILSON:
2  Q. How did it come that it ended in August of 2002?
3  Did one of you move off the shift?
4  A. I moved from third shift to first shift.
5  Q. When you were on third shift, were there other
6  employees who were working on that same shift with you
7  and Mr. Thompson?
8  A. In our department or as far as other people?
9  Q. In maintenance.
10 A. One other person.
11 Q. Who was that?
12 A. Mr. Whitecomb.
13 Q. Is that Nate Whitecomb?
14 A. Yes.
15 Q. What was the primary type of work done on third
16 shift during this time?
17 A. Painting.
18 Q. Was there anybody, a Dover Downs employee who
19 held a supervisor title working on this same shift as
20 you, Mr. Thompson, and Mr. Whitecomb?
21 A. Repeat that.
22 Q. Was there anybody on third shift that held the
23 title of supervisor during this time?
24 A. During the time I was on it?

Page 11

1  Q. Yes.
2  A. No.
3  Q. Did you work under Mr. Thompson's guidance and
4  supervision on this shift?
5  A. I reported to Bob Morrison, who was my
6  supervisor. He was on second shift. And I took
7  instructions from Mr. Thompson, also.
8  Q. Did Mr. Morrison tell you that Mr. Thompson was
9  in charge of the shift?
10        MR. WILSON: Can we go off the record for a
11 second?
12        (Discussion off the record.)
13        MR. WILSON: I think I asked a question and
14 I didn't get a response.
15        Could you read the question back, please?
16        (The reporter read from the record as
17 requested.)
18 A. Yes.
19 BY MR. WILSON:
20 Q. Did anybody else tell you that Mr. Thompson was
21 in charge of the shift?
22 A. Mickey.
23 Q. Did Mr. Duncan tell you?
24 A. No.

Page 12

1  Q. Anybody else?
2  A. No.
3  Q. Mr. Gorlich, have you ever been given any type
4  of disciplinary warning while you have been at Dover
5  Downs?
6  A. Yes.
7  Q. Were some of these disciplinary warnings known
8  as coachings?
9  A. Coaching?
10 Q. Yes.
11 A. Coaching? I don't follow you.
12 Q. You're not familiar with the term "coaching"?
13 A. No.
14 Q. Just to back up for just a second, when you were
15 on third shift, did you do other things other than the --
16 A. Yes.
17 Q. -- the painting?
18 A. Yes.
19 Q. What other types of things did you do?
20 A. Plumbing, electrical repairs, anything that had
21 to be done.
22 Q. Okay.
23 A. In the casinos, some money drawers needed
24 repairing.

Page 13

1  Q. Can you give me an outline as far as the process
2  for getting a disciplinary warning?
3        MR. ELLIS: Object to the form of that
4  question.
5        MR. WILSON: Okay. I'll ask it again
6  because it was confusing.
7  BY MR. WILSON:
8  Q. What happens when you get a disciplinary
9  warning? Are you given any type of document telling you
10 that you're being given the warning?
11        MR. ELLIS: You're referring to a
12 disciplinary warning and not a coaching?
13        MR. WILSON: I'm referring to any type of
14 disciplinary warning.
15        MR. ELLIS: Object to the form of the
16 question.
17        Go ahead. You can answer.
18        MR. WILSON: He already stated he doesn't
19 know what a coaching is.
20        MR. ELLIS: Then maybe he didn't get one.
21 BY MR. WILSON:
22 Q. Are you given a document when you're given a
23 disciplinary warning?
24 A. On mine it was, yes.

A0027

4 (Pages 10 to 13)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,           )
                                   )
            Plaintiff,             )
                                   )
v.                                 )   Civil Action No.
                                   )      05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS     )
GAMING & ENTERTAINMENT INC.,       )
DOVER DOWNS GAMING MANAGEMENT      )
CORP., DOVER ENTERPRISES, INC.     )
and DOVER DOWNS PROPERTIES,        )
INC.,                              )
                                   )
            Defendants.            )

       Deposition of MARIE A. ISENBERG taken pursuant to notice at the law offices of Margolis Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware, beginning at 11:40 a.m. on Tuesday, April 12, 2006, before Kathleen White Palmer, Registered Merit Reporter and Notary Public.

APPEARANCES:

       TIMOTHY J. WILSON, ESQUIRE
       MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19899
          for the Plaintiff

       BETH A. FRIEL, ESQUIRE
       MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
          123 South Broad Street
          Philadelphia, Pennsylvania  19109
          for the Defendants

A0028

--------------------------------------------------
WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

| Thompson | | Dover Downs |
|---|---|---|
| Marie A. Isenberg | v.<br>C.A. # 05-274 (GMS) | April 12, 2006 |

Page 22

1  Q. How far back does this go? For his entire
2  career at Dover Downs?
3  A. Our discipline is a rolling 12 months.
4  Q. Same with attendance?
5  A. Yes.
6  Q. So at this point on June 22nd, 2004, there were
7  no attendance issues with Mr. Thompson?
8  A. That's correct.
9  Q. There were no disciplinary actions taken against
10 him?
11 A. Correct.
12 Q. Now, in Duncan Number 4, not the first two, but
13 the last two warnings are dated 6/17/04 and 2/4/04;
14 correct?
15 A. Yes.
16 Q. Whenever you checked the file, these were not in
17 the file; correct?
18 A. And they would never be.
19 Q. Tell me again why they would never be in his
20 file.
21 A. Anything that is below a verbal never is part of
22 their file.
23 Q. So where do these stay? Do you know?
24 A. In the department. I'm assuming that they were

Page 23

1  in the department.
2  Q. So it's your testimony that a coaching form is
3  not supposed to be forwarded to human resources to be
4  included in the personnel file?
5  A. That's correct.
6  Q. So when we received the personnel files of the
7  employees that we've asked for, there should be no
8  coachings in those files?
9  A. The official file in the human resource office
10 would not have coachings.
11 Q. Are you aware that there's a coaching dated
12 August 30th, 2004, in Mr. Thompson's personnel file?
13 A. I'm not -- I can't say I'm aware or not aware.
14 I would -- I don't know.
15 Q. Well, I'll represent to you that included in his
16 human resources personnel file was a coaching dated
17 August 30th, 2004.
18     Can you explain how that could have
19 possibly gotten into his personnel file?
20 A. Not without seeing it.
21     MS. FRIEL: Can you give me the Bates
22 number of that?
23     MR. WILSON: Excuse me. Let's go off the
24 record for a second.

Page 24

1     (Discussion off the record.)
2  BY MR. WILSON:
3  Q. With respect to promotions, is it Dover Downs'
4  custom or policy to post job openings to current Dover
5  Downs employees prior to opening it up to outside
6  potential employees?
7  A. All of our jobs are posted internally for five
8  days.
9  Q. Is that an official policy?
10 A. I don't believe it's in the handbook, but it's a
11 practice.
12 Q. Is that practice followed in all instances?
13 A. Yeah, I believe it is, yes.
14 Q. If a job is posted and a current Dover Downs
15 employee meets all the qualifications needed for the
16 position, will they be given the position?
17     MS. FRIEL: Objection to form.
18     You can answer if you are able to answer.
19 A. No.
20 Q. Why wouldn't they be given the position?
21 A. Well, there's an interview process.
22 Q. Right.
23 A. And like if you were hired from outside --
24 everyone that meets the qualifications doesn't

Page 25

1  necessarily get hired.
2  Q. So a job could be posted, a current Dover Downs
3  employee could have all the qualifications, go in for an
4  interview, and then it be decided that person doesn't get
5  the job and then you move outside?
6  A. Correct.
7  Q. Are you aware that in June of 2004 a job was
8  posted for a first shift maintenance mechanic?
9  A. This position?
10 Q. Yes, I believe that is the position. I have the
11 notice if you would like to see that, I believe.
12 A. Please.
13 Q. It's Duncan 6.
14 A. This is our posting.
15 Q. Did Mr. Thompson apply for that job?
16 A. Mr. Thompson put an upgrade transfer form for
17 that position and we have it logged in as June 21st,
18 2004, which was five days after the close of the posting.
19 Q. Do you know who got that job?
20 A. I do, and let me think of his name.
21 Q. Was it Robert Knotts?
22 A. Robert Knotts.
23 Q. Did Mr. Knotts meet all the minimum
24 qualifications based on the job posting?

A0029

7 (Pages 22 to 25)

| Thompson | | Dover Downs |
|---|---|---|
| Robert A. Knotts | v.<br>C.A. # 05-274 (GMS) | April 11, 2006 |

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,      )
                              )
            Plaintiff,        )
                              )
v.                            )  Civil Action No.
                              )    05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS)
GAMING & ENTERTAINMENT INC.,  )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,   )
INC.,                         )
                              )
            Defendants.       )
```

Deposition of ROBERT A. KNOTTS taken pursuant to notice at the law offices of Margolis Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware, beginning at 12:10 p.m. on Tuesday, April 11, 2006, before Kathleen White Palmer, Registered Merit Reporter and Notary Public.

APPEARANCES:

    TIMOTHY J. WILSON, ESQUIRE
    MARGOLIS EDELSTEIN
      1509 Gilpin Avenue
      Wilmington, Delaware  19899
      for the Plaintiff

    EDWARD T. ELLIS, ESQUIRE
    MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
      123 South Broad Street
      Philadelphia, Pennsylvania   19109
      for the Defendants

---

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

A0030

| Thompson | v. | Dover Downs |
|---|---|---|
| Robert A. Knotts | C.A. # 05-274 (GMS) | April 11, 2006 |

Page 10

1  Q. What's that?
2  A. August 9th of -- would that be '04?
3  Q. Did you have an interview for this job?
4  A. Yes.
5  Q. With whom?
6  A. Bob Morrison.
7  Q. Do you remember when the interview was?
8  A. No, I don't remember the date.
9  Q. It was prior to August --
10 A. Prior to, yes.
11 Q. Within a week, perhaps?
12 A. I don't remember, to be honest with you.
13 Q. During that interview, did you discuss the types
14 of work that you would be doing?
15 A. Yes.
16 Q. What type of work is that?
17 A. Plumbing work and other general maintenance.
18 Q. What was your initial starting salary?
19 A. You know, I couldn't tell you. I don't know.
20 Q. Do you remember how much you made per hour?
21 A. That's -- 16 something. I can't remember
22 exactly.
23 Q. How much do you make per hour now?
24 A. It's -- I'd have to check the stub, to be honest

Page 11

1  with you. I don't know. I think it's 17 something, but
2  I could be mistaken.
3  Q. Do you get overtime on a regular basis?
4  A. No.
5  Q. Never?
6  A. Not often. Race weekend. That's usually it.
7  Q. By "race weekend" you mean when the Nextel cup
8  races are in Dover?
9  A. Yes.
10 Q. Did you interview with anybody else besides Bob
11 Morrison?
12 A. No.
13 Q. What did he tell you about the job when you
14 interviewed with him?
15 A. That they needed another plumber out there to
16 help out.
17 Q. Did he tell you that it would be hot?
18 A. Yes.
19 Q. Did he tell you that it was a heavy job?
20 A. Yes.
21 Q. Did he tell you that it was a hard job?
22 A. Yes.
23 Q. What did he say about it being heavy? How
24 would --

Page 12

1  A. Well, heavy lifting involved.
2  Q. Are you aware that Mr. Thompson wanted to move
3  to outside maintenance at the time you got the job?
4  A. No, I wasn't.
5  Q. Have you ever been made aware of a conversation
6  Mr. Thompson had with Mr. Morrison?
7  A. No.
8  Q. Are you aware that Mr. Morrison discouraged
9  Mr. Thompson from bidding on the job?
10        MR. ELLIS: Object to the form of the
11 question.
12 Q. You can answer.
13 A. No, I wasn't aware.
14 Q. I believe you testified Mr. Morrison told you he
15 was looking for a plumber?
16 A. Yes.
17 Q. He told you that at the interview?
18 A. Yes.
19 Q. At that time you were not a licensed plumber;
20 correct?
21 A. Correct.
22 Q. How much experience did you have at that time as
23 a plumber? How many years?
24 A. Twenty-five.

Page 13

1  Q. What was the reason that you weren't licensed at
2  that time with all that experience?
3  A. I just never took the time to go through the
4  procedure of getting it.
5  Q. After you were given this job, were you aware
6  that Mr. Thompson had a meeting with Mr. Morrison and
7  Mrs. Isenberg --
8  A. No.
9  Q. -- regarding not getting the job?
10 A. No.
11 Q. Are you aware of something called the 72-hour
12 rule?
13 A. No.
14 Q. Are you aware of any rule that requires Dover
15 Downs to meet with an employee within a certain amount of
16 time after the employee has committed some type of
17 infraction?
18 A. No.
19 Q. Did you hear anything about Mr. Duncan writing
20 Mr. Thompson up for infractions that had occurred months
21 prior?
22 A. No.
23 Q. To your knowledge, does the human resources
24 department keep track of all attendance and disciplinary

A0031

4 (Pages 10 to 13)