Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,        )
                                )
                Plaintiff,      )
                                )
v.                              )    Civil Action No.
                                )     05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS) 
GAMING & ENTERTAINMENT INC.,   )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,    )
INC.,                          )
                                )
                Defendants.     )

                Deposition of WILLIAM ROBERT MORRISON taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 1:15 p.m. on Tuesday, April 11, 2006, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.

APPEARANCES:

            TIMOTHY J. WILSON, ESQUIRE
            MARGOLIS EDELSTEIN
               1509 Gilpin Avenue
               Wilmington, Delaware  19899
               for the Plaintiff

            EDWARD T. ELLIS, ESQUIRE
            MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
               123 South Broad Street
               Philadelphia, Pennsylvania   19109
               for the Defendants

-------------------------------------------------------
            WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

**A0032**

Thompson                              v.                          Dover Downs
William Robert Morrison          C.A. # 05-274 (GMS)              April 11, 2006

Page 14

1    A.   Initially it was Mr. Thompson by himself and
2    then we was able to get more people in and Kevin Gorlich
3    was assigned over there and a Nate Whitecomb.
4    Q.   When there was the overlap between the ending of
5    your shift and the beginning of the third shift, did you
6    have conversations with Mr. Thompson?
7    A.   I did.
8    Q.   What did these conversations consist of?
9    A.   Of what his work assignments would be that night
10   and what the people that would be working with him would
11   be doing.
12   Q.   When Mr. Gorlich and Mr. Whitecomb started on
13   third shift, did you have the same discussions with them?
14   A.   Well, we talked as a group normally.
15   Mr. Thompson was a Mechanic I. The other two individuals
16   were Mechanic II and III, whereas Mr. Thompson would have
17   the ability to direct them or, you know, have them assist
18   him in his job.
19   Q.   Is that by virtue of his capacity as a
20   Mechanic I?
21   A.   That is correct.
22   Q.   So Mechanic I is a higher position than a
23   Mechanic II or Mechanic III?
24   A.   Correct. At our location Mechanic III is the

Page 15

1    entry level. Mechanic I is the highest level in the
2    mechanic levels.
3    Q.   Is there anything higher than a Mechanic I?
4    A.   Supervisor.
5    Q.   That's what you were?
6    A.   Yes.
7    Q.   Did you tell Mr. Whitecomb and Mr. Gorlich that
8    they were under Mr. Thompson's supervision at this time?
9    A.   I would say yes because as a Mechanic I, he
10   would be able to lead them, supervise them.
11   Q.   How specific was your direction to Mr. Thompson
12   as to the tasks that he was to complete?
13       MR. ELLIS:  Objection to the form of the
14   question.
15       MR. WILSON:  Let me see if I can ask it a
16   different way.
17   BY MR. WILSON:
18   Q.   In the half hour that you had with Mr. Thompson,
19   did you walk around and show him exactly what had to be
20   done, or would you just communicate and say, hey, we need
21   to take care of this area and things of that nature?
22   A.   Due to Mr. Thompson's knowledge of the property
23   and the area and the casino, we did it both ways. We
24   went out and looked at different areas such as columns,

Page 16

1    or if it was in a cage area, secure area, we'd go out and
2    look at it. On most occasions after we initially did
3    that, I didn't really have to take Mr. Thompson out. He
4    knew what had to be done. He had a good idea of the
5    areas that we were trying to renovate as far as the faux
6    painting.
7    Q.   Is that primarily what they did on third shift,
8    was the faux painting?
9    A.   Yes.
10   Q.   Did they do anything else besides --
11   A.   Yes.
12   Q.   What else did they do?
13   A.   Well, since the casino stayed open until 2:00,
14   they would be responsible to any maintenance calls that
15   might come in. If the kitchen was still open, they would
16   respond to those calls. If there was trouble on the
17   floor such as a casino machine, hopper, or something with
18   a door or something off on the storage cabinets, they
19   would repair those. Any other type maintenance calls
20   that might come up that they might be able to assist in.
21   Q.   If one of those maintenance calls came up, would
22   somebody contact Mr. Thompson and ask him to address it?
23   A.   They wouldn't probably contact Mr. Thompson
24   directly. They would probably do a general maintenance

Page 17

1    call. We have communication via radio. And if it came
2    in, it would either come in a couple ways. It would come
3    in face-to-face or it would come into either the radio or
4    come in telephonically.
5        And once you received what the problem was,
6    then a decision would be made of who would go out and do
7    it. I mean, with Mr. Thompson being the Mechanic I, if
8    it was something a Mechanic II or III could do, he could
9    tell them to go out and do it, yes.
10   Q.   Would it be fair to say that it was at his
11   discretion as to how to handle these instances that
12   happened on third shift?
13   A.   To a certain point. If it was something out of
14   his scope as a Mechanic I, he would be required to
15   contact myself or Mr. Duncan.
16   Q.   When a job opening occurs in the maintenance
17   department, the job is posted; correct?
18   A.   Internally, yes.
19   Q.   What do you mean by "internally"?
20   A.   Well, any job positions that normally get posted
21   at Dover Downs normally get posted internally for
22   internal employees to apply for. That's usually posted
23   for five days, working days.
24   Q.   Is this so the internal employees have an

A0033

Thompson
William Robert Morrison

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 34

1  trade school, I understood.
2      Q.  Is there an individual at Dover Downs who is
3  responsible for entering information regarding employees
4  specifically when an employee changes one job title to
5  another, a person who's responsible for changing that
6  information in a computer system?
7      A.  I'm not sure who the exact person is, but I
8  would say if anyone would, it would be the HR department,
9  which would also impact payroll.
10     Q.  I'm going to shift a little bit again here.
11         Are you aware of a job posting for a
12  Maintenance Mechanic I on first shift in 2004?
13         MR. ELLIS:  You are talking about for
14  outside maintenance now?
15         MR. WILSON:  Yes.
16     A.  What was the position?  Mechanic I?
17  BY MR. WILSON:
18     Q.  Yes.
19     A.  Probably so.  I ended up losing some mechanics,
20  yes.
21     Q.  Do you recall Mr. Thompson applying for a
22  Maintenance Mechanic I job outside in 2004?
23     A.  Maintenance Mechanic I?  I don't recall one.
24  I think a II he was looking at at one time.  2004, March.

Page 35

1      Q.  I don't know if this was March.  This may have
2  been later in 2004.
3      A.  I don't recall in March him applying for a job
4  at outside maintenance?
5         MR. ELLIS:  Are you talking about Duncan 6?
6         MR. WILSON:  Yes.
7  BY MR. WILSON:
8      Q.  Can you look at Exhibit 6, entitled Duncan 6?
9      A.  That would be in this pile?
10     Q.  Yes.
11     A.  (The witness reviews the document.)  Okay, yes.
12     Q.  Do you recall Mr. Thompson applying for this
13  job?
14     A.  Yes.
15     Q.  Did you have a conversation with Mr. Thompson
16  regarding this job?
17     A.  I had an interview with Mr. Thompson, yes.
18     Q.  What was said at the interview?
19     A.  We did the interview process going down all the
20  jobs and also his experiences.
21     Q.  Did you think Mr. Thompson could handle the job?
22     A.  The only weak spot I thought with Mr. Thompson
23  was the plumbing, which at the time I was looking for a
24  plumber who was working in the trade more and with more

Page 36

1  experience.  With the amount of time, I got the
2  experience and observed Mr. Thompson inside, he did do
3  light plumbing on a number of things, water coolers,
4  steamers and so forth.
5         But the responsibility of the different
6  systems that we had in the plumbing out at the outside
7  maintenance, I did not feel that he met those
8  requirements.  And one of those, again, was being able to
9  multitask, which if you're not aware, we winterize all
10  our plumbing fixtures in the outside maintenance division
11  area, NASCAR and so forth, and also bring them back up in
12  the springtime.
13     Q.  Did you think that physically Mr. Thompson could
14  handle the job?
15     A.  Yes.
16     Q.  Did you tell Mr. Thompson that it was a hot,
17  heavy job?
18     A.  I explained to Mr. Thompson that I have worked
19  in the building for a number of years and come outside
20  and it was a different experience for me from being in
21  HVAC all the time.  And I did briefly talk to
22  Mr. Thompson about the extremes of weather out there,
23  yes.
24     Q.  What about the heaviness of the job?

Page 37

1      A.  Heaviness --
2      Q.  Did you tell him that it was a heavy job?
3      A.  When you say "heavy," can you give me a
4  definition of "heavy"?
5      Q.  Did you say that to Mr. Thompson, that it was a
6  heavy job?
7      A.  I conveyed to Mr. Thompson that it entailed
8  several different taskings to get the job done, yes.
9      Q.  Such as?
10     A.  The different water systems we had such as the
11  water valves, the different pumps that we maybe had out
12  there that would have to be reenergized or basically
13  brought back online every year.  I probably touched base
14  on the number of toilets, hoppers, and stuff that we had.
15     Q.  Did you indicate that it would involve heavy
16  lifting?
17     A.  If I did, it would be basically what's on the
18  job description.
19     Q.  Is it your testimony that the main reason
20  Mr. Thompson did not get the job is because he didn't
21  have the requisite plumbing skills?
22     A.  That's correct.
23     Q.  I would like to refer you to a couple documents.
24         MR. WILSON:  I would like to have this

A0034

Thompson                                                          Dover Downs
William Robert Morrison          v.    C.A. # 05-274 (GMS)        April 11, 2006

Page 38

1    marked as Morrison Number 1.
2        (Morrison Exhibit 1 was marked for
3    identification.)
4    BY MR. WILSON:
5        Q.   Take your time and look at that document and let
6    me know when you're done.
7        A.   (The witness reviews the document.)  Okay.
8        Q.   What is this, Mr. Morrison?
9        A.   It's a recommendation for Employee of the Month
10   for Mr. Thompson.
11       Q.   Did you prepare this?
12       A.   I did.
13       Q.   Is that your signature on the last page?
14       A.   It is.
15       Q.   In the first paragraph it appears you wrote,
16   referring to Mr. Thompson, "He is also our primary
17   plumber, carpenter, and electrician, on the midnight
18   shift."
19       A.   That's correct.
20       Q.   Did you write that?
21       A.   Yes.
22       Q.   So did Mr. Thompson have plumbing skills?
23       A.   He was able to do light plumbing, yes.
24       Q.   Who eventually received this job, this outside

Page 39

1    maintenance job?
2        A.   The one that was posted previously?
3        Q.   Yes.
4        A.   It was Mr. Bob Knotts.
5        Q.   Mr. Knotts was not a plumber, was he?
6        A.   Yes, he was.
7        Q.   What type of plumbing did he do?
8        A.   My understanding he did residential, commercial.
9        Q.   Would this be considered light plumbing?
10       A.   The position posted?
11       Q.   No.  What Mr. Knotts did prior to his being
12   awarded this position.
13       A.   No.  I would say doing it day in, day out, new
14   construction and also commercial, I would say that would
15   be heavier plumbing.
16       Q.   Explain to me the difference between light
17   plumbing and heavy plumbing.
18       A.   Well, one of the differences would be that you
19   do plumbing all the time.  Mr. Thompson basically fixed
20   leaks, stuff like that that would pop up.
21            By virtue of me making this statement here,
22   one is inside maintenance didn't have a plumber.  Okay?
23   And the outside plumber, basically his shift was during
24   the day.  So, in essence, by me writing this, him being

Page 40

1    the primary plumber on that shift, that would be a
2    correct statement.  He had light plumbing skills and
3    would be able to fix, you know, minor leaks and stuff
4    like that.
5        Q.   Were you aware that prior to coming to Dover
6    Downs that Mr. Thompson did all the plumbing at the
7    Ramada Inn and Howard Johnson in Dover?
8        A.   He did indicate that he did work down there and
9    he was, I guess, their fix-it man down there, yes.
10       Q.   So would you have considered that heavy
11   plumbing?
12       A.   Since he did other chores or other taskings down
13   there such as from drywall to painting and other things,
14   I would say no whereas Mr. Knotts, plumbing is all he
15   did.
16       Q.   So if somebody does other tasks, then it becomes
17   light plumbing regardless of the type of plumbing that
18   they do?
19       A.   Well, the definition -- the way I look at it,
20   the definition may not be the same as maybe you look at
21   it.  The way I look at it, someone that spends time in
22   the field every day, and basically this guy's hand's in
23   it pretty much eight hours a day.  Mr. Thompson did not
24   have his hands in plumbing eight hours a day at the job

Page 41

1    he did.
2        Q.   Did Mr. Knotts?
3        A.   Yes.
4        Q.   Does Mr. Knotts do heavy plumbing now presently?
5        A.   Plumbing what?
6        Q.   Heavy plumbing presently.
7        A.   Yes.  He's -- he's one of our main plumbers.  I
8    have two plumbers now.
9        Q.   When you hired Mr. Knotts, was he a licensed
10   plumber?
11       A.   No.
12       Q.   What is the difference between a licensed
13   plumber and a plumber?
14       A.   A licensed plumber is recognized by the State of
15   Delaware to go out and basically run his own business as
16   a plumber.  A regular plumber, if he does any plumbing,
17   basically he would have to have a licensed plumber come
18   in and inspect his work to ensure that it met codes.
19       Q.   Did Mr. Knotts meet the minimum qualification
20   for the job Maintenance Mechanic I?
21       A.   In retrospect, looking at it, I thought he did,
22   but evidently some things were overlooked.
23       Q.   Such as?
24       A.   Mr. Knotts did not have a high school diploma.

11 (Pages 38 to 41)

Thompson                                                                    Dover Downs
William Robert Morrison              C.A. # 05-274 (GMS)                     April 11, 2006

Page 42

1    Q.  How was that overlooked?
2    A.  I'd have to say the buck stops here with me.  I
3    received the application from HR and I thought it had
4    already been screened.  By virtue -- I was looking for
5    experience in the field, I was looking for, which was
6    plumbing, which Mr. Knotts did have and had plenty of.
7    Q.  So is it your testimony that at the time you
8    hired Mr. Knotts, you weren't aware that he did not have
9    a high school diploma?
10   A.  I did not concentrate on that sheet.  And I
11   would say that if I did, I thought it was -- since I
12   received the application from HR, I evidently thought we
13   was okay, which was a mistake on my part.
14   Q.  Did you receive an application for Mr. Thompson
15   for this job?
16   A.  For that posting?  Yes.
17   Q.  So did you assume the same thing with regard to
18   his plumbing skills, that it had passed HR and,
19   therefore --
20        MR. ELLIS:  Object to the form of the
21   question.
22   A.  I did, but then you get into the conversation
23   phase, the interview phase where you get to learn more
24   about what the individual has done and what he's doing

Page 43

1    every day now.
2        And currently -- or when the interviews
3    were done with Mr. Thompson, again, he was not working in
4    plumbing every day and did not have the experience in
5    plumbing that I was looking for to fill with the taskings
6    that I had at hand to get fulfilled.
7    Q.  Did you have a conversation about Mr. Knotts
8    about his education?
9    A.  I did.
10   Q.  So you were aware that he did not have a high
11   school diploma?
12   A.  Yes.
13   Q.  You just decided to overlook that?
14   A.  It was a mistake on my part, evidently, yes.  I
15   had -- I had an impending race coming up on me that I
16   needed to -- I had a plumber that I had presently.  The
17   plumber had indicated that he may quit at any time.  I
18   had to have someone who basically could, one, get the job
19   done for me, and with the skills that Mr. Knotts had, I
20   proceeded with hiring paperwork.
21   Q.  Was Mr. Knotts an internal employee when he got
22   this job?
23   A.  He was not.
24   Q.  When you talked to Mr. Thompson about this job,

Page 44

1    did you indicate to him that you'd like to fill this job
2    with a plumber and then you would post another job for a
3    maintenance mechanic that Mr. Thompson could bid on?
4    A.  I would not have had that conversation.  I
5    wouldn't have knew what positions I had open unless I had
6    someone vacate those positions.  I have a limited number
7    of positions that I can post for.  I couldn't indicate to
8    him that I got a position coming open if I didn't know
9    that.
10   Q.  Did Mr. Thompson withdraw his application for
11   this job?
12   A.  Not to my knowledge.
13   Q.  After Mr. Knotts was hired, was Mr. Thompson
14   upset?
15   A.  Yes.
16   Q.  Did he come to talk to you?
17   A.  I don't believe he came to the office.  I can't
18   recall.  We did have conversation, a conversation, I do
19   recall one, which was down in the building maintenance's
20   operation office.
21   Q.  Can you tell me what happened there?
22   A.  It was for prep up for the September race.  I
23   was down there.  It was probably close to maybe after
24   hours or something, after normal, the daylight -- or

Page 45

1    during the day hours.
2        Mr. Thompson came in on doing his job,
3    might have been opening a safe or something, and he made
4    indication to me that he was done wrong.  And I told him
5    that Mr. Knotts had more experience in the plumbing I
6    looking for.  And he wanted to engage in some heavier
7    conversation and I declined to do that.
8    Q.  Did he indicate to you at that time that he
9    thought it was age discrimination?
10   A.  I don't recall.
11   Q.  Did you and Mr. Thompson have a meeting with
12   Mrs. Isenberg?
13   A.  There was a meeting called by Mrs. Isenberg with
14   myself and Mr. Thompson, yes.
15   Q.  Where did that occur?
16   A.  Where?
17   Q.  Yes.
18   A.  In Mrs. Isenberg's office, in HR.
19   Q.  You don't recall the date that that happened, do
20   you?
21   A.  I do not.
22   Q.  Was it in August of 2004?
23   A.  Could have been.  Like I said, I don't recall
24   the dates on that.

**A0036**

12 (Pages 42 to 45)

Thompson                                            v.                              Dover Downs
William Robert Morrison                        C.A. # 05-274 (GMS)              April 11, 2006

Page 54

1  whether he was formally trained or not, and basically had
2  to take care of, you know, the different damages that
3  would occur in a motel/hotel operation there.
4      Q.  But you also testified that he was the only one
5  down there; right?
6      A.  Where at?
7      Q.  At the Ramada Inn, at the Howard Johnson's.
8      A.  I'm not aware how many employees they had, no.
9      Q.  So you didn't testify that he was the only guy
10  down there?
11      A.  Did I?
12      Q.  Yes.
13      A.  That I knew that he was the only one at Ramada?
14      Q.  Yes.
15      A.  No, I did not.
16      Q.  By working at Ramada and Howard Johnson's, is
17  any of the plumbing that would be associated with the
18  hotel or motel like that industrial plumbing?
19      A.  Would it be?  I would say yes.
20      Q.  So by virtue of him working there, it's possible
21  that he did have industrial plumbing experience; correct?
22      A.  Yes and no, depending on exactly how much he did
23  with that.  In a typically -- I know from experience in
24  our hotel, there's not a lot of plumbing breaks.  There

Page 55

1  may be some leaks or something of plumbing underneath a
2  sink or something or unclogging a hopper or something
3  like that.
4           But actually getting into -- and I know
5  from our being out to where I'm at now, we actually have
6  pipe breaks, we have major pipe breaks.  I mean, stuff
7  that's up 80 foot, numerous stuff, eight-inch stuff that
8  we have to go in and try to repair.  It's a little bit
9  different than fixing maybe a leak underneath a sink or
10  maybe a shower that's leaking or something like that,
11  which by virtue of also my experience with the hotel,
12  that maybe he was exposed to and was doing.
13      Q.  When you interviewed him, did you question him
14  as to the extent of his plumbing experience at the Ramada
15  Inn at the Howard Johnson's?
16      A.  I believe I did.
17      Q.  Do you recall what he told you?
18      A.  Not right off.  That he did work down there, and
19  I guess he had on and off maybe for a few years.
20      Q.  Had you ever observed Mr. Thompson doing
21  plumbing work?
22      A.  I did or have.
23      Q.  Did he do a good job?
24      A.  Yes, he did.

Page 56

1      Q.  Prior to hiring Mr. Knotts, had you ever
2  observed him doing plumbing work?
3      A.  No.
4      Q.  Did you give him any type of plumbing test prior
5  to hiring?
6      A.  Basically what I did -- in fact, one of the
7  sheets there, I looked at his company he was working for,
8  which I don't recall exactly who it was, but it was a
9  prominent plumbing contractor in town and that he had
10  been with them for 12 years, and all aspects of what I
11  heard, they were reputable and I had not heard any bad
12  complaints about their plumbing work.
13      Q.  Did you confirm that he actually worked for
14  them?
15      A.  I did not actually call the company, no.
16      Q.  Duncan Number 6, I believe it's right there, did
17  Mr. Thompson meet the minimum requirements of this job
18  posting?
19      A.  In the trade that he had, yes.
20      Q.  You testified earlier that internal employees
21  were given preference over external individuals in
22  hiring; correct?
23      A.  Yes.  And by me making the -- or answering yes,
24  he met it in the painting section there.

Page 57

1      Q.  But he did meet the essential functions and the
2  requirements/educations?
3      A.  Yes.
4      Q.  So Mr. Thompson was not given preference in this
5  one instance; correct?
6      A.  Because the experience in plumbing, yes, which
7  was the position level that I was trying to get filled at
8  that time.
9      Q.  I'd like to switch gears here again.
10          Are you aware in 2003 that Mr. Thompson was
11  out work for a period of time due to being involved in an
12  automobile accident?
13      A.  Yes.
14      Q.  When he was recovering from that accident, he
15  returned to work on light duty; correct?
16      A.  I believe so, yes.  What was the time frame
17  there when he come back?
18      Q.  Fall of 2003, I believe September.
19      A.  September?  Okay.
20      Q.  Do you have any recollections as to what his
21  light-duty limitations were?
22      A.  I believe it might have entailed lifting, and I
23  don't recall what the other was.
24      Q.  Do you recall what position he was given?

A0037

15 (Pages 54 to 57)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,        )
                                )
          Plaintiff,            )
                                )
v.                              )    Civil Action No.
                                )     05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS)
GAMING & ENTERTAINMENT INC.,   )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,     )
INC.,                           )
                                )
          Defendants.           )

          Deposition of LINDA M. RENNINGER taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 1:40 p.m. on Tuesday, April 12, 2006, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware  19899
            for the Plaintiff

          BETH A. FRIEL, ESQUIRE
          MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
            123 South Broad Street
            Philadelphia, Pennsylvania   19109
            for the Defendants

          ---------------------------------------------------
                        WILCOX & FETZER
          1330 King Street - Wilmington, Delaware 19801
                        (302) 655-0477

**A0038**

Thompson                 v.                        Dover Downs
Linda M. Renninger         C.A. # 05-274 (GMS)        April 12, 2006

Page 6

1    A.  That would be Jim Shreves.  He was named -- the
2  announcement was made today.
3    Q.  And the director?
4    A.  The director is Rich Duncan.
5    Q.  How long have you been in this position?
6    A.  In this position for -- since the end of '99.
7    Q.  How long have you worked for Dover Downs in
8  total?
9    A.  In total?  I started there April 4th of '98.
10    Q.  What did you do between 1998 and 1999?
11    A.  I worked in the ticket office for about nine
12  months, and before that I was part-time, ushered
13  concerts, ran the elevator when they had parties, just
14  anything.  Worked in the coat room sometimes for the
15  casino.  Whatever they needed.
16    Q.  You mentioned earlier that you met with
17  Ms. Friel.  Was that in preparation of today's
18  deposition?
19    A.  Yes.
20    Q.  What day was that?
21    A.  That was Monday.
22    Q.  How long did you meet with her?
23    A.  About 15 minutes, I think.
24    Q.  Did you review any documents?

Page 7

1    MS. FRIEL:  Objection.
2    You can answer.
3    A.  No, we didn't review any documents.
4    Q.  Did you talk to anybody other than Ms. Friel in
5  preparation for this deposition?
6    A.  No.
7    Q.  Have you talked to anybody, in general, about
8  Mr. Thompson's lawsuit or the factual circumstances
9  surrounding his lawsuit?
10    A.  No.
11    Q.  No other Dover Downs employees or anything?
12  Just in passing conversations?
13    A.  Probably back when -- my part was when it
14  happened and everything, but recently...
15    Q.  What was your part when it happened?
16    A.  Anything I've been asked about was when
17  Mr. Thompson was not feeling well, he was in the security
18  office and I went down there to see what was going on.
19    Q.  Can you tell us what happened?
20    A.  I went down to the security office.  There were
21  three or four people there besides Mr. Thompson.  He said
22  he wasn't feeling well.  And they had offered to call an
23  ambulance, but he didn't want an ambulance called.  And
24  security would not do it because that's their policy,

Page 8

1  would not take him to the hospital.
2    So I said I would do it.  I went back to my
3  office, got my coat on.  At that time the director came
4  in and the director and the part-time person in my office
5  both kept saying, "I don't think you should do it because
6  of liability, if something happened to Mr. Thompson while
7  you were -- he was in your car, you know, you could be
8  liable."  And then Mr. Wertz said he would go down and
9  talk to him and that was it.
10    Q.  When you say he was not feeling well, what was
11  wrong with him?
12    A.  When I got down there, they said he was acting
13  like he was kind of hyperventilating is what someone -- I
14  don't know if Ross said that or who.
15    Q.  Who else was down there?
16    A.  Ervin Ross, Mickey, me, and there was -- I think
17  it was Joe McNair, but I'm not sure.  There was one other
18  person there.
19    Q.  What was his name?
20    A.  McNair.
21    Q.  Joe McNair?
22    A.  Yes.  He was the one who called back to the
23  security office to see about getting a ride.
24    Q.  Had you ever taken anybody to the hospital on

Page 9

1  your own previously?
2    A.  No.
3    Q.  When you say the director said no because of
4  liability, was that Mr. Duncan?
5    A.  No.  The director -- I guess it was the director
6  of security on the phone said, no, that security wouldn't
7  do it because of liability, that they would always call
8  an ambulance.  The director in my office was Rich Wertz
9  at the time and he wouldn't tell me I couldn't do it.  He
10  just said, "If I were you, I wouldn't because of
11  liability."
12    Q.  So he did not forbid you to do it?
13    A.  No, he did not.
14    Q.  Do you have an understanding as to what the base
15  of Mr. Thompson's lawsuit is?
16    A.  No, I don't.
17    Q.  Are you aware it's an age discrimination case?
18    A.  I've heard that, but -- I heard it was age
19  discrimination.  I don't know anything about it.
20    Q.  I believe you stated that during your position
21  you had something to do with payroll?
22    A.  Mm-hmm.
23    Q.  Is this for maintenance exclusively?
24    A.  Yes.  Just for the maintenance department.

A0039

3 (Pages 6 to 9)

Page 1

                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,        )
                                )
            Plaintiff,           )
                                )
v.                              )    Civil Action No.
                                )      05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS)
GAMING & ENTERTAINMENT INC.,    )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,      )
INC.,                           )
                                )
            Defendants.          )


            Deposition of JAMES M. SHREVES, SR., taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 10:35 a.m. on Tuesday, April 12, 2006,
before Kathleen White Palmer, Registered Merit Reporter
and Notary Public.

APPEARANCES:

        TIMOTHY J. WILSON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19899
          for the Plaintiff

        BETH A. FRIEL, ESQUIRE
        MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
          123 South Broad Street
          Philadelphia, Pennsylvania  19109
          for the Defendants


        ------------------------------------------------------
                      WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                      (302) 655-0477

**A0040**

Thompson                                          v.                              Dover Downs
James M. Shreves, Sr.                    C.A. # 05-274 (GMS)                      April 12, 2006

Page 6

1 **contractors, does the budgets.**
2   Q. Is that the same position that Bob Morrison
3 does?
4   **A. Yes.**
5   Q. So there's two of you?
6   **A. There's three, really:  inside maintenance,**
7 **outside maintenance, and grounds.**
8   Q. So by building maintenance, you mean inside?
9   **A. Inside, yes.**
10   Q. You say you just got that job on Monday?
11   **A. Yes.**
12   Q. Congratulations.
13   **A. Thank you.**
14   Q. What did you do prior to that?
15   **A. Supervisor, second shift.**
16   Q. How long had you held that position?
17   **A. Almost two years.**
18   Q. Would that have been approximately March of
19 2004? April of 2004?
20   **A. I believe it was April.  I believe.  I'm not**
21 **good on dates, but somewhere around there.**
22   Q. Prior to that, what was your position?
23   **A. Mechanic I, second shift.**
24   Q. How long did you hold that position?

Page 7

1   **A. About six months, I believe.**
2   Q. Were you a Mechanic II prior to that?
3   **A. Yes.**
4   Q. For how long?
5   **A. Eight months.**
6   Q. Mechanic III?
7   **A. Yes, started out.**
8   Q. For how long were you a Mechanic III?
9   **A. I --**
10   Q. Let's just establish when you started at Dover
11 Downs.
12   **A. Started November 9th, '01.**
13   Q. Where did you work immediately before that?
14   **A. Before that, Wyndham Hotel.**
15   Q. In what capacity?
16   **A. General engineering maintenance.**
17   Q. Was that in Dover?
18   **A. Yes -- no.  Wilmington.**
19   Q. Wilmington?
20   **A. Yes.**
21   Q. Can you tell me what you did to prepare for
22 today's deposition?
23   **A. Just tried to remember things that happened.**
24   Q. Did you meet with Miss Friel?

Page 8

1   A. Yes.
2   Q. Did you review any documents?
3   A. No.
4   Q. When did you meet with Ms. Friel?
5   A. What was it?  Last week?
6   Q. For approximately how long was the meeting?
7   A. About 20 minutes to half an hour.
8   Q. Was it face-to-face or by the telephone?
9   A. Face-to-face.
10   Q. Did you talk to anybody else other than
11 Miss Friel to prepare for this deposition?
12   A. No.
13   Q. Have you talked to anybody in general about this
14 lawsuit?
15   A. No.
16   Q. You haven't talked to anybody at Dover Downs --
17   A. No.
18   Q. -- just in general about the lawsuit?
19   A. No.  The only thing was I asked who was coming
20 up to the deposition and who was coming up close to my
21 time.
22   Q. So you could share a ride?
23   A. Right.
24   Q. You are aware of this lawsuit, though, are you

Page 9

1 not?
2   A. Yes.
3   Q. What's your understanding of what Mr. Thompson's
4 claims are?
5   **A. I know it's supposed to be about age**
6 **discrimination.  That's, you know, basics.**
7   Q. You stated that you became the second shift
8 supervisor in approximately March or April of 2004;
9 correct?
10   **A. Yes.**
11   Q. Was this position posted?
12   **A. Yes.**
13   Q. Can you briefly outline what Dover Downs posting
14 policy is with respect to open jobs?
15   **A. They post it for five working days, and before**
16 **they were posting it in the maintenance shop on the**
17 **bulletin board.**
18   Q. During this five days, is that when the
19 employees are supposed to submit their applications for
20 the job?
21   **A. Yes.**
22   Q. Did you submit your application for the job?
23   **A. Yes.**
24   Q. When did you submit your application?          **A0041**

3 (Pages 6 to 9)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Thompson                                           v.                              Dover Downs
James M. Shreves, Sr.                    C.A. # 05-274 (GMS)                        April 12, 2006

Page 10

1    A.  Same day it came out.  It was on a Thursday, I
2  believe.
3    Q.  Do you if this job was actually posted for five
4  days?
5    A.  Yes.
6    Q.  Did you know that this job was going to be
7  posted prior to the posting actually going up?
8    A.  Yes.
9    Q.  How did you know?
10   A.  The supervisor that I had then was leaving for a
11 new job, so if he left, it had to be posted.
12   Q.  Who was that?
13   A.  Dean Cheshack.
14   Q.  Do you have any idea how to spell his last name?
15   A.  C-h-e-s-h-e-a-k.  Something like that.
16      MS. FRIEL:  I believe it's C-h-e-s-n-i-c-k.
17 Chesnick, I think.
18   Q.  How did you find out that Mr. Cheshack was
19 leaving?
20   A.  He told me.
21   Q.  When did he tell you, approximately?
22   A.  About a week before.
23   Q.  Did you speak to anybody else besides
24 Mr. Cheshack about the job being open prior to it being

Page 11

1  posted?
2    A.  I don't recall talking to anybody about it.
3    Q.  Were you interviewed for the job?
4    A.  Yes.
5    Q.  Do you recall when you were interviewed?
6    A.  Somewhere around the 15th.
7    Q.  The 15th of April or March?
8    A.  Whenever it was posted.  Like I say, I'm not
9  good with the date on it.
10   Q.  Do you have any recollection as to, was it
11 within the posting period?
12   A.  After the posting was over.
13   Q.  Who did you interview with?
14   A.  Rich Duncan.
15   Q.  What did you and Rich Duncan talk about?
16   A.  The responsibilities of being the supervisor,
17 how to treat some of the guys, you know, treat them with
18 respect, stuff like that.
19   Q.  Do you know if Dean Cheshack talked to Rich
20 Duncan on your behalf?
21   A.  He sent in a letter of recommendation, yes.
22   Q.  During your interview, did Mr. Duncan give you
23 any indication as to whether or not you would get the
24 job?

Page 12

1    A.  No.  He said -- no.
2    Q.  When were you officially awarded the job?
3    A.  Somewhere around the 17th.
4    Q.  Who told you you had the job?
5    A.  Mr. Duncan.
6    Q.  Did he tell you prior to it being announced?
7    A.  He told me the day before he announced it.
8    Q.  Did you interview with anybody else besides
9  Mr. Duncan?
10   A.  Mr. Wertz was in there.
11   Q.  Mr. Mertz?
12   A.  Wertz.
13   Q.  Wertz.  What did Mr. Wertz say during the
14 interview?
15   A.  He didn't say anything.  He was just there to be
16 as a witness or whatever.
17   Q.  How long did the interview last?
18   A.  About 25 minutes.
19   Q.  Did you talk about anything else other than the
20 responsibilities of a shift supervisor?
21   A.  No.
22   Q.  When you worked at the Wyndham Hotel, how long
23 did you work for them?
24   A.  A little over three years.

Page 13

1    Q.  Mr. Shreves, have you been given an employee
2  discipline warning while you've been at Dover Downs?
3    A.  Have I?
4    Q.  Yes.
5    A.  Yes.
6    Q.  Have you either as a supervisor or as an
7  employee?
8    A.  Both.
9    Q.  Both?
10      Is there a difference between a
11 disciplinary warning and a coaching?
12   A.  Yes.
13   Q.  Can you explain that difference to me?
14   A.  A coaching just goes into the employee's file.
15 Doesn't have to be notified.  Disciplinary has to go up
16 to HR with like a consultation with the employee that's
17 getting wrote up.
18   Q.  When you say "consultation," is that a
19 consultation with HR?
20   A.  Most of the time it's just with a supervisor or
21 a manager.  The only way it goes farther than that is if
22 it's a bigger discretion.
23   Q.  The coaching, is there notice given to the
24 employee regarding the coaching?

A0042

4 (Pages 10 to 13)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,        )
                                )
              Plaintiff,        )
                                )
v.                              )    Civil Action No.
                                )     05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS)
GAMING & ENTERTAINMENT INC.,  )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,    )
Inc.,                           )
                                )
              Defendants.       )

              Deposition of NATHAN R. WHITECOMB taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 3:05 p.m. on Tuesday, April 11, 2006, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.

APPEARANCES:

        TIMOTHY J. WILSON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19899
          for the Plaintiff

        EDWARD T. ELLIS, ESQUIRE
        MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
          123 South Broad Street
          Philadelphia, Pennsylvania  19109
          for the Defendants

---------------------------------------------------
            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477                          **A0043**

Thompson                                v.                          Dover Downs
Nathan R. Whitecomb              C.A. # 05-274 (GMS)              April 11, 2006

Page 10

1    A.  Yes, sir.
2         MR. ELLIS:  I still object to the form of
3  the question, but go ahead.
4         You can answer.  I'm not telling you not to
5  answer the question.
6         THE WITNESS:  Okay.
7  BY MR. WILSON:
8    Q.  Who did you discuss this with?
9    A.  Jim Shreves.
10   Q.  What did you and Jim discuss?
11   A.  Basically it was not so much as into why we had
12 to be here as much as it was everything that had
13 happened.  Basically not everything that had happened,
14 but -- it's hard to explain.
15   Q.  Did you discuss the events that led to this?
16   A.  Not really, just that we both knew that we were
17 going to have to come here and we knew this was going to
18 happen, that we knew this was going to happen, and that
19 was about the extent of the conversation.
20   Q.  Why did you know it was going to happen?
21   A.  Because I was told.
22   Q.  Who told you?
23   A.  Mr. Thompson.
24   Q.  Did you talk to anybody else besides

Page 11

1  Mr. Shreves?
2    A.  Outside of preparation, no.
3    Q.  You stated earlier that you worked on third
4  shift with Mr. Thompson at some point; correct?
5    A.  Yes, sir.
6    Q.  Can you give me a time frame as to when that
7  was?
8    A.  February -- the same.  The year, I am so
9  terrible with the years.  It was the first night that the
10 hotel opened.  It was my first night with third shift.
11 As a matter of fact, it was the same night, I believe
12 October 15th of the year the hotel opened.
13   Q.  2001?
14   A.  I believe so, yes.  Sounds about right.
15   Q.  Okay.  Go ahead.
16   A.  And that lasted till about two years ago.  I
17 couldn't give you an exact month.  I don't really
18 remember.
19   Q.  How long were you on that shift with
20 Mr. Thompson?  Do you recall?
21   A.  Better part of a year.
22   Q.  So that would have been your first year on third
23 shift?
24   A.  Yes, sir.

Page 12

1    Q.  Were there other employees on third shift?
2    A.  At the time I came on, no, sir.
3    Q.  Eventually did other employees get added?
4    A.  Yes, sir.
5    Q.  Who were they?
6    A.  Kevin Gorlich.
7    Q.  Anybody else?
8    A.  And eventually supervisor Al Baldwin, Bill
9  Carlisle.  And there was another gentleman, he only
10 lasted a month.  I really don't recall his name at all.
11   Q.  Was Mr. Baldwin on the shift when Mr. Thompson
12 was there?
13   A.  I don't recall at first if he was or not.  I
14 know -- I believe he was, but I'm not 100 percent sure on
15 that.
16   Q.  At some point it was three employees:  you,
17 Kevin Gorlich, and Mr. Thompson; correct?
18   A.  Yes, sir.
19   Q.  Let's just focus on that period of time for
20 right now.  Okay?
21   A.  Yes, sir.
22   Q.  During that period of time, what type of work
23 did you do on third shift?
24   A.  I was basically a runner.

Page 13

1    Q.  What's a runner?
2    A.  Basically I made sure that all the parts are in
3  place and small duties are taken care of so that
4  high-ranking mechanics can do their job without
5  interference.
6    Q.  Were you a Maintenance Mechanic III at this
7  time?
8    A.  No, sir, I was not.  I was a Maintenance
9  Mechanic II at this time.
10   Q.  What about Kevin Gorlich, do you recall what he
11 was?
12   A.  He came on at a Mechanic II.
13   Q.  Was Mr. Thompson a Mechanic I?
14   A.  Yes, sir.
15   Q.  At this time when it was just you three, there
16 was nobody on the third shift that held the title
17 supervisor; correct?
18   A.  No, sir, there was not.
19   Q.  Was Mr. Morrison the official supervisor for
20 this shift?
21   A.  Yes.  Officially, yes.
22   Q.  But he worked second shift; correct?
23   A.  Yes.
24   Q.  Was there an overlap between second shift and

**A0044**

4 (Pages 10 to 13)

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON,                     :
                                        :
          Plaintiff,                    :
                                        :
          v.                            :      Civil Action No.: 05-0274 (GMS)
                                        :
DOVER DOWNS, INC.,                      :
                                        :
          Defendant.                    :

## <u>DECLARATION OF ERIC DANIEL</u>

I, Eric Daniel, hereby aver as follows under penalty of perjury:

1.  I am an employee in the Maintenance Department at Dover Downs, Inc. ("Dover Downs").

2.  On August 25, 2004, I went on workers' compensation.  My doctor released me to return to work on regular duty with the recommendation that I be assisted with lifting weight over 25 pounds.  I returned to work on regular duty on September 4, 2004, and I returned to my position as a Maintenance Mechanic with Dover Downs.

3.  I have never had any light duty assignments while I worked at Dover Downs.

4.  I have never worked in the Human Resources Department at Dover Downs, and I was never offered a position in the Human Resources Department.  I have worked in the Maintenance Department throughout my entire employment with Dover Downs.

I make the foregoing statements under penalty of perjury pursuant to 28 U.S.C. § 1746.


_____
Eric Daniel

Dated: _04-25-06_

**A0046**

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON,        :
                             :

        Plaintiff,        :
                             :

        v.         :     Civil Action No.: 05-0274 (GMS)
                             :

DOVER DOWNS, INC.,        :
                             :

        Defendant.     :

## <u>DECLARATION OF FRED DOWNS</u>

I, Fred Downs, hereby aver as follows under penalty of perjury:

1.  I am a Human Resources Manager with Dover Downs, Inc. ("Dover Downs").

2.  Eric Daniel is an employee of Dover Downs, who went out on workers' compensation on August 25, 2004. Mr. Daniels' doctor then released him to return to work on regular duty with the recommendation that he be assisted with weight over 25 pounds. Upon this release from his doctor, Mr. Daniel returned to work on regular duty on September 4, 2004 and returned to his position as a Maintenance Mechanic with Dover Downs. Eric Daniel never had any light duty assignments while he worked at Dover Downs, and he was never offered a position in the Human Resources Department.

3.  Brance Thompson was out on workers' compensation during the past year. Mr. Thompson's doctor never released him to return to work on regular duty. Instead, at certain times, the doctor released Mr. Thompson to return to work on light duty with several restrictions. Thompson could not perform the duties of a Maintenance Mechanic with these restrictions, and Dover Downs was unable to place Thompson in a light duty job.

**A0047**

I make the foregoing statements under penalty of perjury pursuant to 28 U.S.C. § 1746.

_____
Fred Downs

Dated: 4/25/06

A0048

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON,      :
                            :
      Plaintiff,        :
                            :
      v.            :     Civil Action No.: 05-0274 (GMS)
                            :
DOVER DOWNS, INC.,      :
                            :
      Defendant.     :

## DECLARATION OF RICHARD DUNCAN

I, Richard Duncan, hereby aver as follows under penalty of perjury:

1.  I am currently the Director of Facilities for Dover Downs, Inc. ("Dover Downs").

2.  In or around January 2005, Brance Thompson complained to me that someone was stealing or tampering with his paint supplies. As part of the investigation into Mr. Thompson's complaint, Dover Downs placed a hidden camera in the paint shop where Mr. Thompson kept his supplies. The investigation revealed no one who was stealing or tampering with the paint supplies.

I make the foregoing statements under penalty of perjury pursuant to 28 U.S.C. § 1746.

_Richard Duncan_
Richard Duncan

Dated: _4-26-06_

A0049

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON,                  :
                                     :
            Plaintiff,               :
                                     :
      v.                             :        Civil Action No.: 05-0274 (GMS)
                                     :
DOVER DOWNS, INC.,                   :
                                     :
            Defendant.               :

### DECLARATION OF MARIE ISENBERG

I, Marie Isenberg, hereby aver as follows under penalty of perjury:

1. I am a Human Resources Manager with Dover Downs, Inc. ("Dover Downs").

2. The pay scale for an Outside Maintenance Mechanic I at Dover Downs is the same as the pay scale for an Inside Maintenance Mechanic I. The salary for a Maintenance Mechanic I position depends upon the employee's background and experience

I make the foregoing statements under penalty of perjury pursuant to 28 U.S.C. § 1746.

_Marie Isenberg_
Marie Isenberg

Dated: _April 26, 2006_

**A0050**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON,         :
                               :
           Plaintiff,         :
                               :
           v.                 :       Civil Action No.: 05-0274 (GMS)
                               :
DOVER DOWNS, INC.,         :
                               :
           Defendant.       :

## DECLARATION OF ROBIN ROBERTS

I, Robin Roberts, hereby aver as follows under penalty of perjury:

1. I am the Vice President of Human Resources for Dover Downs, Inc. ("Dover Downs").

2. Pursuant to Dover Downs' policy, an employee does not receive a bonus if he or she receives a Final Written Warning.

3. Dover Downs initially did not provide Brance Thompson with his bonus for 2004 because he was on a Final Written Warning. Mr. Thompson's Final Written Warning occurred in January 2005, however, and he was not on a Final Written Warning at any time during 2004. Therefore, pursuant to Dover Downs' practice, Mr. Thompson should have received a bonus for the year 2004 in February 2005. The initial failure to provide Mr. Thompson with a bonus was an administrative error, and Dover Downs has since rectified this mistake. Dover Downs sent Mr. Thompson a check in the amount of $309.00 for his 2004 bonus payment (1% of his annual wages). Dover Downs also provided Mr. Thompson with a check in the amount of $14.35 for the interest accrued on the bonus payment.

I make the foregoing statements under penalty of perjury pursuant to 28 U.S.C. § 1746.

_Robin Roberts_

Robin Roberts

Dated: _4-26-06_

**A0052**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON,                 :
                                    :
              Plaintiff,            :
                                    :
        v.                          :     Civil Action No.: 05-0274 (GMS)
                                    :
DOVER DOWNS, INC.,                  :
                                    :
              Defendant.            :

## DECLARATION OF RICHARD WERTZ

I, Richard Wertz, hereby aver as follows under penalty of perjury:

1. In or around January 2005, Brance Thompson complained that someone was stealing or tampering with his paint supplies. As part of the investigation into Mr. Thompson's complaint, I arranged with Dover Downs' security personnel to have a hidden camera placed in the paint shop where Mr. Thompson kept his supplies. The investigation revealed no one who was stealing or tampering with the paint supplies.

I make the foregoing statements under penalty of perjury pursuant to 28 U.S.C. § 1746.

Richard Wertz

Dated: 4|26|06

A0053