## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **BRANCE F. THOMPSON, SR.,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No.: 05-274 (GMS)** |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **DOVER DOWNS, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

## ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Date: May 26, 2006

Timothy J. Wilson (4323)
1509 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 777-4680
Facsimile: (302) 777-4682
twilson@margolisedelstein.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **BRANCE F. THOMPSON, SR.,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No.: 05-274 (GMS)** |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **DOVER DOWNS, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

## CERTIFICATE OF SERVICE

I, Timothy J. Wilson, hereby certify that two copies of the foregoing *Plaintiff's*

*Answering Brief in Opposition to Defendant's Motion for Summary Judgment*  was

served by electronic filing and U.S. mail, prepaid, on May 26, 2006 to the following:

Richard M. Donaldson, Esquire
Noel C. Burnham, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Ave, Suite 750
Wilmington, DE 19801

_____/s/_____
Timothy J. Wilson (ID # 4323)
1509 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 777-4680
Facsimile: (302) 777-4682
twilson@margolisedelstein.com
*Attorney for Plaintiff*

# TABLE OF CONTENTS

**Page No.**

TABLE OF CITATIONS……………………………………………………......iv

NATURE AND STAGE OF THE PROCEEDINGS ……………………………….1

STATEMENT OF MATERIAL FACTS……………………………………………2

- Retaliation……………………………………………………………5

ARGUMENT……………………………………………………………..…..11

I.    STANDARD OF REVIEW………………………………………….....11

II.   GENUINE ISSUES OF MATERIAL FACT EXIST THAT
      PRECLUDE THE GRANTING OF SUMMARY
      JUDGMENT ON COUNT'S I AND V……………………………………..13

      1.  Failure to Promote………………………………………………..14

          a.    Mr. Thompson's Claim Based Upon Dover Downs'
                Failure to Promote Him in 2001 Grow from the Charge
                Discrimination and Therefore, is a Viable
                Claim……………………………………………………..14

          b.    Mr. Thompson's Claim Based Upon Dover Downs' Failure
                to Promote Him in 2001 is a Viable Claim Under the
                Continuing Violation Theory……………………………………15

          c.    Dover Downs Intentionally Disqualified Mr. Thompson
                From the Opportunity to Apply for the March 2004
                Shift Supervisor Position Which Preclude Summary
                Judgment Based Upon Dover Downs Claim that Mr.
                Thompson Did Not Apply for the Position………………………16

          d.    Maintenance Mechanic I Position………………………..……17

III.  LIGHT DUTY ASSIGNMENTS……………………………………...…...18

          a.    Mr. Thompson's Claim Based Upon Dover Downs'
                Failure to Provide Him a Light Duty Assignment
                May Not be Dismissed Because This Claim is Fairly
                Within the Scope of His Charge of Discrimination……………..…18

i

Page No.

b.    Mr. Daniel is a Proper Comparator for Mr. Thompson
as are other Dover Downs Employees Who Have
Been Released to Return to Work on Light-Duty
Status…………………………………………………………..20

IV.    RETALIATION CLAIM…………………………………………...………21

a.    Disciplinary Warning Notices Constitute a Valid
Basis for Mr. Thompson's Retaliation Claim……………………21

1.    Dover Downs Fraudulently "Released" the
Disciplinary Warning Notices After Mr.
Thompson Made a Complaint of Age
Discrimination…………………………………...………..22

2.    Mr. Thompson Suffered an Adverse
Employment Action Because the Disciplinary
Warning Notices are Coupled with a Threat
Of Termination……………………………………….…..23

3.    There is Sufficient Evidence of Retaliatory
Animus to Sustain Mr. Thompson's
Retaliation Claim……………………….................…….23

b.    The Withholding of Mr. Thompson's Bonus was
Intentional and to Permit Dover Downs to Have this
Claim Dismissed Would Violate the Purpose of
Assigning Liability Under Title VII, Which is to
Compensate Employees for Injury They Suffer and to
Eradicate Discrimination Throughout the Economy……………24

c.    Workload and Transportation to the Hospital……………………26

d.    Dover Downs Failed to Carry its Burden With
Respect to its Argument Against the Court Considering
Mr. Thompson's Claim for Retaliation Based Upon
The Camera in Paint Shop………………………………….…….26

V.    OVERWHELMING EVIDENCE OF FRAUD, DECEIPT
AND MISREPRESENTATION EXISTS TO SUSTAIN MR.
THOMPSON'S CLAIM FOR BREACH OF COVENANT OF
GOOD FAITH AND FAIR DEALING…………………………….…….27

**Page No.**

    E.    FAILURE TO PROMOTE…………………………….……..28

CONCLUSION……………………………………………………….……….29

**Unreported Cases**                               **Tab No.**

*Allen v. Mineral Fiber Specialists*
2004 U.S. Dist. LEXIS 1982, 36 (D. Pa. 2004)…………………………………..………A

*Ebert v. Office of Information Systems*
1998 U.S. Dist. LEXIS 9100, 12 (D. Del. 1998)………………………………………..…..B

*Robinson v. Bt. Fin. Corp.*
2003 U.S. Dist. LEXIS 2311 (D. Pa. 2003)……………………………………….…..C

# TABLE OF CITATIONS

**Cases**                                                                    **Page No.**

*Adickes v. S.H. Kress & Co.*
398 U.S. 144, 157 (1970)……………………………………...…………………11

*Allen v. Mineral Fiber Specialists*
2004 U.S. Dist. LEXIS 1982, 36 (D. Pa. 2004)………………………………………….23

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 255 (1986)…………………………………………………………….11, 12

*Buffa v. N.J. Dept. of Judiciary*
56 Fed. Appx. 571, 576 (3d cir. 2003)……………………………………………….…23

*Carpenter v. Gulf States Mfrs., Inc.*
764 F.Supp. 427, 532 (N.D. Miss. 1991)……………………………………………...13

*Celotex Corp. v. Catrett*
477 U.S. 317- 323-4 (1986)…………………………………………………………...…13

*Ebert v. Office of Information Systems*
1998 U.S. Dist. LEXIS 9100, 12 (D. Del. 1998)…………………………………………..14

*Grande v. State Farm Mut. Auto. Ins. Co.*
83 F. Supp. 2d 559, 563-564 (E.D. Pa. 2000))………………………………………….…17

*Horowitz v. Fed. Kemper Life Assurance Co.*
57 F.3d 300, 302 n.1 (3d Cir. 1995)……………………………………………...……11

*Logan v. Commercial Un. Ins. Co.*
96 F.3d 971, 978 (7th Cir. 1996)…………………………………………………...……..12

*MacDonald v. Delta Air Lines, Inc.*
94 F.3d 1437, 1440 (10th Cir. 1996)…………………………………………...……..12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S 574, 586 n. 10, 89 L.Ed.2d 538, 106 S.Ct. 1348 (1986)…………………………..11

*McDonnell Douglas Corp. v. Green*
411 U.S. 792, 802 (1973)………………………………………………………...……13

*Moon v. The Delaware River and Bay Auth.*
2006 U.S. Dist. Lexis 7101, 7 (D. Del 2006)……………………………………….……15

*Pa. Coal Ass'n v. Babbitt*
63 F.3d 231, 236 (3d Cir. 1995)………………………………………...………………..11

*Robinson v. Bt. Fin. Corp.*
2003 U.S. Dist. LEXIS 2311 (D. Pa. 2003)……………………………………….…..17

*Rodgers v. Monumental Life Ins. Co.*
289 F.3d 442, 448 (6th Cir. 2002)………………………………………………..………12

*Rush v. Scott Specialty Gasses, Inc,*
113 F.3d 476, 481 (3d Cir. 1997)……………………………………………..………….16

*Sistrun v. Time Warner Cable*
2004 U.S. Dist. 16681 (E.D. Pa 2004)……………………………………………..…….16

*Troy Chemical Corp. v. Teamsters Union Local No. 408*
37 F.3d 123, 126 (3d Cir. 1994)…………………………………………………………….12

*United States v. Burke*
504 U.S. 229, 250 (1992)……………………………………………………….……..24

*Waiters v. Parsons*
729 F.2d, 233 (3d Cir. 1984)………………………………………………...………….18, 20

*Zucherbraun v. General Dynamics Corp.*
935 F.2d 544, 547-58 (2d Cir. 1991)……………………………………………………….13

## Other Authorities

*Age Discrimination in Employment Act* 19 U.S.C. §621 et. Seq………………………..….1

19 <u>Del. C.</u> §711………………….……………………………………………………….……1

Fed. R.Civ.P. 56(c)…………………………………………………………………………11

*Moore's Federal Procedure, §56.11[5][a]*……………………………………….………14

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Brance F. Thompson (hereinafter "Plaintiff" or "Mr. Thompson") filed a lawsuit against his employer, Dover Downs Inc. (hereinafter "Defendant" or "Dover Downs") on May 6, 2005, claiming that the Dover Downs unlawfully discriminated against him on the basis of age and retaliated against him after he complained to them of age discrimination. Mr. Thompson's Complaint was preceded by his filing of a Charge of Discrimination with the Delaware Department of Labor (hereinafter "DDOL") alleging age discrimination, (B-0337), that was supplemented by another charge of discrimination alleging age discrimination and retaliation. (B-0038).

In his Complaint, Mr. Thompson asserts the following causes of action: 1) Age discrimination in violation of the Age Discrimination in Employment Act 19 U.S.C. § 621 *et. seq.* ("ADEA"); 2) retaliation in violation of the ADEA; 3) a state law claim of breach of covenant of good faith and fair dealing; 4) discrimination based upon age in violation of 19 *Del. C.* § 711; and (5) a state law failure to promote claim.

On June 30, 2005, Dover Downs filed its Answer to the Complaint and the parties thenengaged in discovery. On April 28, 2006, Dover Downs filed a Motion for Summary Judgment, seeking dismissal of the action either by specific count or in its entirety.

This is Mr. Thompson's Answering Brief in Opposition to Dover Downs' Motion for Summary Judgment.

1

## STATEMENT OF MATERIAL FACTS

Mr. Thompson began his employment with Dover Downs on April 23, 2001, when he was hired by Dover Downs Maintenance Manager, Richard Duncan ("Mr. Duncan"), as a Maintenance Mechanic. (B-0010 – B0011). He is presently sixty-five (65) years old. (B-0005).

The first year that Mr. Thompson worked at Dover Downs, he worked on Second Shift[1] under the Supervision of Bob Morrison ("Mr. Morrison"). (B-0028). Following that first year, Mr. Thompson was moved to Third Shift[2] with no supervision. (B-0030, B-0231, B0261, B-0278). There were also two other employees, Nate Whitecomb and Kevin Gorlick, who worked on Third Shift under Mr. Thompson's supervision. (B-0032 – B-0033, B0261, B-0277 – B-0278). His primary responsibility on Third Shift was performing faux painting[3] and other painting applications at Dover Downs. (B-0261).

On September 9, 2002, Mr. Thompson was in a horrific automobile accident. (B-0029). Due to the injuries sustained in that accident, Mr. Thompson missed approximately one year and six days of work, returning to work on or about September 15, 2003. (B-0029). He was placed on light duty in the security office, distributing radios to security guards. (B-0242). He remained on light duty for approximately two months before he returned to his job as a Maintenance Mechanic 1 doing faux painting on Third Shift. (B-0032, B-0261). He continued to work with Nate Whitecomb and Kevin Gorlick, on Third Shift. (B-0032 – B-0033, B0261, B-0277 – B-0278).

Mr. Thompson's supervisor at that time was Bob Morrison – although Mr. Morrison worked Second Shift. (B-0260). Essentially, Mr. Thompson performed all of the functions and

---

[1] Second Shift is typically 3:00 p.m. to 11:30 p.m.
[2] Third Shift is typically 11:00 p.m. to 7 a.m.

2

duties of a Third Shift Supervisor. (B-0261). Shortly thereafter, on or about October 19, 2001, a job posting was released for a Third Shift Supervisor. (B-039, B-0339). Mr. Thompson was the only individual who applied for the Third Shift Supervisor's position. (B-0039, B-0064)

Mr. Thompson was not awarded the position. When questioned by Mr. Thompson, Mr. Duncan explained that he did not get the job because he had come to realize that he did not need a Third Shift Supervisor. (B-0040, B-0054, B-0057). Approximately two to four months later, Dover Downs promoted Al Baldwin, a Maintenance Mechanic 1 who had previously been working on the First Shift, to the Third Shift Supervisor position. (B-0235, B-0040, B-0057). When the opening for Third Shift Supervisor was posted, Mr. Baldwin did not apply for the opening. (B-0058). Instead, Mr. Duncan approached Mr. Baldwin and asked him if he wanted the job. (B-0065). Mr. Baldwin was thirty-nine years old at the time of his promotion. (B-0391).

Mr. Thompson, who, until that time had been the *de facto* Third Shift Supervisor, was then transferred to First Shift. (B-0038, B-0261). On or about March 4, 2004 a job opening for Second Shift[4] Supervisor was posted. (B-0072, B-0339). However, the job posting was taken down that same day, in violation § 2.06 of the Dover Downs Employee Handbook (hereinafter "Employee Handbook"). (B-0069). Section 2.06 requires: "Postings that are posted will be posted "in house" for at least 5 days." The five-day rule was implemented so that everybody who works in the Maintenance Department would have an opportunity to see the posting and to bid on the job if interested – regardless of the time of week in which their regularly scheduled days off fell.

Mr. Thompson was not scheduled to work the day that the posting went up. (B-0069). As

---

[3] Faux Painting is a method of painting in which walls and other structures are painted to look like they are made of marble, granite and other similar materials.
[4] Second Shift typically runs from 3:00 p.m. to 11:00 p.m.

3

a result, Mr. Thompson never saw the job posting and did not find out about it until March 12, 2004, when he heard about the job posting through another employee. (B-0073). On that date, Mr. Thompson approached Mr. Duncan and asked him, if he applied for the position, would he be considered or if he would be wasting his time doing so. Mr. Duncan told him to put in for the job and find out.

Mr. Thompson did apply for the job, but the position had already been awarded to Jim Shreves on March 2, 2004 – two days before the job was even posted. (B-0069 – B-0070, B0075). Mr. Shreves was thirty-nine years old at that time. (B-0295, B-0391). Mr. Thompson complained to Mr. Duncan about not getting the job, but he got no response. (B-0076).

On or about June 11, 2004, a job was posted for an Outside Maintenance Mechanic 1. The Outside Maintenance Mechanic 1 employees made more money than the "inside" Maintenance Mechanic employees. (B-0089 – B-0091). This posting was an "in house" posting, meaning that current employees who are qualified for the position are to be considered for the position before the company would look to the outside to fill the position. (B-0023, B-0289).

Bob Morrison was the Outside Maintenance Manager and was in charge of hiring the Outside Maintenance Mechanic 1 to fill the opening. Mr. Thompson approached Mr. Morrison to discuss the position. He was interviewed on June 25, 2004. (B-0094). Despite the interview on the 25th, Documentation shows that Mr. Thompson had already been declined for the position on June 24, 2004. (B-0095,B-0339).

Nevertheless, at his interview, Mr. Morrison discouraged Mr. Thompson from bidding on the job and said that when working outside, "the weather was hot and it was heavy work … that [Mr. Thompson] would be out in the sun." (B-0095). Mr. Thompson told him that he didn't care because he wanted the additional pay and because he wanted the change from his current

4

position. (B-0095). In response, Mr. Morrison asked Mr. Thompson to not bid on the job so that he could hire a plumber to fill the position. (B-0095). Mr. Morrison then assured Mr. Thompson that he would post another Outside Maintenance Mechanic 1 position and he would fill that position with Mr. Thompson. (B-0095, B-0098).

Sometime in August 2004, Mr. Morrison hired Robert Knotts, then forty-three (43) years old, to fill the Outside Maintenance Mechanic 1 position. (B-0138, B-0253). This individual was *not* a licensed plumber. (B-0253, B-0267).

Furthermore, Mr. Knotts was not a current Dover Downs employee. Therefore his hiring was in violation of the "in-house" posting rule as Mr. Thompson was qualified for the job. (B-0290). Anxious to get outside, Mr. Thompson approached Mr. Morrison to discuss the new hire and to inquire into when the new posting for Outside Maintenance Mechanic 1 would be posted. (B-0095 – B-0097). Mr. Morrison told Mr. Thompson that he was not going to post another Outside Maintenance Mechanic 1 position and that Mr. Thompson was not "coming outside." (B-0095 – B-0097).

Mr. Thompson had reached his breaking point with respect to being passed over for promotions for younger, less qualified individuals. He asked for a meeting with Dover Downs Human Resources to discuss what he believed to be Dover Downs' age discrimination in hiring and promotion. (B-0268, B-0308). On August 23, 2004, Mr. Thompson and Mr. Morrison met with Dover Downs Human Resources employee, Mrs. Eisenberg. (B-0268, B-0308). During the meeting, Mr. Thompson accused Dover Downs of age discrimination. (B-0177 – B-0179, B-0269). The meeting resolved nothing.

**Retaliation:**

The very next day after Mr. Thompson complained of age discrimination, August 24,

2004, Mr. Thompson was a given disciplinary warning notice for four separate instances that had occurred as early as February, 2004. (B-0038). All of these write up slips were dated August 24, 2004, even though the write ups were from various dates prior to August 24. (B-0345).

According to the well-established custom and work-practice at Dover Downs, an employee must be written up within seventy-two hours of the occurrence event. (B-0181, B-0238, (B-0281). As a consequence, the August 24, 2004 write ups for the alleged previous violations were not in compliance with this policy and therefore were invalid. Additionally, the employees in the Dover Downs maintenance department had been instructed that they could cover their absences with vacation time or sick time and they would not accrue incidents of absences. (B-0115 – B-0117, B-0315). All maintenance employees were allowed to cover their absences in this manner until Mr. Thompson complained of discrimination. (B-0115 – B-0117). In fact, even though Mr. Thompson was disciplined for the absences in this manner, the official policy was not changed until late 2005 to early 2006 – long after Mr. Thompson had been prohibited from using his sick and vacation time to cover absences. (B-0315).

Many of the absences for which Mr. Thompson was disciplined were covered by vacation time or sick time. Mr. Thompson also had doctor's excuses for some of these absences. (B-0115, B-0147). Furthermore, with respect to the doctor's excuses, maintenance employees are to give their doctor's excuses to Linda Renninger who handles attendance. (B-0150) After his complaint of discrimination, Richard Duncan instructed Ms. Renninger that she could no longer accept Mr. Thompson's doctor's notes and that Mr. Thompson would have to turn them in directly to H.R. (B-0112 – B-0114, B-0150 – 0152, B-0317)

When Mr. Thompson saw the dates on the documentation, he advised Mr. Duncan of the seventy-two hour rule. (B-0327,B-392 – B-394). In apparent agreement of the invalidity of the

written disciplinary documentation, Mr. Duncan destroyed the original write up slips dated August 24, 2004 and reissued them. (B-0166). These new write up slips were back-dated to the date that the alleged violations occurred. (B-0121). Significantly, within the box delineated "date signed" are the dates that the alleged events occurred. Mr. Homlish's signature appears beside the "date signed" box. (B-0286). It is improper to put a date other than the actual date that the form was signed in the "date signed" box. (B-0269). Simply put, Mr. Duncan and Mr. Homlish falsified these documents to make them appear as if they were executed on the previous dates instead of on August 24, 2004. Prior to August 24, 2004, Mr. Thompson had *never* been written up during the entire time he had worked at Dover Downs. (B-0138).

On or about August 24, 2004, with no other administrative remedy available to him, Plaintiff filed a Charge of Discrimination against Defendants with the Delaware Department of Labor and the United States Equal Employment Opportunity Commission alleging age discrimination. (B-0337).

On January 4, 2005, Mr. Thompson was called into another meeting with Human Resources. (B-0155) In the four and a half months that had elapsed since August 24, 2004, Mr. Thompson had been written up numerous additional times. (B-0346 – B-0350). At the meeting, he was instructed that upon his next write up, he "*could*" be terminated; although, he was instructed further, Dover Downs did not "*want*" to execute such a termination. (B-0328, B-392 – B-394)    Mr. Thompson took this statement as a threat – meaning Dover Downs would not terminate him as long as he made no further complaints or trouble for them regarding age discrimination; but if he did continue to complain, they could and *would* terminate him. (B-0328, B-392 – B-394)

7

In the eight months that have elapsed since that meeting, Mr. Thompson has been written up four additional times for various offenses. (B-0346 – B-0350).    In all, Mr. Thompson was not written up a single time from 2001 until August of 2004. (B-0138).  Since that date, he has been written up nine (9) times in the eight (8) months that have elapsed since he made his first formal complaint of age discrimination to his employer.

On or about January 10, 2005, Mr. Thompson found a hidden camera the size of a pencil in his paint shop. (B-0183, B-0186).  The camera was placed there by Mr. Duncan. (B-0185). Disturbed by this, he intended to make it obvious to his employer that he knew that they had him under surveillance, so he went up to the camera and put his eye right up to the camera.  Mr. Thompson then left his paint shop. (B-0328)    When he came back later in his shift, the camera had been removed.  (B-0328)

On or about January 21, 2005, Plaintiff filed an amendment to his original Charge of Discrimination against Defendants with the Delaware Department of Labor, alleging age discrimination and retaliation. (B-0338)

The Delaware Department of Labor investigated Plaintiff's Charges of Discrimination and issued a Final Determination and Right to Sue Notice to Plaintiff on or about February 22, 2005, received by Plaintiff's counsel on or about March 3, 2005.  (B-0337, B-0338)

Also on or about February 22, 2005, bonus checks were distributed at Dover Downs to the Dover Downs employees. (B-0190).  These bonus checks amount to approximately 1% of each employee's yearly salary. (B-0329).    Mr. Thompson did not receive a bonus check. (B-0329).  This was the first year that he did not receive a bonus check.  (B-0329).

Mr. Thompson inquired as to why he did not receive a bonus check.  Mr. Richard Wirtz and Mr. Duncan told him that it was because of all the write ups that he had received in the past

8

year. (B-0188 – B-0189).  However, there were other similarly-situated employees who received bonus checks despite write ups and even despite suspensions (of which Mr. Thompson had none).  (B-0329, B-392 – B-394).

On March 13, 2005, Mr. Thompson injured his neck at work while lifting some scaffolding. (B-0190 – B-0191, B-0329).   He has been out of work since due to the injury, and also due to work-related stress.  (B-0329).

His doctors released him to return to work on light-duty. (B-0104 – B-0105).  Defendants have instructed Mr. Thompson that they have no light-duty work for him to perform. (B-0329, B-392 – B-394).

Upon information and belief, there is another employee, Eric Daniels, who, like Mr. Thompson was injured on the job. (B-0192).  However, unlike their treatment of Mr. Thompson, Defendants gave Mr. Johnson the *choice* of returning to work and performing light duty work or staying out on workers' compensation. (B-0192).  Mr. Thompson was given no such choice. (B-0102, B-0106).  Moreover, in virtually every situation when a Dover Downs maintenance employee is released to work on light duty status, Dover Downs assigns them a position that conforms to their light-duty restrictions. (B-0272, B-0292).

Mr. Daniels, as well as other employees who have been provided light duty restrictions are substantially younger than Mr. Thompson.  (B-0330, B-392 – B-394).

As a result of Dover Downs' discrimination and retaliation against Mr. Thompson, he has been diagnosed with depression by Dr. Osun Koya for which he treats Mr. Thompson with Xanex. (B-0204 – B-0208).  Mr. Thompson also suffers from chest pains, panic attacks and problems sleeping. (B-0205, B-0330).

9

Also as a direct result of Dover Downs discrimination against Mr. Thompson, he has suffered a substantial loss of wages, emotional distress, other physical and mental maladies, lost employment opportunities, and other consequential damages.

## ARGUMENT

## I.  STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome under the governing substantive law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A dispute over a material fact must be "genuine", i.e., the evidence is such "that a reasonable jury could return a verdict in favor of the non-moving party."  Id.  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."  Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995).

To survive a motion for summary judgment, Defendant "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).  The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion."  Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

In meeting its burden of showing an absence of a genuine issue as to any material fact, "the material it lodge[s] must be viewed in the light most favorable to the opposing party." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  "[E]vidence of nonmovant is to be

11

believed and all reasonable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

To properly apply the summary judgment standard in Rule 56, it becomes necessary to unpack the phrase "genuine issue of material fact." The substantive identifies whether the fact is "material." That is, a fact is only material if the "establishment thereof might affect the outcome of the lawsuit under governing substantive law." Rodgers v. Monumental Life Ins. Co., 289 F.3d 442, 448 (6th Cir. 2002); see also Logan v. Commerical Un. Ins. Co., 96 F.3d 971, 978 (7th Cir. 1996) ("The nonmovant must do more . . . than demonstrate some factual disagreement between the parties; the issue must be 'material.' Irrelevant or unnecessary facts do not preclude summary judgment even when they are not in dispute."). A material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." MacDonald v. Delta Air Lines, Inc., 94 F.3d 1437, 1440 (10th Cir. 1996); see also Troy Chemical Corp. v. Teamsters Union Local No. 408, 37 F.3d 123, 126 (3d Cir. 1994) (holding that factual issues are not "genuine" unless a reasonable jury could return a verdict for nonmovant based on nonmovant's submissions).

This is a case of drawing inference from fact (i.e., the inference that the Defendant's promotional practices were based on age). Drawing inferences is typically reserved for a jury at trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (holding that drawing inferences is a jury's function so long as competing inferences are reasonable under the law).

12

## II.    GENUINE ISSUES OF MATERIAL FACT EXIST THAT PRECLUDE THE GRANTING OF SUMMARY JUDGMENT ON COUNTS I AND V.

Defendant inappropriately launches into an analysis of this case under the *McDonnell Douglas* opinion. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Def.'s Opening Brief at 10. While *McDonnell Douglas* does provide the appropriate law in deciding a charge of discrimination such as is before the Court, a summary judgment motion is not the time—as Defendant seems to argue—in which to determine whether the plaintiff will ultimately prevail in its claim.

Although the phrase "*prima facie* showing"[5] is usually used in terms of a plaintiff's required showing, the *prima facie* standard has also been used to describe the moving party's burden to obtain summary judgment and, reciprocally, the nonmoving party's requisite showing to defeat summary judgment if moving party first meets its burden. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–4 (1986) (holding that the party seeking summary judgment has the *prima facie* burden of informing the court of the basis for the motion and identifying portions of the record buttressing its motion); *see also*, Zucherbraun v. General Dynamics Corp., 935 F.2d 544, 547–58 (2d Cir. 1991) (holding that if plaintiff cannot establish prima facie case for recovery, summary judgment for defendant is the appropriate action); *Carpenter v. Gulf States Mfrs., Inc.*, 764 F. Supp. 427, 432 (N.D. Miss. 1991) (holding that in order to defeat summary judgment motion by defendant, Title VII plaintiff need not establish *prima facie* elements of discrimination,

---

[5] Black's Law Dictionary defines *prima facie* showing as, "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." BLACK'S LAW DICTIONARY 1209 (7th ed. 1999).

but must set forth evidence sufficient to show a genuine factual dispute as to whether discrimination occurred).

Thus, the question is not—as Defendant frames it—whether Plaintiff will ultimately be able to satisfy his burden of persuasion at trial. Rather, the issue is whether there is a genuine issue of material fact vis-à-vis Defendant's discrimination against Plaintiff. This Court must determine whether there is a sufficient factual dispute as to whether Defendant discriminated against Plaintiff to warrant a trial. The issue is no different than the simplest case of a factual dispute:

> In other words, the court deciding a summary judgment motion is not to make a determination of any specific facts such as whether the stoplight was red or green when the defendant drove through intersection. Rather, the court reviews the summary judgment motion and response papers and seeks to determine whether the record reveals a disputed factual issue material enough to require a trial and fact finder determination (usually by a jury) of the factual question.

Moore's Federal Procedure, § 56.11[5][a] (parenthetical in original).

### 1.    Failure to Promote

#### a.    Mr. Thompson's Claim Based Upon Dover Downs' Failure to Promote Him in 2001 Stems from the Charge of Discrimination and Therefore, is a Viable Claim.

The claims made in a civil complaint arising from the issuance of a right to sue letter are "defined by the scope of the EEOC[6] investigation which can reasonably be expected to grow out of a charge of discrimination, regardless of the actual scope of the EEOC investigation." *Ebert v. Office of Information Systems*, 1998 U.S. Dist. LEXIS 9100, 12, (D. Del. 1998)(attached at B). Courts have considered "claims not specifically

---

[6] Although Mr. Thompson filed his Charge of Discrimination with the Delaware Department of Labor, it was simultaneously filed with the EEOC.

mentioned in the prior EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint. *Moon v. The Delaware River and Bay Auth.*, 2006 U.S. Dist. Lexis 7101, 7 (D. Del. 2006)(quoting *Ebert, supra*)(attached at B). With respect to the filing of the charge of discrimination, the technicalities of filing the charge of discrimination should be done generally because these charges are typically initiated by laymen, unassisted by trained lawyers. *Id*. at 6.

In *Moon*, the Delaware River and Bay Authority sought to have Plaintiff's failure to promote claim dismissed because it was not specifically raised in his Charge of Discrimination. This Court held that this claim could not be dismissed because "a reasonable investigation of that charge would have encompassed that claim within its scope." *Id*.

Similarly, an investigation into Mr. Thompson's claim that he was discriminated against in 2001 on the basis of age would fall within the scope of his charge of discrimination filed with the DDOL and EEOC that was based on age discrimination. Furthermore, as a layman, Mr. Thompson's charge of discrimination must not be held to the highest level of technicality. Therefore, Mr. Thompson's claim based upon Dover Down's failure to promote him in 2001 may not be dismissed.

        **b.**    **Mr. Thompson's Claim Based Upon Dover Down's Failure to Promote Him in 2001 is a Viable Claim Under the Continuing Violation Theory**

The incidents of discrimination by Dover Downs dating back to 2001 are not barred by the 300-day statute of limitations due to the *continuing violation theory*. "The continuing violation theory allows a plaintiff to pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the

act is part of an ongoing practice or patter of discrimination of the defendant. *Rush v. Scott Specialty Gasses, Inc.*, 113 F.3d 476, 481 (3d Cir. 1997).

As is outlined in detail in the Complaint, the discriminatory conduct dating back to 2001 was not an isolated incident. Dover Downs continued to discriminate against Mr. Thompson up to, and even after he stopped working due to a work-related injury. Consequently, the 300-day statute of limitations, via the continuing violation theory, does not foreclose Mr. Thompson's claim for Dover Downs' failure to promote him in 2001.

### c.   Dover Downs Intentionally Disqualified Mr. Thompson From the Opportunity to Apply for the March 2004 Shift Supervisor Position Which Precludes Summary Judgment Based Upon Dover Downs Claim that Mr. Thompson Did Not Apply for the Position

Defendants claim that Mr. Thompson may not claim that he was denied a promotion in March 2004 because he never applied for the position. However, the fact of the matter is, Mr. Thompson could not apply for the position because, number one, the job posting had already been taken down (in violation of the employee handbook)(B-0358); and number two because Dover Downs had already given the position to somebody else. In essence, Dover Downs intentionally disqualified Mr. Thompson from bidding on the job before he had a chance to do so.

The plaintiff in *Sistrun v. Time Warner Cable*, 2004 U.S. Dist. 16681 (E.D. Pa 2004) faced a similar situation. In that case, the plaintiff brought a discrimination claim based upon race and sex. She claimed that she was discriminated against because Defendants did not give her the opportunity to compete for a certain position. Like the present case, the Defendant contended that it was entitled to summary judgment on the issue because Plaintiff had never applied for the position.

16

The Court refused to grant summary judgment. The Court considered the intentional disqualification of an employee for a position based upon the employee's protected class as discriminatory and denied the defendant's motion for summary judgment – even without the plaintiff applying for the job.

Here, Mr. Thompson faced the same set of circumstances. The job posting was taken down and the position awarded to Al Baldwin before Mr. Thompson ever had a chance to bid on the job. While it is true that they told him that he could still bid on it, that statement is of no moment inasmuch as the position was already filled and to apply would be a nullity.

### d.    Maintenance Mechanic I Position.

Defendants assert that Mr. Thompson may not claim that he was denied a promotion in June of 2004, because the position applied for, Outside Maintenance Mechanic, would be a lateral move for Mr. Thompson; not a promotion. Defendant's assertion is incorrect. "To be an adverse action, an employment decision must be serious and tangible enough to alter an employee's *compensation*, terms, *conditions* or privileges of employment. *Robinson v. Bt Fin. Corp.*, 2003 U.S. Dist. LEXIS 2311 (D. Pa. 2003)(original brackets removed)(attached at C)(quoting *Grande v. State Farm Mut. Auto. Ins. Co.*, 83 F. Supp.2d 559, 563-564 (E.D. Pa. 2000)).

Although Mr. Thompson's title would not have changed, his compensation, terms and conditions of his employment would have changed. First he would have received an increase in pay by moving from third shift to first shift. (B-0089 – B-0091). He would also have been working a much more favorable shift in terms of hours worked; from the 11:00 p.m. to 7:00 a.m. shift to 7:00 a.m. to 3:00 p.m. shift. (B-0039). Finally, he would

be functioning in a much more diverse role on first shift, where he would be performing the duties in different trades than he was functioning on third shift. (B-0098). Consequently, because the compensation, terms, and conditions of his employment would have changed, Dover Downs' denial of his request for this position in favor of another candidate who did not meet the requisite requirements is an adverse employment action based upon his age and is therefore discriminatory.

## III.    LIGHT DUTY ASSIGNMENTS

### a. Mr. Thompson's Claim Based Upon Dover Downs' Failure to Provide Him a Light Duty Assignment May Not be Dismissed Because This Claim is Fairly Within the Scope of His Charge of Discrimination

Defendant contends that Mr. Thompson failed to exhaust his administrative remedies with respect to his claim that Dover Downs discriminated/retaliated against him by virtue of its refusal to provide him with a light duty assignment upon his release back to work. In support, Defendant cites to *Waiters v. Parsons*, 729 F.2d, 233 (3d Cir. 1984) setting forth the standard for determining whether a plaintiff is required to exhaust his administrative remedies prior to filing suit. Although the Defendant provided no analysis of that case in its Opening Brief, the facts and circumstances of that case turn out to be very similar to the present case – especially in terms of the timing of when the respective events took place in relation to the filing of the charge of discrimination and subsequent discrimination/retaliation.

In that case, the plaintiff made an informal complaint with the EEOC in March 1978. *Id*. at 235. Thereafter, she withdrew the complaint. However, because she felt that she was a victim of continuing discrimination, she filed a formal complaint with the

EEOC in August 1979. *Id*. This was the last time she sought to pursue her administrative remedies.

On November 12, 1981, the plaintiff was terminated from her employment. *Id*. at 236. She then a filed complaint in district court alleging discrimination and retaliation. *Id*. Significantly, her complaint included the termination as a cause of action. *However, she pursued no administrative action with the EEOC for the termination. Id*. The district court dismissed her complaint on the grounds that she failed to exhaust her administrative remedies. *Id*.

The Third Circuit reversed the district court and remanded the case. *Id*. at 238. It held:

> Where discriminatory actions continue after the filing of an EEOC complaint, however, the purposes of the statutory scheme are not furthered by requiring the victim to file additional EEOC complaints and restarting the 180 day waiting period.
>
> . . . .
>
> While it is true that the allegedly discriminatory officials and acts are different, the core grievance – retaliation – is the same and, at all events, it is clear that the allegations of the appellant's complaint fall within the scope of the district director's investigation of the charges contained in the 1979 complaint. Under these circumstances, the policy of promoting conciliation would not be furthered by allowing the defendants to delay having to answer in court for retaliatory action allegedly taken against appellant for asserting her rights.

*Id*. at 237–238.

Stated differently, the Court held that the purpose the statutory scheme is to settle claims of discrimination at the administrative level. However, once the Complaint has been filed, further investigation and efforts at conciliation would be futile. Therefore, as

long as the new claims "are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom," they may be included in the plaintiff's complaint.

Here, like the Plaintiff in *Waiters v. Parsons*, Mr. Thompson filed his original Charge of Discrimination with the DDOL on September 24, 2004 alleging age discrimination. (B-0337). Thereafter, on or about January 21, 2005, he filed another charge alleging both discrimination and retaliation. Furthermore, on that charge of discrimination, in the box entitled "DATE DISCRIMINATION TOOK PLACE," it states that the discrimination is a "continuing action." (B-0338).

Mr. Thompson's claim for discrimination/retaliation for Dover Downs' failure to provide him a light duty assignment did, in fact, occur after the final charge of discrimination. However, according to *Waiters v. Parsons*, Mr. Thompson may properly pursue his claim in this regard because it falls squarely within the scope of the prior investigation of discrimination and retaliation. As a consequence, Dover Downs is not entitled to summary judgment for its claim that Mr. Thompson failed to exhaust his administrative remedies.

### b. Mr. Daniels is a Proper Comparator for Mr. Thompson, as are other Dover Downs Employees Who Have Been Released to Return to Work on Light-Duty Status

Dover Downs next alleges that Mr. Thompson's claim on the light duty issue has no merit because Eric Daniels, his comparator, did not have the same restrictions. Dover Downs also seems to believe that due to the fact that Daniels was eventually released to regular duty status that this bears some relevance in this case.

In the first place, Mr. Daniels *did* have the same restrictions as Mr. Thompson and Dover Downs was going to give Mr. Daniels a light duty position that confirmed with his

restrictions. (B-192 – B-196). It was only after Mr. Daniels realized he would not make as much money at that position that he returned to his doctor and had the restrictions removed. (B-192 – B-196).

Moreover, virtually every time a Dover Downs maintenance employee is returned work with light duty restrictions, Dover Down assigns them to a position that confirms to their light duty restrictions. (B-0272, B-0292). However, in Mr. Thompson's case, and in only Mr. Thompson's case, they did not. (B-0102 – B-0106). It is of no moment what the restrictions are if it is the policy of Dover Downs to bring their employees back. In fact, in 2003 when Mr. Thompson was released to light duty, he was not assigned to do his regular job. He was given the job of handing out radios. (B-0242). If this very same position was given to Mr. Thompson again, it would fall within the restrictions of his lifting fifteen pounds or less. (B-0105, B-392 – B-394).

Simply put, whether Daniels has the same restrictions as Mr. Thompson is not the issue. Nor is it an issue that Mr. Daniels eventually returned to full duty. What is significant here is that Mr. Thompson is the only employee who has not been provided the accommodation of a light duty assignment – no matter what that employee's restrictions may be. Therefore, Dover Downs is not entitled to summary judgment on this issue.

## IV.    RETALIATION CLAIM

### a.    Disciplinary Warning Notices Constitute a Valid Basis for Mr. Thompson's Retaliation Claim

Dover Downs contends that the Disciplinary Warning Notices do not constitute retaliatory measures for three reasons. They are addressed below in order.

1. Dover Downs Fraudulently "Recreated" the Disciplinary Warning Notices After Mr. Thompson Made a Complaint of Age Discrimination.

Dover Downs claims that pursuant to Dover Downs policy, upon an employee's sixth unexcused absence, that employee is to receive a final written warning, and, they claim, that is exactly what Mr. Thompson received. What Dover Downs fails to consider is that Mr. Thompson got absolutely no warnings, written, verbal or otherwise of the prior five absences. They also fail to consider that no action or documentation of any alleged action was taken against Mr. Thompson until he complained of age discrimination to his employer.

The lynchpin to this issue is, once Mr. Thompson complained of age discrimination, Dover Downs immediately wrote him up for all of these violations all in one day. (B-0138). Realizing their mistake, they then back-dated the warnings to the dates that they happened. (B-0121 – B-0123). Essentially, Dover Downs falsified records in order to discipline Mr. Thompson. This is because there is a box entitled "date signed", and Dover Downs inserted the date of the infraction, not the date that it was actually signed. (B-0344, B-0345).

It is clear that Dover Downs did not intend to pursue enforcing the absentee policy against Mr. Thompson until he made his complaint of discrimination. Only then did Dover Downs attempt to enforce the policy against Mr. Thompson with fraudulently created documents.

2.  Mr. Thompson Suffered an Adverse Employment Action Because the
    Disciplinary Warning Notices are Coupled with a Threat of
    Termination

Dover Downs' second argument is that Mr. Thompson suffered no negative consequences as a result of the notices. Under most circumstances, a simple disciplinary warning notice does not amount to adverse employment action. However, the Third Circuit has opined that a written disciplinary warning *combined with a threat of termination* is sufficient to constitute an adverse employment action. *Buffa v. N.J. Dept. of Judiciary*, 56 Fed. Appx. 571, 576 (3d Cir. 2003); *see also, Allen v. Mineral Fiber Specialists*, 2004 U.S. Dist. LEXIS 1982, 36 (D. Pa. 2004) (attached at Tab A)

Here, that is exactly what happened. Viewing the facts in a light most favorable to Mr. Thompson, after he received the disciplinary warnings, Mr. Thompson was called into the office, informed that he "could" be terminated, but, ostensibly, Dover Downs would not want to have to do that.  (B-0328, B-392 – B-394).  Obviously, this was a thinly veiled threat directed at Mr. Thompson to either stop causing problems for Dover Downs or be faced with termination. Importantly, that is *exactly* how Mr. Thompson took the comment.  (B-0328, B-392 – B-394).

Therefore, because the written disciplinary warnings are coupled with the threat of termination, they constitute an adverse employment action and summary judgment may not be granted on this issue.

3.  There is Sufficient Evidence of Retaliatory Animus to Sustain Mr.
    Thompson's Retaliation Claim

Finally, Dover Downs asserts that there is no evidence that the warning notices were the product of retaliatory animus. This argument is wholly without merit, given the

timing of the notices, one day following his Complaint, (B-0138), as well as the fact that there had been no documentation of these notices *at all* until after his complaint of age discrimination. (B-0121 – B-0123). Finally, there is the fact that Dover Downs went back and actually falsified these records by backdating them to the dates that they allegedly occurred. (B-0121 – B-0123). Added up, these things all point directly to retaliatory animus for his legitimate workplace complaint.

> **b.     The Withholding of Mr. Thompson's Bonus was Intentional and to Permit Dover Downs to Have this Claim Dismissed Would Violate the Purpose of Assigning Liability Under Title VII, Which is to Compensate Employees for Injury They Suffer and to Eradicate Discrimination Throughout the Economy**

Next, Dover Downs contends that their withholding of Mr. Thompson's bonus was not retaliatory because once they realized their "mistake," they paid Mr. Thompson. Mr. Thompson does not contest the case law cited by Dover Downs in their Opening Brief, except to the extent that the all are from outside jurisdictions and therefore have no binding effect on this Court.

Mr. Thompson argues that although he was eventually paid the bonus, he nevertheless suffered an adverse employment action. This is because Dover Downs' withholding of the bonus was *intentional*. Such an intentional withholding frustrates the purpose of assigning liability under Title VII. That purpose is "not to reassign economic benefits to their rightful owner, but to compensate employees for injury they suffer and to eradicate discrimination throughout the economy." *United States v. Burke*, 504 U.S. 229, 250 (1992).

In this case, allowing Dover Downs to eventually pay Mr. Thompson does in fact, satisfy that assignment of the economic benefit to its rightful owner. However, it fails to

compensate Mr. Thompson for his emotional injuries due to this denial of his earnings and also fails to aid in eradicating discrimination throughout the economy. Stated differently, such a ruling permits an employer to intentionally retaliate at will, and to the extent that it so desires, with no repercussions.

If the employee ultimately decides to file a lawsuit over the employer's actions, the employer can simply absolve itself by doing what it should have done all along. In essence, the courts in the cases cited by Defendant have given any employer a license to retaliate. As such, it should be a question left to the jury as to whether the withholding of this bonus was intentional. If such intentional conduct is found, Dover Downs must compensate Mr. Thompson for his damages and suffer additional penalties in order to eradicate discrimination in its workplace.

Dover Downs also contends that it had no retaliatory intent; that "once it learned of its error, it corrected it." This is not true. Mr. Thompson complained when the bonuses were handed out in 2005 that he should have received his bonus. It was at this point when Dover Downs was on notice of the error, or in the very least of a potential error. It is at that point that the error should have been rectified. Moreover, Dover Downs justified the action by telling Mr. Thompson that he was not entitled to a bonus because of disciplinary actions.

Dover Downs' obvious response to this is, despite Mr. Thompson's complaint about the bonus, they just didn't realize it until now. However, the onus on knowing their own policies and procedures should fall on Dover Downs, not Mr. Thompson. It is patently unfair for them to delay paying Mr. Thompson in the face of his complaint over not receiving the bonus.

As none of the cases cited are controlling in this jurisdiction, and as dismissing his claim of retaliation based upon the wrongful withholding of his bonus would frustrate the purpose of Title VII, Mr. Thompson respectfully requests that this Court establish a rule of law  in this jurisdiction that comports with the purpose of Title VII and permit his retaliation claim based upon the intentional withholding of the bonus be presented to the jury at trial.

### c.    Workload and Transportation to the Hospital

Mr. Thompson concedes these points.

### d.    Dover Downs Failed to Carry its Burden With Respect to its Argument Against the Court Considering Mr. Thompson's Claim for Retaliation Based Upon the Camera in Paint Shop

Dover Downs has failed to carried its burden in establishing that the setting up of a surveillance camera in one's work area does not constitute retaliation.  It must do more than simply state that "once again, this is not an adverse employment action …."  This is simply a conclusory statement backed by no citations or analysis whatsoever.  As a consequence, it is not sufficient to warrant summary judgment.

Dover Downs goes on, claiming that it had a legitimate, non-retaliatory reason to place the camera in the shop; that it was part of an investigation into Mr. Thompson's complaint that somebody was tampering with his paint supplies.  Not surprisingly, Mr. Thompson made his complaint about the tampering several months before the camera was placed in his paint shop. (B-0184).  Even less surprising is that Dover Downs did nothing with respect to attempting to catch the "paint tamperer" until Mr. Thompson made his complaint of age discrimination. (B-0184).

26

Once Mr. Thompson discovered it, the camera no longer served its real purpose – to observe Mr. Thompson in an attempt to catch him doing something against a Dover Downs policy so that it could terminate him. (B-0183 – B-0186, B-0932 – B-0394). Therefore, it was immediately removed.

Conversely, if the real purpose of the camera was to catch the person who was tampering with the paint supplies, then it would do no harm if only Mr. Thompson knew that it was there. Therefore, there would have been no reason to remove the camera because the "paint tamperer" would still have no knowledge of the camera.

Clearly, there was no legitimate business reason for the camera. Dover Downs is shamelessly fabricating these justifications in hindsight. There can be no question that all of the incidents identified in this section did not just occur by coincidence after Mr. Thompson made his complaint of discrimination. The question of what Dover Downs' purpose for the installation of the camera is an issue that must remain for the jury. Therefore, summary judgment may not be granted on this issue.

## V.    OVERWHELMING EVIDENCE OF FRAUD, DECEIT AND MISREPRESENTATION EXISTS TO SUSTAIN MR. THOMPSON'S CLAIMF FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

Dover Downs contends that there is no fraud, deceit or misrepresentation present and therefore, Mr. Thompson's breach of covenant of good faith and fair dealing must be dismissed. Conveniently, Dover Downs fails to recognize the fraud present in the disciplinary notices that were back-dated. (B-0121 – B-0123). It fails to recognize the deceit present in subversively spying on Mr. Thompson. (B-0183 – B-0186, B-0932 – B-0394). It fails to recognize the deceit present in their taking down the job posting for the

March 2004 Second Shift Supervisor position in violation of the Dover Downs job posting policy. (B-0358). It fails to recognize its misrepresentation to Mr. Thompson that it would hire a plumber and then hire Mr. Thompson to go outside. (B-0095, B-0098). It fails to recognize its misrepresentation that Mr. Thompson could apply for the Second Shift Supervisor position, even though it had already been given to another person. (B-0075).

Dover Downs also argues that Mr. Thompson has suffered no damages as a result of their behavior. Again, it fails to recognize the devastating impact that its behavior has had on Mr. Thompson's mental and physical health. (B-0328, B-0329). As a consequence, Mr. Thompson's claim for breach of covenant of good faith and fair dealing must survive.

### E.    FAILURE TO PROMOTE

In its argument against Mr. Thompson's failure to promote claim, Dover Downs incorporates its argument contained earlier in its Opening Brief. As such, Mr. Thompson incorporates his response to those arguments herein as well.

## CONCLUSION

For the foregoing reasons, Plaintiff Brance F. Thompson respectfully requests that

Dover Downs' Motion for Summary Judgment be denied.

MARGOLIS EDELSTEIN

Timothy J. Wilson (4323)
1509 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 777-4680
Facsimile: (302) 777-4682
twilson@margolisedelstein.com
*Attorney for Plaintiff*

DATED:  May 26, 2006.

# TAB  A

LEXSEE 2004 U.S. DIST. LEXIS 1982

**JOHN W. ALLEN, SR., Plaintiff, v. MINERAL FIBER SPECIALISTS, INC., Defendant.**

**Civil Action No. 02-7213**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2004 U.S. Dist. LEXIS 1982*

**January 30, 2004, Decided**

**DISPOSITION:** Defendant's Motion for Summary Judgment was granted. Judgment was entered.

**COUNSEL:** [*1] For JOHN W. ALLEN, SR., Plaintiff: DONALD P. RUSSO, DONALD P. RUSSO, ESQUIRE, BETHLEHEM, PA.

For MINERAL FIBER SPECIALISTS, INC., Defendant: A. GALE SEIDER, DAVIS PARRY TYLER & WRIGHT, PHILADELPHIA, PA.

**JUDGES:** Franklin S. Van Antwerpen, U.S.D.J.

**OPINIONBY:** . Franklin S Van Antwerpen

**OPINION: MEMORANDUM AND ORDER**

**Van Antwerpen, J.**

Plaintiff John W. Allen, Sr. (Allen) has filed a four-count Complaint n1 against his former employer, Defendant Mineral Fiber Specialists, Inc. (MFS), alleging violations of Title VII of the Civil Rights Act of 1964, *42 U.S.C. 2000e*, and of the Pennsylvania Human Relations Act, *43 P.S. § 951 et. seq.* Defendant MFS now seeks an order granting it summary judgment, pursuant to *Fed. R. Civ. P. 56(c)*, with respect to Counts II and III of the Complaint, on grounds that there is no genuine issue of fact for trial and thus, it is entitled to judgment as a matter of law. For the reasons discussed below, as to both counts, we grant Defendant's Motion for Summary Judgment.

> n1 Since Plaintiff filed his Complaint, according to a Stipulation of Counsel, filed July 2, 2003, Plaintiff has withdrawn Count I, as well as any other claims in the Complaint regarding age discrimination.

[*2]

**I. FACTUAL BACKGROUND**

The following are the circumstances of this case, as reflected most favorably on Plaintiff. Plaintiff Allen worked in the maintenance department of Defendant MFS from May 1988 until he resigned on August 6, 2001. (Allen Dep. at 58, 199-200.) The culture of the work environment at MFS was characterized by horseplay and profanity. (See e.g., Hauff Dep. (explaining the culture of the plant, the use of nicknames, and the profanity used by everyone at the plant, including Plaintiff; Bealer Dep. at 23-26 (discussing the fairly common use of profanity and the term "gay boy.") Plaintiff himself admits to the use of profanity and name-calling. (See Allen Dep. at 72-76.)

Plaintiff also recognizes the horseplay characteristic of the plant's culture (See e.g., Allen Dep. at 67-69 (discussing the history of "mooning" in the maintenance department)); in fact, Defendant himself has played practical jokes on his co-workers. (See e.g., Allen Dep. at 88-91 (discussing an incident where Plaintiff ate the cream out of a co-worker's oreo cookies, which the co-worker, unaware of Plaintiff's actions, later ate.)) This conduct resulted in a disciplinary [*3] write-up.

Throughout his tenure, but starting in 1988, Plaintiff received multiple disciplinary write-ups, verbal warnings, and was placed on probation, for inappropriate behavior ranging from his practical jokes to his disregard for safety regulations and his failure to meet production standards. (See Allen Dep. at 276-339 (reviewing more than thirty disciplinary write-ups and probationary hearings); Hauff Dep. at 30-32 (discussing Plaintiff's poor productivity and Hauff's numerous recommendations that, due to his poor performance, Plaintiff be fired.)) However, Defendant never fired Plaintiff.

Plaintiff was not very happy at MFS. He believes he had low self-esteem because his coworkers led him to feel dumb and that he could not obtain a job elsewhere. (Allen Dep. at 231.) He claims to have a learning disability and

that his co-workers poked fun at him because he could not read. (See Allen Dep. at 71-72, 88-91.) He also claims that his supervisor called him "fag boy" (Allen Dep. at 98), and that someone wrote on his truck an offensive phrase insinuating that he was a homosexual. (See Allen Dep. at 63, 99-101.)

After one particular work incident in February 2001, for [*4] which Plaintiff's supervisor disciplined him because he resisted a direct order then operated the forklift in a dangerous manner (see Allen Dep. at 170-74), but during which Plaintiff claimed that his supervisor verbally assaulted him, Plaintiff's wife sent a letter to Jack Folck, the Chief Executive Officer of MFS. In the letter, she recognized that "some aspects of [Plaintiff's] personality [we]re less than pleasant," but complained that Plaintiff's supervisor harassed him and singled him out for being insubordinate, even though other co-workers failed to follow his instructions, as well. (Allen letter, 2/26/01, Pl.'s Br. Ex.A.) Plaintiff's wife further expressed her confusion at why Management had not fired her husband, despite "receiving so many disciplinary actions, the most recent being followed by a raise in pay two days later." (Allen letter.) After receiving this letter from Plaintiff's wife, Management offered to discuss their grievances; however, Plaintiff and his wife rejected the offer. (See Allen Dep. at 215-16.)

Around February 2001, Plaintiff discovered that someone had drawn two offensive pictures of him at MFS. One drawing, located in the shower room [*5] of the men's bathroom, depicted him performing oral sex on another, unidentified individual. The other drawing showed Plaintiff receiving anal sex from his supervisor, Norman Bealer; both individuals had been labeled on the drawing. (See Allen Dep. at 263-69.) Despite Plaintiff's complaints to Management about the drawings within a few days of his discovering them, this drawing remained in the maintenance room for about one month. (Allen Dep. at 268-69.)

Defendant indicates that he complained repeatedly to Ralph Klotz, the Comptroller at MFS, and that the CEO, Folck, also knew of his concerns about the harassment he received from his co-workers, who picked on him, and his supervisor, who singled him out. However, aside from the EEOC complaint that he filed in March 2001, he never filed any kind of written or formal complaint with MFS. (See Allen Dep. at 102-03, 147.) On March 31, 2001, Plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC), claiming that he had "been subjected to an ongoing patter [sic] of harassment by his supervisor, Norman Bealer," which included "constant verbal badgering, as well as sexual harassment." Additionally, the [*6] EEOC complaint indicated that Plaintiff felt that because Defendant had not attempted to identify or penalize the individuals who had drawn the sexually offensive drawings and "was very lax in making any effort to remove the drawing" of him performing oral sex on his supervisor, Defendant had "officially sanctioned this type of behavior." (EEOC Complaint, Bealer Dep., Ex.1.)

Since the March filing of his EEOC complaint, Plaintiff identifies only one other incident that, despite the fact that Management did not discipline him, reflects the harassment that he endured. One morning in April 2001, someone placed a banana peel in his welding machine, which James Hauff, the operations manager, had to fish out of the machine. It angered Plaintiff that Defendant was not able to identify or punish the responsible party. That same morning, someone wrote the words "porn star chip tub" near Plaintiff's name on the schedule for dumping the refuse from the tub, which angered Plaintiff tremendously such that, in a very agitated state, he approached Hauff and demanded to know what Management was going to do about it. Plaintiff further claims that during that heated encounter, Hauff grabbed his arm. [*7] (See Hauff Dep. at 57-66.)

Conspicuously absent from the record is any evidence of activity, harassing or otherwise, between April 11, 2001 and August 2001. However, according to Plaintiff, he started looking for a job soon after he filed his EEOC complaint in March. After securing a position, for higher pay, with the Laborers Union, he resigned, on August 6, 2001. Through the Laborers Union, Plaintiff started working at Fabcon around "a couple days" or a week after he resigned. (See Allen Dep. at 198-200.)

Plaintiff has filed the instant action, claiming that the verbal abuse he received from his co-workers and supervisor, as well as Management's failure to, in his mind, adequately address the sexually offensive drawings of him, constituted sexual harassment under Title VII of the Civil Rights Acts of 1964, *42 U.S.C. § 2000e*, and amounted to constructive discharge.

In addition, Plaintiff claims that after he and his wife complained to Management about the harassment and filed the EEOC complaint in March, Defendant further harassed him by enhancing its monitoring and supervision of him. (See Allen Dep. at 345-46.) Moreover, because his supervisor [*8] followed him around, Plaintiff claims that his co-workers rebuked him. Additionally, Defendant claims that, in bad faith, Defendant destroyed several of his disciplinary write-ups, presumably to downplay the harassment; however, Defendant cannot identify any specific disciplinary incident for which the corresponding report is absent from the file. (See Allen Dep. at 150-56, 347-48.) According to Plaintiff, this conduct amounted

Case 1:05-cv-00274-GMS    Document 46    Filed 05/26/2006    Page 40 of 64

Page 3
2004 U.S. Dist. LEXIS 1982, *8

to illegal retaliation under Title VII, *42 U.S.C. § 2000e-3(a).*

## II. JURISDICTION

Pursuant to *28 U.S.C. § 1331*, this Court has jurisdiction over this matter. See *Northeast Women's Center, Inc. v. McMonagle*, 939 F.2d 57, 59 (3d Cir. 1991).

## III. DISCUSSION

Pursuant to *Fed. R. Civ. P. 56(c)*, Defendant moves for summary judgment on grounds that there exists "no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

*Rule 56(c)* allows for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that [*9] there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56*. An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and is material only if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

At the summary judgment stage, the moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Thereafter, to defeat summary judgment, the non-movant must respond with specific facts "sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id. at 322*. At this stage, our role is "not [] to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; [*10] *Country Floors v. Partnership of Gepner & Ford*, 930 F.2d 1056, 1062 (3d Cir. 1991).

We are required to view the record in the light most favorable to the non-moving party, *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Betz Laboratories, Inc. v. Hines*, 647 F.2d 402, 404 (3d Cir. 1981), and to resolve all doubts against the moving party. *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.), cert. denied, 474 U.S. 1010, 106 S. Ct. 537, 88 L. Ed. 2d 467 (1985). Because we find, after reviewing the record in a light most favorable to Plaintiff, that there is no genuine issue for trial, as to Counts II and III, we grant Defendant's Motion for Summary Judgment.

### A. Count II: Sexual Harassment Claim under Title

## VII

Plaintiff alleges that the "ongoing and lengthy pattern of explicitly sexual harassment," which he endured during his employment, and which Defendant condoned, constituted a violation of Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. § 2000e*, and resulted in his constructive discharge [*11] from his employment. (Compl. PP 32–33.) Defendant argues that it is entitled to summary judgment because the same-sex sexual harassment suffered by Plaintiff does not constitute discrimination based on sex, which is required under Title VII. We agree and thus grant summary judgment to Defendant on Count II.

The Supreme Court has established a two-prong test for determining whether same-sex sexual harassment violates Title VII. The plaintiff must first show that the sexual harassment "was not merely tinged with offensive sexual connotations, but actually constituted '*discrimination . . . because of . . . sex.*'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (emphasis, ellipses, and brackets in original); *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir. 2001). The plaintiff must then show that the harassment was so severe or pervasive that it "created an objectively hostile or abusive work environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993); *Bibby*, 260 F.3d at 264 n.6.

Defendant [*12] argues that Plaintiff cannot make out the first prong of the test, that the alleged harassment constituted "discrimination because of sex," because there is no evidence in the record showing that the alleged harassment was motivated by sexual desire, a hostility to the presence of men in the workplace, or Plaintiff's failure to comply with gender stereotypes. (Def.'s Br. at 6.) Contrarily, Plaintiff claims that his failure to comport with male stereotypes motivated the alleged harassment. (Pl.'s Mem. in Opp. at 31.) Considering the record in a light most favorable to Plaintiff, we find that it fails to reveal any evidence that the alleged same-sex sexual harassment was motivated in any way by gender, much less by Plaintiff's purported failure to comply with gender stereotypes. As such, because Plaintiff cannot satisfy the first prima facie element of same-sex sexual harassment under Title VII, we must grant summary judgment to Defendant on Count II.

The Third Circuit has identified three specific bases for establishing that same-sex sexual harassment constitutes discrimination based on gender: evidence that it was motivated by the sexual desire of the defendant harasser; evidence [*13] of general hostility by the harasser to the existence of the plaintiff's gender in the work envi-

ronment; or evidence that the defendant was retaliating against or penalizing the plaintiff for not complying with gender stereotypes. *Bibby, 260 F.3d at 264.* Plaintiff fails to presents any such evidence.

With respect to the first two scenarios, Plaintiff does not even allege, much less present evidence, that any of his co-workers or his supervisor were sexually attracted to him or that his colleagues were angry that a man held his position or were angry that other men worked at MFS.

Furthermore, Plaintiff presents no evidence that anyone at MFS thought he was effeminate or did not act sufficiently masculine, such that it would demonstrate that he was being punished for not conforming to gender stereotypes. He makes a general statement that "there was significant sexual stereotyping in the workplace, and [that he] was discriminated against . . . because he did not conform to gender norms or stereotypes," but he fails to identify what testimony or other evidence supports that argument. (See Pl.'s Mem. in Opp. at 31–32.)

The seminal case involving sexual harassment [*14] based on gender stereotyping involved a female employee at a corporation whom Management had informed that if she wished to enhance her chances at promotion, she needed to adhere better to female stereotypes. See *Price Waterhouse v. Hopkins, 490 U.S. 228, 235, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)* (noting that the company policy board's explanation of the plaintiff's failure to make partner included the advice that she "'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry'"). Finding that the company's actions, based on a belief that women should not be aggressive, violated Title VII, the plurality of the Supreme Court reasoned that if one of the bases for an employer's decision was the fact that the employee was of a particular gender, gender motivated the decision and thus it violated Title VII. See *id. at 250.* In other words, to satisfy the first prong of the test for same-sex sexual harassment, based on gender stereotyping, Plaintiff needs to show that one of the reasons for his alleged constructive discharge is the fact that he is a man. Allen sets forth no such argument. [*15]

Moreover, while Plaintiff provides an exhaustive list of cases that recognizes this basis for Title VII discrimination, he fails to establish any parallel between it and the facts of his case. Furthermore, we can easily distinguish those cases because, unlike here, they identify male stereotypes that the defendants believed the plaintiffs failed to satisfy, thus establishing a basis for a sex discrimination claim. See Pl.'s Mem. in Opp. at 30–31 (identifying numerous cases that have recognized gender discrimination claims raised by men). For example, Plaintiff cited a ruling by the Ninth Circuit that recognized a viable Title VII claim where the openly gay plaintiff's co-workers blew him kisses, called him "sweetheart," caressed and hugged him, grabbed his crotch, and touched him *as if he were a woman.* See *Rene v. MGM Grand Hotel, Inc., 305 F.3d 1061, 1064 (9th Cir. 2002).*

In the lone case cited by Plaintiff from this Circuit, this Court rejected the plaintiff's Title VII claim on grounds that he did not sufficiently show that the same-sex harassment was based on his gender. In Bianchi v. City of Philadelphia, co-workers placed explicit, "homosexual" [*16] playing cards and other materials insinuating that he was homosexual within the belongings of the male firefighter plaintiff, as well as made reference to his position at the fire department as a "pussy job." *183 F. Supp. 2d 726, 731–32, 737 (E.D. Pa. 2002).* The court found that any link between these incidences and gender stereotypes was too attenuated to survive summary judgment. Even the comment regarding his job position, which could be characterized as a female reference, failed to demonstrate that the sexual harassment was based on gender because the plaintiff failed to argue that his co-workers targeted him because they thought that he did not comply with a male stereotype. See *id. at 737.*

Similarly, here, Allen fails to allege any intent by anyone at MFS to target him because they thought that he acted too femininely or did not conform to a particular male stereotype. As such, his claim under Title VII must fail.

Plaintiff then discusses two circuit court decisions that merely highlight this critical deficiency in his argument. In Nichols v. Azteca Rest. Enter., Inc., the plaintiff endured "a relentless campaign of insults, name-calling, [*17] and vulgarities," occurring a number of times per week and often throughout the day, which included repeated references to the male plaintiff as a woman, mockery that he performed his job duties in an effeminate manner, and taunting that he was a "faggot" and a "fucking female whore." *256 F.3d 864, 870 (9th Cir. 2001).* Additionally, the plaintiff in Doe by Doe v. City of Belleville, Ind. wore an earring, on which basis his coworkers harassed him. See *119 F.3d 563, 581–82 (7th Cir. 1997),* vacated on other grounds, *523 U.S. 1001, 118 S. Ct. 1183, 140 L. Ed. 2d 313 (1998)* (finding it to be an "obvious inference" that if the plaintiff had not been a man, his co-workers would not have questioned his gender for wearing an earring).

Unlike the clear cases of gender stereotyping and harassment in *Nichols* and *Doe,* we underscore that conspicuously absent from Allen's argument is any evidence or notion that his co-workers thought that he did not subscribe to a particular male stereotype. For example, Plaintiff alleges that the testimony of Ralph Klotz, the MFS comptroller, shows how MFS discriminated against

Plaintiff because he did [*18] not conform to gender stereotypes. However, nothing in Klotz's deposition establishes how Allen was perceived not to have conformed to a male stereotype. Klotz's deposition reveals only that he was aware of the drawings and the name-calling, which Defendant does not dispute, and which does not establish how the harassment was based on Plaintiff's failure to conform to male stereotypes. (See Pl.'s Mem. in Opp. at 22-23.)

Moreover, while Klotz's deposition summary notes that Klotz thought that Allen's supervisor "treated people differently" and that "Allen was being mistreated with regard to certain issues," Plaintiff neither identifies specifically what those issues are, nor, more importantly, establishes whether any such treatment was motivated by a belief that Plaintiff did not act sufficiently like a stereotypical male. (Pl.'s Mem. in Opp. at 23.) In fact, Klotz indicates that the term "fagboy" was used "in general" as horseplay at MFS, was directed at various coworkers, and that even Plaintiff may have used the term. (Klotz Dep. at 36-37.) This statement appears to refute Plaintiff's contention, implying instead that the term's connotation played no role in its use by Plaintiff's [*19] co-workers.

Furthermore, Plaintiff's own deposition fails to reveal any evidence that Plaintiff's coworkers did not believe that he conformed with stereotypes. In fact, Plaintiff admits that he does not even know their motivation for the harassment. (See Allen Dep. at 360, 369 (stating that he "[did not] know what they were thinking" when asked what he thought was his harassers' motivation, and whether he thought the harassment was motivated by a belief that he did not conform to gender stereotypes or that his co-workers thought that he was a homosexual.))

Furthermore, Plaintiff provides no basis for a reasonable inference that the drawings depicting him in a sexually offensive manner were motivated by a belief that he did not conform to male stereotypes. One might only reasonably infer that, despite his marital status, certain coworkers thought that Plaintiff might be homosexual; however, precedent is clear that Title VII does not protect discrimination based on sexual orientation. See *Bibby, 260 F.3d at 260-61.* As such, Plaintiff's argument that his same-sex sexual harassment was based on his failure to conform to sex stereotypes of masculinity fails.

Despite [*20] Plaintiff's failure to set forth facts demonstrating one of the three established paradigms for showing discrimination based on sex, the Third Circuit does not limit to those three scenarios the manners in which one can show such discrimination, noting that "based on the facts of a particular case and the creativity of the parties, other ways . . . may be available." *Bibby, 260 F.3d at 264.* However, beyond the unpersuasive general

statement that he was discriminated against because he did not comply with male stereotypes, Plaintiff does not allege any specific motivation for the alleged harassment he endured. (See Pl.'s Mem. in Opp. at 32.) As such, no reasonable factfinder could conclude that he was discriminated against because of sex, and summary judgment is warranted. n2

> n2 As did the Third Circuit in Bibby, because we find that Plaintiff could not make out the first prong of the test, we decline to address the second prong, that the conduct be so severe or pervasive that it "created an objectively hostile or abusive work environment." See *Bibby, 260 F.3d at 264 n.6* (internal quotes omitted).

[*21]

Constructive Discharge

Plaintiff further alleges within Count II that the adverse employment actions of Defendant amounted to constructive discharge because the continued harassment and retaliation that he suffered created a sufficiently hostile environment that he was forced to resign. For example, Plaintiff stated that he began searching for a new job just "a couple [of] days" after filing his complaint with the Equal Employment Opportunity Commission (EEOC) because "nobody would talk to [him]," instead cursing at him and telling him to leave the work area because his supervisor would follow him there. (Allen Dep. at 136-37.)

Because Plaintiff sets forth no argument or evidence to show that his gender motivated the actions of his co-workers, he cannot raise a successful constructive discharge claim before a jury. However, even if we were to find that Plaintiff's allegations qualified as discrimination under Title VII, we agree with Defendant that the treatment by Plaintiff's co-workers and supervisor does not meet the objective standard required to establish a claim of constructive discharge under Title VII.

This Circuit has established that to raise a viable claim [*22] under the constructive discharge doctrine, the plaintiff need satisfy the objective standard of showing that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984).* This standard requires that the conditions exceed an objective threshold of intolerability, where the plaintiff does not merely consider resignation the best decision, or even subjectively the only decision, but rather, where a reasonable person would feel "*compelled* to resign" based on the belief that s/he had no other choice. *Connors v. Franklin Financial*

*Corp., 160 F.3d 971, 976 (3d Cir. 1998)* (emphasis in original; internal quotations and citations omitted). The allegations set forth by Plaintiff simply do not meet this threshold of intolerability.

The Third Circuit has identified several factors upon which employees have alleged constructive discharge: threats of discharge; persuasion or suggestion that they resign or retire; demotion; reduction in salary or benefits; involuntary transfer to a less desirable placement; a change [*23] in job duties; and sub-par performance evaluations. *Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)*. While these factors do not represent an exhaustive list, we find it significant that, of these factors, Plaintiff can establish only that he received unsatisfactory performance evaluations, the credibility of which he does not seem to refute. (See e.g., Allen Dep. at 350-54, Ex. D-14.)

Moreover, all of the cases cited by Plaintiff in this Circuit involve Clowes factors and substantial changes to those plaintiffs' employment conditions and responsibilities. See Pl.'s Mem. in Opp. at 34-35 (citing cases involving demotions or lateral transfers that resulted in diminished work conditions). Furthermore, the cases that Plaintiff highlights only undermine Plaintiff's argument because they set forth facts that establish clear cases of constructive discharge, and Plaintiff can establish no nexus between them and his circumstances.

For example, Plaintiff discusses in detail the Third Circuit's decision to overturn summary judgment in *Levendos v. Stern Entertainment, Inc., 860 F.2d 1227 (3d Cir. 1988)*, but fails to establish [*24] any parallel between those facts and his own situation. As Plaintiff correctly indicates, Levendos involved a female restaurant worker who had been promoted to a management position but who had been excluded from management meetings and denied other liberties consistent with her position, despite the fact that males previously holding her position had received such privileges. Further, she was informed that the restaurant intended to replace her with a man and was forced to endure false accusations of stealing and a conspiracy to falsely accuse her of consuming alcohol on the job. See id. at 123; *Levendos v. Stern Entertainment, Inc., 909 F.2d 747, 753-54 (3d Cir. 1990)* (Levendos II); see also Pl.'s Mem. in Opp. at 34-35.

Plaintiff here makes no similar allegations. He never contends that he applied for a promotion that he did not receive, much less that he was denied privileges specific to his position that women in his same position enjoyed. Management never told him that they were thinking of replacing him with a woman. At most, the record includes a statement from Plaintiff that, after he resigned, another individual heard Management comment that [*25] "it

worked"; however, even if we were to find it a reasonable inference to believe that the comment reflected a conspiracy to force Plaintiff to resign, Plaintiff sets forth no basis for concluding that his gender served as the impetus for Management's urging him to resign.

Finally, he never suffered false accusations of anything as egregious as stealing or drinking while he worked. Despite Plaintiff's claim that Defendant falsely accused him of stealing a grinder (Allen Dep. at 233), the disciplinary report shows that, after further investigation, the manager found that Plaintiff did not take the machine without permission and that the language reflecting the allegation was deleted from the report. (Klotz Dep. at Ex.1.) n3 As such, no reasonable jury would find that Defendant falsely accused him of stealing the grinder. Thus, Plaintiff's allegations do not begin to rise to the level of the "the serious grievances [raised by Levendos] which would constitute constructive discharge." *Levendos II, 909 F.2d at 754* (internal quotes and citation omitted).

> n3 While it appears that Management may have given Plaintiff a verbal warning for taking the grinder, the allegation that he stole it (i.e., took it without permission) was removed from the report.

[*26]

Levendos II further highlights another important deficiency in Plaintiff's argument, as it determined whether a valid constructive discharge claim requires that the employee provide notice to the employer prior to resigning. While the Third Circuit held that such notice was not a prerequisite to invoking the constructive discharge doctrine, it did conclude that whether the employee provided notice was an appropriate factor to consider. See *909 F.2d at 751*. Levendos made several attempts over many months, as well as numerous phone calls to the manager the day before she resigned, to communicate her complaints to him. He never provided her the opportunity to discuss her grievances. *909 F.2d at 753*.

Contrarily, Defendant offered Plaintiff the opportunity to discuss his grievances after Valerie Allen wrote the February 2001 letter about her husband's allegations of harassment; however, Plaintiff rejected the offer. (See Allen Dep. at 215-16.) Moreover, while Plaintiff alleges that he complained numerous times, he admits that he never filed a formal complaint with MFS (Allen Dep. at 103), and that he complained only to Ralph Klotz, the Comptroller, [*27] who did not have authority to affect any change. (See Allen Dep. at 147, 230-31). n4 In fact, beyond his verbal complaints to Management regarding the sexual drawings and his EEOC complaint, the record reflects only one other complaint, during April 2001, n5

before Plaintiff decides to resign five months later, in August 2001.

> n4 We also note that the sexual harassment policy likely directs alleged victims to report problems to their supervisors and, if the supervisors failed to act, then "up the chain of command." (See Hauff Dep. at 57.) The chain of command does not include Klotz, but rather Bealer and the manager, Folck.

> n5 Plaintiff did complain to Ralph Hauff about the so-called "porn star chip tub" incident from the spring of 2001, where, on the same morning that Plaintiff found a banana peel in his welding machine, someone wrote those words next to Plaintiff's name on the schedule for dumping the chip tub. (See Hauff Dep. at 57-66; Allen Dep. at 182-83.)

Finally, the lone sexual harassment [*28] case of constructive discharge cited by Plaintiff is clearly distinguishable, as it involves a substantially stronger set of facts than Plaintiff's allegations. *Suders v. Easton, 325 F.3d 432 (3d Cir. 2003)*, cert. granted, *Pennsylvania State Police v. Suders, 157 L. Ed. 2d 692, 124 S. Ct. 803 (U.S. Dec. 1, 2003)* (No. 03-95), involved a female plaintiff whose male superiors subjected her to a daily torment of "sexual suggestions, innuendoes and solicitatious [*sic*] behavior," which included lewd and graphic gestures and comments regarding her body, bestiality, and oral sex and "repeated acts of intimidation." *Id. at 443, 446* (internal quotes omitted; brackets in original).

This reprehensible harassment culminated in their conspiring to falsely accuse her of theft, for which they "treated her as they would an accused suspect," handcuffing and photographing her, reciting her *Miranda* rights, and interrogating her without permitting her to leave until she made clear her intent to resign. *Id. at 439*. In no manner does the discomfort Plaintiff felt by being shunned by his co-workers, closely monitored by his supervisor, or the current [*29] target of some crude drawings, which may have been used for years to poke fun at various employees, approach the level of intolerability endured by the plaintiff in Suders.

While we certainly do not undermine the unrest suffered by Plaintiff, "'the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge.'" Gray

v. *York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992)* (quoting *Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)*). Plaintiff himself admits that the low self esteem he felt from hearing that he was too

"dumb" to get another job was the reason he was so miserable, and that he "should have quit years ago." (Allen Dep. at 231.) It appears as though the childish and lewd drawings represented the final straw that gave him the strength to leave a job where he was unhappy. While one can certainly understand the difficulty in being rebuffed by one's coworkers or feeling singled-out by a supervisor, Plaintiff's circumstances simply are not characterized by the severity necessary to establish a successful constructive discharge claim.

## B. Count III: Illegal Retaliation [*30]

Count III of Plaintiff's Complaint alleges that, in violation of Title VII, *42 U.S.C. § 2000e*, MFS engaged in "adverse employment actions" in retaliation against Plaintiff's filing a claim with the EEOC and complaining to Management about the sexual harassment. (Compl. PP 37-39.) More specifically, Plaintiff argues that the destruction of part of his personnel file, the enhanced surveillance of his activities, and ultimately, his constructive discharge, violated *§ 2000e-3(a)*, which prohibits employers from discriminating against any employee for engaging in a protected activity.

Preliminarily, as the moving party, it is the Defendant's burden to identify in the record evidence showing the absence of an issue of material fact. See *Celotex, supra, 477 U.S. at 323*. Defendant argues that, in light of the absence of any formal discipline of Plaintiff following the filing of his complaint with the EEOC, heightened supervision, his supervisor's decision not to speak with Plaintiff, and co-workers' resentment towards him due to the heightened supervision, do not rise to the level of retaliation for which one can obtain relief. See Def.'s Reply Br. at [*31] 3-6 (quoting Plaintiff's deposition regarding his allegation of retaliation.) We agree and thus grant Defendant's motion for summary judgment with respect to Count III.

Plaintiff must show three elements to establish a prima facie case of discriminatory retaliation under Title VII:

> (1) []he engaged in activity protected by Title VII;

> (2) the employer took an adverse employment action against [him]; and

> (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action.

*Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir.*

*1995).* According to Plaintiff, Defendant increased its disciplinary write-ups and later destroyed part of Plaintiff's personnel file after he and his wife complained about the sexual harassment. (Compl. PP 39-40; Pl.'s Mem. in Opp. at 37.) Plaintiff further claims that after he filed his complaint with the EEOC, his co-workers rebuffed him and his supervisor increased his monitoring and supervision, often following him around. (See Allen Dep. at 130-37.)

The prima facie analysis focuses on the second prong of the test, i.e., whether Defendant took an adverse [*32] employment action against Plaintiff. n6 We find that no reasonable jury could conclude that Defendant did take such action; thus, Plaintiff's case fails. Retaliation violates Title VII "only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his [or her] status as an employee." *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)* (internal quotes omitted; brackets in original). Thus, not every unfortunate event or unwelcome action by an employer can constitute retaliation. Id. Plaintiff's allegations, while unfortunate and clearly unwelcome, do not rise to the level of illegal retaliation because they are insufficient to show an adverse employment action on the part of Defendant.

> n6 The filing by Plaintiff of a complaint with the EEOC unquestionably satisfies the first prong. *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997); Upsala, 51 F.3d at 386.* Additionally, the February 2001 letter from Valerie Allen to Management qualifies as protected activity.

[*33]

The Third Circuit's findings in Robinson are instructive here, as Plaintiff's allegations are not as severe as those of the plaintiff in Robinson, who unsuccessfully argued that actions taken by her employer after she filed an EEOC complaint for sexual harassment qualified as an adverse employment action. There, the plaintiff claimed that, after she filed her complaint, her employer restricted her job responsibilities, failed to transfer her from her position under direct supervision of the man who had harassed her, and allowed her to be subjected to "'unsubstantiated oral reprimands' and 'unnecessary derogatory comments.'" Additionally, she alleged that at times her supervisor ignored her after she refused his advances. *Robinson, 120 F.3d at 1300.* The Third Circuit found that, if believed, her claims simply were insufficient to constitute an adverse employment action in our circuit. *Id. at 1300, 1301.*

Similarly, Allen's claims do not qualify as an adverse

employment action. While Plaintiff may not have appreciated the comments he received from co-workers, they were not serious or tangible enough to change the conditions of his employment. [*34] Moreover, just as Robinson failed, Plaintiff has not set forth any evidence that his co-workers' response was motivated by his filing the claim. See e.g., *id. at 1301-02* (rejecting the argument that the plaintiff's restriction of computer access by a co-worker qualified as an adverse employment action because the plaintiff failed to offer any evidence that the co-worker acted in retaliation of the plaintiff's filing the EEOC complaint).

Finally, Plaintiff fails to provide any evidence with respect to his allegations that, after he complained about the harassment, Management disciplined him more aggressively and then destroyed some of his personnel file. With the exception of the February 2001 incident (see Allen Dep. at 170), the latest date of any disciplinary write-up in the record is March 31, 1998, several years before the alleged harassment and, more importantly, Plaintiff's filing the EEOC complaint in March 2001. (See Pl.'s App. Ex. B at 56-59, 363-401, 365). More significantly, Plaintiff cannot identify one incident for which he was disciplined that was not present in his file (see Allen Dep. at 347-48). n7

> n7 Pages 347-49 of Plaintiff's testimony seem to reflect that the one document that Plaintiff did not receive with his file involved a report that Management agreed to destroy at Plaintiff's request. Thus, its alleged absence is of no consequence. Either way, it appears that Plaintiff's attorney obtained a copy of that document, thus, based on Plaintiff's testimony, completing the file.

[*35]

Finally, where the Comptroller, Klotz, saw the CEO removing documents from Plaintiff's file, Klotz indicates that Folck merely was consolidating two of Plaintiff's personnel files, and that Folck had informed him that he was removing the duplicates, as well as the report regarding the grinder incident that Plaintiff had requested that he remove. (Klotz Dep. at 30.) In light of the absence of any direct evidence of disciplinary reports removed from Plaintiff's personnel file and the undisputed legitimate explanation for removing some documents from the file, no reasonable jury could find that Defendant purposefully destroyed documents to downplay the alleged harassment and excessive scrutiny with which Plaintiff claims Defendant oversaw him in retaliation of his complaints.

Furthermore, Plaintiff appears to contest many of the

disciplinary reports, which, significantly, were written several years before 2001. (See Allen Dep. at 276–339) (involving the parties' review of Plaintiff's personnel file). Thus, if anything, the disciplinary reports tend to imply that animus existed from very early in Plaintiff's lengthy tenure at MFS, instead of as a result of Plaintiff's complaints. [*36] As such, at trial, Plaintiff would not be able to establish a causal connection between the disciplinary activity and his complaints, the third prima facie element of illegal retaliation. See *Robinson, 120 F.3d at 1301* (stating that the plaintiff could not establish a causal connection between the conduct she considered to be retaliatory and her complaint because it occurred before she filed the complaint).

Finally, we find that the enhanced supervision by Plaintiff's supervisor and his decision not to speak to Plaintiff did not amount to an adverse employment action. While Bealer may have monitored him more closely than he had previously, Plaintiff provides no direct evidence that he actually did something harassing. Furthermore, "we cannot expect, let alone obligate, [] supervisors to act cordially toward one who has sued them." *Miller v. ALCOA, 679 F. Supp. 495, 505,* aff'd., *856 F.2d 184 (3d Cir. 1988)* (finding that the "snubbing" by the plaintiff's supervisors and co-workers did not constitute retaliation under Title VII).

While not precedential, the Third Circuit's facts and findings in *Buffa v. New Jersey State Dep't of Judiciary, 56 Fed. Appx. 571, No. 01–4094, 2003 WL 115948* [*37] *(3d Cir. Jan.14, 2003),* present a persuasive parallel. There, the plaintiff argued that, in retaliation of her complaints regarding her work environment, she suffered an adverse employment action when her supervisor subjected her "to harassment, intense scrutiny and overly–critical supervision." *56 Fed. Appx. 571, [WL] at **5.* Rejecting the plaintiff's argument, the Third Circuit reasoned that while it was possible for an employee to suffer an adverse employment action despite not having been fired, the plaintiff here "was never threatened with termination, demoted, urged to resign, or asked to assume lesser job responsibilities." As such, the plaintiff's allegations reflected, at most, "a poor working relationship with her superior." Id.

We find no reason to distinguish *Buffa* from the case at hand. Even accepting the allegation that Defendant inappropriately disciplined Plaintiff without foundation in retaliation of his complaints, Plaintiff sets forth no evidence that his job responsibilities changed, that Defendant threatened to fire him, or that Defendant pressed him to resign. Moreover, the plaintiff in *Buffa* sets forth more evidence than does Plaintiff in [*38] his argument. She showed that her supervisor questioned her about her decisions and criticized her work attire. Id. Plaintiff here sets forth evidence not of negative treatment, but rather only that his supervisor monitored him more closely.

"'Not everything that makes an employee unhappy' qualifies as retaliation, for 'otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Robinson, 120 F.3d at 1300* (quoting *Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996)* (internal quotes omitted)). While the actions of Plaintiff's employer may not have made him happy, they do not rise to the level of an adverse employment action necessary for a valid retaliation claim. Because no reasonable jury could find that Defendant engaged in an adverse employment action, Plaintiff would not be able to establish a prima facie case of illegal retaliation at trial. Thus, with respect to Count III, summary judgment is granted.

## IV.  DISMISSAL OF COUNT IV WITHOUT PREJUDICE

Plaintiff, by stipulation, has withdrawn Count I and, for the reasons [*39] stated above, we find it appropriate to enter judgment at this time on Plaintiff's remaining federal counts, Counts II and III. The lone remaining count in this matter is Plaintiff's allegation that Defendant's conduct violates the Pennsylvania Human Relations Act, *43 Pa. Cons. Stat.. § 951, et. seq.* In the instant motion, Defendant did not request summary judgment with respect to this state claim, Count IV. As such, pursuant to *28 U.S.C. 1367(c)* and *42 Pa. Cons. Stat. § 5103,* we will dismiss Count IV without prejudice to Plaintiff's right to pursue this matter in state court.

The Third Circuit has stated that "if the federal count is subject to dismissal on a motion for summary judgment, then the district court should 'ordinarily refrain from exercising jurisdiction (over the state law claims) in the absence of extraordinary circumstances.'" *Weaver v. Marine Bank, 683 F.2d 744, 746* (quoting *Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir. 1976))* (citation omitted in original). No such "extraordinary circumstances" present themselves here.

Moreover, both federal [*40] and state statutes provide for the transfer of state claims whose corresponding federal claims have been withdrawn or dismissed. See e.g., *28 U.S.C. § 1367(c)(3)* ("the district courts may decline to exercise supplemental jurisdiction over [related state claims] if the district court has dismissed all claims over which it has original jurisdiction"); *42 Pa. Cons. Stat. § 5103(b)* (allowing for the transfer to an appropriate state court of any matter brought in a court that lacks jurisdic-

2004 U.S. Dist. LEXIS 1982, *40

tion over the matter); see also *Weaver, 683 F.2d at 747* (recognizing the authority of a federal court to transfer a case to state court through the state enabling statute, *42 U.S.C. § 5103*).

Thus, we will dismiss Count IV without prejudice to Plaintiff's right to pursue this matter in state court.

**ORDER**

AND NOW, this 30th day of January, 2004, after full consideration of Defendant's Motion for Summary Judgment, filed November 12, 2003, Plaintiff's response thereto, filed December 10, 2003, and Defendant's reply, filed December 24, 2003, it is hereby ORDERED that said motion is GRANTED, and judgment [*41] is entered in favor of Defendant on Counts II and III. We note that Count I has been withdrawn and these are the sole remaining federal counts in this case. Count IV, Plaintiff's state law count, is hereby DISMISSED without prejudice to Plaintiff's right to pursue this count in state court. This case is closed.

BY THE COURT

Franklin S. Van Antwerpen, U.S.D.J.

**ORDER**

AND NOW, this 30th day of January, 2004, judgment is entered in favor of Defendant and against Plaintiff on all federal claims.

BY THE COURT

Franklin S. Van Antwerpen, U.S.D.J.

# TAB B

LEXSEE 1998 U.S. DIST. LEXIS 9100

**CHRISTINE A. EBERT, Plaintiff, v. OFFICE OF INFORMATION SYSTEMS, an
Agency of the State of Delaware, Defendant.**

**C.A. No. 97–530–SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1998 U.S. Dist. LEXIS 9100*

**June 12, 1998, Decided**

**NOTICE:** [*1]   FOR ELECTRONIC PUBLICATION
ONLY

**DISPOSITION:** Defendant's motion to dismiss denied
in part and granted in part.

**COUNSEL:** For plaintiff: Roy S. Shiels, Esquire, Brown,
Shiels & Chasanov, Dover, Delaware.

For defendant:   Elizabeth D. Maron, Esquire, Deputy
Attorney General, Delaware Department of Justice,
Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: June 12, 1998
Wilmington, Delaware

**ROBINSON, District Judge**

**I. INTRODUCTION**

Plaintiff Christine A. Ebert filed this action on
September 18, 1997 against defendant Office of
Information Systems ("OIS"), an Agency of the State
of Delaware, asserting a claim under the Civil Rights Act
of 1964, *42 U.S.C. § 2000*(e) et seq. for sexual harass-
ment, failure to promote, and retaliation. (D.I. 1) Plaintiff
alleges that the actions of her manager and OIS, which
were willful and intentional acts based on discriminatory
animus, resulted in physical and mental abuse, including
a mental breakdown disabling her from work. (D.I. 1)
Currently before the court is defendant's motion to dis-
miss. (D.I. 5) This court has jurisdiction pursuant to *28*

*U.S.C. § 1331.*

For [*2] the reasons stated below, defendant's motion
to dismiss will be denied in part and granted in part.

**II. BACKGROUND**

Beginning on or about October 16, 1980, plaintiff
began employment with OIS as an Application Support
Specialist. (D.I. 10 at A4) Plaintiff subsequently rose to
the position of Management Information Specialist. (D.I.
10 at A4)

On October 28, 1994, plaintiff completed, as part of
her employment, a Position Classification Questionnaire
("PCQ"). (D.I. 7 at A19–A24) In the general comments
section of the questionnaire, plaintiff wrote the following:

> To be successful in this position, an incum-
> bent must have an extremely large amount
> of endurance, resolve, persistence, resigna-
> tion, stamina, backbone, guts, moxie, re-
> silience, spirit, backbone, spunk, strength,
> pluck, chutzpa[] and determination to deal
> with items such as Attachment A. This item
> was given to me at the beginning of the first
> interview I had in this building with OIS–
> ASG.

(D.I. 7 at A23) Attachment A was a "puzzle" containing
a sexually offensive suggestion. (D.I. 7 at A24)

In November 1994, Assistant Manager of OIS,
Thomas Burn, brought plaintiff's PCQ to the attention
of Richard [*3] Iovino, Manager of OIS. After review-
ing the PCQ, Iovino had Burn bring plaintiff to his office
to discuss her allegations. (D.I. 7 at A4; A26–A27; A29–
A30; A36) Plaintiff refused to cooperate in Iovino's inves-
tigation, denying that the conduct was sexual harassment
(although admitting it was inappropriate) and refusing to
identify the individual(s) who gave her the document in
question. (D.I. 7 at A4; A26–A27; A29–A30; A36) As a

result of her refusal to cooperate, Iovino reprimanded plaintiff, informing her that he would proceed with a "formal contact" for insubordination should she refuse to identify the individual(s) involved and that she was free to check the Merit Rules if she were in doubt as to his authority to do so. (D.I. 7 at A4; A26–A27; A29–A30; A36) Plaintiff left the room, returning a short while later with John Nold, Executive Director of OIS, whom she had asked to join the meeting. (D.I. 7 at A4; A26–A27; A29–30; A36) Iovino again asked plaintiff to identify the individual(s) involved and again she refused, indicating that Iovino was aware of the individuals' identities. (D.I. 7 at A4; A26–A27; A29–A30; A36) At no point during the meeting did Nold direct plaintiff to [*4] answer Iovino's questions. (D.I. 7 at A36)

On November 10, 1994, Iovino filed a "formal contact," charging plaintiff with insubordination, falsification of records, and insulting words toward the public or any state employee. (D.I. 7 at A4; A26–A27; A29–A30; A31–A32) Nold, acting as Hearing Officer for the "Third Step Grievance Proceeding" held on December 9, 1994, found that there existed insufficient testimony to substantiate the charges of falsification and insulting words; however, he found the charge of insubordination to be supported by the record. (D.I. 7 at A33–A34)

On September 5, 1995, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Delaware Department of Labor against defendant, alleging continuing acts of sexual discrimination and retaliation beginning in November 1981 and continuing until November 10, 1994. (D.I. 7 at A2) Specifically, the charge alleged (1) an on-going course of sexually offensive behavior on the part of management; and (2) retaliation on the part of defendant and Iovino after plaintiff complained to management about a sexually offensive item she had been given during her initial interview [*5] in 1980. (D.I. 7 at A2) In the charge, plaintiff stated:

> Mr. Iovino treats the women he supervises in a demeaning and insulting manner. In February, 1995, during a meeting of the entire office (approximately sixty people), Mr. Iovino criticized the women in the office. He said: "You women, you want to be treated equal but you're not willing to work equal." He accused the women employees of abusing the flex time policy to care for their children. He also criticized the women for using their accumulated sick leave to stay home and care for their sick children. . . . During the February, 1995, meeting Mr. Iovino criticized the women in the office but did not

criticize the men who used flex time or sick leave.

(D.I. 10 at A4)

On September 18, 1995, as part of the Fourth Step Grievance Decision, plaintiff's written reprimand for insubordination was upheld while all other references to her alleged misconduct were purged from her file. (D.I. 7 at A35–A38)

On April 12, 1996, the State responded to the EEOC Charge of Discrimination, denying all the allegations made therein. (D.I. 7 at A3–A39)

Plaintiff appealed the insubordination disciplinary action to the Merit Employee [*6] Relations Board ("MERB"). (D.I. 7 at A5; A39) On September 4, 1996, defendant agreed to void the written reprimand and remove it from plaintiff's personnel file, thereby mooting the MERB grievance. (D.I. 7 at A40–A41) Consequently, the grievance was dismissed on September 6, 1996. (D.I. 7 at A42)

On August 28, 1996, after the EEOC's settlement efforts had failed, Marjorie McLean, the EEOC investigator assigned to plaintiff's charge, wrote to plaintiff asking her to reply to defendant's answer to the charge. (D.I. 10 at A9–A12; A16–A17) On September 12, 1996, plaintiff responded with a four-page letter supplementing her charge. (D.I. 10 at A9–A12) In the letter, plaintiff emphasized that her complaint was one of "'CONTINUING ACTION' with the earliest date of '11/81' with the last[] being '11/10/94.'" (D.I. 10 at A10) She further indicated that her complaint was "not about one incident of sexual harassment," citing to a number of other incidents of "sexual harassment." (D.I. 10 at A11)

On June 20, 1997, the EEOC issued a 90-day "Right to Sue" letter and dismissed plaintiff's charge, stating that

> based upon its investigation, the EEOC is unable to conclude that the information [*7] obtained established violations of the statutes. This does not certify that the respondent is in compliance with the statutes.

(D.I. 7 at A43)

Plaintiff filed this action on September 19, 1997 alleging generally that "continuous discriminatory acts of defendant, and Manager Richard Iovino in particular, have over a period of years deprived plaintiff of rights granted her by, and protected by *42 USC Section 2000*(e) et. []seq., known as Title VII." (D.I. 1) Specifically, plaintiff alleges that (1) she has been denied advancement in status and pay because of her gender; (2) the behavior and statements of

Iovino have resulted in a hostile work environment; (3) she has been retaliated against because of her complaints; (4) the discriminatory actions of Iovino and defendant "were willful and intentional acts based on discriminatory animus"; and (5) intentional misrepresentation of her work performance and interpersonal relationships caused or contributed to her lack of advancement in status and pay. n1 (D.I. 1)

> n1 In a sworn affidavit dated January 1998 submitted as an attachment to her answering brief, plaintiff clarified an unspecified count in the complaint as follows:

>> 2. That one count of the Complaint in [the case at bar] deals with impeding the upward reclassification of her position by administrative superiors, including a Richard Iovino.

>> 3. That impeding consisted of inaction and the giving of incorrect information over an extended period of time, and no reclassification of the position of any male employee of the agency was treated in the same fashion.

>> 4. She believes the impeding of the reclassification of her position occurred because of discrimination, and because she was retaliated against for raising complaints of discrimination.

> (D.I. 10 at A27)

[*8]

## III. STANDARD OF REVIEW

Since the parties have referred to matters outside the pleadings, defendant's motion shall be treated as one for summary judgment. n2 See *Fed.R.Civ.P. 12(b)*. Summary judgment should be granted only if the court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact is in dispute. See *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id. at 587* (quoting *Fed.R.Civ.P. 56(e)*). "Facts that could alter the outcome are 'material,'

and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (citations omitted). If the nonmoving [*9] party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. This court, however, must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)* (citation omitted). With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer [*10] intentionally discriminated against the plaintiff.'" *Revis v. Slocomb Industries, Inc., 814 F. Supp. 1209, 1215 (D. Del. 1993)* (quoting *Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987))*.

> n2 Rule 12(b) provides that

>> if, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

> *Fed.R.Civ.P. 12(b)*.

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

In the instant action, defendant maintains that plain-

tiff's Title VII n3 claims for hostile work environment and failure to promote are precluded because she failed to exhaust her administrative remedies by not including these claims in the charge filed with the EEOC. Defendant, [*11] thus, asserts that plaintiff's complaint should be dismissed. Alternatively, defendant requests that the court require plaintiff file a more definite statement of her claims.

> n3 Title VII of the 1964 Civil Rights Act provides in pertinent part:

> > (a) Employer practices. It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

*42 U.S.C. § 2000e-2*(a).

The preconditions (exhaustion requirements) to a suit under Title VII are [*12] the filing of a charge with the EEOC and the receipt of the EEOC's notice of the right to sue. See *42 U.S.C. §§ 2000e-5*(e), 2000(e)-5(f). Because the statutory scheme of Title VII emphasizes informal means of achieving settlement over formal adjudication, a potential plaintiff normally is required to set forth in the charge to the EEOC those allegations subsequently raised in the district court. See *Schanzer v. Rutgers University, 934 F. Supp. 669, 673 (D.N.J. 1996)*.

In accordance with the exhaustion requirement, there are limitations on the presentation of new claims in the trial court. See *Howze v. Jones & Laughlin Steel, Corp., 750 F.2d 1208, 1212 (3d Cir. 1984)*. The parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are "'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination,'" regardless of the actual scope of the EEOC investigation. *Hicks v. ABT Assocs., Inc., 572 F.2d 960, 966 (3d Cir. 1978)* (quoting *Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99*

*(3d Cir. 1976)*, cert. denied, *429 U.S. 1041, 50 L. Ed. 2d 753, 97 S. Ct. 741 (1977)*. [*13] Therefore, a trial court may assume jurisdiction over additional charges only if "the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996)* (quoting *Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984))*. However, this standard must be applied in accord with the "sound and established policy that procedural technicalities should not be used to prevent Title VII claims from being decided on the merits." *Revis, 814 F. Supp. at 1216* (quoting *Gooding v. Warner-Lambert Co., 744 F.2d 354, 358-59 (3d Cir. 1984))*.

Where the allegations in the complaint were sufficiently distinct from those presented in the EEOC charge and were not part of the EEOC investigation, courts have refused to entertain the expanded claims until administrative procedures have been exhausted. See e.g., *Zalewski v. M.A.R.S. Enterprises, Ltd., 561 F. Supp. 601, 604-05 (D. Del. 1982)* (finding the charge of gender discrimination presented to the EEOC and the claim of sexual harassment in the civil suit to be unrelated and independent charges since the facts alleged [*14] in the complaint were wholly different from those set forth in the charge); *Sandom v. Travelers Mortgage Services, Inc., 752 F. Supp. 1240, 1246-48 (D.N.J. 1990)*, aff'd without op., *998 F.2d 1005 (3d Cir. 1993)* (dismissing a sexual harassment claim that was not raised in the EEOC charge because it arose from a set of wholly distinct facts and thus would not have been discovered by a reasonable EEOC investigation of the filed charge of sexual discrimination). However, courts have heard claims not specifically mentioned in the prior EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint. See e.g., *Howze, 750 F.2d at 1212* (finding the claim in the civil suit that plaintiff was discriminated against because of her involvement with a "Black Caucus" explained the original EEOC charge, which alleged racial discrimination in job promotion); *Ostapowicz, 541 F.2d at 398-99* (finding that additional charges of gender discrimination filed during the pendency of the administrative proceedings may be considered "explanations of the original charge and growing out of it").

In the instant action, the charge [*15] filed with the EEOC alleged an on-going course of gender discrimination and retaliation. (D.I. 33 at A8) The question is whether or not a reasonable investigation would have led to the facts surrounding plaintiff's claims of hostile work environment and failure to promote. See *Zalewski, 561 F. Supp. at 604*.

Reviewing the EEOC complaint filed by plaintiff and her September 12, 1995 response to the EEOC inquiry, the court finds, as a matter of law, that plaintiff's hostile work environment claim qualifies under the above standard. First, there is a close nexus between the facts supporting plaintiff's charge of gender discrimination and those supporting the complaint's claim of hostile work environment. Second, an EEOC investigation of retaliation and gender discrimination based on the original charge would have disclosed the hostile work environment claim. Cf. *Zalewski, 561 F. Supp. at 605* (finding "the sole common denominator of the two charges [a male–female sexual discrimination claim and a sexual harassment claim based on termination for refusal to accept offer for homosexual favors] is the fact that the discrimination allegedly involved sex, yet the two sex discrimination [*16] claims were in no way 'alike or related.'") (citations omitted)). Third, in the instant action, the activity alleged by plaintiff in her charge to the EEOC and her supplemental letter could give rise to both gender discrimination and hostile work environment claims. See *Ostapowicz, 541 F.2d at 399* ("The additional charges filed during the pendency of the administrative proceedings may fairly be considered explanations of the original charge and growing out of it."); accord *Schanzer, 934 F. Supp. at 674.* Accordingly, the court finds that a reasonable investigation by the EEOC of plaintiff's charge would have encompassed the allegations raised in her complaint with regard to the hostile work environment claim.

Unlike the hostile work environment claim, however, plaintiff's failure to promote or advance claim does not fall within the scope of the EEOC complaint or a reasonable investigation thereof. First, there is nothing in the record to indicate that the EEOC investigated or had any reason to investigate whether plaintiff had been discriminated against by defendant's failure to promote or advance her. Plaintiff's charge alleged continuing discriminatory and retaliatory conduct; [*17] there was no mention of or allegation of any facts to support a claim of failure to promote or advance in the charge or in her September 12, 1996 letter to the EEOC. See *Antol, 82 F.3d at 1295– 96* (finding that a disability discrimination charge did not encompass a claim for gender discrimination even though investigation would have revealed that the position plaintiff (a man) was denied was filled by two female employees); *Parsons v. City of Philadelphia Coordinating Office of Drug & Abuse Programs, 822 F. Supp. 1181 (E.D. Pa. 1993)* (finding that claims of retaliation and race discrimination for failure to compensate "out-of-class" for additional duties did not encompass a claim for failure to promote despite the fact that the EEOC investigation considered whether plaintiff was qualified for the position). Second, a claim of failure to promote does not flow logically from, and would have required investigation of events not raised by, claims of gender discrimination or retaliation. See *Parsons, 822 F. Supp. at 1183–84;* cf. *Foust v. FMC Corp., 962 F. Supp. 650 (E.D. Pa. 1997)* (finding that the additional allegation raised in the complaint was within the scope of the [*18] EEOC investigation since it "merely added other improper motives" for the same event raised in the charge). The record indicates that the occurrences of alleged failure to promote were distinct incidents from those of alleged gender discrimination and retaliation. Third, under the circumstances, neither the EEOC nor defendant were put on notice of plaintiff's failure to promote claim; thus the EEOC was not "afforded . . . the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." *Antol, 82 F.3d at 1296;* see also, *Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 485 (3d Cir. 1997)* ("To allow a stale claim to proceed to be inconsistent with the administrative procedure established by Title VII which contemplates prompt filing of charges so that discrimination controversies may be resolved promptly."). Accordingly, the court concludes that plaintiff's failure to promote or advance claim is a distinct claim not within the scope of the EEOC charge. See *Rush, 113 F.3d at 483–85* (finding plaintiff's failure to promote and train claim distinct from her sexual harassment claim because, inter alia, the claims [*19] address different types of conduct). Consequently, to the extent that Counts I, n4 III, n5 and V n6 of the complaint allege failure to promote or advance claims, they shall be dismissed for failure to exhaust administrative remedies. n7

n4 Count I provides in relevant part:

10. By constant belittling of the work performance and contributions to the agency of women in general, and plaintiff in particular, Iovino made it clear to plaintiff as well as to subordinate supervisors that he did not believe females sufficiently contributed to be given advancements in status and pay equal to males.

11. Despite satisfactory or better than satisfactory work performance plaintiff has consistently been, over a period of years, denied advancement in status and pay within the agency because of her sex leading to severe frustration and mental distress, including a mental breakdown disabling plaintiff from work.

(D.I. 1)

n5 Count III provides in relevant part:

16. Plaintiff on a number of occasions complained to her supervisor or to Manager Iovino of the discriminatory treatment, and hostile work atmosphere, based on specific events which had occurred.

17. Defendant and Iovino took little or no action to effectively address plaintiff's complaints but instead retaliated against plaintiff because of those complaints.

(D.I. 1)

[*20]

n6 Count V provides in relevant part;

21. The actions of Iovino were intended to, and did, cause higher level administrative superiors within the agency to have a false impression of plaintiff's work performance and interpersonal relationships within [the] agency.

22. The intentional misrepresentations of plaintiff's work performance and interpersonal relationships caused or contributed to plaintiff's lack of advancement in status and pay, and the mental frustration and stress thereby caused plaintiff.

(D.I. 1)

n7 Even assuming arguendo that plaintiff exhausted administrative remedies with respect to the failure to promote or advance claim, she has failed to present sufficient evidence to establish a prima facie case under Title VII. In order to establish a prima facie case of failure to promote or advance a plaintiff must show:

(a) she belongs to a protected category; (b) she applied and was qualified for a promotion; (c) despite her qualifications, she was denied the promotion; and (d) other employees of simi-

lar qualifications who were not members of the protected group were promoted at the time the plaintiff's request for promotion was denied.

*Lewis v. State of Delaware Dept. of Public Instruction, 948 F. Supp. 352, 358 (D. Del. 1996).* In the instant action, even accepting her allegations as true, plaintiff has not made such a showing. Specifically, although plaintiff alleges that Iovino impeded reclassification of her position (D.I. 1 at P 6A) and indicated that women did not deserve advancements in status and pay equal to that of men (D.I. 1 at P 10), plaintiff has failed to allege, much less establish, that she was qualified for a promotion or advancement and that male employees of similar qualifications were promoted or advanced while she was not.

[*21]

## B. The EEOC 300-Day Filing Requirement

Defendant contends that only those discriminatory acts which occurred during the 300 days prior to the filing of the EEOC charge are actionable. Consequently, defendant argues that to the extent plaintiff's allegations are based on events occurring prior to November 9, 1994 the charge is untimely and that plaintiff failed to preserve her claims. Defendant contends that the EEOC charge relates solely to the 1994 discipline, which it argues was not raised in plaintiff's complaint.

According to *42 U.S.C. § 2000e-5(e)*, a charge of employment discrimination must be filed within 300 days "after the alleged unlawful employment practice occurred." This filing requirement, however, "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 71 L. Ed. 2d 234, 102 S. Ct. 1127 (1982).* In *West v. Philadelphia Electric Co., 45 F.3d 744 (3d Cir. 1995),* the Third Circuit determined the continuing violation theory to be one such equitable exception to the timely filing requirement. [*22] See *id. at 754.* Under this theory, a "plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." Id. To establish a continuing violation, a plaintiff must demonstrate (1) that at least one discriminatory act occurred within the filing period and (2) that the harassment is "'more than the occurrence of isolated or sporadic acts of intentional discrimination'" but is a "persistent, on-going pattern." *Id. at 754-55* (quoting *Jewett*

v. *Int'l Tel. & Tel. Corp., 653 F.2d 89, 91 (3d Cir. 1981)*; accord *Rush, 113 F.3d at 481 (3d Cir. 1997)*. In determining whether a continuing violation exists, the court must consider:

> (i) subject matter—whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence—whether the nature of the violations would trigger the employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

*West, 45 F.3d at 755 n.9* (adopting [*23] the approach taken by the Fifth Circuit in *Berry v. Bd. of Supervisors of Louisiana State Univ., 715 F.2d 971, 981 (5th Cir. 1983))*; accord *Rush, 113 F.3d at 481–82.* "Once the plaintiff has alleged sufficient facts to support use of the continuing violation theory, however, the 300-day filing period becomes irrelevant—as long as at least one violation has occurred within that 300 days." *West, 45 F.3d at 755.*

As the Third Circuit in West noted, "there is a natural affinity between" hostile work environment and continuing violation claims. *Id. at 755.*

> "In the arena of sexual [or racial] harassment, particularly that which is based on the existence of a hostile environment, it is reasonable to expect that violations are continuing in nature: a hostile environment results from acts of sexual [or racial] harassment which are pervasive and continue over time, whereas isolated or single incidents of harassment are insufficient to constitute a hostile environment. Accordingly, claims based on hostile environment sexual [or racial] harassment often straddle both sides of an artificial statutory cut-off date."

*Id.* (quoting *Jenson v. Eveleth Taconite* [*24] *Co., 824 F. Supp. 847, 877 (D. Minn. 1993))* (alterations in original).

In the case at bar, a reasonable jury could conclude that plaintiff has alleged sufficient facts to support application of the continuing violation theory to her hostile environment claim. n8 First, the record indicates that there were episodes of alleged harassment after the 300-day period began to run on November 9, 1994. n9 Specifically, plaintiff cited the "formal contact" she received on November 10, 1994 and a February 1995 office meeting during which

Iovino allegedly criticized the women, but not the men, in the office. Second, the record supports a finding that plaintiff experienced continuous sexual harassment, including intensified harassment after the filing of the EEOC charge. Plaintiff has cited a series of allegedly discriminatory incidents occurring consistently over the period of her employment. n10 These purported incidents all involved sexual harassment in some form, either demeaning comments, rude behavior, inappropriate touching, or discriminatory conduct. The alleged harassment, i.e., impeding the classification of her position, grabbing by a co-worker, Iovino's derogatory statements, was [*25] not of such a nature as to "trigger a duty of the plaintiff to assert [her] rights arising from the deprivation." *45 F.3d at 756.* Since plaintiff has alleged sufficient facts to support use of the continuing violation theory, the 300-day filing period is irrelevant. See id. Consequently, plaintiff may present evidence of the entire continuing violation. n11 See id.

> n8 Although in the charge, plaintiff alleged the first and last dates of discrimination as being November 1981 and November 10, 1994, respectively, she also indicated that the discriminatory activity was continuing.

> n9 Plaintiff filed the requisite EEOC charge on September 25, 1995. Consequently, the 300-day retrospective limitations period began to run on November 9, 1994.

> n10 In many, if not most, of her allegations, plaintiff fails to specify the date of the purported discriminatory conduct. However, viewing the facts and all reasonable inferences therefrom in the light most favorable to the plaintiff, sufficient indicia exist for the court to discern a continuous pattern of allegedly discriminatory conduct.

> n11 Since the court has already concluded that plaintiff's hostile work environment claim falls within the scope of the EEOC investigation, plaintiff also may present evidence of incidents of sexual harassment occurring subsequent to the filing of the charge. See *Robinson v. Dalton,, 107 F.3d 1018 at 1025; Waiters, 729 F.2d at 235.*

[*26]

## C. Plaintiff's Hostile Environment Claim

Defendant next contends that plaintiff has failed to produce sufficient evidence to establish a prima facie case of hostile work environment under Title VII. The Supreme Court has recognized that Title VII is violated by a "work environment abusive to employees because of their race, gender, religion, or national origin." *Harris v.*

*Forklift Systems, Inc., 510 U.S. 17, 22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)* ("[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."). To be cognizable within the meaning of Title VII, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB, 477 U.S. at 67* (quoting *Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982)*). In order to establish a hostile work environment,

> a plaintiff must establish "by the totality of the circumstances, the existence of a hostile [*27] or abusive working environment which is severe enough to affect the psychological stability of a minority employee."

*Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)* (quoting *Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1989)*. Specifically, a plaintiff must demonstrate that:

> (1) the employees suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

Id.

Defendant argues that plaintiff has failed to make the specific allegations required to establish factors four and five of the Andrews test. n12 In addressing the objective standard of factor four, the Third Circuit noted:

> To make out a case under Title VII it is "only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff 'had been a man she would not have been treated in the same manner.'"

*895 F.2d at 1485* (quoting [*28] *Tomkins v. Public Serv. Elec. & Gas Co., 568 F.2d 1044, 1047 n.4 (3d Cir. 1977)* (citation omitted)). The court went on to hold that "the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment." Id. Review of the record reveals that plaintiff has alleged incidents involving demeaning comments, inappropriate touching, pornographic material, and discriminatory conduct. Considered as a whole and in a light most favorable to plaintiff, the court concludes that a reasonable juror could conclude that these incidents "produce a work environment hostile and offensive to women of reasonable sensibilities." *895 F.2d at 1486.*

> n12 Defendant does not dispute that plaintiff has alleged sufficiently factors one, two, and three.

In accord with the agency principles, to establish respondeat superior liability as required by the fifth factor, a plaintiff must demonstrate

> that management-level employees [*29] had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action.

Id. Defendant argues that by statute only Nold, the Executive Director of OIS, had sufficient authority so as to be an agent for Title VII purposes and that since plaintiff does not assert that Nold knew of the alleged hostile environment, defendant has no liability under Title VII. The Third Circuit, however, has stated that, under Title VII, "'the act of a supervisory employee or agent is imputed to the employer.'" *Levendos v. Stern Entertainment, Inc., 909 F.2d 747, 751 (3d Cir. 1990)* (quoting *Meritor Sav. Sank, FSB, 477 U.S. at 75*). In Levendos, the Third Circuit found that a person with the power to hire and fire, or influence hiring and firing decisions, is a supervisory agent of the employer. See *909 F.2d at 751–52; Antol, 82 F.3d at 1301* (finding that an employee's discriminatory acts may be imputed to the employer if the employee is within "'the chain of decision-makers who had the authority to hire and fire plaintiff'") (quoting *Gomez v. Allegheny Health Services, Inc., 71 F.3d 1079, 1085 (3d Cir. [*30] 1995)*. Thus, even if Nold was the only individual with the authority to hire and fire and was without knowledge of the sexually hostile environment, respondeat superior liability could still be found as long as a supervisory employee in a position to affect plaintiff's work situation subjected her to sexual harassment, i.e, contributed to the hostile work environment. See *Harris, 510 U.S. at 21–23.*

Review of the record reveals that plaintiff has produced sufficient evidence to establish respondeat superior liability. Plaintiff has alleged that Iovino, her manager, not only acquiesced in, but also wilfully and intentionally

participated in, the hostile work atmosphere. She also contends that she complained repeatedly to her supervisor as well as to Iovino of the discriminatory treatment but to no avail. A reasonable jury could conclude that Iovino, as well as plaintiff's supervisor, are middle-management employees whose actions are properly imputed to defendant. Accordingly, the court concludes that the five-part Andrews test has been satisfied and plaintiff's claim for hostile work environment should go forward.

## IV. CONCLUSION

For the reasons stated above, the [*31] court finds that there exist genuine issues of material fact relating to plaintiff's claims of hostile environment discrimination under Title VII. The court further finds that to the extent plaintiff alleges failure to promote or advance claims in Counts I, III, and V, they shall be dismissed for failure to exhaust administrative remedies. Therefore, defendant's motion to dismiss shall be denied in part and granted in part. An appropriate order shall issue.

# TAB  C

LEXSEE 2003 U.S. DIST. LEXIS 2311

**LORETTA L. ROBINSON, Plaintiff, v. BT FINANCIAL CORPORATION, et al.,
Defendants.**

**Civil Action No. 01–574**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA**

*2003 U.S. Dist. LEXIS 2311*

**February 11, 2003, Decided**

**DISPOSITION:** [*1] Recommended that Defendants' Motion for Summary Judgment be granted and case be dismissed with prejudice.

**COUNSEL:** For LORETTA L. ROBINSON, plaintiff: Neal A. Sanders, Law Office of Neal Alan Sanders, Butler, PA.

For BT FINANCIAL CORPORATION, LAUREL BANK, defendants: Hayes C. Stover, Kirkpatrick & Lockhart, Pittsburgh, PA.

**JUDGES:** FRANCIS X. CAIAZZA, Chief U.S. Magistrate Judge. Judge Standish.

**OPINIONBY:** FRANCIS X. CAIAZZA

**OPINION:**

**MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION**

**I. RECOMMENDATION**

For the reasons stated below, it is respectfully recommended that the District Court grant the Defendants' Motion for Summary Judgment (Doc. 13) and dismiss this case with prejudice.

**II. REPORT**

**BACKGROUND**

The Plaintiff Loretta L. Robinson ("Ms. Robinson" or "the Plaintiff") has filed this age discrimination lawsuit against her former employer(s), BT Financial Corporation and Laurel Bank ("the Bank"). n1 *See generally* Compl. (Doc. 1). Ms. Robinson asserts parallel claims of discrimination under the Age Discrimination in Employment Act, *29 U.S.C. § 621, et seq.* ("the ADEA") and the Pennsylvania Human Relations Act, *43 Pa. Cons. Stat.*

*§* [*2] *951, et seq.* ("the PHRA"), and her pleadings state the following allegations in support thereof.

> n1 The Defendant–financial institutions indicate that they became the Plaintiff's employer through "[a] series of mergers and acquisitions." *See generally* Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 14, hereinafter cited as "Defs.' Br.") at 1–2. For the sake of simplicity, Defense counsel's papers refer to the Defendants collectively as "the Bank," *see id.* at 2, and the court follows counsel's lead.

In 1963, the Plaintiff began working for the Bank at its branch in Kittanning, Pennsylvania ("the Kittanning Branch"). *See* Compl. at P 9. She worked at the Kittanning Branch until approximately December 2, 1999, when her employment was terminated. *See id.* at PP 13, 20. At the time of her termination, Ms. Robinson was fifty-four years old and she held the title of "Supervisor of Tellers" at the Kittanning Branch, a position she acquired through a series of promotions. *See generally id.* at PP [*3] 8, 10–14.

The Plaintiff describes the circumstances leading to her termination as follows. On approximately November 19, 1999, the Bank informed Ms. Robinson that she "would be required to transfer" to one of three other branches, "any of which would require [her] to engage in substantial additional travel." *See id.* at P 15. The Bank informed her that, "if she did not transfer to one of the other [three] branches ..., her employment would be terminated." *See id.* at P 16.

At the time this "ultimatum was issued," the Bank "was aware that [Ms. Robinson] was not comfortable driving long distances and would not be able to make the commute." *See id.* at P 17. On this basis, the Plaintiff "requested on numerous occasions to be assigned to a position at the Kittanning [Branch,] as she did not want to commute to any of the other [three] branches." *See id.* at

P 19. The Bank declined Ms. Robinson's requests, and it terminated her employment when she refused to accept the transfer. *See id.*. at P 20

In support of her discrimination claims, the Plaintiff alleges that: at the time she was terminated, "employees who were substantially younger than" her "were treated [*4] more favorably in that they were hired or retained to work in the Kittanning" Branch, *see id.* at P 21; the Bank's denial of her requests to remain in Kittanning was "motivated by ... age," *see id.* at P 22; and the Bank's decision to terminate her was similarly motivated. *See id.* at P 23.

The Defendants filed their Motion for Summary Judgment on June 27, 2002. *See* Defs.' Mot. for Summ. J. (Doc. 13). Among other things, their counsel asserts that the Plaintiff has failed to sufficiently refute the Bank's legitimate, non-discriminatory reason for terminating her employment. *See generally, e.g.,* Defs.' Br. at 22. The undersigned agrees, and therefore recommends that the Defendants' Motion for Summary Judgment be granted.

## ANALYSIS

The age discrimination claims presented in this case are subject to analysis under the familiar *McDonnell Douglas* framework. *Cf. generally Fakete v. Aetna, Inc., 308 F.3d 335, 337–38 & n.3 (3d Cir. 2002).* n2 First, the Plaintiff must establish her *prima facie* case by showing that: "(1) [she] was a member of a protected class, *i.e.,* ... she was over forty, (2) [she] was qualified for the [*5] position, (3) [she] suffered an adverse employment decision, (4) and [she] was ultimately replaced by[, or treated less favorably than,] a person sufficiently younger to permit an inference of age discrimination." *See Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001)* (citation omitted). If the Plaintiff makes her *prima facie* case, the burden shifts to the Defendants to identify "a legitimate, nondiscriminatory reason" for the adverse employment action. *See generally Fakete, 308 F.3d at 338, n.3.* Once the Defendants proffer a legitimate, nondiscriminatory reason, the Plaintiff "must demonstrate that the proffered reason was merely a pretext for unlawful discrimination." *See Hubbard v. Ashcroft, 44 Fed. Appx. 542, 2002 U.S. App. LEXIS 15430, 2002 WL 1769003, *1 (3d Cir. Aug. 1, 2002)* (citation omitted). To show pretext, the Plaintiff "must submit evidence [that] ... casts sufficient doubt upon ... the legitimate reason[]" identified by the Defendants or that "allows the factfinder to infer ... discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *See id.* (citation and internal [*6] quotations omitted).

n2 "There is no need to differentiate between"

Ms. Robinson's ADEA and PHRA claims because "the same analysis is used for both." *See generally Connors v. Chrysler Fin. Corp., 160 F.3d 971, 972 (3d Cir. 1998)* (citations omitted).

In this case, the undersigned has serious doubts regarding Ms. Robinson's ability to satisfy one of her *prima facie* elements, namely that she "suffered an adverse employment decision." *See generally* discussion *supra.* n3 Even assuming the Plaintiff has made her *prima facie* case, however, she has completely failed to meet her burden on pretext.

> n3 As further addressed below, it was the Bank's decision to transfer Ms. Robinson, not her being terminated for refusing the transfer, that forms the crux of the Plaintiff's discrimination claims. *See generally* discussion *infra.* As also seen below, the Bank's decision to transfer her does not qualify as an "adverse employment decision." *See id.* Thus, if the court focuses on the true employment decision being challenged, the Plaintiff fails even to state a *prima facie* case. Nevertheless, the fact that Ms. Robinson ultimately was terminated, an archetypical adverse employment decision, causes the undersigned sufficient pause to forego a recommendation of dismissal based on her *prima facie* case, alone. At a minimum, however, the shortcoming in Ms. Robinson's *prima facie* case provides additional grounds for entering summary judgment against her.

[*7]

At the onset, the court notes that the parties have expended the bulk of their energy debating whether the Bank was justified in requiring Ms. Robinson to transfer. *Compare* Defs.' Br. at 20-23 (arguing that Bank had legitimate reasons for transferring Plaintiff and for not requiring younger employees to transfer) *with* Pl.'s Opp'n Br. at 4-5, 8-11 (arguing opposite). Although ultimately misguided, this approach is somewhat understandable in light of the express allegations of the Complaint. *See, e.g.,* Compl. at P 21 (asserting that "substantially younger" employees "were treated more favorably" because they were "retained to work in ... Kittanning"). As seen below, however, the Bank's decision to transfer Ms. Robinson has no bearing on whether it had a legitimate, nondiscriminatory reason for terminating her employment.

The flaw in the Plaintiff's reasoning is best exemplified through the Pennsylvania district courts' analyses in *Hussein v. Genuardi's Family Mkts., 2002 U.S. Dist. LEXIS 430, 2002 WL 56248 (E.D. Pa. Jan. 15, 2002)* and

in *Grande v. State Farm Mut. Auto. Ins. Co., 83 F. Supp.2d 559 (E.D. Pa. 2000)*. In Hussein, the plaintiff was transferred from [*8] one of the defendant–employer's stores to another, while retaining "the same responsibilities and pay as [she had in her former] position ...." *See 2002 U.S. Dist. LEXIS 430 [WL] at *2.* Shortly thereafter, she was terminated by her employer when she "abandoned" the new position. *See id.*

In the lawsuit that followed, the plaintiff sought to establish that her former employer discriminated against her by requiring the transfer. The Hussein court rejected this approach, reasoning:

> Although the plaintiff ... establishes the [adverse employment decision] element of [her] *prima facie* case because[,] as a formal matter, she was terminated[, her transfer to another store] ... does not constitute [an] adverse employment action[] ...
>
> The record indicates that [she] was provided essentially the same job with the same responsibilities at the same pay at the new location ... Even viewing the evidence in the light most favorable to the plaintiff, an essentially lateral transfer such as this does not equal an adverse employment action ... This is true even if ... [the] defendant forced the plaintiff to accept [the] transfer ... against her will.

*See* [*9] *2002 U.S. Dist. LEXIS 430, 2002 WL 56248* at *5–6 (citation omitted, some emphasis added, some in original).

The Hussein Court's holding that an "essentially lateral transfer" does not constitute an adverse employment decision is hardly unique. As seen below, a multitude of federal courts have issued decisions, both before and after Hussein, reaching the very same conclusion. *See generally* discussion *infra*. Hussein is particularly instructive here, though, in its recognition that an employer "need not offer legitimate, nondiscriminatory reasons for" a decision to transfer that "ultimately does not constitute [an] adverse employment action[]." *See 2002 U.S. Dist. LEXIS 430 [WL] at *5 (emphasis added).* This conclusion demonstrates why the parties' debate as to whether the Bank's proposed transfer was supported by a legitimate, non-discriminatory reason (as opposed to pretext) misses the mark.

Of course, this conclusion is based on the undersigned's finding that Ms. Robinson's anticipated transfer did not rise to the level of an adverse employment deci-

sion. The Pennsylvania district court's analysis in Grande further supports this proposition.

In Grande, the plaintiff "was offered [*10] a lateral transfer to another" of the defendant–employer's offices. *See id., 83 F. Supp.2d at 561.* When the plaintiff "decided not to report" to the new location, his employer "fired [him] ... for his failure to" show. *See id.*

In his discrimination lawsuit, the plaintiff "argued that the long commute to" the new location "made [the] transfer an adverse employment decision." The court disagreed:

> To be an adverse action, an employment decision must be serious and tangible enough to alter an employee's compensation, terms, conditions or privileges of employment. ... [Although the court declines to hold that] a lateral transfer can never constitute an actionable employment decision, ... [none of the requisite] qualifying circumstances exist[.] ...
>
> [The] plaintiff has presented no evidence suggesting that the transfer was anything but a full-fledged job. [He] conceded in his deposition ... that he did not believe the transfer was a first-step towards a termination or demotion ... [The] plaintiff has provided no evidence suggesting that his pay, promotion, or other benefits would have been harmed by [the] transfer ... In [*11] fact, in his deposition ..., he conceded that there would have been no difference in pay or benefits and that he could have performed the job, which would have had the same title ...
>
> He also stated that he could have made the commute to [said location], ... although he stressed that the drive would have been longer ...
>
> In these circumstances, ... there has been no adverse employment decision. While the court does not minimize the effect of a lengthened commute ..., without some evidence of actual harm to [the] plaintiff's career or some indication that he could not perform the job, these factors do not create ... a *prima facie* case. n4 ...
>
> [Relatedly,] the simple increase in the commuting distance is not enough to find [a] constructive discharge ... While [the plaintiff]

may have found the [additional] distance impossible to tolerate, ... the test looks to the reasonable person. ... [Thus, for example,] ... while an employer cannot transfer an employee to a job the employee cannot do, a desire to live in a certain city is not a job-related factor supporting a claim of constructive discharge. ... Similarly, subjective feelings, [*12] on their own, are insufficient to find [a] constructive discharge.

*See id. at 563–64* (citations and internal quotations omitted, emphasis added).

n4 As a purely technical matter, the plaintiff in *Grande* suffered an adverse employment action in that he was terminated for his failure to appear at the new location. *See generally* discussion *supra* in text. The *Grande* Court nevertheless held that the plaintiff could not state a *prima facie* case, implicitly recognizing that his termination was a mere formality resulting from his refusal to appear. *Cf.* *Grande.* This court is inclined to agree with *Grande,* and disagree with *Hussein,* that Ms. Robinson's ability to state a *prima facie* case should not turn on whether she was terminated, as opposed to having resigned, based on the anticipated transfer. Indeed, to entertain such a distinction would be to elevate form over substance. For this reason, the undersigned's recommended dismissal of the Plaintiff's discrimination claims would be equally justified at the *prima facie* stage of the *McDonnell Douglas* analysis. *Cf. Grande, 83 F. Supp.2d at 564.*

[*13]

As referenced above, the holdings in *Hussein* and *Grande* are far from unique. A number of other federal courts, in Pennsylvania and elsewhere, have likewise concluded that a truly "lateral" transfer is not converted to an adverse employment decision, notwithstanding complaints regarding additional commute time. *See, e.g., Jenkins v. Phila. Hous. Auth., 2001 U.S. Dist. LEXIS 17343, 2001 WL 1298988,* *5 (E.D. Pa. Oct. 24, 2001) (transfer to "division [that] was less geographically convenient" to plaintiff did not constitute adverse employment action because her "assigned shift, days off, pay [and] responsibilities [did not] change[] depending on [the] site at which she worked"); *Spears v. Missouri Dep't. of Corr. & Human Res., 210 F.3d 850, 853–54 (8th Cir. 2000)* (transfer resulting in "mere[] ... inconvenience" to plaintiff, absent "any impact on her job title, salary, benefits, or any other material aspect of her employment," was not adverse employment decision); *Anzaldua v. Chi. Transit*

*Auth., 2002 U.S. Dist. LEXIS 22241, 2002 WL 31557622,* *3–4 (N.D. Ill. Nov. 15, 2002) (even transfer "adding up to an hour and a half each way to [plaintiff's] daily [*14] commute" was insufficient to establish adverse employment decision; such increased commute is "merely an inconvenience," not an actionable employment decision) (emphasis added); *Johnson v. Eastchester Union Free Sch. Dist., 211 F. Supp.2d 514, 517–18 (S.D.N.Y. 2002)* (plaintiff's "mere dissatisfaction" with transfer, based on "inconvenience of the change in location," was not actionable as adverse employment decision). n5

n5 In *Hussein,* the district court stated in *dicta* that the failure to show the "new location was particularly inconvenient for or placed an [undue] burden on" the plaintiff further supported the court's conclusion that her lateral transfer was not an adverse employment decision. *See 2002 U.S. Dist. LEXIS 430, 2002 WL 56248* at *6. In light of the numerous court decisions holding that mere "inconvenience" fails to establish an adverse employment decision, however, the undersigned cannot agree with the *dicta* in *Hussein.* Thus, even assuming Ms. Robinson can satisfy the overly-liberal standards suggested in *Hussein,* the District Court should decline to adopt them here. *Cf. generally* cases cited *supra* in text (repeatedly concluding that mere inconvenience does not constitute adverse employment decision).

[*15]

Under the aforementioned standards, Ms. Robinson has failed to show that the Bank's ordered transfer rose to the level of an adverse employment decision. Her counsel has neither urged nor shown that the transfer would have "any [adverse] impact on her job title, salary, benefits, or any other material aspect of her employment." *See Spears, 210 F.3d at 853–54.* In fact, Ms. Robinson has expressly admitted that the proposed transfer to the Bank's branch in Sarver, Pennsylvania would have resulted in a job promotion. *Compare* Defs.' Am. Statement of Uncontested Material Facts (Doc. 17) at P 33 (stating that Plaintiff "would receive a promotion" upon transfer to Sarver) *with* Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 21) at P 33 (stating that said "averment [was] admitted") (emphasis added). Simply put, there is no evidence in the record that the Bank's proposed transfer would have had any negative impact on Ms. Robinson's present or future conditions of employment. n6

n6 This conclusion renders inapposite the holding in *Torre v. Casio, Inc., 42 F.3d 825 (3d Cir. 1994),* the only potentially relevant decision cited

in the Ms. Robinson's opposition papers. In *Torre*, the plaintiff was transferred "to [a] dead-end position, ... from which he could [more easily] ... be fired." *See id. at 827* (emphasis added). Indeed, the plaintiff's employment was terminated within five weeks of the transfer, *see id.*, and the *Torre* Court considered the "transfer[] and ... discharge[]" collectively when discussing the adverse employment decision presented. *See id. at 831*. In this case, no evidence exists that the Bank sought to transfer Ms. Robinson into a "dead-end position" or to make easier a later discharge. The Plaintiff's refusal to accept the transfer, moreover, negates any speculative allegations regarding the same.

[*16]

The only other conceivable basis for distinguishing Ms. Robinson's claims is her counsel's bald assertion that "Sarver was too far for her to drive." *See generally, e.g.*, Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 20, hereinafter cited as "Pl.'s Opp'n Br.") at 10. Unfortunately for the Plaintiff, however, she has failed to show that her purported difficulties in driving are relevant to the adverse employment inquiry.

At the onset, the undersigned finds telling the Plaintiff's express averment in her pleadings that she "was not comfortable driving long distances ...." *See* Compl. at P 17 (emphasis added). And while this averment is followed by the bare assertion Ms. Robinson "would not be able to make the commute," *see id.* (emphasis added), there is absolutely no evidence supporting this conclusion. To the contrary, the record plainly reveals that Ms. Robinson "has been a licensed driver since the age [of] 18," she has "no restrictions on her driver's license," and she has no medical restrictions regarding her ability to drive. *See* Defs.' Br. at 11 (citing evidentiary support in record). In addition, the record confirms that the additional commute [*17] required by the transfer to Sarver would have been a mere nineteen miles, the difference between a seven-mile drive from her home to the Kittanning Branch and a twenty-six mile drive to Sarver. *See id.* at 11-12 (citing record support).

As just seen, the Plaintiff has failed to identify any evidence supporting her assertion she was unable to make the additional commute: no restrictions on her driver's license, no findings or testimony of a medical health professional establishing her inability to drive the additional distance, *et cetera*. Instead, she offers only her subjective statements that the additional commute would be "difficult[]" and that she "intensely dislike[s] driving." *See* Pl.'s Opp'n Br. at 10. This type of evidence is insufficient for the purposes of establishing an adverse employment ac-

tion. *Cf., e.g., Grande, 83 F. Supp.2d at 564* ("subjective feelings, on their own, are insufficient to find" an adverse employment decision); *see also, e.g., Pimentel v. City of New York, 2002 U.S. Dist. LEXIS 8454, 2002 WL 977535*, *4 (S.D.N.Y. May 14, 2002) ("purely subjective feelings about a transfer which, by objective standards, [do] not [*18] negatively alter the terms and conditions of [the plaintiff's] employment in any respect have no bearing on whether an adverse employment action has occurred"; "interference with sleeping, therapy, eating and medication schedules are purely subjective matters that [unrelated discrimination statutes] do[] not address") (citations and internal quotations omitted, emphasis added).

For all of these reasons, the Plaintiff has failed to show that the Bank's proposed transfer constituted an adverse employment decision. n7 Even assuming this conclusion is not fatal to her *prima facie* case, the Bank owed no duty to "offer legitimate, nondiscriminatory reasons for" its decision to transfer the Plaintiff. *See Hussein, 2002 U.S. Dist. LEXIS 430, 2002 WL 56248* at *5.

> n7 As referenced above, the undersigned concludes that the Bank's proposed transfer, and not the mere formality of Ms. Robinson's being terminated based on her refusal to accept it, constitutes the purported adverse employment decision placed before the court. *See generally* discussion *supra*. The undersigned also has doubts regarding the Plaintiff's ability to show that younger employees were treated more favorably. *See generally* Compl. at P 21 (alleging that "substantially younger" employees "were treated more favorably in that they were hired or retained to work in ... Kittanning") (emphasis added). Ms. Robinson's supposition that working in Kittanning would, in fact, be more favorable to younger employees enjoys no evidentiary support. Stated differently, there is no reason for the court to presume that younger workers likewise would have preferred to stay in Kittanning; it seems equally likely that working in one or more other location(s) may have been of greater convenience to any given worker. This analytical disconnect further evidences the infirmity of Ms. Robinson's approach.

[*19]

The proper inquiry is whether the Defendants have proffered, and whether the Plaintiff has sufficiently refuted, the Bank's non-discriminatory reason for Ms. Robinson's termination. The bank's stated reason is clear, and it seems beyond meaningful dispute: the Plaintiff was terminated for refusing to accept the transfer. And though the Plaintiff's Complaint alleges that the termi-

nation was "motivated by ... age," *see id.* at P 23, her counsel has failed to identify one shred of evidence supporting this assertion and/ or refuting the Bank's stated non–discriminatory reason. *See generally* Pl.'s Opp'n Br. Rather, in arguing that the transfer was not supported by legitimate reasons, Ms. Robinson implicitly concedes that her termination was based on her refusal to agree to the same. *See id.*

As seen above, the Bank's decision to transfer was not an adverse employment action, and it therefore is not subject to the "legitimate non–discriminatory reason" analysis under *McDonnell Douglas. See* discussion *supra.* Having failed to identify evidence that she was terminated for any reason other than her refusal to transfer, the Plaintiff cannot meet her burden on pretext. [*20]

In conclusion, Ms. Robinson's grievances boil down to her displeasure with the Bank's reassigning her to a different location. "The realities of the workplace," however, "dictate that employees do not always have the option to work in the location they desire." *See Nonnenmann v. City of New York, 174 F. Supp.2d 121, 133 (S.D.N.Y. 2001)* (citation and internal quotations omitted, emphasis added) (holding that employer's denial of request for transfer to

facility "13.5 miles closer to [plaintiff's] home was insufficient to constitute an adverse employment action"). Nothing in the ADEA bestows upon Ms. Robinson the right to demand employment at the Bank branch of her choosing, and for this reason, as well as the others stated above, the Defendants' Motion for Summary Judgment is well taken.

## CONCLUSION

For the reasons stated above, it is recommended that the District Court grant the Defendants' Motion for Summary Judgment (Doc. 13) and dismiss this case with prejudice.

In accordance with the Magistrates Act, *28 U.S.C. § 636*(b)(1)(B) and (C), and Rule 72.1.4(B) of the local Rules for Magistrates, objections to this report [*21] and recommendation are due by February 27, 2003. Responses to objections are due by March 10, 2003.

February 11, 2003

FRANCIS X. CAIAZZA

Chief U.S. Magistrate Judge