## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **BRANCE F. THOMPSON, SR.,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No.: 05-274 (GMS)** |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **DOVER DOWNS, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

## APPENDIX TO PLAINTIFF'S
## ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Date: May 26, 2006

Timothy J. Wilson (4323)
1509 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 777-4680
Facsimile: (302) 777-4682
twilson@margolisedelstein.com
*Attorney for Plaintiff*

## TABLE OF CONTENTS

**Document**                                                    **Appendix Page**

Deposition of Brance F. Thompson dated April 5, 2006......................B-0001-B-0226

Deposition of Richard R. Duncan dated April 11, 2006......................B-0227-B-0244

Deposition of Kevin E. Gorlich dated April 11, 2006.......................B-0245-B-0251

Deposition of Robert A. Knotts dated April 11, 2006.......................B-0252-B-0256

Deposition of William R. Morrison dated April 11, 2006....................B-0257-B-0273

Deposition of Nathan R. Whitecomb dated April 11, 2006....................B-0274-B0281

Deposition of Steven T. Homlish dated April 12, 2006......................B-0282-B-0293

Deposition of James M. Shreves, Sr. dated April 12, 2006..................B-0294-B-0300

Deposition of Marie A. Isenberg dated April 12, 2006......................B-0301-B-0311

Deposition of Linda M. Renninger dated April 12, 2006.....................B-0312-B-0318

Complaint filed May 6, 2005...............................................B-0319-B-0336

Charges of Discrimination dated
September 24, 2004 and January 20, 2005...................................B-0337-B-0338

Upgrade/Transfer form dated June 21, 2004.................................B-0339

Disciplinary Warning Notice dated February 4, 2004........................B-340-B-0341

Disciplinary Warning Notice dated June 17, 2004...........................B-0342

Disciplinary Warning Notice dated August 11, 2004.........................B-0343

Disciplinary Warning Notice dated August 17, 2004.........................B-0344

Disciplinary Warning Notice dated August 20, 2004.........................B-345

Disciplinary Warning Notice dated August 30, 2004.........................B-0346

Disciplinary Warning Notice dated November 16, 2004.......................B-0347

Disciplinary Warning Notice dated November 29, 2004....................... B-0348- B-0349

Disciplinary Warning Notice dated January 4, 2005...................................B-0350

Dover Downs' Employee Handbook...........................................B-0351-B-0390

Excerpt from Defendant's Responses to Plaintiff's
First Set of Interrogatories...............................................................B-0391

Affidavit of Brance F. Thompson dated May 24, 2006........................B-0392-B-0394

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **BRANCE F. THOMPSON, SR.,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No.: 05-274 (GMS)** |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **DOVER DOWNS, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

## CERTIFICATE OF SERVICE

I, Timothy J. Wilson, hereby certify that two copies of the foregoing *Appendix to Plaintiff's Answering Brief in Opposition to Defendant's Motion for Summary Judgment* was served by electronic filing and U.S. mail, prepaid, on May 26, 2006 to the following:

Richard M. Donaldson, Esquire
Noel C. Burnham, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Ave, Suite 750
Wilmington, DE 19801

Timothy J. Wilson (ID # 4323)
1509 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 777-4680
Facsimile: (302) 777-4682
twilson@margolisedelstein.com
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON,                )
                                   )
          Plaintiff,               )
                                   )   Civil Action
vs.                                )   No. 05-0274 (GMS)
                                   )
DOVER DOWNS, INC.,                 )
                                   )
          Defendant.               )


          Deposition of BRANCE F. THOMPSON taken
pursuant to notice at the law offices of Montgomery,
McCracken, Walker & Rhoades, LLP, 300 Delaware Avenue,
Wilmington, Delaware, beginning at 10:02 a.m., on Wednesday,
April 5, 2006, before Allen S. Blank, Registered Merit
Reporter and Notary Public.

APPEARANCES:

  TIMOTHY J. WILSON, ESQUIRE
  MARGOLIS EDELSTEIN
  1509 Gilpin Drive
  Wilmington, DE 19806

       For - Plaintiff

  BETH A. FRIEL, ESQUIRE
  MONTGOMERY, McCRACKEN, WALKER & RHOADES, LLP
  123 South Broad Street
  Avenue of the Arts
  Philadelphia, PA 19109

       For - Defendant



                WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1

2                      BRANCE F. THOMPSON,

3              the deponent herein, having first been

4              duly sworn on oath, was examined and

5              testified as follows:

6                              EXAMINATION

7    BY MS. FRIEL:

8        Q     Good morning, Mr. Thompson.

9        A     Good morning.

10       Q     My name is Beth Friel and I represent Dover Downs in

11   a case you brought against Dover Downs.

12       A     Yes, ma'am.

13       Q     And I'm here today to take your deposition.

14       A     Yes, ma'am.

15       Q     Have you ever been deposed before?

16       A     No, ma'am.

17       Q     Okay.  What's going happen is I'm going to ask you

18   questions and you're going to answer my questions to the

19   best of your ability.  And the court reporter is here to

20   take down my questions and your responses.

21       A     Yes, ma'am.

22       Q     Do you understand?

23       A     Yes, ma'am.

24       Q     The court reporter cannot take down head nods or

1    head shakes.  You're going to have to give verbal responses.

2    Do you understand?

3        A    Right.

4        Q    Do you understand that you're under oath today?

5        A    Yes, ma'am.

6        Q    And do you understand that being under oath means

7    you have to tell the truth?

8        A    Yes, ma'am.

9        Q    If at any time you don't understand my question,

10   will you let me know and I'll try to rephrase my question?

11       A    Yes, ma'am, I will.

12       Q    If at any time you need a break, will you let me

13   know?

14       A    Yes, ma'am.

15       Q    If at any time during the deposition you realize an

16   earlier answer you gave is not complete or it isn't

17   accurate, will you let me know that as well?

18       A    Yes, ma'am.

19       Q    Are you taking any medications or drugs that would

20   affect your ability to understand my questions today?

21       A    No.  I do take them but I didn't take them this

22   morning in order to be alert.

23       Q    And are you alert today?

24       A    Yes, ma'am.

```
 1        Q     What medications do you normally take?

 2        A     Alerica, Flomax, Xanax.  For sugar diabetes.  There

 3    is another one.  I can't even think of the name of that.

 4    But, anyway --

 5        Q     Alerica, what's that for?

 6        A     That's for my nerve.  My nerve was stretched here in

 7    my neck.

 8        Q     In your neck?

 9        A     Yes, ma'am.

10        Q     And what's Flomax?

11        A     Flomax is for an extra enlarged prostrate.

12        Q     And why do you take Xanax?

13        A     My nerves.

14        Q     But you don't believe the medication would affect

15    your ability to understand my questions today?

16        A     No.  I'm sure that it wouldn't.

17        Q     Is there any reason why you would not be able to

18    give full and complete testimony today?

19        A     No.

20        Q     Mr. Thompson, where do you live?

21        A     1679 South State Street, Lot 72, Dover, Delaware

22    19901.

23        Q     And do you live with anyone?

24        A     Yes.  My wife.
```

1       Q       What's your wife's name?

2       A       Frances.

3       Q       And how long have you been married?

4       A       Seventeen years.

5       Q       Do you live with anyone else besides your wife?

6       A       No.

7       Q       And what's your phone number there?

8       A       302-351-6116.

9       Q       What's your date of birth?

10      A       10/28/40.

11      Q       And do you have any children?

12      A       Yes.  But they are not around here nowhere.

13      Q       And what are your children's names?

14      A       I have eight of them.

15      Q       You have eight kids?

16      A       Yes.

17      Q       Okay.

18      A       Sherry.  Then I got one, Betty, daughter.  And my

19      sons are Anthony, Daniel, Michael, Nicky and Donald and

20      Mickey Brance.

21      Q       That's eight.

22              Okay.  Have you ever been involved in any

23      lawsuits?

24      A       At one time, yes.  But there was never anything done

BRANCE F. THOMPSON                                                    6

1     about it because I didn't go through with it.

2          Q     What was that lawsuit?

3          A     It was many years ago. I hurt myself on the job.

4     It was my arm. But, like I said, that I just didn't do

5     nothing with it.

6          Q     And where were you working at the time when you hurt

7     your arm?

8          A     It was in Benton, Missouri. 1970.

9          Q     And did you sue anyone as a result of the injury?

10         A     I did but I dropped the case. I didn't even go

11    through with it. I had to be operated on due to the injury

12    and stuff.

13         Q     Why did you drop the case?

14         A     I don't know. I don't even remember, tell you the

15    truth.

16         Q     How far did you go in school?

17         A     Two years of college. And it was an ICS course, by

18    the way.

19         Q     I'm sorry, it was a what?

20         A     It was an ICS course.

21         Q     What does that mean, ICS course?

22         A     It's having school through mail, you know.

23         Q     Okay. And what years were you in college, the two

24    years?

| | | |
|---|---|---|
| 1 | A | I had to take -- see, it was '59 and '60. |
| 2 | Q | What year did you graduate high school? |
| 3 | A | '56. A year earlier. |
| 4 | Q | I'm sorry? |
| 5 | A | A year earlier than what I should have. |
| 6 | Q | Okay. Mr. Thompson, where did you work before you |

7  worked at Dover Downs?

| | | |
|---|---|---|
| 8 | A | Ramada Inn and Howard Johnson's. |
| 9 | Q | You worked at both places? |
| 10 | A | Yes, ma'am. I was maintenance for both places. |
| 11 | Q | Was that one employer or two employers? |
| 12 | A | No, one employer. |
| 13 | Q | And what was the name of the employer? |
| 14 | A | Mr. Seth. |
| 15 | Q | I'm sorry? |
| 16 | A | Seth. Mr. Seth. |
| 17 | Q | Is Seth his last name? |
| 18 | A | Yes. |
| 19 | Q | What's his first name? |
| 20 | A | I can't pronounce it. It's very odd. I can't |

21  pronounce it.

| | | |
|---|---|---|
| 22 | Q | Can you spell it? |
| 23 | A | No. It was at Dover, Delaware. |
| 24 | Q | And what was your position at this job? |

BRANCE F. THOMPSON                                              8

1        A      I was the maintenance -- the only maintenance person

2    they had, which is supervisor or what have you.

3        Q      And what were your responsibilities as a

4    maintenance --

5        A      Air-conditioning.  Everything.  All maintenance.

6    Plumbing, air-conditioning.  Everything.  Electrician.

7        Q      Did you do any painting?

8        A      Oh, yes.

9        Q      What percentage of your job with the Ramada Inn and

10   Holiday Inn involved painting?

11       A      Just the rooms when they come up that they needed

12   it.  That was it.

13       Q      How frequently would you paint when you worked

14   there?

15       A      Maybe once a year.

16       Q      And what percentage of your job when you worked the

17   Ramada Inn and Holiday Inn involved plumbing work?

18       A      Quite a bit.

19       Q      What percentage would you say involved plumbing?

20       A      I would say 40 percent.

21       Q      And what kind of plumbing work would you do when you

22   worked at the Holiday Inn and Ramada Inn?

23       A      It was just general plumbing.  For like bathtubs

24   and, you know, et cetera.

```
 1        Q     And what were the years you worked at the Ramada Inn

 2   and Holiday Inn?

 3        A     '94 to 2001.

 4        Q     And how much did you make working for Ramada Inn and

 5   Holiday Inn?

 6        A     Well, it was just one check.  It wasn't for each

 7   individual place.  It was just for one.

 8        Q     Okay.

 9        A     I was getting a salary check.  Six hundred a week.

10        Q     You were getting six hundred a week?

11        A     Yes, ma'am.

12        Q     And where did you work before the Ramada Inn and

13   Holiday Inn?

14        A     For painters.  I just -- it wasn't -- I worked for

15   myself a little bit.  But I had to leave there because I

16   couldn't get the help right.  Everybody wanted more money

17   than I made.  So as a painter, several contractors.  I can't

18   give you the names of all of them because I don't remember

19   them.

20        Q     And you did primarily painting with these

21   contractors?

22        A     Yes.

23        Q     Did you do any plumbing work with these contractors?

24        A     No.  No.
```

1    Q    And why did you leave the Ramada Inn and Holiday Inn

2    job?

3    A    They had sold them out and I had spoken to

4    Mr. Duncan and he suggested to me that I come to work for

5    Dover Downs, his department.

6    Q    And by Mr. Duncan, you mean Richard Duncan?

7    A    Richard Duncan, yes, ma'am.

8    Q    And when did you speak to Mr. Duncan?

9    A    That was about 2001.

10   Q    Did you know Mr. Duncan before you spoke with him in

11   2001?

12   A    No, I didn't.  But my wife worked for Delmarva

13   Cleaning.  And Jeff, the one that is supervisor for Delmarva

14   Cleaning, he talked to Mr. Duncan concerning me.

15   Q    And when did you start working at Dover Downs?

16   A    2001.  April 23rd, I believe.

17   Q    So you were 60 years old at the time?

18   A    Um-hmm.

19   Q    Is that a yes?

20   A    Yes.  I'm sorry.

21   Q    And why did you apply to work at Dover Downs?

22   A    I was asked to come over and put in my application

23   for it.  Because of my past experience.

24   Q    And what past experience was that?

1      A    Maintenance.  General.  And painting primarily.

2      Q    Was it primarily painting?

3      A    Yes.

4      Q    And what position did you apply for at Dover Downs?

5      A    Maintenance Mechanic I.

6      Q    And were you a Maintenance Mechanic I when you

7   started at Dover Downs?

8      A    Yes.

9      Q    And how did you come to get this Maintenance

10  Mechanic I position?

11     A    It was given to me.

12               Which time?

13     Q    Did you interview?  In 2001 we are talking about.

14     A    Oh, Mr. Duncan.  He just gave me the Mech I because

15  of my past experience.

16     Q    Did you interview for the Maintenance Mechanic I

17  position in 2001?

18     A    I just had an interview with them and this is what

19  he placed me at.

20     Q    You interviewed with Mr. Duncan for this position?

21     A    Yes, ma'am.

22     Q    And who made a decision to hire you in 2001 as a

23  Maintenance Mechanic I?

24     A    Richard Duncan.

1     Q    Beside Mr. Duncan, did you meet with anyone else at

2    Dover Downs for your position in 2001?

3     A    No.

4     Q    Tell me about the interview you had with Mr. Duncan

5    in 2001 for the Maintenance Mechanic I position?

6     A    I was more or less given questions.  It was

7    questionnaires that I was given about plumbing and electric

8    and carpentry work.

9     Q    Did Mr. Duncan speak to you about the primary

10   responsibilities of your job as a Maintenance Mechanic I?

11    A    Yes, ma'am.

12    Q    And was your primary responsibility going to be

13   painting?

14    A    Yes.

15    Q    When you started?

16    A    Um-hmm.

17            MS. FRIEL:  Let's mark this.

18            (Thompson Deposition Exhibit No. 1 was

19   marked for identification.)

20   BY MS. FRIEL:

21    Q    Mr. Thompson, do you recognize this document?

22    A    Yes, ma'am.

23    Q    Just for the record, this document is D 0098 through

24   D 0099.

1            Mr. Thompson, what is this document?

2     A     It's an application for employment.

3     Q     And is this your job application?

4     A     Yes.

5     Q     And you submitted this job application to Dover

6     Downs?

7     A     Yes, ma'am.

8     Q     And what's the date at the top of this application?

9     A     4/7/01.

10    Q     And is April 7, 2001, the date you submitted this

11    application to Dover Downs?

12    A     Yes, ma'am, it is.

13    Q     Mr. Thompson, look at the second page of this

14    application.  Is that your signature at the bottom?

15    A     Yes, ma'am, it is.

16    Q     And is this information you provided on this job

17    application to Dover Downs accurate?

18    A     Yes, ma'am.

19    Q     In the paragraph before your signature, it states, I

20    understand that misrepresentation or admission of facts

21    called for is cause for dismissal.

22            Do you see that?

23    A     Where are we at now?

24    Q     I'm sorry.  The paragraph right before your

1        signature on page two.

2            A    Um-hmm.

3            Q    Do you see where it says that?

4            A    Yeah.  The previous sentence.

5            Q    Was that your understanding, that you could be

6        terminated if you misrepresented or omitted any facts from

7        this job application to Dover Downs?

8            A    Yes, ma'am.

9            Q    Okay.  Look at the chart in the middle of the page

10       on page two.  Do you see that, Mr. Thompson?

11           A    Um-hmm.

12           Q    And it lists your previous employer as Ramada Inn.

13       Do you see that?

14           A    Yes.

15           Q    And next to it it says, salary, a rate per hour.

16       And underneath that, it says, $500 per week.  Do you see

17       that?

18           A    Yeah.  That was starting.  When I started with

19       Ramada Inn.

20           Q    So that was your starting salary when you started?

21           A    Yes.

22           Q    Okay.  And you testified that you made $600 per week

23       at the Ramada Inn and Holiday Inn?

24           A    At the time of leaving, yeah.  When I left.

```
 1        Q    When did you get a raise from $500 to $600?

 2        A    I was there about three years.

 3        Q    Okay.  When did you get the raise?  When did you

 4    start making $600 per week?

 5        A    It had to be 2000.

 6        Q    Mr. Thompson, is this your handwriting on this

 7    application?

 8        A    Yes, ma'am, it is.

 9        Q    And look at the top of page one of the application.

10    Is that your handwriting where it says, Mech I?

11        A    No.  No, it isn't.

12        Q    Okay.  Do you know whose handwriting that is?

13        A    No, I don't.  I'm not even going to guess.

14        Q    Okay.  That's all I have for that document right

15    now.

16             Mr. Thompson, did you receive any documents

17    when you first started at Dover Downs?

18        A    Yes, ma'am, I did.

19        Q    And what documents did you receive?

20        A    What I received was when I went to the orientation

21    part.  They gave you a, you know, papers and stuff showing

22    the insurance that you could get and your work schedules.

23        Q    Did you also receive an employee handbook?

24        A    Yes.
```

1      Q    Okay.  I'm going to mark this Exhibit 2.

2                       (Thompson Deposition Exhibit No. 2 was

3      marked for identification.)

4      BY MS. FRIEL:

5      Q    And this exhibit is marked Margolis Edelstein 0119

6      through 0157.

7                       Mr. Thompson, do you recognize this document?

8      A    Yes, ma'am.

9      Q    And what is this document?

10     A    Employee handbook.

11     Q    And you received this employee handbook from Dover

12     Downs?

13     A    If this is the handbook.  I just -- from what I

14     read, yes.  It says handbook.  Yes, I received it.  It's a

15     handbook.

16     Q    Mr. Thompson, I received this document from your

17     attorney.  So did you provide this to your attorney?

18     A    I believe I did.  I'm not for certain.

19     Q    So you received this document from Dover Downs?

20     A    Yes.

21     Q    Turn to the page -- see at the bottom it has

22     numbers?  I'm going to ask you to turn to the page that's

23     marked 0145.  The page numbers are cut off.  So if you just

24     would identify it?

1           MR. WILSON:  Actually, the Bates numbers are

2    cut off, too, on the copies.  What's the section?

3           MS. FRIEL:  6.04.

4           MR. WILSON:  It's this number here.

5           THE WITNESS:  I don't even know what I'm doing

6    trying to read it.  I can't hardly see it with my glasses

7    on.  I have cataracts real bad.

8    BY MS. FRIEL:

9      Q    I don't want to rush you.  So take your time

10   reading.  Whatever time you need to read through the

11   documents.

12     A    Okay.

13     Q    Do you see where it's policy 6.04?

14     A    Yes, ma'am.

15     Q    And what does that policy deal with?

16     A    It shows that it's my responsibility for my

17   attendance and the property necessary of me being there.

18     Q    So does this policy, 6.04, deal with absences and

19   latenesses at Dover Downs?

20     A    Yes, ma'am.

21     Q    And tell me your understanding about the absentee

22   policy?

23     A    Well, if you're late, you have to call in.  Or if

24   you don't show up, you have to call in.  You're supposed to

1    call in two hours ahead of time.

2        Q    Okay.  What if an employee is absent from work at

3    Dover Downs and does not have any sick time accrued, what

4    would happen?

5        A    You would have a writeup.

6        Q    And what do you mean by a writeup?

7        A    You would be written up for not having a doctor's

8    excuse.  It would go against your record and being

9    terminated because you have -- what is it, seven writeups I

10   believe it is.

11       Q    And is a writeup a disciplinary action?

12       A    Yes.

13       Q    Turn to the next page.  In that chart, it talks

14   about occurrences.  Do you see that?

15       A    Yes, ma'am.

16       Q    And what does it say?

17             And when you were talking about a writeup, is

18   that what you meant, an occurrence?

19       A    Yes, ma'am.

20       Q    And what's an occurrence?

21       A    It's when you're either late or you don't bring in a

22   doctor's excuse.

23       Q    And would an employee get an occurrence when they

24   were absent from work and didn't have any sick time accrued?

1    A    Yes.

2    Q    Look at that chart where it says first to third

3    occurrences.  What would happen during your first through

4    third occurrences?

5    A    You would be coached concerning each occurrence.

6    Q    Would you receive a document for the coaching?

7    A    Yes.  You would receive the writeup plus you would

8    be given the option to sign the writeup or deny it.

9    Q    Now, the first through third occurrences, you

10   receive a coaching.  Is coaching put in your personnel file?

11   A    Yes.

12   Q    Look at, underneath that chart, and there is an

13   asterisk.  Do you see that?

14   A    What are we looking for?

15   Q    The asterisk underneath the chart we were just

16   looking at where it says, this is documented and placed in

17   your personnel file.  Do you see that?

18   A    Oh, okay.  Yeah.

19   Q    And do you see the asterisk start with the fourth

20   occurrence?

21   A    Issued a verbal warning, yeah.

22   Q    And there is an asterisk next to where it says

23   fourth occurrence?

24   A    Okay.

1     Q     And look above.  It says, first through third

2     occurrences.

3     A     Right.

4     Q     Is there an asterisk there?

5     A     Yes.

6     Q     There is an asterisk next to the first through third

7     occurrences?

8     A     Yes.

9     Q     I don't see an asterisk there.

10    A     I tell you, I can't see it too well.

11    Q     Okay.

12    A     I'm looking at something I can't hardly see.

13    Q     You testified that first through third occurrences

14    an employee would receive a coaching, is that correct?

15    A     All occurrences is supposed to be a coaching in all

16    written -- in all writeups.

17    Q     Doesn't this chart we are looking at explain what

18    happens with each occurrence?

19    A     Like the one to three note on your attendance card,

20    yes.

21    Q     And you testified you receive a coaching for the

22    first through third occurrences, is that right?

23    A     You're supposed to.

24    Q     And the fourth occurrence.  What happens on your

1      fourth occurrence?

2          A     I'm sure it has the same thing.  I don't know.  I

3      have been written up several times and a lot of times they

4      were never read to me.

5          Q     I'm looking at the chart.  It says fourth

6      occurrence.  What would happen on your fourth occurrence?

7          A     It says, issue verbal warning.

8          Q     And what would happen on your fifth occurrence?

9          A     Written warning.

10         Q     And your sixth occurrence, what would happen?

11         A     Final written warning and up to three days

12     suspension.

13         Q     And/or up to a three-day suspension?

14         A     Right.

15         Q     And your seventh occurrence --

16         A     And you will be terminated.

17         Q     And on this chart, it just notes that the fourth

18     through the seventh occurrences are placed in your personnel

19     file.  Do you see that?

20         A     Yes.

21         Q     But the first through third occurrences, which you

22     testified would have been a coaching, are not placed in your

23     personnel file.  Do you see that?

24         A     I see it but it's not true.

1      Q      How do you know it's not true?

2      A      Because all of it was placed in my personnel file.

3      Q      How do you know all the occurrences are placed in

4    your personnel file?

5      A      Because I got the copies out of my personnel file.

6      Q      And where did you see your personnel file?

7      A      Human resources.

8      Q      Do you have a copy of the personnel file you saw

9    from HR, human resources?

10     A      I believe I do.  I don't quite remember on the paper

11   itself.

12     Q      Okay.  And tell me about your understanding about

13   the Dover Downs lateness policy?

14     A      Well, if you're late, you're supposed to call in two

15   hours ahead of time.

16     Q      Okay.  And what if an employee is late for work and

17   doesn't call in two hours ahead of time?

18     A      Then you're eligible to be written up for it, or

19   disciplinary action.

20     Q      And would an employee receive the same occurrence

21   schedule that's outlined in this chart for their latenesses

22   as well as their absences?

23     A      Yes.

24     Q      Okay.  Let's go to policy 2.06.  And, Mr. Thompson,

1    what does policy 2.06 deal with?

2        A    Job posting.

3        Q    And tell me about your understanding of the job

4    posting policy at Dover Downs?

5        A    Are we speaking of the transfer job policies?

6        Q    Yes.

7        A    That's in-house transfers.  That's mostly what they

8    have.  That the in-house transfer should be an employee has

9    first choice.  And then it is I guess eligible to hire

10   somebody else beyond that.

11       Q    What do you mean an employee has first choice?

12       A    Well, that's what I was told.  That an employee has

13   first choice of getting the job before anybody else because

14   it's an in-house posting.

15       Q    And who told you that?

16       A    Everybody I have ever talked to at Dover Downs.

17       Q    Who?  Tell me who you talked to?

18       A    Richard Duncan, Bob Morrison.  All my supervisors.

19       Q    And what if an employee applied for a position but

20   didn't meet the qualifications, would that employee still

21   get the job?

22       A    No.  If you don't qualify for the position, you

23   shouldn't get it anyway.

24       Q    And is it your understanding that the in-house job

1   posting would be posted for five days internally?

2      A    Yes.

3      Q    And where would these job postings be?

4      A    Usually in maintenance.  But they are placed

5   different places in Dover Downs.  On bulletin boards and

6   break room, et cetera.

7      Q    Anywhere else you can think of?

8      A    The break room, which is the lunchroom anyway.  At

9   the maintenance department, the office, the main office

10  would be there.  And inside the maintenance department.

11     Q    And did an employee have to be employed with Dover

12  Downs for at least six months before that employee could

13  request a transfer to another position?

14     A    Yes, ma'am.

15     Q    Now, were there two separate maintenance groups?

16  Was there an inside maintenance and an outside maintenance,

17  is that correct?

18     A    Yes, it is.

19     Q    Was the inside maintenance also referred to as

20  building maintenance?

21     A    Building maintenance, yes, sir.

22     Q    And was outside also referred to as grounds?

23     A    Grounds.

24     Q    Now, you testified that when you started at Dover

1    Downs, you were a Maintenance Mechanic I?

2    A    Yes, ma'am.

3    Q    Where did you start?  Were you inside or outside

4    maintenance?

5    A    Inside.

6    Q    And have you remained in inside maintenance

7    throughout your employment at Dover Downs?

8    A    Yes, ma'am.

9    Q    And have you remained a Maintenance Mechanic I

10   throughout your employment at Dover Downs?

11   A    Yes, ma'am.

12   Q    Tell me your job responsibilities as a Maintenance

13   Mechanic I?

14   A    Well, that's to work in the hotel.  You do whatever

15   is called -- you're called upon to do.  In the electrical

16   field, plumbing, carpentry.  All phases of maintenance.

17   Q    Did you do painting as well as a Maintenance

18   Mechanic I?

19   A    Oh, yes.  That was my primary job.  It was painting.

20   It's called flex painting.

21   Q    What does that mean, flex painting?

22   A    Flex painting is where you take three or four

23   different colors and put it on one wall.  In other words,

24   make a wall look like marble.

1     Q     And did you have any experience in flex painting

2     before you came to Dover Downs?

3     A     Yes, ma'am.  I have a master's degree in art.

4     Q     Where did you received your master's degree in art

5     from?

6     A     Herring School of Art in Indianapolis, Indiana.

7     Q     And when did you receive your master's degree in

8     art?

9     A     In the sixties.  I don't remember at all.  There was

10    a lot of things I try to remember and I just can't remember.

11    I don't know what it is.  Age, I guess.

12    Q     What percentage of your work that you did as a

13    Maintenance Mechanic I at Dover Downs was painting?

14    A     Besides painting?

15    Q     No, was painting.  What percentage of your job was

16    painting.

17    A     When I first started, it was only like I'd say

18    25 percent.  Right there at the end when I got hurt, I was

19    more 50 percent.

20    Q     And what percentage of your job as a Maintenance

21    Mechanic I at Dover Downs was dealing with plumbing?

22    A     It varied.  I'd say 20 percent.

23    Q     You believe it was 20 percent you did plumbing work?

24    A     Yes, ma'am.

1      Q    And what kind of plumbing work did you do at Dover

2   Downs?

3      A    Well, broken water lines, leaks, bathrooms,

4   receptacles.  Not receptacles.  We are talking about

5   electric now.  Anyway, the toilets and et cetera that needed

6   to be fixed had to be finished.

7      Q    I'm sorry, what did you say?

8      A    That had to be fixed.

9      Q    And was part of your responsibility as a Maintenance

10  Mechanic I to direct the tasks of any of the Maintenance

11  Mechanic II's and Maintenance Mechanic III's?

12     A    Yes.

13                MS. FRIEL:  Mark this Exhibit 3.

14                     (Thompson Deposition Exhibit No. 3 was

15  marked for identification.)

16                MS. FRIEL:  And it's Bates label D 0121.

17  BY MS. FRIEL:

18     Q    Mr. Thompson, do you recognize this document?

19     A    Yes, ma'am.

20     Q    What is this document?

21     A    It's a job title for Maintenance Mechanic I.

22     Q    Okay.  And under essential functions, do you see

23  that?

24     A    Yes, ma'am.

1    Q    In the second bullet from the bottom, it reads,

2    preparation of work area to include movement of furniture/

3    obstructions, ordering required materials and direct tasks

4    for Maintenance Mechanic II's and III's.  Do you see that?

5    A    Yes, ma'am.

6    Q    Were you assigned to a certain shift when you first

7    started at Dover Downs in 2001?

8    A    Yes, I was.  3:30 to 11:00.  Evening shift.

9    Q    And was that also called the second shift?

10   A    Yes, ma'am, it was.

11   Q    And who was your supervisor when you first started

12   at Dover Downs and were working on the second shift?

13   A    Bob Morrison.

14   Q    And what was Mr. Morrison's position at that time?

15   A    Supervisor.

16   Q    Supervisor of the second shift?

17   A    Yes.

18   Q    Was that his title?  Okay.

19        Now, did there come a time when you moved from

20   the second shift to another shift?

21   A    Yes, ma'am, there was.

22   Q    When did you move from the second shift?

23   A    I don't remember the dates.

24   Q    What shift --

```
1      A      I went to the midnight shift.  It was just -- they

2   was just starting it.

3      Q      They were just starting that midnight shift?

4      A      Yes.

5      Q      At Dover Downs.  And that was called the third

6   shift, is that right?

7      A      Third shift.  Yes, ma'am.

8      Q      Now, you were in a car accident in September 2002,

9   is that right?

10     A      Yes, ma'am.

11     Q      And when did you return to Dover Downs, to working

12  at Dover Downs after that car accident?

13     A      One year and six months later.  That was -- I had

14  the car wreck September 9th.

15     Q      2002?

16     A      2002.  And it was one year and six days later that I

17  returned back to work.

18     Q      So September 2003 you came back to Dover Downs?

19     A      Right.

20     Q      When you moved from the second shift to the third

21  shift that we were just talking about, was that before your

22  car accident?

23     A      Yes, ma'am.

24     Q      It was before your car accident in 2002?
```

1     A    Yes, ma'am.

2     Q    And why did you switch from the second shift to the

3     third shift?

4     A    Because Mr. Duncan felt that I would be able to do

5     my painting and everything a little better.  People wouldn't

6     be in my way.

7     Q    Because you were painting the casino?

8     A    Yes.  The hallways and stuff.  There was too much

9     traffic, people.

10    Q    So did you mainly switch from the second shift to

11    the third shift to focus on your painting responsibilities?

12    A    All maintenance.  But mostly painting, yes.  I'd say

13    50 percent of the painting.

14    Q    And who was your supervisor when you went, now that

15    you're on the third shift?

16    A    I was my own supervisor.

17    Q    You didn't have a supervisor?

18    A    I didn't have a supervisor.

19    Q    Did anyone evaluate you when you were on the third

20    shift?

21    A    Yes.  Bob Morrison.  Second shift supervisor.  He

22    said he would still act as my supervisor if there was

23    anything really necessary for me to get ahold of him.

24    Q    So Mr. Morrison remained your supervisor even when

1     you went to the third shift?

2          A     Acting as supervisor.

3          Q     What do you mean acting as supervisor?

4          A     He is not my primary supervisor at that time.  But

5     he was just acting.  In other words, he was there if I

6     needed him as a supervisor.  Because I didn't have a

7     supervisor on my shift.

8          Q     But Mr. Morrison was the one who evaluated you, is

9     that right?

10         A     Correct.  Yes, ma'am.

11         Q     So did you report to Mr. Morrison when you were on

12    the third shift?

13         A     Just on jobs if I needed to see him, yeah.  Yes.

14         Q     So was it your understanding that Mr. Morrison was

15    your supervisor when you were on the third shift?

16         A     No, he wasn't my supervisor.  He was acting as

17    supervisor.

18         Q     Well, Mr. Morrison, even when you're on the third

19    shift, Mr. Morrison still evaluates your work, is that

20    correct?

21         A     Yes, ma'am.

22         Q     And Mr. Morrison still oversees your employment, is

23    that correct?

24         A     Yes.

1      Q    So wasn't Mr. Morrison your supervisor when you were

2  on the third shift?

3      A    Yeah.  We can go ahead and leave it as supervisor.

4  That way there will be no argument.

5      Q    Mr. Thompson, how long were you on the third shift?

6      A    A year.  I believe it was a year.  Maybe it was two

7  years.  I don't recall exactly.

8      Q    When you had your car accident in September of 2002,

9  were you working on the second shift or the third shift?

10  No, you were working on the third shift at that time?

11      A    I was on the third shift at that time.

12      Q    And when you came back from your car accident in

13  September 2003, were you still on the third shift at that

14  point?

15      A    I was still on the third shift, yes, ma'am.

16      Q    Now, when you worked on the third shift during this

17  time period, did you work with any other co-workers on the

18  third shift?

19      A    Yes.

20      Q    Who did you work with?

21      A    Let's see.  I'm trying to think.  My mind is so

22  twisted right now.

23      Q    Do you want to take a break?

24      A    Nate Whitcomb was transferred to the third shift to

1   work under my supervision.  And Kevin Gorlich.  I can't even

2   pronounce his name.

3       Q    Gorlich?  Kevin Gorlich?

4       A    He was also under my supervision in the third shift.

5       Q    When you say Nate Whitcomb was under your

6   supervision, what do you mean?

7       A    He was under my supervision to train him in painting

8   and the jobs that had to be done because he was a Mech III

9   at the time.

10      Q    Do you believe that you were Mr. Whitcomb's

11  supervisor when you were on the third shift?

12      A    I was acting as supervisor to both of them.

13      Q    It's your belief that you were acting as supervisor

14  to Mr. Whitcomb and Mr. Gorlich?

15      A    Yes, ma'am.

16      Q    Did anyone at Dover Downs tell you that you were

17  acting as Mr. Whitcomb's and Mr. Gorlich's supervisor?

18      A    Yes, ma'am.

19      Q    Who told you that?

20      A    Mr. Duncan, Bob Morrison.  And they told them that

21  if there was anything that they needed, that they was to

22  contact me and it would be my decision.

23      Q    And what position was Mr. Whitcomb at this time when

24  you were on the third shift?

1      A      Mech III.

2      Q      And what position was Mr. Gorlich at this time when

3    you were on the third shift with him?

4      A      He had just started.  I believe they had him as a

5    Mech II.  Started him as a Mech II.

6      Q      Now, did you evaluate?  Were you responsible for the

7    evaluations of Mr. Whitcomb and Mr. Gorlich?

8      A      No, I did not do any evaluations.

9      Q      Did you control any aspects of Mr. Whitcomb's

10   employment?

11     A      As far as training, yes.

12     Q      Did you have the authority to terminate

13   Mr. Whitcomb's employment?

14     A      No.

15     Q      Did you have the authority to terminate

16   Mr. Gorlich's employment?

17     A      No, I had no authority for neither one of them in

18   that respect.

19     Q      But you testified you were acting supervisor for

20   Mr. Whitcomb and Mr. Gorlich?

21     A      Right.

22     Q      In what way were you the acting supervisor if you

23   weren't evaluating them or didn't control their --

24     A      Well, an acting supervisor doesn't mean that you can

1    fire and hire them.  It just means that I am over them in

2    order to show them what to do, that they have to honor and

3    respect what I say.

4        Q    Was there anyone at this time when you were on the

5    third shift, was there any supervisor, anyone with the title

6    supervisor on that shift?

7        A    No.

8        Q    Okay.  Let's turn to -- I gave you this exhibit.

9    Exhibit 3 that we just looked at.  The job description.  And

10   you testified that a central function of a Maintenance

11   Mechanic I job was to direct the task for Maintenance

12   Mechanic II's and III's.

13       A    Yes.

14       Q    Is that correct?

15       A    Yes.  It's not only for me.  It was for all Mechanic

16   I's.  They are over Mechanic II's and III's.  What they say,

17   they honor.  They don't have to be a supervisor in order for

18   that to take place.

19       Q    So weren't you directing the tasks for Mr. Whitcomb

20   and Mr. Gorlich on shift three?

21       A    Was I directing it?

22       Q    Yes.

23       A    Yes.

24       Q    And that was part of your responsibilities as a

1    Maintenance Mechanic I, correct?

2        A    Right.

3        Q    So other than directing their tasks, which was an

4    essential function.  Your job as a Maintenance Mechanic I,

5    why do you believe you were acting as their supervisor?

6        A    Because I was told -- I wasn't told that I was

7    acting as a supervisor.  I was told that they were to work

8    under me and I would be the same as their supervisor.  I

9    wouldn't be their supervisor but I would be the same as

10   their supervisor.

11       Q    In what respect would you be the same as their

12   supervisor?

13       A    That they would honor what I would tell them to do.

14       Q    Under your job description for a Maintenance

15   Mechanic I, wasn't that that you would direct the tasks of

16   both Mr. Whitcomb and Mr. Gorlich?

17       A    Yes.

18       Q    So wasn't that what you were performing?

19       A    Um-hmm.

20       Q    Your job duties as a Maintenance Mechanic I?

21       A    Yes.  And beyond that.

22       Q    Tell me how you went beyond the responsibilities of

23   a Maintenance Mechanic I?

24       A    I just told you.  I can't go any further than what I

1     just said.

2         Q    Okay.  So besides what you already told me, there is

3     nothing else that you did besides direct the tasks for

4     Mr. Gorlich and Mr. Whitcomb?

5         A    Training.  That's all I did.  Is the training of

6     them.

7         Q    And how did you train Mr. Whitcomb and Mr. Gorlich?

8         A    With the paints, the colors, applications.

9         Q    Was the training focused primarily on painting?

10        A    Yes, ma'am.  That's what I was supposed to train

11    them in.

12        Q    And who evaluated you when you were on the third

13    shift?

14        A    Bob Morrison.

15        Q    And who was responsible for evaluation of

16    Mr. Gorlich when Mr. Gorlich worked on the third shift with

17    you?

18        A    I couldn't tell you that.

19        Q    Who was responsible for the evaluation of

20    Mr. Whitcomb?

21        A    I couldn't tell you that.

22        Q    Do you know if Mr. Morrison was evaluating

23    Mr. Gorlich and Mr. Whitcomb?

24        A    I couldn't tell you.  I don't know.

BRANCE F. THOMPSON

38

1    Q    Okay.  Did there come a time when you moved from the

2    third shift at Dover Downs?

3    A    Yes.  I moved to the first shift.

4    Q    You moved to the first shift?

5    A    Yes, ma'am.

6    Q    And what's the first shift?

7    A    It's from 7:00 to 3:30.  7:00 a.m. to 3:30 p.m.

8    Q    And when did you move from the third shift to the

9    first shift at Dover Downs?

10   A    It was after the accident.  I can't tell you exactly

11   when.  It was after the accident.

12   Q    Do you remember if it was months that you got moved

13   to the first shift after the car accident?

14   A    It was a few months, yeah.

15   Q    And why did you move from the third shift to the

16   first shift at Dover Downs?

17   A    Because I was asked to through Mr. Richard Duncan.

18   Q    And why did Mr. Duncan ask you to move shifts, from

19   the third shift to the first shift?

20   A    I don't remember.

21   Q    Did you talk to Mr. Duncan about switching shifts?

22   A    Yes.  He just asked if I would -- if I wanted to go

23   back and work on the day shift under him.  And I said, that

24   would be fine.

1     Q     When you were on the third shift, did you ever

2     complain to anyone at Dover Downs that you didn't like being

3     on the third shift?

4     A     Yes.  Yes.

5     Q     Who did you complain to?

6     A     Everybody I could.

7     Q     Did you complain to Mr. Duncan about being on the

8     third shift?

9     A     Yes.  Everybody.

10    Q     Did you complain to Mr. Morrison about being on the

11    third shift?

12    A     Yes, I did.

13    Q     And why didn't you like being on the third shift?

14    A     For one thing, I couldn't get my sleep right.  I

15    couldn't -- it was just nothing organized.  I couldn't

16    organize anything right.  And I wasn't treated right there.

17    So that's why I didn't want third shift.

18    Q     Why weren't you treated right on the third shift, do

19    you believe?

20    A     I put in for supervisor's job and I was denied the

21    job.

22    Q     The supervisor job on the third shift?

23    A     Third shift, yes.  I was the only one that put in

24    for it at that time.

1     Q    And when did you apply for the supervisor job on the

2     third shift?

3     A    Boy, I can't remember the date.  Oh, I know.  They

4     put in an in-house posting and I applied for it and then I

5     was called to Mr. Duncan's office to tell me that they

6     decided at that time they wasn't going to have a

7     supervisor's job opening.

8     Q    And do you know if Dover Downs hired anyone for the

9     supervisor position on the third shift?

10    A    Yes.  A short time after that, after they told me

11    they wasn't going to hire anybody.

12    Q    By short time, what do you mean?  How long after?

13    A    A couple months.

14    Q    Who did they hire for the third shift supervisor

15    after a couple months?

16    A    Al Baldwin.  He worked under Mr. Duncan on day

17    shift.

18    Q    Was there a posting for this job a couple months

19    later?

20    A    There was a posting but he was already promised the

21    job.

22    Q    Did you apply for this job when there was a posting?

23    A    I couldn't.  He was already promised the job.

24    That's the reason I said that I wanted off of that shift.

1       Q      How do you know that Mr. Baldwin was promised the

2    third shift supervisor position?

3       A      We were told.  Just through employees.  Through him

4    as one.  Al Baldwin.

5       Q      Al Baldwin told you that he received the third shift

6    supervisor position?

7       A      Yes.

8       Q      And Mr. Baldwin told you this before the posting

9    went up?

10      A      No.  I can't say that.  All I know, he told me that

11   he received -- that he was asked to take the job as

12   supervisor for Mr. Richard Duncan.

13      Q      But there was still a posting for this job, is that

14   correct?

15      A      Yes.

16      Q      And you didn't apply at the time of the posting?

17      A      I was turned down before.  What would make me think

18   I would get it then?

19      Q      But you just told me you were turned down before and

20   Mr. Duncan said they weren't hiring anyone for the

21   supervisor at that time, is that correct?

22      A      Yeah.

23      Q      Then according to you, a couple months later, they

24   have another posting for the same position, is that correct?

1    A    Yes.

2    Q    Did you apply?

3    A    Yes, I applied for it.

4    Q    You applied for the second posting as well?

5    A    Yes. I applied for every position as far as

6  supervisor's jobs.

7    Q    You applied for every supervisor position?

8    A    The ones that came up as far as maintenance, yes.

9    Q    Okay. Let's get back. When you were switched to

10  the first shift, were you still a Maintenance Mechanic I?

11    A    Yes.

12    Q    And did you have the same job responsibilities as

13  you did on the third shift?

14    A    Yes, ma'am.

15    Q    You told me that you complained to several people at

16  Dover Downs, include Mr. Duncan and Mr. Morrison, that you

17  didn't like being on the third shift?

18    A    Right.

19    Q    Do you know if that's why you were moved from the

20  third shift to the first shift, because of your complaints?

21    A    It could be. I don't know. I talked to Mr. Duncan

22  and Mr. Duncan asked me about if I wanted to go to the first

23  shift. And I said, yes.

24    Q    Did you supervise any employees when you worked on

1    the first shift?

2        A    The first shift?

3        Q    Yes.

4        A    Yes.

5        Q    Who did you supervise on the first shift?

6        A    Well, see, they have like a supervisor, and on his

7    days off, then they have somebody setting in for him on that

8    day.  And then it goes by seniority.  And there is days that

9    I had to sit in and supervise whoever worked that day.

10       Q    And by supervise --

11       A    I was a Mech I and they were Mech II's, you know, et

12   cetera.

13       Q    So as a Maintenance Mechanic I, what do you mean by

14   you had to supervise the people below you?  What do you mean

15   by supervise?

16       A    Well, you're the only person there that, as a Mech

17   I, which is the highest that you can be, other than a

18   supervisor.  So if the supervisor is not there, then you

19   become that supervisor for that day.

20       Q    Did that mean you had to direct the tasks of the

21   Maintenance Mechanic II's and Maintenance Mechanic III's?

22       A    Yes, ma'am.

23       Q    And did you have to do anything besides directing

24   the tasks of the Maintenance Mechanic II's and III's?

1      A     Well, you worked, too.  But outside of that.

2      Q     And who was your supervisor when you worked on the

3   first shift?

4      A     I must be getting Alzheimer's.  I can't think.

5      Q     Was Mr. Morrison your supervisor?

6      A     No.

7      Q     Was Mr. Duncan your supervisor on the first shift at

8   this time?

9      A     No.

10     Q     Was Mr. Homlish your supervisor?

11     A     Yes.

12     Q     Steve Homlish?

13     A     Steve Homlish.

14     Q     When you switched from the third shift to the first

15  shift, Steve Homlish became your supervisor?

16     A     Became my supervisor, yes.

17     Q     You testified that you were supervised by Bob

18  Morrison during certain points of your employment at Dover

19  Downs?

20     A     Yes, ma'am.

21     Q     How did you get along with Mr. Morrison?

22     A     We got along great.  We became close friends at that

23  time.

24     Q     Are you still close friends with Mr. Morrison?

BRANCE F. THOMPSON                                          45

1       A      As far as I'm concerned, yes, ma'am.

2       Q      Do you feel that Mr. Morrison treated you fairly?

3       A      No.  He did when I worked under him, yes.

4       Q      So when you worked under Mr. Morrison, you believe

5    he treated you fairly?

6       A      Oh, yes.  He treats everybody fairly, as far as

7    that's concerned.

8       Q      And did there come a time when you felt Mr. Morrison

9    didn't treat you fairly?

10      A      Yes.  When I put in for the transfer for outside

11   maintenance.

12      Q      And when was that transfer to outside maintenance

13   that you requested?

14      A      To get the plumbing job.

15      Q      And when was that?

16      A      2004.

17      Q      Was that June 2004?

18      A      Yes, ma'am.

19      Q      And was Bob Morrison the decision-maker in this

20   outside maintenance position in June 2004?

21      A      Yes, ma'am.  He was more or less outside manager.

22   He was not a supervisor, he was a manager.

23      Q      And you testified that Richard Duncan also

24   supervised you at a certain point during your employment at

1    Dover Downs?

2        A    Yes, ma'am.

3        Q    Do you think Mr. Duncan treated you fairly?

4        A    Yes.  I can't say he didn't.

5        Q    Did you get along with Mr. Duncan?

6        A    Yes, ma'am.

7        Q    And then you testified that Steve Homlish was your

8    supervisor when you were on the first shift?

9        A    Yes, ma'am.

10       Q    What's Mr. Homlish's position?  What was his job

11   title?

12       A    Supervisor.

13       Q    Supervisor of the first shift?

14       A    The first shift.  Yes, ma'am.

15       Q    And did you get along with Mr. Homlish?

16       A    Yes, ma'am.

17       Q    Do you feel in Mr. Homlish treated you fairly?

18       A    Yes, ma'am.

19       Q    Did you ever have any problems with any of your

20   co-workers while you worked at Dover Downs?

21       A    Yes, I did.

22       Q    What co-workers did you have problems with?

23       A    Gorlich.

24       Q    Any other co-workers you had problems with besides

1     Gorlich?

2        A    I don't know who all in general at first.  They were

3     throwing cigarette butts and everything in my paint and

4     stuff.  It was just jokes that they were pulling.  Yes, I

5     had problems at that time.

6        Q    And you said they.  Who were you referring to with

7     they?

8        A    It had to be maintenance.  They covers a lot of

9     field because I don't know who they were.

10       Q    And you say they would throw cigarette butts in your

11    paint?

12       A    Yeah, my paint thinner.

13       Q    Were they joking when they threw the cigarette

14    butts?

15       A    Yeah.  They did it intentionally.  Because they have

16    a tendency that if you start as a Mech I, you shouldn't

17    start at a Mech I.  They were there longer than you and they

18    should be there.  So that's what the problems were.

19       Q    What do you mean that's what the problems were that

20    you were a Maintenance Mechanic I?

21       A    That's the way it is there.  If you're a Mechanic I,

22    nine out of ten of them that's been there a lot longer than

23    you have, they felt that they should have had that position

24    and not you.

BRANCE F. THOMPSON

48

1     Q   Okay.  You testified that you had problems with

2   Kevin Gorlich?

3     A   Um-hmm.

4     Q   What were your problems with Kevin Gorlich?

5     A   I think Kevin has problems with a lot of people.

6   But mine was the fact that I asked him to get me some paint

7   and he didn't get the color I wanted and I told him.  Well,

8   he got mad and I was up at the midway slots in Harrington

9   and my tires were slashed up there.  And it was -- seemed to

10   be him.  Some people had seen it and they didn't want to say

11   nothing, you know, because they were out of state and, et

12   cetera, but my tires were slashed.  Both of them.

13     Q   And when was that?  When were your tires slashed,

14   when you were in Harrington?

15     A   2004.  Yeah, 2004.

16     Q   And why do you believe Mr. Gorlich was responsible

17   for slashing your tires?

18     A   He was there.  And when he left, the people that --

19   when I went out to get in my car, they told me that they

20   seen a gentleman with the color clothes that he had on

21   stabbing my tires but he took off and they said they didn't

22   want to stay and be a witness to it.  They were out of state

23   and they didn't want to have problems.

24     Q   Do you know who these people were, who you talked to

BRANCE F. THOMPSON                                        49

```
 1     them about it?

 2        A     No, ma'am, I don't.  All I know is they told me my

 3     tires was flat and they explained to me what the person

 4     looked like that did it.

 5        Q     Prior to this incident in 2004 with your tires being

 6     slashed, did you have any problems with Gorlich before that?

 7        A     No.

 8        Q     Did you have any arguments with Gorlich before the

 9     2004 tire slashing incident?

10        A     In the argument, no.  If I would tell him something

11     to do, he would take off and do what he wanted.  He has been

12     like that ever since he has been there.  It's not just with

13     me.

14        Q     Did you ever threaten Mr. Gorlich?

15        A     We had a consultation.

16        Q     What does that mean, you had a consultation?

17        A     He said a few things to me and I said a few things

18     to him and that's as far as it went.

19        Q     Okay.  Well, tell me, what did he say to you and

20     what did you say to him?

21        A     He told me I had to quit badmouthing him.  And I

22     told him I knew that he had slashed my tires.  And he said

23     that I was crazy.  So I just asked him if he had a problem,

24     let's take it outside.
```

1       Q     And what do you mean if you had a problem, let's

2    take it outside when you said that to Mr. Gorlich?

3       A     If he had a problem, we would just take it outside

4    and fight and get it over with.  But he went to Mr. Duncan

5    and Mr. Duncan talked to me and it was all straightened out.

6       Q     Besides Mr. Gorlich, did you ever ask anyone else to

7    go outside and fight with you while you worked at Dover

8    Downs?

9       A     No.  I had no reason to.

10      Q     Do you think that's proper workplace behavior to

11   offer to fight someone on the job?

12      A     You ask him the same question.  So, you know, it

13   goes both ways.  They did me the same way I did him.

14      Q     I'm asking your opinion.

15      A     No, it's not proper.

16            MS. FRIEL:  Let's take a short five-minute

17   break because I want to switch to another topic.

18            MR. WILSON:  Okay.

19            (A brief recess was taken.)

20   BY MS. FRIEL:

21      Q     Okay, Mr. Thompson, you had testified that you were

22   a Maintenance Mechanic I throughout your employment at Dover

23   Downs, is that correct?

24      A     Yes, ma'am.

1        Q    And you testified you applied for some other

2   positions during your employment at Dover Downs, is that

3   correct?

4        A    Yes, ma'am.

5        Q    Okay.  Tell me the first position you applied for at

6   Dover Downs?

7        A    Midnight supervisor.

8        Q    And by midnight, is that third shift supervisor?

9        A    Third shift supervisor.

10       Q    And when was that?  When did you apply for the third

11   shift supervisor position?

12       A    2001.

13       Q    Do you remember when in 2001 you applied for the

14   third shift supervisor?

15       A    No, ma'am, I sure don't.

16              (Thompson Deposition Exhibit No. 4 was marked

17   for identification.)

18   BY MS. FRIEL:

19       Q    Mr. Thompson, do you know what this document is,

20   Exhibit 4?

21       A    Yes, ma'am, I do.  Interrogatories.

22       Q    And what are these?

23       A    Statements.

24       Q    Are these your answers to the questions or

52

1    interrogatories asked of you by Dover Downs?

2    A    Yes, ma'am, they are.

3    Q    And turn to the second to last page of this

4    document.

5    A    Okay.

6    Q    Do you know what this page is?

7    A    Certification.

8    Q    And what is the certification for?

9    A    In other words, I swear that the documents are true

10    by signing them.

11    Q    Does it say in the first line, I certify that the

12    foregoing answers made by me to these interrogatories are

13    true and correct?

14    A    Yes, ma'am.

15    Q    Doesn't that say that, I am aware that if any of the

16    foregoing answers are willfully false, I am subject to

17    punishment?

18    A    Yes, ma'am.

19    Q    And is that your signature at the bottom?

20    A    Yes, ma'am, it is.

21    Q    And what's the date that you signed this document?

22    A    11/29/05.

23    Q    Turn to -- and there is no page numbers -- the ninth

24    page.  And it's interrogatory number four.

1          Do you see where it says number four,

2    Mr. Thompson.  Identify each and every position the

3    plaintiff contends he was unlawfully denied.  Do you see

4    that?  Do you see where it says that under four?

5      A    Yes, ma'am.

6      Q    And then the answer.  Do you see where it says

7    answer?

8      A    Yes, ma'am.

9      Q    And at number one it says, midnight supervisor

10   position?

11     A    Yes, ma'am.

12     Q    Is this the third shift supervisor position that we

13   are talking about?

14     A    Yes, ma'am.

15     Q    That you allege you applied for in 2001?

16     A    Yes, ma'am.

17     Q    And 1 c) says, middle of July, 2001.

18               Do you see that?

19     A    Yes, ma'am.

20     Q    And is that when you applied for this position in

21   the middle of July, 2001?

22     A    Yes, ma'am.

23     Q    And how did you learn about this third shift

24   supervisor position in July 2001?

1    A    I was told that the posting was put up and I went

2    and read it.

3    Q    And who told you there was a posting put up?

4    A    Just employees.

5    Q    Do you remember who, what employees told you about

6    the posting?

7    A    Bob Morrison for one.  I do remember him telling me.

8    He told me to put in for the job at that time.

9    Q    And do you have a copy of the job posting for the

10   third shift supervisor position?

11   A    I do in my documents.  Yes, I do.

12   Q    For the July 2001 position?

13   A    Yes, I do.

14           MS. FRIEL:  Okay.  I don't have that in my

15   file.  So I'm going to ask, request, Tim, that I get a copy

16   of that job posting.

17           MR. WILSON:  Okay.

18   BY MS. FRIEL:

19   Q    And did you interview for this third shift

20   supervisor position in July 2001?

21   A    There was really no interview to it.  I was called

22   down to the office and they -- and Mr. Duncan said him and

23   Mr. Wertz at that time felt that they didn't need a midnight

24   supervisor.

1 Q Okay.  Is this a discussion that we talked about

2 earlier today?

3 A Yes, ma'am, it is.

4 Q That they said they didn't need a third shift

5 supervisor at the time?

6 A Yes, ma'am.

7 Q And who was the decision-maker for this third shift

8 supervisor position in July of 2001?

9 A Richard Duncan.

10 Q And as of July 2001, how long had you been employed

11 by Dover Downs?

12 A Five months.

13 Q May, June, July.  Three months.  Is that right?  You

14 started in April of 2001?

15 A Yeah.

16 Q Three months?

17 A Um-hmm.

18 Q And you testified earlier that employee needed to be

19 employed with Dover Downs for six months before they can

20 apply for a transfer position, isn't that correct?

21 A I wasn't told at this time.  I was told to put in

22 for the job because I was the only one working midnights at

23 that time.  It had nothing to do with how long I had been

24 there.

BRANCE F. THOMPSON

56

1    Q    Okay.  Didn't we review a policy earlier today that

2    showed --

3    A    Yes, ma'am.

4    Q    And didn't that policy say that an employee had to

5    be there for six months at Dover Downs before --

6    A    I'll repeat myself again.  I was never told anything

7    concerning the policy at the time.

8    Q    And the policy was in the employee handbook that we

9    reviewed earlier today?

10    A    Yes, ma'am.  I was never told anything concerning

11    the policy in the handbook.  I was told to put in for the

12    job because I was the only one working at that time.

13    Q    Didn't you receive a copy of the employee handbook

14    when you started at Dover Downs?

15    A    Yes, ma'am.

16    Q    So how could you have received that position if

17    there was a requirement that an employee had to be there for

18    six months?

19    A    Why was I told to ask for it?

20    Q    Why were you told to -- I'm sorry?

21    A    Why was I told to ask for the job?  So evidently

22    they thought I would be receiving that job.

23    Q    And who asked you to apply for that?

24    A    Bob Morrison.

```
 1      Q     But Mr. Morrison was the decision-maker for this
 2   third shift supervisor position, is that correct?
 3      A     Right.
 4      Q     Mr. Duncan was the decision-maker?
 5      A     Correct.
 6      Q     Did you ever talk to Mr. Morrison about why you did
 7   not receive this position in July 2001?
 8      A     No, ma'am.  I did tell him.  And he knew that I
 9   didn't receive it.  But I didn't need to talk to him about
10   it.
11      Q     Do you think that you were discriminated against by
12   not receiving this position?
13      A     Yes, I was.
14      Q     And why do you believe that?
15      A     Age.  Much younger.  And right after I was denied
16   the position, and it wasn't that I was denied the position
17   because of the handbook, they just said they didn't want a
18   supervisor at that time.  And then right shortly thereafter,
19   they hired Al Baldwin as supervisor.
20      Q     But you testified earlier that there was a later
21   posting and for third shift supervisor and Mr. Baldwin
22   received the job after that posting?
23      A     Yes, ma'am.
24      Q     Now, we are focusing now just on the July 2001
```

1    posting.  Did Mr. Baldwin receive the job based on the

2    July 2001 posting?

3        A    I was the only one that put in for it.  Nobody

4    received it.

5        Q    So no one received that July 2001 third shift

6    supervisor position?

7        A    No, ma'am.

8        Q    Okay.  And then you stated that there was another

9    posting for the third shift supervisor position?

10       A    Yes, ma'am.

11       Q    And when was that do you believe?

12       A    A couple months after the first posting.

13       Q    Okay.  Let's turn back to Exhibit 4, your answers to

14    interrogatories, the same page you're on.

15       A    Okay.

16       Q    And under answer two.  I'm sorry.  Answer to

17    interrogatory number four, part two, it says, midnight

18    supervisor position?

19       A    Yes, ma'am.

20       Q    And then the date under 2 c) says, October 19, 2001.

21    Do you see that?

22       A    Yes, ma'am.

23       Q    And is that the date of the posting for the third

24    shift supervisor position?

1       A       The second time, yes, ma'am.

2                       MS. FRIEL:  Exhibit No. 5.

3                       (Thompson Deposition Exhibit No. 5 was

4       marked for identification.)

5                       MS. FRIEL:  And this is Bates labeled Margolis

6       Edelstein 0064.

7       BY MS. FRIEL:

8       Q       Mr. Thompson, do you recognize this document,

9       Exhibit 5?

10      A       Yes, ma'am, I do.

11      Q       And what is this document?

12      A       It's a posting for the supervisor building

13      maintenance job.

14      Q       And is this the third shift supervisor position we

15      talked about?

16      A       Yes, ma'am, it is.

17      Q       And when was the posting date for this position?

18      A       October 19th, 2001.

19      Q       And when was the closing date for this third shift

20      supervisor position?

21      A       October 24th, 2001.

22      Q       And when did you apply for this third shift

23      supervisor position?

24      A       Well, it was when it was put up.  You have five days

60

1    to apply for it.  What day, I don't remember.

2        Q    Okay.  Do you have a copy of the transfer form you

3    allegedly submitted for this third shift supervisor position

4    in October 2001?

5        A    I should have.  But I don't remember.

6                 MS. FRIEL:  I'm going to request, if he still

7    has a copy.  I don't have it in my file that you gave it to

8    me.

9    BY MS. FRIEL:

10       Q    Do you know who got this position, the shift

11   supervisor position?

12       A    Yes, I do.  Al Baldwin.

13       Q    And do you know when Al Baldwin received this

14   position?

15       A    Yes.  He received it within that period of time,

16   October 24th.  Somewhere in that vicinity.

17       Q    And how do you know that's when Mr. Baldwin became

18   the third shift supervisor?

19       A    I was told that.

20       Q    Who told you that?

21       A    Al Baldwin himself.

22       Q    Al Baldwin told you that he started as a third shift

23   supervisor in October of 2001?

24       A    Yes, ma'am.

1    Q    Do you know how long Mr. Baldwin worked at Dover

2    Downs when he received the position as third shift

3    supervisor?

4    A    No, I don't.

5    Q    Was Mr. Baldwin there when you started at Dover

6    Downs?

7    A    Yes, ma'am, he was.

8    Q    And was Mr. Baldwin a Maintenance Mechanic I as

9    well?

10   A    Yes, ma'am.

11                MS. FRIEL:  I'm going to -- Exhibit 6.

12                (Thompson Deposition Exhibit No. 6 was

13   marked for identification.)

14   BY MS. FRIEL:

15   Q    Mr. Thompson, do you recognize this document?

16   A    Yes, ma'am, I do.

17   Q    And what is this document?

18   A    A jury trial demanded.

19   Q    Is Exhibit 6 the complaint you filed against Dover

20   Downs?

21   A    Yes, ma'am.

22   Q    Did you review this complaint before it was filed

23   with the Court?

24   A    Yes, I did.

1    Q    Is everything in this complaint true?

2    A    Yes, ma'am, it is.

3    Q    Please turn to page four.

4    A    Okay.

5    Q    Starting with paragraph 17.  It says, shortly

6    thereafter, on or about October 19th, 2001, a job posting

7    was released for third shift supervisor.  Mr. Thompson

8    applied for that position.

9         Paragraph 18.  Upon information and belief, Mr.

10   Thompson was the only individual who applied for the third

11   shift supervisor's position.

12             Is that what that says?

13   A    Yes, it is.  But that's incorrect as far as the 17.

14   17 was the second time that the application was put in for

15   the transfer.

16   Q    Okay.  Then paragraph 18 --

17   A    Is when I put in for it the first time.

18   Q    I'm sorry.  Paragraph 18 refers to what job that you

19   put in for?  What time?

20   A    The midnight shift supervisor.  But it was when the

21   in-house transfer was first brought out.  And that was

22   before -- before this one.

23   Q    So paragraph 18 is not referring to the October 2001

24   job posting?

BRANCE F. THOMPSON                                    63

1        A      No, ma'am.

2        Q      Okay.  Paragraph 19.  Mr. Thompson was not awarded

3    the position.  Mr. Duncan explained that he did not get the

4    job because Mr. Duncan had come to realize that he did not

5    need a third shift supervisor?

6               What position is paragraph 19 referring to?

7    What job posting?

8        A      That 18 and 19 is before the 17.

9        Q      So is that referring to the July 2001 position we

10   talked about earlier?

11       A      No.  Yeah, the earlier position that was in July.

12       Q      Okay.  Turn to paragraph 20 on the next page.

13   Approximately two to four months later, Dover Downs promoted

14   Al Baldwin, a Maintenance Mechanic I, who had been

15   previously working on the first shift, to the third shift

16   supervisor position.

17               Do you see that?

18       A      Yes.  That was referral to an October 24th.

19       Q      When the opening for third shift supervisor was

20   posted, Mr. Baldwin did not apply for the opening.

21               Do you see where it says that?

22       A      Yes.

23       Q      Did Mr. Baldwin apply for this third shift

24   supervisor position?

1    A    I don't -- the understanding I had at the time, he

2    did not apply for it.  But was asked to apply for it.  So he

3    might have after I had found out about it.  I don't know.

4    Q    So you don't know if Mr. Baldwin applied for the

5    position or not?

6    A    No, ma'am, I don't.

7    Q    And you applied for this October 2001 third shift

8    supervisor position?

9    A    Yes, ma'am.

10   Q    The next line of paragraph 27, instead, Mr. Duncan

11   approached Mr. Baldwin and asked if he wanted the job.

12             Is that what that says?

13   A    Yes, ma'am.

14   Q    And how do you know that?  How do you know

15   Mr. Duncan approached Mr. Baldwin?

16   A    Because Mr. Baldwin said so.

17   Q    Mr. Baldwin told you that Mr. Duncan approached him

18   about the job?

19   A    Yes.  He told me and told Mr. Whitcomb and he told a

20   few other people, as far as I know, in maintenance.

21   Q    And so Mr. Baldwin told you this but you still

22   applied for the third shift supervisor position in October

23   of 2001?

24   A    Yes.

1      Q     So you didn't care if --

2      A     I applied for it.

3      Q     Mr. Duncan told Mr. Baldwin --

4      A     I applied for it.  I didn't know that he had applied

5      for it.  And I didn't know Mr. Duncan had told him to apply

6      for it.  At the time I applied for it.

7      Q     When did Mr. Baldwin supposedly tell you that

8      Mr. Duncan asked him if he wanted the job?

9      A     At the time of the posting.

10     Q     So Mr. Baldwin told you this and then you applied

11     after Mr. Baldwin told you this?

12     A     No.  No.  I applied for the job and I was told by

13     Mr. Baldwin that Mr. Duncan had asked him if he wanted the

14     job.  And this is where he spoke to others in maintenance

15     concerning the job transfer.

16     Q     And did you receive an interview for this

17     October 2001 job posting?

18     A     No.  I never did.

19     Q     And who was the decision-maker for this third shift

20     supervisor in October 2001?

21     A     Richard Duncan.

22     Q     Did you ever talk to anyone at Dover Downs about why

23     you didn't receive an interview for this position in October

24     of 2001?

1       A      I asked questions but I was never given an answer.

2       Q      Well, who did you question about why you didn't

3    receive the job?

4       A      To Mr. Duncan.

5       Q      And when did you talk to Mr. Duncan about this?

6       A      Shortly after that.

7       Q      And what did Mr. Duncan tell you as far as why you

8    didn't get the position?

9       A      I received no answer.

10      Q      Well, tell me about the discussion you had with

11   Mr. Duncan about the position?

12      A      I just asked him why wasn't I given the opportunity

13   as Al Baldwin to get the supervisor's job.  I wasn't told

14   anything.  He just turned around and walked away.  That's

15   the way the conversation went.

16      Q      Do you feel that you didn't receive this position

17   because of your age?

18      A      Yes, I do.

19      Q      And why do you believe that you didn't receive this

20   position in 2001, October 2001, because of your age?

21      A      Because a younger person will stay with the company

22   longer because of age and they feel they can get more out of

23   a younger person.

24      Q      I'm sorry.  I didn't hear you.

1      A     They feel they would get more out of a younger

2   person longer in years than they would an older person.  And

3   that's my belief.

4      Q     What's your belief based on?

5      A     Through the years of seeing things in same similar

6   situations.

7      Q     Tell me about those similar situations you have

8   seen?

9      A     It's just seeing it happen through other places and

10  hearing about it happening in other places.  I can't tell

11  you exactly where.

12     Q     Through places other than Dover Downs, you mean?

13     A     Yes.

14     Q     What at Dover Downs did you see that would make you

15  think you not receiving this job in October 2001 was age

16  discrimination?

17     A     Because of the way it all happened.

18     Q     I'm sorry?  The way what all happened?

19     A     The way the conversation and not getting a response

20  and the person taking the supervisor's job.  This is what

21  made me believe it.

22     Q     Anything else?

23     A     No.

24     Q     Do you know if Mr. Baldwin was more qualified than

BRANCE F. THOMPSON                                    68

1     you for this position, for the third shift supervisor

2     position?

3         A    No.  Because he wasn't on the job two or three

4     months and he was fired off the job, not being able to do

5     the job.

6         Q    The third shift supervisor job?

7         A    Yes.  Al Baldwin.

8         Q    But that was after Mr. Baldwin received the

9     position.  Prior to Mr. Baldwin receiving the third shift

10    supervisor position, do you know if he was more qualified

11    than you to be the third shift supervisor?

12        A    No.

13        Q    Why you do you believe he wasn't more qualified than

14    you, Mr. Baldwin?

15        A    I'd say we were equal because we are both a Mech I.

16        Q    Are you aware of Mr. Baldwin's evaluations during

17    his employment at Dover Downs?

18        A    No.

19        Q    And you testified that you don't know how long

20    Mr. Baldwin has been employed with Dover Downs, is that

21    correct?

22        A    No, I don't.

23        Q    Did you ever tell anyone at Dover Downs that you

24    felt you were discriminated against for not receiving this

1    supervisor position in October of 2001?

2    A    I spoke of it, yes.

3    Q    Who did you speak to about it?

4    A    Nate Whitcomb.  My wife for one.  There was other

5    people.  I couldn't tell you their names.  A lot of times

6    when you get hurt or you get mad like that, you speak to,

7    you know, you just speak out.

8    Q    Okay.  After the October 2001 position, what's the

9    next position you applied for at Dover Downs?

10   A    Dean Chesnick was leaving the Dover Downs and he was

11   a supervisor on the evening shift.

12   Q    By evening shift, what does that mean?

13   A    Second shift.

14   Q    Second shift?

15   A    Second shift, yes.

16   Q    So was this an opening for the second shift

17   supervisor position?

18   A    Yes.  The posting was put up and it was taken down.

19   And the reason I didn't see it is because I was -- I was on

20   my two days off and it was taken down while I was off.

21   Q    Okay.  Did you apply for this second shift

22   supervisor position?

23   A    I was going to apply for it but it didn't do any

24   good because they had already given the job to Jim Shreves.

1    It went up on the 4th and he was given the job on the 2nd

2    before it ever went up.

3      Q    And how do you know Mr. Shreves was given the

4    position on the 2nd?

5      A    The person who put it in the computer told me so.

6      Q    And who was the person that told you that?

7      A    I can't remember his name right now.  I don't

8    remember his name right now.

9      Q    What department did he work in?

10     A    Computers.  He is the one that fixes the computers

11   and everything.  He did all the monitoring for the computers

12   for the departments.

13     Q    How would this computer person know if Jim Shreves

14   got the job or not?

15     A    He was the one that put it in the computer.  He was

16   told to put it in the computer and everything and that Jim

17   Shreves would be the next supervisor on that shift.

18     Q    Does human resources monitor who gets the job and

19   who doesn't?

20     A    No.

21     Q    How do you know that that's not human resources'

22   responsibility?

23     A    Because it was put up for maintenance and Richard

24   Duncan is the one that does the decisions on that.  Rich

1    Wertz and Rich Duncan.

2        Q    Okay.  Now, when was this posting put up?

3        A    2004, I believe.  2003.  I don't remember, ma'am.

4    I'm sorry.

5        Q    You said that the posting was taken down?

6        A    Yes.  It was taken down.  I found out it was taken

7    down after I came back to work.

8        Q    After you came back from your two days off?

9        A    Yeah, after I came back from my two days off, I was

10   told that the posting was for the evening supervisor's job.

11   But I never did see one.  So I don't know.  I did approach

12   Mr. Duncan concerning it and he told me to put in for it.

13   He said, that's all I can tell you, just put in for it.

14       Q    And where were the job postings posted?

15       A    In the maintenance department where the employees

16   are.

17       Q    And was it posted in the break room like you

18   testified that the postings were usually posted?

19       A    Not the break room.  It was in the maintenance

20   department where the time clock is kept, the time cards.  I

21   was told that Dean was the one that really took it down.

22   Him and Jim Shreves were close friends, became close friends

23   working together.

24       Q    And it's you have belief that Dean Chesnick took

BRANCE F. THOMPSON

72

1     down this posting?

2         A     I was told that, ma'am.  I couldn't say that he did.

3     I was just told that.

4         Q     Who told you that Dean Chesnick took down this job

5     posting for the second shift supervisor position?

6         A     Kennedy.  He said he thought that.  He didn't say he

7     knew of it.

8         Q     Okay.  Turn to page five of the complaint in

9     Exhibit 6 that we had looked at earlier.  I think it's

10    probably right in front of you.

11        A     Um-hmm.

12        Q     Paragraph 23.

13        A     All right.

14        Q     It says, on or about March 4, 2004, a job opening

15    for second shift supervisor was posted.

16                Is that the position --

17        A     That's it, yes, ma'am.

18        Q     -- we're talking about?  Okay.

19                And then under the employee handbook that we

20    already reviewed, the posting is supposed to be posted for

21    five days, is that correct?

22        A     Yes, ma'am.

23        Q     Go down to paragraph 25.  Mr. Thompson was not

24    scheduled to work the day the posting went up because it was

1    a Thursday, his regularly scheduled day off?

2        A    Yes, ma'am.

3        Q    As a result, Mr. Thompson never saw the job posting

4    and did not find out about it until March 12th, 2004, when

5    he heard about the job posting through another employee.

6                 Is that what it says?

7        A    Yes, ma'am.

8        Q    And it's your testimony that you found out about the

9    job, the second shift supervisor position, on March 12th,

10   2004?

11       A    Yes.

12       Q    And the five days had already expired?

13       A    Yes.

14       Q    And who was the other employee that supposedly told

15   you about this posting on March 12th?

16       A    Kennedy.

17       Q    Now, looking at your Exhibit 4 of plaintiff's

18   answers.  It should be in front of you, Exhibit 4,

19   plaintiff's answers to the interrogatories asked of you.  I

20   want to look at those again.

21       A    Okay.

22       Q    And it's the same page, interrogatory number four,

23   that we looked at earlier.

24       A    Okay.

74

1    Q    And then I'm going to look at the answer number

2    three listed for the supervisor for second shift position.

3    Do you see that?

4    A    Yes, ma'am.

5    Q    Okay.  Turn to the next page.  And part d says, the

6    posting was taken down before answering plaintiff could

7    apply, but plaintiff spoke with supervisor regarding posting

8    on March 7th, 2004, when supervisor was available.

9    Answering plaintiff asked Supervisor Duncan if he can still

10   apply.  Duncan replied that he could.

11            Is that what that says?

12   A    Yes, it is.

13   Q    So on March 7th, actually, you learned about this

14   posting?

15   A    Yes, instead of the 12th.

16   Q    Not the 12th like you had testified?

17   A    The dates, I couldn't tell you exactly.

18   Q    Well, I'm not making up the dates as we sit here

19   today.

20   A    I know, ma'am.  They are in the paper.  I realize

21   that.  I'm sorry.  But like I say, I couldn't tell you if it

22   was the 7th or the 12th.  But it was one of them.  That's

23   all I can say.

24   Q    Okay.  And did you apply for this position, the