BRANCE F. THOMPSON                                    75

1      second shift supervisor position?

2          A     No, ma'am.

3          Q     Okay.  But if you learned about it on March 7th, you

4      still had time to apply, didn't you?

5          A     No.  Because it was already given to Jim Shreves on

6      the 2nd.

7          Q     How do you know it was given to Jim Shreves?

8          A     I was told it was given to Jim Shreves by the person

9      that had to put it into the computer.

10         Q     On March 7th, you spoke with Mr. Duncan?

11         A     Yes, ma'am.

12         Q     Did Mr. Duncan tell you that Mr. Shreves had already

13     received this second shift supervisor position?

14         A     No.  No, he didn't.

15         Q     And was Mr. Duncan the decision-maker for this

16     second shift supervisor position?

17         A     Mr. Duncan and Mr. Wertz, yes, ma'am.

18         Q     And this computer person that supposedly told you

19     that Mr. Shreves had gotten the position, did he have any

20     role as to who would be given this position?

21         A     Outside of being the person that put it in there,

22     no, ma'am.

23         Q     Besides talking to this computer person, do you have

24     any other reason to think that Mr. Shreves received this

1    position on March 2nd, 2004?

2       A    No, ma'am.

3       Q    Do you know when Mr. Shreves started working as a

4    second shift supervisor?  Do you know when he did?

5       A    No, ma'am, I don't.

6       Q    Do you know how long Mr. Shreves was at Dover Downs

7    when he received the second shift supervisor position?

8       A    No.  But he was hired after I was.

9       Q    He was hired after you?

10      A    Yes, ma'am.  Several months after I was.

11      Q    And you testified that Mr. Duncan was a decision-

12   maker for the second shift supervisor position?

13      A    Yes, ma'am, he was.

14      Q    Did you talk to Mr. Duncan about why you didn't

15   receive this position?

16      A    Yes, I did.

17      Q    Tell me about that conversation?

18      A    I just asked, why wasn't I told about his decision

19   of giving it to Mr. Shreves and why did he tell me to put in

20   for it when the decision was already made.  And at that

21   time, I got no response and he walked away from me.

22      Q    And when did you have this discussion with

23   Mr. Duncan?

24      A    Shortly after I found out about it.  That's all I

BRANCE F. THOMPSON                                                    77

1      can say.  I don't know the dates.  I couldn't tell you the

2      dates.

3          Q      And do you think you were discriminated against by

4      not receiving this position?

5          A      I honestly do, yes.

6          Q      And why do you believe there was age discrimination?

7          A      Well, not only just age discrimination, but I do

8      feel age discrimination had a part in it.  But I just felt

9      that friendship was the -- was an issue of it.

10         Q      The friendship between who?

11         A      Jim Shreves and --

12         Q      Richard Duncan?

13         A      No.

14         Q      Dean Chesnick?

15         A      Dean Chesnick.

16         Q      And why do you think their friendship played a role

17     in the decision?

18         A      Because Dean said, if he wanted anybody to have it,

19     he felt that Jim Shreves should have it.  He wanted to see

20     him get it.

21         Q      So you think Jim Shreves got the position because he

22     was friends with Dean Chesnick?

23         A      No.  I think that it played a part of it.  I think

24     he got the job because of his age.  He was younger than I.

1    And that's the reason he got the job.

2        Q    Okay.  Besides Mr. Shreves being younger than you,

3    why else do you believe that your age played a role in you

4    not receiving the second shift supervisor position?

5        A    Because of me being much older.

6        Q    And that's it, just because you're older?

7        A    Yes.

8        Q    Are you aware of Mr. Shreves' qualifications at the

9    time he received the position?

10       A    Yeah.  He was a Mech II.  A Mech I is before you

11   become a supervisor.  You have to to be a Mech I.  And he

12   was changed from a Mech II to a Mech I and then became

13   supervisor.

14       Q    When did he become a Maintenance Mechanic I?

15       A    Just before he got the position as supervisor.

16       Q    So he is a Maintenance Mechanic I at the time this

17   second shift supervisor position became available, is that

18   correct?

19       A    Yes.  He was just given it, yeah.

20       Q    Are you aware of Mr. Shreves' evaluations while he

21   has worked at Dover Downs?

22       A    No, ma'am, I'm not.

23       Q    Now, you testified that you didn't apply, that you

24   never submitted an application for this second shift

BRANCE F. THOMPSON                                79

1    supervisor position?

2        A    That's correct.

3        Q    Well, if you never submitted an application, how

4    could you be considered for the position?

5        A    Because Mr. Duncan told me to, to sign up for it.

6    But then I found out that he had already given the job to

7    Jim Shreves and I approached him about it.  And he wouldn't

8    give me no answer and he walked away from me.

9        Q    But Mr. Duncan told you to apply for the second

10   shift supervisor position, isn't that correct?

11       A    That's correct.

12       Q    And you never applied, is that right?

13       A    Why should I apply for something that it's not

14   there?

15       Q    But you have no firsthand knowledge when Jim Shreves

16   received this position?

17       A    Yes.  He received it on the 2nd.

18       Q    And you know that --

19       A    That I do know, yes.

20       Q    But that's your belief just based on talking to the

21   computer person, isn't that correct?

22       A    Yes.

23       Q    So besides talking to the computer person, you don't

24   know when Mr. Shreves received this position?

1    A    I do know it was before the 7th or the 12th.  That

2    much I do.

3    Q    Why do you know it was before the 7th?

4    A    Because I was told by Mr. Shreves, Jim Shreves, that

5    he was the supervisor, the new supervisor.

6    Q    When did Mr. Shreves tell you he was a new

7    supervisor?

8    A    Dates, I couldn't tell you.  But it was before I

9    approached Mr. Duncan.  That's the reason I approached

10   Mr. Duncan.

11   Q    Well, when you approached Mr. Duncan, you testified

12   Mr. Duncan told you to apply, isn't that correct?

13   A    No.  Why.  Why did he tell me to apply when the job

14   was already given.  That's when I approached him the second

15   time.  And he didn't talk to me.  He turned around and

16   walked away from me.

17   Q    The first time you talked to Mr. Duncan about the

18   second shift supervisor's position, Mr. Duncan told you to

19   apply, isn't that right?

20   A    Yes.  But I think that was just his reason to get me

21   out of the office.

22   Q    At the time you met with Mr. Duncan?

23   A    He really didn't mean for me to apply.  He just told

24   me that to get me out of the office.  I'm sure of it.

1    Q      And why do you believe that?

2    A      Because I'm sure of it.

3    Q      What's that based on?

4    A      Just my theory.

5    Q      Now, at the time you met with Mr. Duncan on

6    March 7th and Mr. Duncan told you to apply, did you know

7    during this conversation that Mr. Shreves had already

8    received the position?

9    A      At the time that I asked him about it?  Yes.

10    Q      So you knew about it when you spoke with Mr. Duncan

11    on March 7th?

12    A      Yes, I did.

13    Q      Well, did you say anything to Mr. Duncan about

14    Mr. Shreves already getting this position?

15    A      No.  No.

16    Q      Why didn't you say anything to Mr. Duncan during

17    this conversation on March 7th?

18    A      Because I want to see where it was going.  Why

19    should he lie to me, in other words.

20    Q      And the result of this conversation on March 7th was

21    Mr. Duncan telling you to apply for the second shift

22    supervisor or position?

23    A      Um-hmm.

24    Q      Is that correct?

BRANCE F. THOMPSON

1     A    Yes, ma'am.

2     Q    Did you ever tell anyone at Dover Downs that you

3    felt discriminated against for not receiving the second

4    shift supervisor position in March of 2004?

5     A    Again, Nate Whitcomb.  Him and I were pretty close

6    friends.  And everything that happened to me all the time I

7    was there was discussed and talked about with Nate Whitcomb

8    because of it.

9     Q    Anyone else at Dover Downs besides Nate Whitcomb?

10    A    Yes.  I talked to several people.  I'm trying to

11    think.  Donald Straw.  I had talked to him.

12    Q    Donald Straw?

13    A    Yes, ma'am.

14    Q    Okay.

15    A    I talked to Jim Shreves himself about it.  And

16    Kennedy, I talked to him.  And then I talked to others but I

17    just don't remember their names.  I was just frustrated in

18    not getting it.

19    Q    What was Nate Whitcomb's position when you talked to

20    him about the second shift position?

21    A    Still a Mechanic II.

22    Q    And what was Donald Straw's position?

23    A    Mechanic I.

24    Q    And what was Jeff Shreves' position when you talked

83

1    to him about not receiving the second shift supervisor

2    position?

3        A    Supervisor.

4        Q    And did you tell Mr. Shreves you thought it was

5    discrimination based on your age that you didn't receive

6    this?

7        A    Yes, I did.

8        Q    And what did Mr. Shreves say to you?

9        A    He had nothing to do with the decision.

10       Q    And Kennedy.  Is Kennedy his last name?

11       A    Yes, ma'am, that's his last name.

12       Q    Do you know Mr. Kennedy's first name?

13       A    I keep thinking John Kennedy.

14       Q    I assume that's not John Kennedy.

15            Do you know Mr. Kennedy's position?

16       A    At that time, he was a Mech I.

17       Q    Okay.  After the second shift supervisor position

18    that was posted in March 2004, what's the next position you

19    applied for at Dover Downs?

20       A    For outside maintenance.

21       Q    And when did you apply for this position of outside

22    maintenance?

23       A    June.  July, rather, I believe it was.  I don't

24    remember the date.

1      Q      And was this the plumbing position you referred to?

2      A      Yes, ma'am, it was.

3      Q      Before we get to that position, there was an outside

4    maintenance position opening in March of 2004?

5      A      Yes, there was.

6      Q      Do you remember that position?

7      A      Yes, it was.

8      Q      And was that for a Maintenance Mechanic II position?

9      A      Yes.  It was Maintenance Mechanic II.  And I did

10   apply for that.  You're right.  But they told me I had to

11   take a drop in pay and go from a Mech I to Mech II in that

12   position.  And I said, no, I wasn't taking a drop in pay or

13   anything.  So I just stayed in the position I was in.

14     Q      So you withdrew your application for the maintenance

15   position in March of 2004?

16     A      Yes.

17     Q      Do you think you not receiving that position was

18   discriminatory?

19     A      That I do know, yes.  Yes, it was.

20     Q      Okay.  Why was that discrimination for you not

21   receiving that position?

22     A      John McCartney was told to put in for it through Bob

23   Morrison.  And Bob Morrison told him that he would have to

24   take a drop in pay but it wouldn't be long that he would be

1    back in, you know, that he would get the same amount of

2    money.  But it was a couple months after that, he became

3    supervisor - outside maintenance.

4        Q    Okay.  So when Mr. McCartney took the position of

5    outside maintenance --

6        A    Knowing that he would come back up to his standards

7    of a Mech I, yes.

8        Q    How do you know that Mr. McCartney --

9        A    I was there when the conversation went through.  Bob

10   Morrison and John McCartney.

11       Q    And what was the position you claim that he became

12   the supervisor a couple months later?

13       A    A couple months later, yes, he did.  He went out as

14   a grounds employee.

15       Q    And that supervisor position was open because Tom

16   Curtis left, is that correct?

17       A    I believe it was.

18       Q    How do you know that, at the time when John

19   McCartney got this job as an outside maintenance worker,

20   that Tom Curtis was going to leave his position?

21       A    He did leave his position and went to a Mech II and

22   went outside maintenance and grounds.  If he is a Mech II,

23   he couldn't go from a Mech II to a supervisor.  He had to be

24   transferred to a Mech I.  You can only be a Mech I before

BRANCE F. THOMPSON                                          86

1      your next step is a supervisor.

2          Q     Okay.

3          A     So he went from a Mech II to supervisor's job when

4      there is other people out there that were there much longer

5      than him and were Mech I's.

6          Q     Did you apply for this outside supervisor position

7      that John McCartney got?

8          A     No, ma'am, I didn't.

9          Q     Okay.  Well --

10         A     I applied for the outside maintenance - grounds.

11     And when I found out I had to go from a Mech I to a Mech II,

12     I decided not to.  Because I didn't want the drop in pay.

13         Q     Okay.  So you withdrew your application for this

14     outside maintenance position, is that correct?

15         A     Yes, ma'am.

16         Q     So how could you not receiving this outside

17     maintenance position be discriminatory when you withdrew

18     your application?

19         A     Because of what took place.  The transfer and

20     everything.  It's not that -- it's not that I didn't get the

21     job.  I'm just saying that it's what happened after I found

22     out and heard what took place that I felt that I was

23     discriminated against.  Because I was told that I had to

24     take the job and go to a Mech I and then John was told after

BRANCE F. THOMPSON

1    that that he had to take the job and go to -- from a Mech I

2    to a Mech II.  But he said he was also told that he would be

3    brought right back up to a Mech I shortly after that.  But I

4    wouldn't.

5        Q    Who told you you wouldn't be brought up?

6        A    He didn't say I wouldn't.  But I wasn't told I would

7    either.

8        Q    Why didn't you put your application in for the

9    Maintenance Mechanic II position and see what happened?

10       A    Because I didn't want the drop in pay.  And why

11   should I take the chance?

12       Q    And the outside supervisor position that John

13   McCartney received, was there a posting for that job?

14       A    I believe so, ma'am.

15       Q    And you didn't apply for that job?

16       A    No.

17       Q    Okay.  You testified earlier that you applied for

18   every supervisor position that became available?

19       A    Inside maintenance.  Excuse me.  I should have

20   clarified it.

21       Q    And did you ever tell anyone at Dover Downs that you

22   felt that you were discriminated against for not receiving

23   this outside maintenance position in March 2004?

24       A    Jim Shreves, Nate Whitcomb.  Jim Shreves was given

BRANCE F. THOMPSON

1    minutes.  And then he said he had to make the decision.  He

2    wasn't going to make it right then.  And I stopped in and

3    seen him a couple times after that.  And we spoke the same

4    thing about it.  And he said he hadn't made his decision

5    yet.  But he said they keep calling me inside.  He says, ask

6    them for more money.  I said, I don't want to stay in there,

7    I want to get out of there, Bob.  He said, well, okay.  And

8    then he was talking to me about bringing me to outside

9    maintenance but he wanted to hire a plumber first.  And that

10   was our next two conversations.

11              And he kept saying how much -- the weather was

12   hot and it was heavy work.  I mean he never did say anything

13   about the age.  But that was an implication.

14   Q    What was an implication?

15   A    That it was heavy work, that I would be out in the

16   sun.  And I told him I knew that, that's the reason I put in

17   for the job.  I just wanted a change.

18              But you said here on your upgrade transfer.  He

19   set me up for an interview on the 24th.  But if you see I

20   was declined on the -- I mean the 25th.  I was declined on

21   the 24th, a day before my interview.

22   Q    Okay.  Now, you said that you thought the comment,

23   Mr. Morrison telling that you the weather was hot and it was

24   heavy work implied age.  Why do you believe that had

BRANCE F. THOMPSON

1    anything to do with your age?

2       A    Because an older person can't take the heat and the

3    heavy work as a younger person could.

4       Q    Who told you that?

5       A    It's a common thing.

6       Q    Did Mr. Morrison ever say it was because of your

7    age?

8       A    No, ma'am.  I said I never did say that Mr. Morrison

9    or anybody said anything about age.  But the implication of

10   telling me that it was heavy work and that I would be out in

11   the sun a lot, that I -- and this was my belief.

12      Q    And was it heavy work, the job you were applying

13   for?

14      A    I believe it was.  I don't know.

15      Q    And was the weather hot?

16      A    I couldn't get it.  I couldn't tell you.

17      Q    And was the weather hot?

18      A    Yes.  It was outside.  I work outside a lot anyway.

19   But it wouldn't have bothered me either way.  So why should

20   I be told that?

21      Q    What Bob Morrison was telling you, that it was heavy

22   work and hot weather, they are accurate descriptions of the

23   job; isn't that true?

24      A    Yes, ma'am.

BRANCE F. THOMPSON                                    97

1        Q     Isn't that true?

2        A     Yeah.  That's what he told me.  What he told other

3    people, I don't know.

4        Q     You don't know if he told other people that it was

5    heavy work or it was hot weather, do you?

6        A     That's what I said.  What he told other people, I

7    don't know.  I can only say what he told me.

8        Q     Like you said, it was hot weather, is that correct,

9    if you worked outside and it was heavy work, is that

10   correct?

11       A     I don't know.  I didn't get the job.

12       Q     Did you ever talk to anyone at Dover Downs about why

13   you didn't receive this job?

14       A     Yeah.  Bob Morrison.

15       Q     When did you talk to Mr. Morrison?

16       A     When he told me that I didn't receive the job.  And

17   I didn't -- I didn't expect the job.  Because he told me

18   that he was going to take and hire a plumber first and then

19   he would see that I would be a number one for him out there

20   with my experience that I could help others.  And at that

21   time, when he told me that he had hired a plumber, I said,

22   well, what about me?  And he said, you're not coming

23   outside.  And that's when I got mad and I walked out the

24   door.

BRANCE F. THOMPSON

98

1    Q    You testified that this position for maintenance

2    mechanic outside was a plumbing position, is that correct?

3    A    That's what I put in for.  But he kept telling me

4    that let him hire a plumber first, that he would take me out

5    there.  Because he knew my painting and carpentry work

6    skills and other skills other than plumbing.

7    Q    And did you believe you were qualified for this

8    position, the outside maintenance, Mechanic I, the plumber

9    position?

10   A    Yes, ma'am.  Very much.

11   Q    Why were you qualified for this position?

12   A    Because I'm a plumber.  I'm a carpenter.  I'm an

13   electrician.  I'm a Mech I.

14   Q    How much experience did you have in commercial

15   plumbing?

16   A    Commercial plumbing?  None.  Outside of working at

17   Ramada and Howard Johnson.

18   Q    And you testified what your plumbing

19   responsibilities at Ramada Inn and Holiday Inn were?

20   A    Yes, ma'am, I did.

21   Q    Do you think you were discriminated against for not

22   receiving this outside maintenance mechanic position in

23   June 2004?

24   A    Yes, I do.

1       Q       And do you believe it was based on your age?

2       A       I believe that was one of the factors.

3       Q       What were the other factors?

4       A       That he had a brother-in-law that worked out there

5    and I think that had something to do with it also.

6       Q       Who was he?

7       A       Sullivan.  Sylvester.

8       Q       Don Sylvester?

9       A       Yes.

10      Q       Okay.  So he worked out in the outside maintenance?

11   Is that what Don Sylvester did?

12      A       Right.  He was an electrician out there.

13      Q       And the person they hired for the plumbing position

14   was Don Sylvester's brother-in-law, you believe?

15      A       Yes, ma'am.

16      Q       What other factors do you believe played a role in

17   why you didn't receive this outside Maintenance Mechanic I

18   position?

19      A       Other than age?

20      Q       Other than age and you just said brother-in-law, Don

21   Sylvester.

22      A       None other that I know of.

23      Q       Why do you believe your age played a factor in you

24   not receiving the outside Maintenance Mechanic I position?

1      A     For the simple reason, he kept telling me it was

2   hot, it was heavy work.

3      Q     Any other reasons you think it was age related, you

4   not receiving this outside Maintenance Mechanic I position?

5      A     Other than brother-in-law.  That's it.

6      Q     Did you tell anyone at Dover Downs that you felt you

7   were discriminated against for not receiving this outside

8   maintenance position?

9      A     Yes.

10     Q     Who did you tell at Dover Downs?

11     A     Richard Duncan, Nate Whitcomb, Jim Shreves, Kennedy,

12   Wally Graham.

13     Q     Wally Graham?

14     A     Um-hmm.

15     Q     Okay.

16     A     He was one of the new employees.

17           I didn't exactly tell him.  He was just there

18   when the conversation was going on.

19     Q     When did you have a conversation with Mr. Duncan

20   about this outside maintenance position?

21     A     A couple days after I had spoken to Bob Morrison.

22     Q     Did you tell Mr. Duncan that you believed your age

23   played a factor in not receiving the position?

24     A     No, ma'am, I didn't.

1      Q      Did you tell Mr. Shreves that you believed your age

2      played a factor in not receiving the outside maintenance

3      position?

4      A      Yes, I did.

5      Q      What did you tell Mr. Shreves?

6      A      I just told him I felt that, you know, my age was

7      one thing that I didn't get it but I said I do feel that him

8      being a brother-in-law and everything, that that had a lot

9      to do with it.

10     Q      And what did Mr. Shreves say?

11     A      There wasn't much he could say, really.  I don't

12     remember the full conversation.  Because it has been quite

13     some time now.

14     Q      And Wally Graham, what position was Wally Graham in

15     in Dover Downs?

16     A      Mech I.

17     Q      Inside or outside?

18     A      Outside.

19     Q      Besides the positions we just went through, were

20     there any other positions that you applied for while you

21     worked at Dover Downs?

22     A      No, ma'am, I wasn't.

23     Q      Now, you had said a little bit ago that Morrison had

24     told you, let him hire a plumber?

1      A     Yes, ma'am.

2      Q     And then he would consider you for an outside

3   maintenance position after, is that correct?

4      A     Yes, ma'am.

5      Q     Did you apply for any other outside maintenance

6   positions after the plumber position?

7      A     I didn't apply for any other position at all after

8   that one.

9      Q     Why not?  Why didn't you apply for any other

10   positions after the plumber position?

11     A     All the ones I applied for, I never got.  So I felt

12   that it wouldn't do me any good to apply for anything else.

13     Q     Did any other positions in outside maintenance

14   become available after the plumber position?

15     A     I don't know.  I didn't pay any attention to it.  I

16   wasn't looking for any other transfers.

17     Q     Okay.  And then you are currently out on disability

18   leave?

19     A     Yes, ma'am, I am.

20     Q     From Dover Downs?

21     A     Yes, ma'am, I am.

22     Q     And why are you out on leave?

23     A     I hurt my neck.  I had an operation from the car

24   wreck and I hurt my neck there at the time.

1    Q    Your neck, you hurt your neck during the car

2    accident?

3    A    Yes, ma'am.  Pulled the nerves out from under the

4    plate that I have in my neck.

5    Q    Okay.  And did you reinjure your neck?

6    A    Yeah, at that time.

7    Q    And when did you go out on disability leave from

8    Dover Downs?

9    A    September 9th.  I remember that well.  That's

10   when -- no, excuse me.  Excuse me.  I'm wrong.

11              That was April or March.  April or March of

12   2004.

13   Q    2004?

14   A    Five.  Five.  Yes.

15   Q    Why are you out on leave?

16   A    Because of my neck.  The nerves was stretched.

17   Q    You said you hurt your neck during your car

18   accident, is that correct?

19   A    In the first time.

20   Q    And then you re-injured it last year, your neck?

21   A    Yes, ma'am.

22   Q    Did you injure your neck while you were working at

23   Dover Downs?

24   A    Yes, ma'am.

1     Q     And who is the doctor you're seeing for your neck

2     injury?

3     A     I have seen so many. I know I have seen nine. I

4     can't give you all the names. If they have to be faxed to

5     you, I can get them for you.

6     Q     Are you seeing a Dr. Rudin? Is that one of the

7     doctors you're seeing?

8     A     Not anymore. Dr. Verapoppa is the one I'm seeing

9     now.

10    Q     When did you start seeing Verapoppa?

11    A     When I -- Dr. Rudin was the one that recommended me

12    to Dr. Varapoppa.

13    Q     Okay.

14          MS. FRIEL: Okay. Tim I'm going to ask that

15    you just update your answer to interrogatories to the list

16    of doctors on list two. It lists doctors and it just lists

17    two. He said he is seeing more now. We can deal with that

18    later.

19          THE WITNESS: Yeah, they sent me to so many,

20    it's pathetic.

21    BY MS. FRIEL:

22    Q     Have any of the doctors given you the okay to come

23    back to work?

24    A     They give me the okay to go back to work as far as

1    light duty.  They said I was able to lift from ten to

2    15 pounds.  No more than that.

3       Q    And when were you released to go on light duty?

4       A    I have been released a couple times now.  I'm just

5    trying to think of his darn name.  I can't think of it now.

6    In human resources.  They knew of it.  And he said -- I got

7    a letter and everything if you need that faxed to you, too.

8    I can give it to my attorney from them.  Stating about the

9    ten percent work and they said that they didn't have a light

10   duty for that.

11      Q    A light duty where you're restricted you said to ten

12   to 15 pounds, is that correct?

13      A    Yes, ma'am.

14      Q    And do you believe you could perform a Maintenance

15   Mechanic I position with that restriction?

16      A    No, ma'am, I can't.

17      Q    As we sit here today, are you released to go back on

18   light duty to Dover Downs?

19      A    Yes, ma'am, I am.

20      Q    Okay.  Do you know when you were released to go back

21   on light duty?

22      A    Like I say, I have it in my papers where I was

23   released and everything.  That's all I can tell you.

24      Q    And the restriction still is, you cannot lift more

1    than ten to 15 pounds, is that correct?

2        A    Yes, ma'am.  I was told by the doctors that this

3    damage would be the rest of my life.

4                    (Discussion held off the record.)

5                    (Thompson Deposition Exhibit No. 9 was marked

6    for identification.)

7    BY MS. FRIEL:

8        Q    Exhibit No. 9 is Bates labeled D 0048 through D

9    0050.

10                   Mr. Thompson, do you recognize this document?

11       A    Yes, ma'am.

12       Q    And what is this document?

13       A    It's an employee evaluation.

14       Q    Is this your evaluation regarding your performance?

15       A    Yes, ma'am, from Richard Duncan, I believe.  No,

16   this is a supervisor, Bob Morrison.  Excuse me.

17       Q    And what's the date of this evaluation?

18       A    23rd of April, 2001.

19       Q    And was this your annual evaluation?

20       A    Yes, ma'am, it was.

21       Q    Was this the first evaluation you received since you

22   worked at Dover Downs?

23       A    Yes, ma'am.

24       Q    And at the time, Mr. Morrison is your supervisor, is

1    that correct?

2        A    Yes, ma'am.

3        Q    And Mr. Duncan is Mr. Morrison's supervisor, is that

4    correct?

5        A    Yes.  He is building maintenance supervisor.  Or

6    manager.  Building maintenance manager.

7        Q    And what was your overall rating for this April 2002

8    evaluation?  It says on the second page, overall.  At the

9    bottom.

10       A    Excellent.  That's all it says.

11       Q    And is excellent the highest --

12       A    Yes, ma'am.

13       Q    -- category you could have received?

14       A    Yes, ma'am.

15       Q    And did you receive a salary increase as a result of

16   this evaluation?

17       A    Yes, I did.

18       Q    And how much was your salary increased?

19       A    Five percent.

20       Q    Was that the maximum that could be increased?

21       A    Yes.

22       Q    And did Mr. Morrison recommend this five percent

23   raise for you?

24       A    Yes, he did.

1    Q    And did Mr. Duncan concur with Mr. Morrison's

2    recommendation for the raise?

3    A    Yes, he did.

4    Q    And were you pleased with this evaluation?

5    A    Yes.

6                    (Thompson Deposition Exhibit No. 10 was

7    marked for identification.)

8    BY MS. FRIEL:

9    Q    Okay.  This is Exhibit 10.  And it's Bates labeled D

10   0041 through D 0047.

11                   Mr. Thompson, do you recognize this document?

12   A    Yes, ma'am.  It's a performance appraisal.

13   Supervisor - Richard Duncan.

14   Q    And what's the date of this evaluation?

15   A    1/3/04.

16   Q    And it says at the top, evaluation period from

17   4/23/02 to 4/23/03.  Do you see that?

18   A    Yes, ma'am.

19   Q    And is the reason you didn't get it in April 2003,

20   is that because you were out on car accident disability?

21   A    Related to the car accident.  Right.  Yes, ma'am.

22   Q    And who wrote this evaluation dated January 3rd,

23   2004?

24   A    Richard Duncan.

```
1      Q    And was Mr. Duncan your supervisor at the time?

2      A    Building manager supervisor, yes, ma'am.

3      Q    And what was your overall score for this

4   January 2004 evaluation?

5      A    85.

6      Q    And what does 85 equate to?

7      A    It's a high score.  I had a three percent raise.

8      Q    And were you pleased with this evaluation?

9      A    Yes, ma'am.

10     Q    And were you pleased with the raise you received?

11     A    Yes, ma'am.

12               MS. FRIEL:  Okay.  No. 11.

13               (Thompson Deposition Exhibit No. 11 was

14   marked for identification.)

15   BY MS. FRIEL:

16     Q    Exhibit No. 11 is Bates labeled D 0034 through D

17   0040.

18               Do you recognize this document, Mr. Thompson?

19     A    Yes, ma'am, I do.

20     Q    What is this document?

21     A    This is a supervisor's performance appraisal.  Steve

22   Homlish was the one that was my supervisor.

23     Q    And is Mr. Duncan Mr. Homlish' manager?

24     A    Yes, ma'am.  He was approved by Mr. Duncan.
```

1    Q    At the top, it says, evaluation period from 4/23/03
2    to 4/23/04.  Do you see that?
3    A    Yes, ma'am.
4    Q    And was this the next evaluation you received after
5    D-10 that we just reviewed?
6    A    Yes, ma'am.
7    Q    What was your overall rating for this evaluation?
8    A    92.2.
9    Q    Was that considered a good evaluation?
10   A    Yes, ma'am.
11   Q    And how much of a raise did you receive for this
12   evaluation?
13   A    I made the mistake a minute ago when I said the
14   other one was a raise of three percent.  It's two percent on
15   the other one and three percent on this one.  Sorry about
16   the mistake.
17   Q    That's okay.
18        Were you pleased with the two percent raise you
19   received on the last evaluation we just reviewed?
20   A    Yes, ma'am.  Yes, on all of them, I have been
21   satisfied with it.
22   Q    Were you pleased with this evaluation that we are
23   looking at, Exhibit No. 11?
24   A    Yes, ma'am.

1    Q    And were you pleased with the three percent raise

2    you received?

3    A    Yes, ma'am.

4    Q    Did you ever receive any coachings while you worked

5    at Dover Downs?

6    A    Yes.  Yes, I did.  A couple times.  From Richard

7    Duncan.

8    Q    Anyone besides Mr. Duncan?

9    A    No.  No, I take that back.  Yes, I did, to Marie

10   Isenberg and Mr. Rich Wertz.

11              MS. FRIEL:  This is Exhibit No. 12.

12              (Thompson Deposition Exhibit No. 12 was marked

13   for identification.)

14   BY MS. FRIEL:

15   Q    It's Bates labeled D 0115 to D0116.

16              Mr. Thompson, do you recognize this document?

17   A    Yes.  It's one that I have a copy of.

18   Q    Okay.  And what is this document?

19   A    It's a disciplinary warning from Steve Homlish.

20   Q    And what's it dated?  What's the date of this

21   warning?

22   A    The date of the notice was 2/4/04.  It was supposed

23   to be a coaching and it wasn't.

24   Q    What do you mean it was supposed to be a coaching

1    and it wasn't?

2        A    The coaching is when they call you in and tell you

3    about the writeup.  I was never called in and told about the

4    writeup.  To even sign it.  It has in the employee's

5    signature box, it says, not required.  But a coaching does

6    require it.

7        Q    How do you know a coaching requires an employee's

8    signature?

9        A    Because it gives you the option to accept it or not

10   to accept it.  And if you don't accept it, it goes in the

11   box as denied by the person that the writeup was to.

12       Q    When did you first see this document?

13       A    When I got it off of my -- out of my files.

14       Q    And when was that?

15       A    After I did all the filing of these papers.  That's

16   all I know.  I don't remember dates or anything.  I just got

17   stuff out of my personal files.

18       Q    In the box, it says, nature of incident.  Did not

19   report to work on 2/3/04 and had no doctor's excuse.

20            Do you see that?

21       A    Yes.  And I did have a doctor's excuse.  My wife

22   gave it to Linda Renninger, the secretary for maintenance.

23   And she gave it back to my wife and said that she was told

24   that she could not take anything like that anymore, it had

1    to be taken to human resources. My wife took it to human

2    resources; and, as far as I know, she turned it in and

3    everything there.

4    Q    Do you know if your wife turned in the doctor's

5    excuse to human resources?

6    A    Yes. There was no doubt about my wife doing that.

7    Q    Did you ever talk to Mr. Homlish about you not

8    reporting to work on February 3rd, 2004?

9    A    No. No. Because I just got it out of my file. I

10   didn't think they would want to talk to me anyway. So I

11   didn't talk to nobody about it.

12   Q    Did you talk to anyone at Dover Downs about your

13   missing work on February 3rd, 2004?

14   A    Yes. And I do take that back. I have to get my

15   time schedule here straightened out.

16            On this writeup here was when Bill -- the

17   nighttime supervisor. That's at the time my tires were

18   slashed and he helped me put air in my tires so my wife

19   could drive the car over and get new tires put on it. I was

20   late but he said he would take care of it. Bill Carlisle.

21   That was on this one. I'm sorry about the statement I made.

22   Q    So you didn't go to work on February 3rd, 2004?

23   A    Yes, I did. I did go to work.

24   Q    You did go to work on February 3rd?

1    A    Yes, I did.

2    Q    So you're claiming that the statement in this

3    coaching dated February 4th, 2004, is not correct?

4    A    Maybe we ought to take time for a minute.

5    Q    Okay.

6    A    To get myself straightened out here.  2004.  I

7    believe it was when I was off sick and my wife took the note

8    to Linda.  It was shortly thereafter.  I know I was written

9    up for a time that I was late.  That's what it was.  But my

10   tires were slashed and that's when he helped me put air in

11   the tires.

12   Q    But you don't know if the tire incident is the

13   incident of this writeup?

14   A    I got a receipt from this from the doctor.  I know I

15   have.

16   Q    And at the time, did you have any time on February

17   4th, 2004, did you have sick time accrued?

18   A    No.  But I had a doctor's slip showing it.  That's

19   when my wife gave it to Linda and Linda had to give it back

20   to her because she said that Mr. Duncan and them wouldn't

21   receive it anymore because human resources is the one that's

22   taking care of it now.

23   Q    But you didn't have any sick time accrued?

24   A    No, ma'am.  I don't know how much time I had.  I'm

1       sure I didn't have enough to cover it, no.   I'm sure of

2       that.

3           Q    Because you didn't have enough sick time accrued,

4       would that count as an occurrence, your not showing up to

5       work?

6           A    It would but --  it wouldn't because Mr. Duncan had

7       already told everybody in maintenance, if he had enough

8       vacation time and sick time to cover it, he would allow it.

9       And which he did on everybody up until I filed these papers.

10      And then he changed it.

11          Q    When did Mr. Duncan tell you and everybody that you

12      could use vacation time for sick time?

13          A    On Thursday meeting.  We had a company meeting for

14      maintenance every Thursday.

15          Q    Okay.  Let me just make sure, since it was

16      confusing.

17               It says here, do not report to work on 2/3/04.

18               Is that your testimony, that you did not report

19      to work on February 3rd, 2004?

20          A    Yes, ma'am.

21          Q    So that statement is correct?

22          A    Yes.  I do have the receipt, though, showing that I

23      went to the doctor and everything on that.

24          Q    But you're not sure if you had sick time accrued at

1    the time, is that correct?

2        A    I don't remember.  I'm sure that I didn't have

3    enough.  But it didn't matter if I had enough or not.

4    Because they took the vacation time as well as the sick time

5    and they added together to cover up for the time that you

6    lost.  And that's not just me but that was everybody in

7    maintenance.

8        Q    When you say everybody, who else was allowed to use

9    vacation time?

10        A    All maintenance employees.

11        Q    Who else in maintenance used their vacation time for

12    their sick time?

13        A    Eric Daniels.  Yeah, Eric Daniels.  Everybody that

14    you have names of everybody in maintenance that works

15    maintenance.

16        Q    So you're saying they called out sick and they used

17    their vacation time?

18        A    Yes.

19        Q    How do you know that?

20        A    I know it personally.

21        Q    How do you know that they used their vacation time

22    for their sick time?

23        A    Because Eric said he didn't have time on his

24    vacation time.  I mean on his sick time.  So he was given

1   vacation time with his sick time to cover up for the time

2   that he missed.  Not just Eric but Wally Graham, who is

3   another one.  Kevin Gorlich.  Nate Whitcomb, Kennedy.  I

4   think Shreves did, too.  I don't remember.  But all the

5   names of the people that work in maintenance has done it at

6   one time or another.

7       Q    And how do you know they have all done it at one

8   time or another?

9       A    Hearsay, as you would put it.

10      Q    Is there a policy at Dover Downs that you know of

11  that would allow an employee to take vacation time for their

12  sick days?

13      A    No, ma'am, there is not.  You're not allowed to by

14  their policy.  But we were told by Mr. Duncan at a meeting

15  that he would allow it, and which he did.

16      Q    This coaching that we are looking at, Exhibit 12,

17  dated February 4th, 2004, would you consider this coaching a

18  discipline?

19      A    Yeah, it was a discipline.

20      Q    And why do you believe it was a discipline?

21      A    Because I didn't deserve it.  I had a note and I'm

22  sure that I had time for vacation time and sick time to

23  cover the time that they said I was out.

24      Q    Did you lose any salary as a result of this

1    February 2004 coaching?

2        A    Yeah.  You automatically lose that day that you're

3    out.

4        Q    And did you lose salary for that day?

5        A    Oh, yes.

6        Q    February 3rd, 2004?

7        A    Um-hmm.

8        Q    So you were aware, then, at the time, that your

9    absence on February 3rd, 2004, counted as an occurrence, is

10   that correct?

11       A    I was aware, yeah, that it did.  Which it shouldn't

12   have.

13       Q    Did you complain to anyone that you lost salary?

14       A    Just when it was given to me.

15       Q    But you already said that you knew in February 2004

16   about the --

17       A    When it was given to me.  When I got it, I

18   complained to Richard Duncan.

19       Q    When did you receive this document?

20       A    Shortly after that, he had the meeting and said that

21   he would not allow it any longer, to take the vacation time

22   and the sick time and allow it to be taken for the time off.

23       Q    So when did Mr. Duncan have this meeting where he

24   said you couldn't use vacation time anymore for sick time?

1    A    It was after I got this off of my personal -- out of

2    my personal files.

3    Q    Okay.  So how long after you received this coaching,

4    February 4th, 2004?

5    A    I couldn't tell you.  I couldn't tell you.  I know

6    it was afterward.

7    Q    And you believe that you lost pay for February 3rd,

8    2004?

9    A    I know I did.

10   Q    How do you know you did?

11   A    Because of my pay slip.

12   Q    I'm sorry, your what?

13   A    Because my pay slip showed it.

14   Q    And did you complain to anyone at Dover Downs about

15   you not receiving pay for this day?

16   A    Yes.  Richard Duncan.

17   Q    And what did Mr. Duncan say to you when you

18   complained?

19   A    Nothing.

20   Q    And is it your belief that this coaching was placed

21   in your personnel file?

22   A    Yes.

23   Q    And why do you believe it was placed in your

24   personnel file?

1     A    And they don't neither unless they go back through

2     the files.  And if they did, that means they were wrong.

3     Q    Wasn't there an attendance record kept of all

4     maintenance employees?

5     A    They had to go back through the files to find them.

6     I don't know, ma'am.

7     Q    Is it your testimony that Exhibit 13 signed by

8     Steven Homlish on June 17th, 2004, is it your testimony that

9     you have seen this document with a different date on it?

10    A    Yes, it is.

11    Q    And what date was on that document you saw?

12    A    I don't remember.  But you should have a copy.  If

13    you have a copy of these, you should have a copy of that

14    one.

15    Q    I don't have another copy of it, I can tell you

16    that, in my file.

17    A    You don't?

18    Q    I do not.  So I'm asking you, what date do you

19    remember seeing it?

20    A    I said I don't remember.  I don't remember.

21    Q    Was this coaching dated June 17th, 2004, put in your

22    personnel file?

23    A    Yes.

24    Q    And did you lose any salary as a result of this

1    coaching dated June 17, 2004?

2        A    Not that I know of.

3        Q    Did you lose any job opportunities because of this

4    coaching dated June 17th, 2004?

5        A    Not that I know of, no.

6        Q    And was your job changed in any way because of this

7    coaching dated June 17th, 2004?

8        A    No.

9        Q    Okay.  Let's go to the next exhibit, Exhibit 14.

10                        (Thompson Deposition Exhibit No. 14 was

11   marked for identification.)

12   BY MS. FRIEL:

13       Q    Exhibit 14 is Bates labeled D 0111 through D 0112.

14                   Mr. Thompson, do you recognize this exhibit or

15   this document?

16       A    Just from me having it, yes, getting it out of my

17   files.

18       Q    And when did you first see this document?

19       A    After getting it out of my files, my personal files.

20       Q    And this is the coaching dated August 11, 2004.  Is

21   that what this document is?

22       A    Yes, ma'am, it is.

23       Q    And under nature of incident, do you see where it

24   says, reported to work eight minutes late?  Do you see that?

1    A    Yes, ma'am, I do.

2    Q    Did you report to work eight minutes late on

3    August 10, 2004?

4    A    I don't remember.

5    Q    Did you talk to anyone at Dover Downs about being

6    late to work on August 10, 2004?

7    A    I don't remember.

8    Q    And do you disagree with this coaching dated

9    August 11, 2004?

10   A    Repeat it again, ma'am.

11   Q    Do you disagree with this coaching dated August 11,

12   2004?

13   A    Yes.

14   Q    Why?

15   A    Because it, I'll state again, I feel that I was

16   being written up for a lot of things that I wasn't supposed

17   to be written up for just because I took them to the Labor

18   Board.

19   Q    But sitting here today, you don't remember if you

20   were late to work on August 10, 2004, is that correct?

21   A    I'm going to say that on a lot of them.  Excuse me.

22   I'm not trying to be smart.  But I'm going to say it on a

23   lot of them because I don't remember.  If I get twisted

24   around, I just don't -- I don't remember.

1       Q       Assuming you were late to work on August 10, 2004,

2       then that would be an occurrence, correct?

3       A       Yes.

4       Q       Was this coaching dated August 11, 2004, put in your

5       personnel file?

6       A       Yes, ma'am, it was.

7       Q       And how do you know it was put in your personnel

8       file?

9       A       That's where I got it from.

10      Q       Did you make a copy of your personnel file at some

11      point?

12      A       Yes, ma'am, I did.

13      Q       Do you still have a copy of your personnel file?

14      A       Yes, ma'am.

15      Q       And where is that copy?

16      A       At my house.

17      Q       Did you provide a copy to your attorney?

18      A       Everything that I have, he does have a copy.

19      Q       And did you lose any salary as a result of this

20      coaching dated August 11, 2004?

21      A       I don't remember.

22      Q       Did you lose any job opportunities because of this

23      coaching dated August 11, 2004?

24      A       I'm sure I didn't, no, ma'am.

1     Q     Did your job change in any way because of this

2  coaching dated August 11, 2004?

3     A     No, ma'am.

4     Q     I know the questions are long.  Just wait until I

5  finish so the record is clear.

6     A     Okay.

7     Q     Thanks.

8              MS. FRIEL:  Exhibit 15.

9              (Thompson Deposition Exhibit No. 15 was marked

10  for identification.)

11  BY MS. FRIEL:

12     Q     And 15 is Bates labeled Margolis Edelstein D 0011

13  through 0012.  And this is a two-page document,

14  Mr. Thompson.

15              Do you recognize this document?

16     A     Yes, I do.

17     Q     And what is this document?

18     A     It's a disciplinary warning.

19     Q     Is this the same coaching we just reviewed,

20  Exhibit 14?

21     A     Yes, it's one of them.

22     Q     And this Exhibit 15 has handwriting on it, is that

23  correct?

24     A     Yes, ma'am, it does.

1       Q     Is that your handwriting?

2       A     That's my handwriting.

3       Q     And next to where it says, reported to work eight

4     minutes late, there is handwriting next to it?

5       A     Yes, there is.

6       Q     And is that your handwriting?

7       A     Yes, it is.

8       Q     Can you read for me what that says?

9       A     One minute late when you're allowed seven minutes

10    before and after to clock in.  So it just made me one minute

11    late, in other words.

12      Q     So you were late on this date, on August 10, 2004?

13      A     I'm just saying what it said.  It said I was late

14    eight minutes.  And I was saying if I was late eight

15    minutes, that I'm allowed seven minutes before and seven

16    minutes after.  Making me late only one minute, if that's

17    the case.

18      Q     Why do you believe you're allowed to be seven

19    minutes?  If your shift starts at 9:00 o'clock, is it our

20    testimony that --

21      A     Because we was told that.  Everybody that's an

22    employee there.  Not just maintenance but all other

23    employees.  You have seven minutes till or seven minutes

24    after.

1    Q    So if your shift were to start at 9:00 o'clock in

2    the morning, could you get in at 9:07 and be on time?

3    A    Yes, ma'am.

4    Q    Who told you you had seven minutes leeway?

5    A    All supervisors.

6    Q    And who told you, I'm asking?

7    A    Duncan, Richard Duncan.  Bob Morrison.

8    Q    Did anyone else tell you that you could be seven

9    minutes late to work?  Was there any policy at Dover Downs

10   that you knew of that allows an employee to be seven minutes

11   late for work?

12   A    I believe so.  I'm not for certain.  I believe it's

13   in the handbook.

14   Q    Let's look at the handbook, Exhibit 2, which we

15   already went over.

16            And if you could just look through Exhibit 2,

17   the employee handbook, and tell me where the policy allowing

18   an employee seven minutes leeway is?

19   A    I don't know if it would be work hours or what.

20   Because I haven't really checked it.  3.2.  I don't know

21   what it would be under.  I know if it's in here.  It might

22   not even be in here.  We were told through our supervisors

23   that you're allowed seven minutes before and seven minutes

24   after.

1       Q    Turning to the next page of Exhibit 14, Bates

2    labeled Margolis Edelstein D 0012, do you see some

3    handwriting on the left-hand side?

4       A    Yes, ma'am.

5       Q    And what is that?  Is that your handwriting there?

6       A    Yes, it is.

7       Q    And what does that handwriting say?

8       A    Coaching 8/11/04.  One minute late, I guess, and

9    three minutes late.

10      Q    What does that mean, one minute late?  It actually

11   says --

12      A    I guess that's for both writeups, one writeup I had

13   for one minute late and the other one I had for three or so

14   minutes late.

15      Q    You agree if you were late, if an employee is late

16   to work, they should receive an occurrence, is that correct?

17      A    Yes.  Definitely.  I agree.

18              (Thompson Deposition Exhibit No. 16 was marked

19   for identification.)

20   BY MS. FRIEL:

21      Q    D-16 is Bates labeled D 0107 through D 0108.

22              Mr. Thompson, do you recognize this document?

23      A    Yes, I do.

24      Q    And what is this document?

```
 1        A     Disciplinary warning.

 2        Q     And is it another coaching?

 3        A     It says to be a coaching but it wasn't.

 4        Q     What do you mean it was not a coaching?

 5        A     I got it off my file, out of my personal files.

 6        Q     And is the date of this coaching August 17th, 2004?

 7        A     That's what it says, yes, ma'am.

 8        Q     And when did you first see this document?

 9        A     When I got it out of my personal files.

10        Q     When you say you got it out of your personal files,

11   are you talking about your personnel file?

12        A     Yes.

13        Q     Did you get any documents out of a file that's kept

14   in the maintenance department?

15        A     Some of it there, yes.  I have a personal file there

16   as well.

17        Q     Well, okay.  But your personnel file is kept in

18   human resources at Dover Downs, is that correct?

19        A     Right.

20        Q     And there is a separate file kept in maintenance, is

21   that correct?

22        A     Right.

23        Q     So the coachings that we have been looking at, were

24   they in your personnel file or your maintenance file?
```

1    A    My maintenance file and my personal file.

2    Q    So you believe these coachings were kept in both?

3    A    Yes.

4    Q    And do you have a copy of your maintenance file as

5    well as your personnel file?

6    A    Just the ones I got out.  That's all I can say.

7    Q    Okay.  On this coaching dated August 17, 2004, it

8    says, on nature of incident, did not report to work on

9    August 16th, 2004, and had no doctor's excuse.

10            Do you see where it says that?

11   A    I see it, yes, ma'am.

12   Q    And did you report to work on August 16, 2004?

13   A    I don't remember that date.

14   Q    Do you remember if you were out sick on August 16th,

15   2004?

16   A    I don't remember.  No, ma'am.

17   Q    Did you speak to anyone at Dover Downs about missing

18   work on August 16th, 2004?

19   A    No, ma'am.

20   Q    Do you disagree with this coaching dated

21   August 17th, 2004?

22   A    Yes, I do.

23   Q    And why do you disagree with it?

24   A    Because I never seen it or didn't know anything of

1      it until after I had filed into the Labor Board.

2          Q    But you don't remember if you were absent from work

3      on August 16th, 2004, is that correct?

4          A    No.  That's correct.

5          Q    And if you were absent from work, then it would have

6      been grounds for an occurrence, is that correct?

7          A    That's correct.

8          Q    Now, this coaching dated August 17, 2004, is this

9      considered a discipline?

10         A    Yes.

11         Q    Did you lose any salary because of this coaching?

12         A    No.

13         Q    Did you lose any job opportunities because of this

14     coaching?

15         A    No.

16         Q    Did your job change in any way because of the

17     coaching date of August 17th, 2004?

18         A    No.

19              MS. FRIEL:  This is Exhibit 17.

20                   (Thompson Deposition Exhibit No. 17 was

21     marked for identification.)

22     BY MS. FRIEL:

23         Q    It's Bates labeled D 0109 through F 0110.

24              Mr. Thompson, do you recognize Exhibit 17?