1        A     Disciplinary warning.

2        Q     And is this another coaching?

3        A     Yes, that's what it says.

4        Q     And is it dated August 30th, 2004?

5        A     Yes, ma'am.

6        Q     And when did you first see this document?

7        A     When I got -- took it off my personal file.

8        Q     And under nature of incident, it says, reported

9    20 minutes late to work on the above scheduled date.  And

10   above scheduled date is August 24th, 2004.

11              Do you see that?

12       A     I don't remember, no.

13       Q     I'm sorry, I'm asking you if you see where that's

14   written?

15       A     I don't remember.

16       Q     You don't remember if you were late for work on

17   August 24th, 2004?

18       A     No.

19       Q     Did you talk to anyone about being late on August

20   24th, 2004?

21       A     No.

22       Q     Do you disagree with this coaching date of August

23   30th, 2004?

24       A     I disagree with it, yes.

1    Q    Why do you disagree with this coaching?

2    A    Because I didn't know anything about it until I took

3    it out of my personal file.

4    Q    But sitting here today, you don't remember if you

5    were late to work on August 24th, 2004, do you?

6    A    No, ma'am.

7    Q    And if you were late on August 24th, 2004, would

8    that be a grounds for an occurrence?

9    A    Yes, ma'am, it would.

10    Q    And so you can receive a coaching for being late, is

11    that correct?

12    A    That's correct.

13    Q    Would you consider this coaching date August 30th,

14    2004, a discipline?

15    A    Yes, I do.

16    Q    And was it put in your personnel file, do you

17    believe?

18    A    Yes.

19    Q    Did you lose any salary because of this coaching

20    dated August 30, 2004?

21    A    No, I didn't.

22    Q    Did you lose any job opportunities because of this

23    coaching?

24    A    No, ma'am.

1    Q    Did your job change in any way because of this

2    coaching dated August 30th, 2004?

3    A    No, ma'am.

4              (Discussion held off the record.)

5              (Recessed for lunch at 1:03 p.m.)

6                    AFTER NOON RECESS

7                      1:28 p.m.

8              (Thompson Deposition Exhibit No. 18 was

9    marked for identification.)

10   BY MS. FRIEL:

11   Q    Okay.  Exhibit 18 is Bates labeled Margolis

12   Edelstein 0066?

13              Mr. Thompson, do you recognize this Exhibit 18?

14   A    Yes, ma'am.  Disciplinary warning notice.

15   Q    And what is the date of this?

16   A    8/20/04.

17   Q    And is that your signature under employee's

18   signature?

19   A    Yes, ma'am, that is.

20   Q    And what is the date signed on that?

21   A    8/24/04.

22   Q    And under nature of incident, it says, most recent

23   is 8/16/04 out of work.  No doctor's excuse.

24              Do you remember if you were out of work on

1    8/16/04?

2        A    No, ma'am.

3        Q    Well, you signed it at the bottom, is that correct?

4        A    The reason I signed it, because I was written up

5    several times here that I shouldn't have been written up.

6    It was a day after I took Bob Morrison to human resources.

7        Q    What was the day after you took Bob Morrison to

8    human resources?

9        A    I took Bob Morrison to human resources on 8/23/04.

10    And I received all these writeups the day after I took him

11    to human resources.  Up to that time, I never had a writeup

12    since I have been there for anything.

13        Q    When you saw you took Bob Morrison to human

14    resources on 8/23/04, what do you mean by that?

15        A    It was concerning the transfer of the Mech I

16    plumbers' application for outside maintenance.

17        Q    Okay.  The one we had just gone over?

18        A    Yes, ma'am.

19        Q    Who received that position, that Maintenance

20    Mechanic I position?

21        A    Donald Knotts.

22        Q    Robert Knotts?

23        A    Robert Knotts.  Excuse me.

24        Q    So you took Bob Morrison to human resources.  Did

1   you have a meeting with human resources?

2       A    Yes, I did.

3       Q    Who did you meet with at human resources?

4       A    Marie Isenberg.

5       Q    Was Bob Morrison at this meeting?

6       A    Yes, he was.

7       Q    And tell me what happened at the meeting?

8       A    Well, she called in another employee that worked up

9   in human resources.  What was his name?  Carolyn was her

10  first name.  That's all I can tell you.

11      Q    Rakowski?

12      A    Yes, that's it.  As a witness.

13      Q    Okay.

14      A    And, anyway, right away, she -- Marie Isenberg acted

15  like it was my fault concerning everything and I told her

16  the meeting was over with and I looked at Bob Morrison and I

17  asked him, there is some questions I would like to ask him,

18  if he would answer them.  He said, yeah, I'll answer them,

19  Mick, what are they?

20          And I said, was this guy younger than I am?

21  And he says, yes, he was.  And I go, well, you know, that's

22  age discrimination.

23          And I said, what about work?  Is he related to

24  someone out there?  He goes, well, that had nothing to do

1    with it.  I said, that's not what I asked you.  Is he

2    related to someone out there?  He said, well, yeah.  I said,

3    you know, that's nepotism.  And then I asked him about --

4    what was it?  Oh, about was he a licensed plumber.  And he

5    said, no.  And I said, okay, thank you.  And I left.  That

6    was the end of the -- our meeting.

7        Q    Do you remember saying anything else during that

8    meeting?

9        A    No.  I just said, thank you, and left.

10       Q    Looking at Exhibit 18.  The disciplinary warning

11   notice.  Is this a verbal warning?

12       A    Which one?

13       Q    The Exhibit 18.

14       A    That's the one I just got?

15       Q    Yeah.  You see it says, action taken?

16       A    Yes.  Mr. Duncan read them to me and everything.

17   That's the reason I signed them, knowing that he was wrong.

18       Q    And under the nature of the incident, is that your

19   handwriting where?  There is some handwriting there.

20       A    That's my handwriting, yes.

21       Q    And what does it say there?

22       A    I can't make out half of it.  Refer to page 28 of

23   employee's handbook were highlighted.  I don't know.  I

24   can't hardly read it.

1      Q    And did you lose any salary as a result of this

2    verbal warning?

3      A    No.

4      Q    Dated August 20, 2004?

5      A    No.

6      Q    Did your job change in any way as a result of this

7    verbal warning dated August 20, 2004?

8      A    More warnings.

9      Q    More warnings as a result of this warning dated --

10     A    After that, yes.

11     Q    But I'm asking you, did anything, did your job

12   change in any way as a result of this warning dated

13   August 20, 2004?

14     A    No, ma'am.

15              MS. FRIEL:   Exhibit 19.

16              (Thompson Deposition Exhibit No. 19 was marked

17   for identification.)

18   BY MS. FRIEL:

19     Q    And this exhibit is Bates labeled D 0072 through

20   D 0073.

21              Mr. Thompson, do you recognize this document?

22     A    Yes, I do.

23     Q    And what is this document?

24     A    It's a disciplinary warning notice.

1      Q    And what's the date of this disciplinary notice?

2      A    Date of notice was November 16, 2004.

3      Q    And what was the action taken as a result of this

4    warning, this warning notice?

5      A    Disciplinary warning writeup.

6      Q    Did you receive a verbal warning as a result?

7      A    Yes, I did.

8      Q    And when did you first see this document?

9      A    At the time that I had the warning, which is

10   11/17/04.

11     Q    And what is this verbal warning regarding?

12     A    It said I was showing the employees documents and I

13   got a writeup for it.

14     Q    And what documents were you showing to other

15   employees?

16     A    Allegedly, it was Robert Knotts.

17     Q    Were you showing Mr. Knotts a job application?

18     A    Yeah.  That's what was allegedly said, which I

19   didn't.  I did speak of it but I didn't show it to nobody.

20     Q    You didn't show that application to anyone?

21     A    No.  I spoke of it.

22     Q    Was there confidential information in Mr. Knotts'

23   job application?

24     A    Yes, there was.

BRANCE F. THOMPSON                    143

1      Q      And what was the confidential information?

2      A      Being a brother-in-law and his education.

3      Q      Did it have his Social Security number on it?

4      A      No, ma'am.  Yes, it had it.  But I didn't show it to

5   nobody and I don't know his number.

6      Q      So your testimony is you have never shown

7   Mr. Knotts' job application to anyone?

8      A      No.  I did speak to people about it, though.

9      Q      Who did you speak to about it?

10     A      Whitcomb.  Donald Straw.  Even Sylvester, Donald

11  Sylvester, which he -- he is the one that said I was showing

12  it around.  But I wasn't.  I told Mr. Duncan and Mr. Duncan

13  had a meeting with me on it.  And that's when I received

14  this writeup.

15     Q      Did Mr. Duncan meet with you regarding this writeup?

16     A      Yes.

17     Q      Dated November 16th, 2004?

18     A      Right.

19     Q      Did Mr. Duncan ask you if you were showing

20  Mr. Knotts' job application?

21     A      No.  He just took it to Marie Isenberg and said that

22  I was showing the document around, which I wasn't.

23     Q      And do you disagree with this verbal warning dated

24  November 16th, 2004?

BRANCE F. THOMPSON                                  144

1    A    Yes, I do.

2    Q    And why do you disagree with it?

3    A    Because I wasn't the one that broke the

4    confidentiality.  Dover Downs did by sending me the copy of

5    his application.  They should have never sent it to me.

6    Q    Why did Dover Downs send you Mr. Knotts' job

7    application?

8    A    That I don't know.

9    Q    Did they send it to you as part of your charge of

10   discrimination?

11   A    I guess, yes.  I don't think Dover Downs sent it to

12   me.  I think it was sent by the attorneys.

13   Q    And what information did you tell Mr. Whitcomb about

14   Mr. Knotts' job application?

15   A    That Sylvester was the brother-in-law to Knotts, and

16   about the education.  You have to be a high school graduate

17   or an equivalent and he is neither one.  He is only 11th

18   grade education.  And that's what I was speaking of.

19   Q    Anything else you remember telling Mr. Whitcomb

20   about Mr. Knotts' application?

21   A    No.  That's all I was speaking about was his

22   education.

23   Q    What did you tell him?

24   A    That I should have got it on account of my

1   education, you know.

2       Q    And what did you tell Donald Straw about Mr. Knotts'

3   job application?

4       A    The same thing.

5       Q    And what did you tell Mr. Sylvester about

6   Mr. Knotts' application?

7       A    I started to tell him and he just got mad and took

8   off and went and told Mr. Duncan and that's where this ended

9   up, the writeup ended up.

10      Q    Did you ever tell Mr. Duncan at your meeting that

11  you never showed anyone Mr. Knotts' job application?

12      A    I didn't have a chance to.  He took it to Marie

13  Isenberg.  He took it to human resources and they called me

14  up there.

15      Q    So who gave you this warning dated November 16th?

16      A    Marie Isenberg.

17      Q    Did you tell Marie Isenberg during the meeting when

18  you received this warning that you never showed --

19      A    Yes, I did.  She said that wasn't what she was told.

20      Q    Do you believe this verbal warning dated

21  November 16th, 2004, is a discipline?

22      A    Yes, I do.

23      Q    Did you lose any salary because of this warning

24  dated November 16th, 2004?

1        A     No, I didn't.

2        Q     Did you lose any job opportunity because of this

3    November 16, 2004?

4        A     No, I didn't.

5        Q     Did your job change in any way because of this

6    verbal warning dated November 16, 2004?

7        A     No, ma'am.

8              MS. FRIEL:  Exhibit 20.

9              (Thompson Deposition Exhibit No. 20 was marked

10   for identification.)

11   BY MS. FRIEL:

12       Q     Exhibit 20 is Bates labeled D 0068 through 0069.

13             Mr. Thompson, do you recognize Exhibit 20?

14       A     Yes, ma'am.  Disciplinary warning notice.

15       Q     And what's the date of this notice?

16       A     Date of notice was 11/29/04.

17       Q     And when did you first receive this notice dated

18   November 29, 2004?

19       A     12/06/04.

20       Q     And who gave you this warning dated November 29th,

21   2004?

22       A     Marie Isenberg.

23       Q     Did you meet with anyone else besides Ms. Isenberg

24   about this warning?

1    A    Just at the time, yes.  Rich Wertz.  Mr. Wertz.

2    Q    Was Mr. Wertz at the meeting with Ms. Isenberg and

3    yourself?

4    A    No.  I spoke to him earlier and that's when I signed

5    it and it was sent to Marie Isenberg and she evidently

6    edited it and she signed her name to it.

7    Q    What do you mean she edited it, Mrs. Isenberg edited

8    it?

9    A    I guess she just looked at it to see.  I don't know.

10   All I know, she seen it and signed it after we did.

11   12/10/04.  We signed it 12/06/04.

12   Q    So did you ever speak with Ms. Isenberg personally

13   about this warning dated November 29th?

14   A    No.

15   Q    Tell me about your discussion with Mr. Wertz about

16   this notice dated November 29th?

17   A    I don't remember the discussion.  I know it was late

18   with no doctor's excuse but I do have doctors' excuses.

19   Q    Okay.  It says, underneath nature of incident on

20   this warning, it says, left work early due to illness.  No

21   doctor's excuse was supplied upon return.

22   A    Yes.  He was the one that sent me home.

23   Q    And the date of the incident says November 17th,

24   2004?

1    A    Right.

2    Q    Did you leave work early on November 17th, 2004?

3    A    Yes, I did.

4    Q    And did you provide a doctor's excuse after, when

5    you returned to work?

6    A    Yes, I did.  I went to outpatient.  It's an

7    emergency thing.  I was pretty sick that day.

8    Q    Okay.  And did you provide Dover Downs with a

9    doctor's note?

10   A    Yes, I did.  It came up.  Nobody has seen it.  But I

11   still have a copy of it.

12   Q    Did you have sick time accrued at the time of

13   November 29, 2004?

14   A    I don't remember.  I don't remember how much time I

15   had, or sick time, vacation time.  I don't remember, ma'am.

16   Sorry.

17   Q    Well, if you had no sick time accrued, even with a

18   doctor's note, that would still be counted as an occurrence,

19   wouldn't it?

20   A    No.  I think we went through that before, that where

21   Mr. Duncan said to everyone at a meeting that they can use

22   their vacation time as well as their sick time to cover up

23   for their time that they missed.  And I'm not saying that I

24   had enough time because I don't know.

BRANCE F. THOMPSON

1    Q    Did you have any vacation time as of November 29th?

2    A    That's what I'm saying, ma'am, I don't remember.

3    Q    You testified earlier, though, that Mr. Duncan told

4    you and others in the department that he was no longer

5    allowing employees to use their vacation time?

6    A    Yeah.  This is after all these writeups and

7    everything that I received.  Then everybody was told that.

8    Q    Well, you told me you met with Rich Wertz regarding

9    this warning?

10   A    Yes, ma'am.

11   Q    Did you tell Rich Wertz, you know, hey, I have

12   vacation time?

13   A    No, ma'am, I didn't.

14   Q    Why didn't you tell Mr. Wertz that?

15   A    Because I figured the vacation time and the sick

16   time would cover the time that I was off.  I didn't have to

17   tell him.

18   Q    Well, you know it didn't cover it when you received

19   this warning, didn't you?

20   A    No, I didn't.  Like all the other warnings I've got,

21   that I didn't deserve them.

22   Q    Okay.  Well, you received this warning at some

23   point, didn't you?

24   A    Yes, ma'am, I did receive it.

150

1      Q      From Mr. Wertz, didn't you?

2      A      Yes, ma'am, I did.

3      Q      And you see that it says at the top, left work early

4      due to illness, and that you see that you see a verbal

5      warning as a result, is that correct?

6      A      Yes, ma'am.

7      Q      At any point, did say to Mr. Wertz, I shouldn't have

8      received a verbal warning?

9      A      Yes, I did.

10     Q      And what did you --

11     A      But I didn't say anything about my vacation time and

12     stuff being taken off for the time that I was off.

13     Q      Tell me what you told Mr. Wertz?

14     A      I told him I didn't deserve it, I have a receipt

15     showing.  And I do.  I was sick that day.  Very sick.  I was

16     in the bathroom more than I was out.  And they told me,

17     well, if you're that sick, go home.  But, yet, I get wrote

18     up for it?  Come on.

19     Q      Did you provide Mr. Wertz with a doctor's note of

20     your absence on November 17th?

21     A      Yes, I did.  I didn't give it to him, no, not

22     personally.  I did take it to maintenance.

23     Q      Who did you take it to in maintenance?

24     A      Automatically, we give it to Linda Renninger.  But

1    after I started getting these writeups, she said she wasn't

2    allowed to receive anything anymore on account of they take

3    them to human resources.  They have to go to human

4    resources.

5        Q    Did you take the doctor's note from November 17th,

6    2004, to human resources?

7        A    No, ma'am, I didn't.

8        Q    Were you supposed to take it to human resources?

9        A    Not at that time, no.  I said after I received these

10   here, then afterward, she said that I was -- whatever my

11   excuses are, anything, any notes that I have, have to go

12   through human resources anymore.  They were handling that.

13       Q    My question is, you claim you have a doctor's note

14   from your absence on November 17th, 2004?

15       A    Yes, ma'am.

16       Q    Who did you give that doctor's note to at Dover

17   Downs?

18       A    Linda Renninger.

19       Q    But then you said Linda Renninger told you it had to

20   go to human resources?

21       A    No, I didn't.

22       Q    Tell me what you said.

23       A    I said, after I had received all these writeups, she

24   said she couldn't receive anymore, that they have to go

1    through human resources.

2        Q    Do you disagree with this verbal warning dated

3    November 29, 2004?

4        A    Yes, I do.

5        Q    Why do you disagree with this?

6        A    Because it's not right.

7        Q    Because it's -- I'm sorry?

8        A    Because it's not right.  I had a doctor's excuse.

9        Q    But you're not sure if you had sick time accrued, is

10   that correct?

11       A    They are not writing me up for the time that I

12   didn't have accrued or anything.  They are writing me up for

13   the sick time.

14       Q    Right.  But to not be written up for sick time, you

15   have to have a doctor's excuse, isn't that correct?

16       A    I said, Rich Wertz -- Rich Duncan said at the

17   meeting we can use our vacation time and our sick time to

18   cover up for any time that we lose as far as being sick so

19   we wouldn't be written up.

20       Q    But you just testified you don't even know if you

21   had vacation time as of November 29th, 2004?

22       A    That's what I said.  And I still don't know that.

23       Q    So you don't know if you had any time that you could

24   take anyway?

1    A    That's true.  So why should I get a writeup anyway

2    until I'm told or shown?

3    Q    You testified that you supplied a doctor's note for

4    the incident on November 17th, 2004, isn't that correct?

5    A    That's correct.

6    Q    Were you trying to use your vacation time for this

7    absence on November 17th?

8    A    I don't know.  I wasn't trying to use anything,

9    ma'am.  I just turned in the receipt showing from the doctor

10   that I went to the doctor's.

11   Q    Well, did you ever tell anyone that you wanted to

12   use any vacation time you had for this November 17th

13   absence?

14   A    I don't think I did.  But, like I said, I don't even

15   know how much time I had, sick time or vacation time.  So I

16   don't know if it covered it or not.  I can't tell you.

17   Q    How many sick days do you get accrued at Dover

18   Downs?

19   A    I forget.  But your vacation time is three hours and

20   something every pay.  And your sick time is X amount of

21   time.

22   Q    How much is your sick time?  How many sick days do

23   you get?  Do you know?

24   A    You get one personal day and then the sick days

BRANCE F. THOMPSON                                154

1    accumulates the same as your vacation time.

2        Q    So you're not sure in 2004 how many sick days you

3    had accrued, is that correct?

4        A    That's correct.

5        Q    Did you lose any salary because of this warning

6    dated November 29th, 2004?

7        A    The day that -- yes, that I was written up for.

8        Q    You mean you didn't get paid for November 17, 2004;

9    is that what you mean?

10       A    Yes, ma'am.  Many days that I have been written up,

11   I definitely wouldn't get paid for them days.

12       Q    Did you lose any job opportunities because of this

13   verbal warning dated November 29, 2004?

14       A    No, ma'am.

15       Q    Did your job change in any way because of this

16   verbal warning from November 29th, 2004?

17       A    No, ma'am.

18            MS. FRIEL:  Exhibit 21.

19            (Thompson Deposition Exhibit No. 21 was marked

20   for identification.)

21   BY MS. FRIEL:

22       Q    And this is Bates labeled D 0066 to D 0067.

23            Mr. Thompson, do you recognize this document?

24       A    Yes, I do.

1    Q    What is this document?

2    A    Disciplinary warning notice.

3    Q    And what's the date of this notice?

4    A    The date of notice is 1/4/05.

5    Q    And what's the date of the incident?

6    A    12/29/04.

7    Q    And did you receive a verbal warning as a result of

8    this incident on December 29th, 2004?

9    A    I believe I did.  I don't remember.  No, I didn't.

10   I know.  No, I didn't.

11   Q    Do you see where it says, action taken, it says,

12   written warning?

13   A    Um-hmm.

14   Q    Did you receive a written warning?  Is there a

15   written warning that we are looking at?

16   A    No.

17   Q    It's not a written warning?

18   A    Yes, it is a written warning.  But if I had received

19   it or any one that I received, I signed.  This is not

20   signed.  I did not receive it.

21   Q    So you're saying you never received this document?

22   A    No.  Any one of them that's not signed, I did not

23   receive.

24   Q    Did anyone show you this document?

1     A    No, ma'am.

2     Q    Under, Nature of Incident, it says, did not report

3   to work on 1/29/04.  And that's supposed to be 12/29/04, I

4   believe.  Due the illness.  Do you remember if you were out

5   of work on 12/29/04?

6     A    No, I don't.

7     Q    And it says, no doctor's excuse was supplied upon

8   return.

9             Did you hand anyone at Dover Downs a doctor's

10  note for your absence on 12/29/04?

11    A    I didn't.  Maybe it was one my wife did.  I don't

12  remember.  I don't know.

13    Q    Do you remember being out on 12/29/04?

14    A    No, I don't.

15    Q    Underneath it, it says, this is the fifth incident

16  of illness without a doctor's excuse or accrued sick time.

17            Do you know if you had accrued sick time as of

18  January 29th, 2004?

19    A    Evidently I didn't, ma'am.  I'm sorry.

20    Q    Did you speak to anyone regarding this warning?

21    A    No, I didn't.

22    Q    Do you disagree with the verbal warning dated

23  January 4th, 2005?

24    A    No, I can't agree to it.

1    Q    Do you disagree with this written warning?

2    A    Yes, I do.

3    Q    Why do you disagree with this writing warning?

4    A    Because I don't know anything about it.

5    Q    Did you lose any salary because of this warning

6    dated January 4, 2005?

7    A    I had to because I got wrote up for it.

8    Q    So you believe you lost salary for the day 12/29/04?

9    A    Yes.

10   Q    Well, didn't you notice on your paycheck that you

11   weren't getting paid for 12/29/04?

12   A    I don't know.  I get a check stub.  And I -- I don't

13   know.  I wasn't paying too much attention to it evidently.

14   My wife is the one that gets it.  It gets direct deposit.

15   Q    So you didn't notice in your paycheck that you were

16   missing --

17   A    I didn't look for it.  Because I wasn't looking for

18   this.

19   Q    How do you know you didn't get paid for 12/29/04,

20   then?

21   A    Because I was written up for it.  Any time you get

22   written up, you don't get paid for that date or they

23   wouldn't have wrote me up.

24   Q    Who told you you didn't get paid for that day?

1        A     Anybody that gets written up don't get paid for a

2     day.

3        Q     I'm asking you, why do you believe that?  Is there a

4     policy that says that?

5        A     No.

6        Q     Why do you believe, if you get a writeup, you don't

7     get paid for that day?

8        A     I don't believe it.

9        Q     You don't believe it?

10       A     No.

11       Q     If an employee receives a writeup, do they get paid

12    for that day?

13       A     Being I'm confused, I'm just saying I don't know

14    nothing.

15       Q     So you don't know if an employee gets paid for

16    writeups they receive?

17       A     No, I don't.

18       Q     Did you lose any job opportunities because of this

19    written warning dated January 4th, 2005?

20       A     No, ma'am.

21       Q     Did your job change in any way us because of this

22    written warning dated January 4th, 2005?

23       A     No, ma'am.

24               MS. FRIEL:  Exhibit 22.

1              (Thompson Deposition Exhibit No. 22 was

2    marked for identification.)

3    BY MS. FRIEL:

4    Q     This is Bates labeled D 0064 through D 0065.

5          Mr. Thompson, do you recognize this document?

6    A     Yes.  Disciplinary warning.

7    Q     Did you ever receive this disciplinary warning?

8    A     No.

9    Q     What's the date of this notice?

10   A     The notice is 1/12/05.

11   Q     And did you receive a final written warning as a

12   result of this?

13   A     Evidently I did receive it.

14   Q     So you did receive this written warning, final

15   written warning?

16   A     I don't remember.  I don't remember.

17   Q     Well, did you know you were placed on final written

18   warning?

19   A     No.

20   Q     You never knew that you were placed on final written

21   warning during your employment at Dover Downs?

22   A     I was told that at one time.  But that wasn't with

23   Marie Isenberg.  She had nothing to do with it.

24   Q     Who told you you were placed on final written

1    warning?

2        A    Richard Duncan.

3        Q    Did Mr. Duncan show you this written warning,

4    Exhibit 22?

5        A    Yes, he did.

6        Q    So you did see this written warning before?

7        A    Yes.  Yes.  Now that -- yes, I did.

8        Q    Okay.  Do you see under it, it says, employee's

9    printed name, it says, Brance Thompson?  Do you see that?

10       A    Yes, ma'am.

11       Q    Underneath it says, check here if employee refuses

12   to acknowledge receipt of this notice.

13            And that is checked.  Do you see that?

14       A    Um-hmm.

15       Q    And do you see where it says, next to your printed

16   name, it says, employee's signature?

17       A    Um-hmm.

18       Q    And employee's signature is blank, isn't it?

19       A    And I refused it.

20       Q    You just testified that any warning that you didn't

21   sign, you never had seen before, is that correct?

22       A    That's correct.  But I did refuse this one.

23       Q    So now your testimony is changing?

24       A    Is that I refused this one.

1      Q     You have seen this one before and you have refused

2   to sign it, is that correct?

3      A     Right.

4      Q     Okay.  It says, Mickey, you did not report to work

5   on 1/12/05 due to illness.

6            Were you absent from work on January 12th,

7   2005?

8      A     I probably was.  I don't remember.

9      Q     It says, this is the sixth indent of illness without

10  a doctor's excuse or accrued sick time.

11           Is that statement accurate?

12     A     I believe it is.

13     Q     Do you speak to anyone regarding this final written

14  warning?

15     A     Just Rich Duncan and --

16     Q     Did you speak to Rich Wertz?

17     A     No.  It was the one over Rich Duncan and I can't

18  think of his darn name.  Excuse my French.

19     .Q    He was above -- I'm sorry.  He was above Rich

20  Duncan?

21     A     Yes, he was above Rich Duncan.  That's correct.

22     Q     Jerry Dunning?

23     A     Dunning.  Yes, ma'am.

24     Q     Were you at a meeting with Mr. Dunning regarding the

BRANCE F. THOMPSON                                    162

1    final written warning?

2        A    Yes.  Rich Duncan took him and I both went to the

3    meeting because Mr. Wertz wasn't there when he wrote me up

4    and he wanted somebody as a witness.  So he took me to

5    Mr. Dunning's office.

6        Q    So you met with Mr. Duncan and Mr. Dunning?

7        A    Right.

8        Q    And tell me about that meeting?

9        A    They just was explaining the disciplinary action to

10   me and I told them that I thought they was harassing me and

11   I wasn't going to sign it and I'd like to have a copy of it.

12   Mr. Duncan said, I can't give you a copy, you have to get it

13   from Marie Isenberg and she is the one that signed it.  And

14   she got it marked before the 17th, which is not right.

15       Q    Did you receive a copy from Marie Isenberg of this

16   document?

17       A    Yes.  Because I went down there and got it from her.

18       Q    In your meeting with Mr. Duncan and Mr. Dunning, did

19   you say anything during this meeting?

20       A    I told them it wasn't right.  I got written up and I

21   have been -- that they are harassing me and everything.

22   That's the reason I've been written up so much, that I had

23   never been written up ever since I had been there.  This is

24   the first time since I have been there that I have been

1    written up with all these writeups.  And I said, and you

2    said that this is my warning.  Well, why haven't you

3    terminated me?  Because seven writeups is a termination.

4    Well, we are not going to terminate you this time.  I said,

5    well, I thought you go by the book.  Well, we do.  I said,

6    well, you're not going by the book, then.

7        Q    So you believe you should have been terminated in

8    January 2005?

9        A    No. Because I got all these writeups I should have

10   never had.

11       Q    Well, you just said that you asked why didn't they

12   terminate you.

13       A    Yeah.

14       Q    Did you want to get terminated in January 2005?

15       A    No.

16       Q    Did you mention your age during your meeting with

17   Jerry Dunning and Rich Duncan?

18       A    No, ma'am.

19       Q    Did you mention discrimination during your meeting

20   with Rich Duncan and Jerry Dunning?

21       A    No, ma'am.

22       Q    Did you lose any pay because of this final written

23   warning from January 2005?

24       A    No, ma'am.

1      Q    Did you lose any job opportunities because of this

2   final written warning?

3      A    No, ma'am.

4      Q    Did your job change in any way because of this final

5   written warning?

6      A    No, ma'am.

7      Q    Besides this discipline that we went through today,

8   did you receive any further disciplinary warnings from Dover

9   Downs?

10     A    Not that I know of.  I hope not, any way.

11                    (Thompson Deposition Exhibit No. 23 was

12   marked for identification.)

13   BY MS. FRIEL:

14     Q    It's Bates labeled -- I don't know the Bates label,

15   actually.  It's a Margolis Edelstein document.

16               Mr. Thompson, do you recognize this exhibit?

17     A    Yes, I do.

18     Q    And what is this exhibit?

19     A    This is a charge of discrimination that I went to

20   the Labor Board.

21     Q    And what's the date of this?

22     A    9/24/04.

23     Q    Is that when you first went to the Department of

24   Labor, September 24th, 2004?

1    A    I believe it is.  I don't remember.  I just remember

2    going there two or three times.

3    Q    Now, Mr. Thompson, you testified earlier today that

4    you did not receive any writeups or disciplinary actions

5    against you until after you filed your charge of

6    discrimination with the agency, is that correct?

7    A    That's correct.

8    Q    Take a look at Exhibit 18.

9    A    Okay.

10   Q    It's Exhibit 18 and it's labeled Margolis Edelstein

11   0066.

12            Is that your signature in the middle of this

13   document?

14   A    Yes, it is.

15   Q    And is this the verbal warning you received?

16   A    Yes, it is.

17   Q    And what's the date next to your signature?

18   A    8/24/04.

19   Q    So obviously you received this verbal warning before

20   you filed a charge of discrimination, is that correct?

21   A    One, two, three, four -- four of them.  Four of them

22   on the same one.  Yes.

23   Q    So you received these four, at least, before you

24   filed your charge of discrimination, is that correct?

```
 1       A    No.  No.  I was written up after that.  When he tore

 2    his up, the one that he made and said he was going to redo

 3    the others back to the dates that they were supposed to,

 4    that's when I went to the Labor Board.

 5       Q    Okay.  But at least this verbal warning that we are

 6    looking at, Exhibit 18, would you agree you received this

 7    and signed it before you filed your charge of

 8    discrimination?

 9       A    Oh, yes.

10       Q    Isn't that correct?

11       A    Yes, ma'am.

12       Q    So your testimony earlier that you weren't written

13    up until after your charge of discrimination is incorrect?

14       A    Right.  No.  Hmm-umm.

15       Q    Okay.  Let's go over this again.

16            Mr. Thompson, Exhibit 18 is a verbal warning,

17    is that correct?

18       A    Yeah.  8/24/04 when that was signed.  This was

19    signed 9/24/04.

20       Q    Exhibit 23?

21       A    Not eight.  One month later.

22       Q    Right.  So you received a verbal warning before you

23    filed your charge of discrimination, is that correct?

24       A    Yeah.  That's the reason I filed it.  That's after I
```

1    got all these writeups.

2        Q    Okay you testified earlier that you didn't get any

3    writeups until after your charge of discrimination?

4        A    No.  During the -- during the time that I had done

5    this, I still continued to get writeups.

6        Q    But you would admit you got writeups before you

7    filed your charge of discrimination, isn't that correct?

8        A    That's the reason I filed it, yes.

9        Q    Okay.  Looking at 18 again.  The verbal warning

10   dated 8/20/04.  Under the nature of the incident, it says,

11   most recent is 8/16/04, out of work.  No doctor's excuse.

12            And the next line says, first three were week

13   of 2/15 ill and no sick time.  6/16, no doctor excuse.

14   8/10, tardy.

15            So is that what that says in there?

16       A    Yes, ma'am.

17       Q    Does that refer to other times that you were either

18   absent or tardy from work?

19       A    I guess.  I don't know.

20       Q    Going back to Exhibit 23, your charge of

21   discrimination.  Under where it says, employment harm.  Do

22   you see that, Mr. Thompson?

23       A    Yes.

24       Q    It says, charging party applied for supervisor

1      position on two separate occasions but was not promoted.

2                       What two supervisor positions did you apply

3      for?

4          A      The two that we spoke of earlier.  One for the

5      midnight shift and then one for the evening shift.

6          Q      But I thought you didn't apply for that?  One of

7      them, you didn't apply --

8          A      The one that I did apply for that he said he didn't

9      have, didn't want a supervisor at that time.  I did apply

10     for that.

11         Q      And then what's the second one you applied for?

12         A      I didn't apply for it.  But I did approach to apply

13     for it.  But it was already given out.

14         Q      So where it says, charging party applied for a

15     supervisory position on two separate occasions, that's not

16     accurate?

17         A      No.  It would be one.  One occasion.

18         Q      And is that your signature under the bottom of

19     Exhibit No. 23?

20         A      Yes, it is.

21         Q      And above your handwriting, does it say, I declare

22     under penalty of perjury that the foregoing is true and

23     correct?

24         A      That's true.

1     Q     But now you're telling me that at least one sentence

2     in this charge is not accurate; is that what you're telling

3     me?

4     A     One I applied for in writing.  The other was verbal.

5     Which I applied for both of them.  No, I did apply for them.

6     It's just one wasn't in writing.

7     Q     Okay.  Are you telling me now that you did apply for

8     the second shift supervisor position in March 2004?

9     A     Verbally.

10    Q     Let's go back to Exhibit 4.

11    A     Okay.

12    Q     And turn to the ninth page again.  It's

13    interrogatory number four.

14          Do you see at the bottom, it says, supervisor

15    for second shift?

16    A     Um-hmm.

17    Q     Turn the page.  Do you see under Section D?

18    A     Yes.

19    Q     It says, the posting was taken down before answering

20    plaintiff could apply?

21    A     Yes, ma'am.

22    Q     So was this statement correct, that you didn't

23    apply?

24    A     No, the statement is not correct.  I went and talked

1       to Mr. Duncan about applying to come to find out that it was

2       already given out.

3           Q    Okay.  So my question to you is, did you apply for

4       this?

5           A    I didn't apply in writing, no.  I made that

6       statement earlier I didn't apply in writing.

7           Q    How did you apply?  Now you're saying you applied

8       verbally?

9           A    Yes, I did.

10          Q    How did you apply verbally?

11          A    I spoke to Mr. Duncan about it.

12          Q    To apply for a job at Dover Downs, don't you just

13      submit an upgrade transfer form?

14          A    Yes, ma'am.

15          Q    And you never submitted an upgrade transfer form for

16      this?

17          A    No.  Because I talked to Mr. Duncan about it and he

18      told me to apply for it.

19          Q    Okay.

20          A    But it was already given out to somebody else.  So

21      why should I apply for it?  He just lied to me.

22          Q    So the question I'm asking, did you apply for this

23      position?

24          A    No, ma'am, I didn't.

1    Q    Going back to Exhibit 23.  In the next sentence, it

2    says, on one occasion, respondent hired a younger, far

3    lesser experienced individual as a supervisor.

4              Who were you referring to then?

5    A    Al Baldwin.

6    Q    Okay.  Go down to the paragraph that says,

7    comparators or other specific reasons for alleging

8    discrimination.

9              Do you see where it says that?

10   A    Yes, ma'am.

11   Q    And it says, the last time I applied for a

12   supervisory position and denied, respondent hired a younger

13   individual who was younger than 40 years of age.

14             Who were you talking about there in that

15   sentence?

16   A    It had to be Al Baldwin.

17   Q    The next sentence says, respondent violated their

18   policy by hiring someone with a relative in the same

19   department?

20             Did Al Baldwin have a relative in the same

21   department.

22   A    No.

23   Q    So what's this paragraph referring to?

24   A    Evidently it was written wrong.

1      Q     How should it have been written?

2      A     The one with the relative was the one that I filed

3  for the outside maintenance for the plumbing job.  And the

4  supervisor, there was never a supervisor's job there on that

5  one.  The supervisor's job was the midnight shift.

6      Q     So that paragraph is not accurate?

7      A     Evidently not, no, ma'am.

8      Q     In your complaint, you allege that Dover Downs

9  discriminated against you because of your age, is that

10 right?

11     A     Yes, ma'am.

12     Q     What acts do you think were discriminatory?

13     A     Well, when I put out for a supervisor's job, hiring

14 somebody younger than I am.  When I put out for the plumbing

15 job, hiring somebody younger than I am.  In both incidents,

16 as far as the supervisor's job.

17     Q     And these are jobs we already talked about earlier

18 today?

19     A     Yes, ma'am.

20     Q     And you believe that it was discriminatory because

21 Dover Downs hired someone younger than you to fill these

22 positions?

23     A     Yes, I do.

24     Q     Any other reason you think it was age

1    discrimination?

2        A    No.

3        Q    Besides the position we already talked about today,

4    is there any other acts of discrimination you allege against

5    Dover Downs?

6        A    Yeah, for harassment.

7        Q    You're alleging a claim of harassment?

8        A    Oh, yes.

9        Q    On what basis?  What was harassment?

10       A    For all the writeups that I received after I took

11   Bob Morrison to human resources.

12       Q    Do you think these writeups were based on your age?

13       A    No.

14       Q    What's your complaint about these writeups?

15       A    That they were harassments toward me going to the

16   Labor Board on Dover Downs.  Because up to that point -- up

17   to that point, I never did have a writeup.  Then all of a

18   sudden after I took them to the Labor Board, I get writeups.

19       Q    So your claim is retaliation; is that what you're

20   referring to?

21       A    Oh, yes.  Yes.

22       Q    You just said, before I interrupted, was they didn't

23   have any writeups before you filed your claim of

24   discrimination?

1      A     That's right.

2      Q     But we went through about ten minutes ago that you

3      had received writeups before your charge?

4      A     I didn't receive any writeups until I took Bob

5      Morrison to human resources.  At that point and then from

6      then on, I received writeups.  But before that, I never

7      received any.

8      Q     Okay.  Now, the writeups you're claiming are

9      retaliation?

10     A     Yes, ma'am.

11     Q     But you're not basing your discrimination claim on

12     the writeups, is that correct?

13     A     No, ma'am.

14     Q     Let's just focus on the discrimination for one

15     second.  Are there any other acts that we didn't go over

16     that you think were discrimination?

17     A     No, ma'am.

18     Q     Did you ever hear anyone make any comments about

19     your age while you worked at Dover Downs?

20     A     Jokingly.  Never nothing serious.

21     Q     Okay.  Tell me the jokes.  Tell me what jokes you

22     heard?

23     A     Just, you know, they talk about old man and stuff

24     like that.  They did that to a lot of people.  So I'm not

BRANCE F. THOMPSON                    175

1    saying that it was against me.

2        Q    It wasn't against you?  I'm sorry?

3        A    No.  I'm just saying that they say that to a lot of

4    people that's elderly, old man.  You know, it's just

5    something that -- a slang word that they use.

6        Q    Did anyone call you old man?

7        A    Oh, yes.  A lot of people.

8        Q    Who called you old man?

9        A    I can't say all the people that called me old man.

10       Q    All right.

11       A    Right.

12       Q    Right.  Name for me the ones that you can remember

13   that called you old man?

14       A    Nate Whitcomb.  The ones that you have written down.

15       Q    Well, Nate you're friends with, isn't that right?

16       A    Yeah.  We have been close friends.

17       Q    So do you think Nate Whitcomb was making comments

18   about your age, that was negative?

19       A    I said none of them was making it concerning the

20   suit or anything.  It's just a slang word that the majority

21   of the people use if you're old, it's old man.  That's it.

22       Q    Who besides Nate Whitcomb used that term?

23       A    I can't name them all.

24       Q    Can you name anyone else, that you can remember,

1    that called you old man?

2    A   No.

3    Q   Did you take these comments in a negative way?

4    A   Yes.  No.  No.  They weren't against me in any way.

5    Q   So were you offended by these comments?

6    A   No.

7    Q   Beside the old man comment that you remember Nate

8    Whitcomb saying, can you remember any other comments that

9    you believe were based on your age?

10    A   No.

11    Q   Okay.  We also talked about the retaliation claim.

12    And you believe your writeups were retaliation?

13    A   Definitely.

14    Q   And what were they retaliation for?

15    A   Taking Bob Morrison to human resources.

16    Q   Okay.  And besides the writeups, were there any

17    other acts that you think were retaliatory?

18    A   No.

19    Q   Do you know if Mr. Duncan knew about your

20    conversation with HR about Bob Morrison?

21    A   Oh, yes.

22    Q   How do you know Mr. Duncan was aware of your

23    conversation?

24    A   Because I told him I was going up there to tell them

1    that I wanted to bring charges against Bob Morrison.

2        Q    Did you mention age discrimination during your

3    conversation with Mr. Duncan?

4        A    No.  Because Mr. Duncan and Marie Isenberg got

5    together talking and that's how he come up to know

6    everything concerning Bob Morrison and stuff.

7        Q    Tell me, during your meeting with HR on August 23rd,

8    2004, Mr. Morrison was at that meeting as well?

9        A    No, ma'am, he wasn't.

10       Q    Oh, it was just you and Marie Isenberg.  I'm sorry.

11       A    Marie Isenberg and Carolyn and Bob Morrison.

12       Q    Bob Morrison was there?

13       A    That is just us four, yes.

14       Q    And during that meeting, you never used the word

15   discrimination, did you?

16       A    Yes, I did.

17       Q    What did you say during that meeting?

18       A    I asked him if the guy was younger than I was that

19   he hired.  And he said, yes.  And I said, you know, that's

20   age discrimination.

21       Q    Do you know if Mr. Duncan was aware that you

22   mentioned age discrimination during your discussion on

23   August 23rd?

24       A    I'm sure he was.  Because Marie Isenberg and all of

1    them got together talking and they was pulling my files.  I

2    was told that they were pulling my files.

3         Q    But you don't know if Mr. Duncan was aware that you

4    mentioned age discrimination during your conversation with

5    HR?

6         A    Not at that time.  But I'm sure he knew it

7    afterwards.

8         Q    How do you know he knew it afterwards?

9         A    Like I said, him and Marie Isenberg, she called him

10   up there and they had a meeting and I'm sure she told him.

11        Q    But you don't know exactly what Mrs. Isenberg told

12   Mr. Duncan, do you?

13        A    No, ma'am, I don't.

14        Q    And do you know if Mr. Wertz was aware that you

15   complained of age discrimination during your meeting with

16   human resources?

17        A    I'm sure he was aware of it.  But I can't say for

18   definite, no.

19        Q    Do you believe, when you met with Marie Isenberg and

20   Carolyn Rakowski and Bob Morrison, do you believe you made a

21   complaint of age discrimination during that meeting?

22        A    Yes, I did.

23        Q    Is there any other time that you allege you made a

24   complaint of age discrimination during your employment with

1    Dover Downs?

2        A    No.  Because I had no reason for it.  I wasn't even

3    thinking in that line of having discrimination against

4    anybody until they started retaliating against me.

5        Q    Have you spoken to anyone at Dover Downs about your

6    lawsuit?

7        A    No.  But they all know it.

8        Q    How do you know they know about your lawsuit?

9        A    Because they have all told me.

10       Q    So then you have spoken to people about your

11   lawsuit?

12       A    No.  They spoke to me about it.

13       Q    Okay.  So you had conversations with people at Dover

14   Downs about your lawsuit?

15       A    Yes, ma'am.

16       Q    Who have you had conversations with about your

17   lawsuit?

18       A    It was nothing -- the conversation had nothing to do

19   with the lawsuit outside of just letting me know that they

20   knew about my lawsuit.  Because you wouldn't explain or

21   wouldn't have a conversation telling them anything

22   concerning it.

23       Q    Okay.  Who did you have a conversation with about

24   your lawsuit?

1      A     Nobody.  Outside of my wife.

2      Q     You didn't have any conversation with anyone at

3    Dover Downs about your lawsuit?

4      A     No.  Outside of just saying that there was a

5    lawsuit.

6      Q     Okay.  Who did you say you just had a lawsuit?

7    That's what I'm trying to figure out.

8      A     I mean they was telling me that they had a lawsuit,

9    that they heard I had a lawsuit.  And I would just say,

10   yeah.  And that was it.  Because I did not talk to anybody

11   about the lawsuit.

12     Q     Who came to you and said I heard about the lawsuit?

13     A     Different employees.

14     Q     I'm asking you who?

15     A     I don't know.

16     Q     You don't remember anyone?

17     A     No, I don't remember nobody.

18     Q     Let's go to your complaint, which is Exhibit 6.  And

19   look at page eight of that.  And paragraph 37.

20           Do you see where it says, in the second

21   sentence, as a consequence, the August 24, 2004 writeups for

22   the alleged previous violations were not in compliance with

23   the employee handbook and, therefore, invalid.

24           How were these writeups not in compliance with

1    the employee handbook?

2        A    I was told that they had 72 hours in which to write

3    you up.

4        Q    And who told you they had 72 hours in which to write

5    you up?

6        A    I heard that it was 72 hours.

7        Q    And who did you hear this from?

8        A    Just say I just heard, heard it said that we had

9    72 hours in which to write you up.

10       Q    Is there a provision in the employee handbook that

11   requires writeups be within 72 hours?

12       A    I don't know.

13       Q    Do you want to take a look at the employee handbook?

14       A    Um-hmm.

15       Q    Exhibit 2.  I'm just going to ask you to find the

16   provision dealing with the 72-hour requirement?

17       A    I don't think you will find that.

18            I don't see anything.

19       Q    Do you believe that there is a policy in the

20   employee handbook requiring that writeups be within 72 hours

21   of the occurrence?

22       A    I don't think so.  But, like I said, I was just told

23   that they had 72 hours.

24       Q    So is that sentence I just read, I'll read it again.

1   As a consequence, the August 24, 2004 writeups for the

2   alleged previous violations were not in compliance with the

3   employee handbook and, therefore, invalid; is that statement

4   not true?

5       A    I'd have to read the whole handbook to find out. I

6   don't know.

7       Q    But as we sat here today, you couldn't find a

8   provision dealing with that?

9       A    Right.  I couldn't find it.

10      Q    Go to paragraph 41 of the complaint.

11      A    Okay.

12      Q    It says, on or about August 24th, 2004, with no

13  administrative remedy available to him, plaintiff filed a

14  charge of discrimination against defendants with the

15  Delaware Department of Labor and the United States Equal

16  Employment Opportunity Commission alleging age

17  discrimination.  Do you see that?

18      A    Yes, ma'am.

19      Q    We just went over Exhibit 23.  And you can put it

20  out in front of you.  And you testified that this was your

21  charge of discrimination you filed.  And that's dated

22  September 24th, 2004, is that correct?

23      A    Yeah, 9/24/04.

24      Q    So paragraph 41 of your complaint is inaccurate, is

1    that right?

2         A    I believe it is.

3         Q    The date on paragraph 14 should read September 24th,

4    on or about September 24, 2004, instead of August 24, 2004,

5    is that correct?

6         A    Yes, ma'am.

7         Q    Turn to the next page, paragraph 44.  And that

8    paragraph says, on or about January 10th, 2005, Mr. Thompson

9    found a hidden camera the size of a pencil in his paint

10   shop.  Is that what that says?

11        A    Yes, it is.

12        Q    Do you know why the camera was in the paint shop?

13        A    No other reason why it should be there outside of

14   seeing what I'm doing.

15        Q    Okay.  Prior to you learning about the camera, had

16   you complained to anyone at Dover Downs that your paint

17   supplies were being stolen or tampered with?

18        A    That was a long time before that.

19        Q    Okay.  Well, tell me about it?

20        A    That was when it -- let me see.  Yeah, I said it was

21   being tampered with, yes.

22        Q    Who did you tell your supplies were being tampered

23   with?

24        A    Richard Duncan.

BRANCE F. THOMPSON

1    Q    Did you tell anyone else besides Mr. Duncan?

2    A    No.

3    Q    And when did you tell Mr. Duncan that your paint

4    supplies were being tampered with?

5    A    That was before the camera was ever put in there.

6    But that was several months before that.

7    Q    Do you think it was several month before the camera

8    was put in?

9    A    Yeah.  I would say it was even before I had these

10   writeups.

11   Q    Okay.  So what year was it in that you remember

12   complaining to Rich Duncan about your paint supplies being

13   tampered with?

14   A    2004.  Before August.

15   Q    And you don't remember speaking to Mr. Duncan after

16   that one time you complained about your paint supplies being

17   tampered with?

18   A    No.  I didn't find the camera in there.  But the

19   camera was there because I seen the camera.

20   Q    Okay.  Who found this camera in the paint shop?

21   A    Jim Shreves.

22   Q    And did Mr. Shreves tell you about the camera?

23   A    Yes, he did.  He called me on the phone and told me.

24   Q    Beside Jim Shreves, have you ever spoken to anyone

1    else at Dover Downs about the camera?

2        A    Yes.  Nate Whitcomb, Wally Graham, Donald Straw.

3    Just about everybody in maintenance.

4        Q    Did you ever talk to Mr. Duncan about the camera?

5        A    No.

6        Q    Did you ever talk to Mr. Wertz about the camera?

7        A    No.

8        Q    Do you know who placed the camera in the paint shop?

9        A    Yes, I do.

10       Q    Who placed it there?

11       A    Mr. Duncan.

12       Q    And how do you know Mr. Duncan placed the camera?

13       A    Because Mr. Duncan told Donald Straw about the

14   camera that was in the paint shop because Donald approached

15   him about it, that I had seen that camera in there.  And he

16   said, well, this is going to come back and bite me now,

17   ain't it?

18       Q    So did Mr. Duncan tell Mr. Straw, to your knowledge,

19   why he put the camera in the paint shop?

20       A    Not that I know of.

21       Q    Do you know if the camera was placed in the paint

22   shop to see if anyone was tampering with the paint supplies?

23       A    I can't say that it was.  But it's never been there

24   before.

1    Q    How do you know when the camera was placed in the

2    paint shop?

3    A    The night before that.  I work in there, in the

4    paint shop, every day, taking my paints in and out.  And I

5    never seen it.  And it is plain as the nose on your face

6    sticking out of the ceiling.

7    Q    So you believe the camera was placed in the paint

8    shop on January 10th, is that right?  When do you believe

9    the camera was placed in the paint shop?

10   A    I don't know.  I have it here January 10th.  But I

11   don't remember the dates.

12   Q    And how big was the camera?

13   A    Very small.  About the size of your ink pen.

14   Q    Okay.  Go on to paragraph 45 of your complaint.

15   A    Okay.

16   Q    It says, on or about January 11, 2005, Mr. Thompson

17   experienced chest pains at work.  He requested a ride to the

18   hospital?

19        Who did you request a ride to the hospital

20   from?

21   A    Surveillance.

22   Q    Who at surveillance?

23   A    I don't know their names.

24   Q    And what did the person tell you?

BRANCE F. THOMPSON                    187

1      A    He told me that -- for me to go to the office and

2    that he was going to make out a complaint and everything.

3    And I was in the office at the time.  Linda came by the

4    office and she seen me setting there and she said, what's

5    wrong.  And I told her.  She said, I will be right back,

6    I'll bring my car and take you to the hospital.  Over a half

7    an hour later, the telephone rang and it was Linda telling

8    them that -- to tell me she couldn't do it, that Mr. Wertz

9    said he didn't want her taking me to the hospital because

10   she didn't need the responsibility.

11     Q    And tell me, what happened on January 11th that you

12   needed to go to the hospital?

13     A    I had chest pains.

14     Q    What were you doing when the chest pain started?

15     A    I was working up on the scaffold.

16     Q    And did you go to the hospital on January 11th?

17     A    Yes, I did.  I drove myself to the hospital.

18     Q    And what was the diagnosis when you left the

19   hospital?

20     A    They said something about my nerves and everything.

21   I went to the emergency ward.  I forget what it said on the

22   paper.

23     Q    Did you ever personally talk to Mr. Wertz about

24   January 11th?

BRANCE F. THOMPSON                                              188

1    A    No.

2    Q    So how do you know Mr. Wertz wouldn't allow

3    Ms. Renninger to take you to the hospital?

4    A    That's what they told me in surveillance.  They said

5    Mr. Wertz told her to call -- she told them that Mr. Wertz

6    said that he didn't want her to have the responsibility of

7    taking me there in case something happened.

8    Q    Like a liability issue?

9    A    I guess, yes.

10   Q    Do you know if Dover Downs has a policy against

11   employees driving other employees to the hospital?

12   A    No.  They used to there for a while.  I don't know

13   if they still do.  They said they quit doing it.  But they

14   would take you to the hospital or take you to different

15   places.  The security would.

16   Q    As of the time, January 11, 2005, do you know what

17   Dover Downs' policy was regarding transportation of

18   employees to the hospital?

19   A    No, ma'am.

20   Q    Did you talk to anyone else about the incident on

21   January 11th besides surveillance and Ms. Renninger?

22   A    No.

23   Q    Going to complaint paragraph 49 on page ten.  It

24   says, Mr. Thompson inquired as to why did he not receive a

1    bonus.  Mr. Richard Wertz and Mr. Duncan told him that it

2    was because of all the writeups that he had received in the

3    past year.  However, there were other similarly situated

4    employees who received bonus checks in spite of writeups and

5    even in spite of suspensions, of which Mr. Thompson had

6    none.

7                Is that what that paragraph says?

8       A    Yes, ma'am.

9       Q    Who are the other similarly situated employees who

10   received bonus checks in spite of writeups?

11      A    I'm trying to think of her name.  I can't think.

12   The name I don't remember.

13      Q    Was it a woman or a man?

14      A    One of them is a woman.

15      Q    What department do they work in?

16      A    Security.

17      Q    And are you referring to two people?

18      A    Yeah, referring to two people.

19      Q    A man and a woman?

20      A    Yes.

21      Q    And they worked in security?

22      A    Yes, ma'am.

23      Q    And did either of these people have a final written

24   warning?

BRANCE F. THOMPSON                                      190

1       A    They were suspended from the job.  If you're

2    suspended at any time, that's the same thing.  You had to be

3    written up in order to be suspended.

4       Q    So these two people were both suspended, you

5    believe?

6       A    Yes, ma'am.

7       Q    How do you know they were suspended?

8       A    Because I was told by them they were.

9       Q    But the two people told you themselves?

10      A    Yes, ma'am.

11      Q    And how do you know they received a bonus?

12      A    I was also told by them.

13      Q    But you can't remember their names?

14      A    No.  But I'm sure I have it written down.

15      Q    If you have it written down somewhere, let me know,

16   please.

17           Do you remember when you talked to this man and

18   this woman?

19      A    No.  No, ma'am, I don't.

20      Q    You would have received a bonus check on

21   February 22nd, 2005, is that correct?

22      A    Um-hmm.  Yes, ma'am.

23      Q    And you went out on leave for disability in March of

24   2005, is that right?

1      A     Yes, ma'am.

2      Q     So did you talk to these two people between February

3    and March of 2005?

4      A     When I came back from work.  When I went back in.

5    No.  Yes.  I talked to them afterward.

6      Q     You talked to them in person?

7      A     Yes.

8      Q     And it was sometime after February 22nd, 2005?

9      A     Yes.  See, another thing, we are speaking of the

10   bonus checks.  I received bonus checks the other times that

11   I have writeups in here showing that I shouldn't have

12   received it.  But I received my bonus checks then.

13     Q     Are you aware of the Dover Downs policy that

14   employees can't receive a bonus check if they have a final

15   written warning?

16     A     Yes, ma'am.  I should have never had any writeups at

17   all.

18     Q     Turning to paragraph 52 of the complaint.  It says,

19   upon information and belief, there is another employee, Eric

20   Johnson, who, like Mr. Thompson, was injured on the job.

21     A     Excuse me.  I want to correct something.  Where it

22   says Eric Johnson, that's Eric Daniels.

23     Q     Okay.

24     A     Instead of Johnson.

1    Q    Okay.  And then it says, however, unlike the

2    treatment of Mr. Thompson, defendants gave Mr. Daniels, it

3    should be, the choice of returning to work and performing

4    light duty work or staying out on Workers' Compensation.

5            How do you know Mr. Daniels had the choice of

6    returning to work and performing light duty?

7    A    I spoke to Mr. Daniels himself.

8    Q    And did Mr. Daniels return to work on light duty?

9    A    They gave him a choice after that to get another job

10   in Dover Downs where he wouldn't have the labor work that he

11   was doing at the present and he wouldn't do it so he went

12   back and talked to his doctor and his doctor released him so

13   he could work.

14   Q    What department did Mr. Daniels work in when he went

15   out on --

16   A    Maintenance.

17   Q    And he returned to Dover Downs.  Was he in

18   maintenance when he returned?

19   A    Yes, ma'am.

20   Q    And so he remained in the same department?

21   A    Yes, ma'am.

22   Q    What were the restrictions placed on Mr. Daniels?

23   A    The same as myself.  He could only lift ten to

24   15 pounds.

1    Q    But I thought you testified earlier that the

2    restriction of only being able to lift ten to 15 pounds,

3    that a person couldn't perform the job of maintenance

4    mechanic?

5    A    Yes, ma'am.

6    Q    So what job did Mr. Daniels perform when he came

7    back?

8    A    I don't know what he performed when he came back.  I

9    wasn't there when he came back.

10   Q    So do you know if he came back in a maintenance

11   department?

12   A    Yes.

13   Q    Okay.  You know I came back in the maintenance

14   department?

15   A    Yes, ma'am.

16   Q    Do you know what position he fulfilled?

17   A    I imagine he went to the same position but they told

18   him that he would have to get another job there at Dover

19   Downs other than working in maintenance.

20   Q    So he couldn't stay in maintenance, then,

21   Mr. Daniels?

22   A    Right.

23   Q    So they told him he had to get another job at Dover

24   Downs outside of maintenance?

1      A     They had another job there that he could have, yes.

2      Q     Did Mr. Daniels apply for another job within Dover

3   Downs?

4      A     No.  He said he couldn't do it because he wouldn't

5   be getting the kind of pay that he was getting.

6      Q     So then Mr. Daniels didn't get a job at Dover Downs

7   after his leave?

8      A     Yes, he did.  He went back to his doctor and got his

9   doctor to release him of the light duty so he could keep his

10  job.

11     Q     Okay.  But you were never released from your light

12  duty, isn't that correct?

13     A     No.

14     Q     I thought you testified earlier that your doctors

15  released you to perform light duty?

16     A     He did.  To light duty.

17     Q     Well, Mr. Daniels, you just said, was released to

18  come back, not only light duty.

19     A     Because he went back to his doctor and told him the

20  only way he could go and do his job is to be released of the

21  light duty job.

22     Q     So Mr. Daniels was released of light duty?

23     A     Yes.  From his doctor in order to keep his job.

24     Q     Were you released from your doctor to get off of

1     light duty?

2        A     No.   Because I wasn't going to go through the pain

3     to get released in that order just to work for Dover Downs.

4        Q     So you chose not to try to get off light duty?

5        A     My doctors chose not to.   Not me.

6        Q     I'm confused, then.   Then how could Mr. Daniels be

7     similarly situated to you?

8        A     He was identical situated to me.   He was on light

9     duty.   But in order to keep his job, he had to go back to

10    his doctor and have his doctor take him off of light duty.

11       Q     Okay.

12       A     And then he went back to Dover Downs.   Not being on

13    light duty, they let him have his job back.

14       Q     But Mr. Daniels came back with no restriction, isn't

15    that right?

16       A     Yeah.   After he had to approach his doctor in order

17    to get it.

18       Q     But you never got released off of light duty, isn't

19    that right?

20       A     You're right.

21       Q     I'm asking.   Mr. Daniels' situation is different

22    than your situation, isn't that correct?

23       A     No.

24       Q     Well, you already testified your doctor released you

BRANCE F. THOMPSON

1    for light duty at some point, is that correct?

2        A    Right.

3        Q    But Mr. Daniels, you're saying, was released without

4    any light duty?

5        A    Because he told his doctor to release him.  It

6    wasn't that his doctor released him for that.  He went to

7    his doctor and had his doctor release him.

8        Q    But he still had his doctors release him, isn't that

9    correct?

10       A    He had him release him, yes.

11       Q    But you never got the release from your doctor,

12   isn't that correct?

13       A    Because I wasn't going to have my doctor do it for

14   me like he did in order to have his job.  I'd stay in pain

15   and I wasn't going to stay in pain.

16       Q    Then you're different than Mr. Daniels?

17       A    Yes.

18       Q    Because Mr. Daniels got released?

19       A    Yes.

20       Q    So my question is, is your situation different than

21   Mr. Daniels?

22       A    Now it is, yes.

23       Q    Going to paragraph 66 on page 13.  It says, as a

24   result of defendant's -- is that the one I want?

1          I'm sorry.  Paragraph 65.  On page 12.  Okay.

2    Says, such retaliation includes, but is not limited to, and

3    part B is, increasing his workload.

4          When was your work load increased?

5    A    After the writeups.  Disciplinary actions.

6    Q    I'm asking you, let's focus on when your work load

7    was increased.  When did that occur?

8    A    I don't know the time or the date.

9    Q    In what way was your work load increased?

10   A    I had more painting to do that I couldn't get done

11   in one day.  More work orders to complete.

12   Q    And did anything happen if you didn't complete these

13   work orders?

14   A    No.

15   Q    You weren't written up, is what I'm asking, for poor

16   performance during these times?

17   A    No.  Because he didn't think he could get away with

18   it.

19   Q    Let's go to Exhibit 4.  It's plaintiff's answers to

20   defendant's interrogatories.  It is interrogatory number

21   nine.  Do you see where it says, the answer?

22   A    Yes, ma'am.

23   Q    It's question nine.  I'm going to read you the

24   answer.

BRANCE F. THOMPSON                                    198

1              In line 17 under answer, it says, in addition

2    to the losses in pay incurred, due to his not being awarded

3    the position for which he was qualified, he also lost

4    bonuses and overtime opportunities in these positions.

5              What were the bonuses you lost?

6       A    The holidays.  Working the overtime.  Any increase

7    in pay.  That's the only thing I can say.

8       Q    So the next thing is overtime opportunities.  What

9    overtime opportunities did you lose?

10      A    Well, it's double time.  Double pay when you work

11   the overtime.  And your holidays, you're working the

12   holidays, and which I didn't get the holidays because they

13   all fell on the holidays, my time to work, which I got paid

14   double time and a half for it.

15      Q    So you still worked overtime in your position as a

16   Maintenance Mechanic I, is that right?

17      A    I did, yes.

18      Q    So how did you lose any overtime opportunities?

19      A    Because I hadn't been working.

20      Q    Right.  Well, this paragraph deals with positions

21   that you applied for and didn't get.

22      A    I wasn't given them, the holidays and stuff that I

23   was given before.

24      Q    I don't understand.  Explain that to me.

1       A     I don't know.  I'm getting confused here.

2       Q     Do you want to take a break?

3       A     Yeah.

4             MS. FRIEL:  Okay.  We'll take a break.

5             (A brief recess was taken.)

6    BY MS. FRIEL:

7       Q     Mr. Thompson, can you tell me now what overtime

8    opportunities you lost by not getting these jobs you applied

9    for?

10      A     Yes.  Instead of me making by the hour, I would be

11   on a salary and the salary would be substantially more than

12   what I'm making by the hour.  And the bonuses would be --

13   would have been pertaining to the amount of salary that you

14   get per year.

15      Q     So you're not really claiming a loss of bonus,

16   you're claiming a loss of amount you would have gotten?

17   Your bonuses would have been bigger if you would have gotten

18   a promotion; is that what you're arguing?

19      A     Right.

20      Q     And if you were a supervisor, you would have been a

21   salaried employee?

22      A     Yes, ma'am.

23      Q     And now as a Maintenance Mechanic I, you're on a

24   salary?

1        A      Yes, ma'am.

2        Q      You're hourly?

3        A      Hourly.

4        Q      Now, the plumbing position we talked about earlier,

5     that was a Maintenance Mechanic I position, right?

6        A      Yes.  Hourly wages.

7        Q      So that would have been hourly?

8        A      Yes, ma'am.

9        Q      So with that position, was your bonus affected by

10    not receiving that job?

11       A      Yes.  Because I would have been higher paid.  So my

12    bonuses would have been higher.

13       Q      And you believe you would have been higher paid

14    because other people received more?  Tell me why you would

15    have been paid more if you would have gotten that plumbing

16    position?

17       A      Bob Morrison said you go from 16 to $19 an hour.

18    And so he didn't say exactly how much you would be getting

19    but it would range from 16 to 19.  Well, even $16 is more

20    than what I make an hour.

21       Q      And what were you making an hour at that time, which

22    was June 2004?

23       A      15.42, I believe.

24       Q      $15.42 an hour?

```
 1        A    Yes, ma'am.

 2        Q    Let's say you started at $16.  It would have been a

 3    58 cent an hour raise?

 4        A    No.  No.  Because he started the other employee off

 5    at $19 an hour.

 6        Q    What employee are you referring to?

 7        A    Knotts.  Robert Knotts.  That's to my belief.  I

 8    don't really know that for sure.

 9        Q    And why do you believe Mr. Knotts started at $19 an

10    hour?

11        A    It was brought up that he did.  That's what he was

12    making when he started.

13        Q    Who brought it up that Mr. Knotts was making $19 an

14    hour?

15        A    He did himself.

16        Q    Did Mr. Knotts tell you that he was making $19 an

17    hour?

18        A    Yes, he did.

19        Q    He told you that?

20        A    Yes.

21        Q    And when did Mr. Knotts tell you that he was making

22    $19 an hour?

23        A    He didn't say exactly $19 an hour.  But he said he

24    was making the max.  So the max is $19 an hour.
```

1    Q    I thought you told me earlier that some employees

2    made $24 an hour?

3    A    That's on different jobs.

4    Q    So you believe the maximum amount of money that you

5    could have received in the plumbing position was $19 an

6    hour, is that correct?

7    A    Yes.  Bob Morrison told that.  Yes, ma'am.

8    Q    And you believe Mr. Knotts received the $19 an hour

9    because he told you he received the maximum, is that

10   correct?

11   A    Yes, ma'am.

12   Q    Mr. Thompson, have you ever suffered any physical

13   injuries as a result of Dover Downs' actions?

14   A    Not of their actions, no.

15   Q    Have you ever received any psychological or

16   emotional injuries as a result of Dover Downs' actions?

17   A    Yes.  Through all this, I have had a lot of

18   problems.  That's the reason I take Xanax and Paxil.

19   Q    And what do you mean by, you said through all this,

20   what do you mean by all this?

21   A    The things that's been taking place here concerning

22   the writeups and my job in jeopardy and just everything, you

23   know, friends that I had.  I just feel that all of it has

24   caused a lot of problems with my health.

BRANCE F. THOMPSON                    203

1    Q    The litigation has caused problems with your health?

2    A    Yes, I believe so.

3    Q    And you said friends.  How has your relationship

4    with your friends been affected by it?

5    A    I guess you could call them so-called friends.

6    Because nobody contacts me anymore.  They don't call me

7    anymore.  I guess because they are afraid they might get

8    caught up into this and lose their jobs.  I don't know.

9    Q    Are you talking about people you worked with at

10   Dover Downs?

11   A    Yes, ma'am.

12   Q    Do you still talk to Nate Whitcomb?

13   A    No.  He doesn't even talk to me.

14   Q    Have you called Mr. Whitcomb?

15   A    Yes.  I called him and I talked to him one day and

16   then he hasn't called me or anything since then.

17   Q    And you said you were on Xanax, is that right?

18   A    Yes, ma'am.  And Paxil.

19   Q    And when were you prescribed Xanax?

20   A    When I went to the hospital that time that Linda

21   Renninger was going to take me to the hospital.  Like right

22   now, my nerves are shot.

23   Q    So January 2005 is when you started on Xanax?

24   A    Yes.

1    Q    And that was after you filed your charge of

2    discrimination with the agency?

3    A    Yes.

4    Q    Was it the process of filing the charge of

5    discrimination that caused you -- what did it cause you?

6    A    I guess my nerves and everything.  I really don't

7    know.  All I know is it just has affected me as far as my

8    nerves.

9    Q    And are you still taking Xanax?

10   A    Yes.

11   Q    And it's for your nerves?

12   A    Yes, ma'am.  And Paxil as well.

13   Q    What doctor prescribes you the Xanax?

14   A    Dr. Osunkoya.

15   Q    And Paxil.  When did you start taking Paxil?

16   A    I took Paxil before and then I got off of it and

17   then I got to the point to where I needed something a little

18   bit stronger than what I was taking.  And Dr. Verapoppa put

19   me back on Paxil.

20   Q    And when did he put you back on Paxil?

21   A    Maybe three months now, four months.

22   Q    So you're taking Xanax and Paxil?

23   A    Yes, ma'am.

24   Q    And you said you were on Paxil before.  When were

1    you on Paxil before?

2        A    At the time I was taking the Xanax, he put me on

3    Paxil to see how I was doing.  I told him I didn't need it

4    that bad, you know, the Paxil.  And because my sleeping

5    habits had changed quite a bit to where I was up and down so

6    much at night.

7        Q    So you didn't think you needed the Paxil and the

8    Xanax at the time?

9        A    No.  The Paxil more or less helps you sleep more

10   than anything.  Xanax does, too.  But both of them together

11   really put you out.

12       Q    And you said you started back on Paxil about three

13   months ago?

14       A    Yes.  About three, four months ago.

15       Q    And what changed that you needed to go on the Paxil

16   about three to four months ago?

17       A    My sleeping habits and everything.  Just my nerves

18   and everything is more -- are worse now than what they ever

19   were.

20       Q    Are you suffering from any emotional distress or

21   pain today?

22       A    Yes.

23       Q    What?  Can you describe for me what you're feeling?

24       A    Just -- I don't know how you explain the pain.