```
 1        Q    Do you have any physical pain?

 2        A    Not physical, no.  Emotionally.

 3        Q    And how is your health today?

 4        A    It's not -- it's not that good, I guess.

 5        Q    And why isn't your health that good?

 6        A    I have sugar diabetes now and high cholesterol.

 7        Q    Anything else?

 8        A    Quite a bit.

 9        Q    What else do you have?  What other health ailments

10   do you have?

11        A    That's the reason I can't see.  Cataracts, enlarged

12   prostate.

13        Q    Anything else?

14        A    No.  I just got over cancer.

15        Q    You just got over cancer?

16        A    Yes.

17        Q    What kind of cancer did you have?

18        A    Colon.

19        Q    And were you undergoing treatment for your colon

20   cancer?

21        A    No.  They just -- they found it and then he said

22   something about scraping the liner or something and I ended

23   up not having cancer.

24        Q    And it turned out not to be cancer?  I'm sorry?
```

1      A      It was cancer, yeah.

2      Q      And they removed the cancer?

3      A      What was there, yeah.

4      Q      And when did this happen?  When did they remove what

5      was there of the cancer?

6      A      Three months?  Has it been that long?

7                  MR. WILSON:  I can't answer.

8                  THE WITNESS:  I called him.  About three, four

9      months.

10     BY MS. FRIEL:

11     Q      And so there has been no problem since the three or

12     four months?

13     A      No.

14     Q      And you had mentioned a Dr. Osunkoya?

15     A      Yes.  He is my family doctor.

16     Q      That's your family doctor?

17     A      Yes, ma'am.

18     Q      And why did you see this doctor?

19     A      Because of my nerves and everything.  No sleep.  I

20     just knew there was something wrong.

21     Q      Have you ever seen a psychologist or psychiatrist

22     before?

23     A      No.

24     Q      Any other problems that you believe resulted from

1     the alleged discrimination by Dover Downs that we haven't

2     talked about today?

3        A     No.

4        Q     Have you ever taken any anti-depressants?

5        A     That's Xanax and Paxil.

6        Q     Is Paxil an antidepressant?

7        A     Yes.  It's a much stronger medicine than Zanax.

8        Q     Do you suffer from depression?

9        A     Yes, ma'am.

10       Q     And how long have you felt depressed?

11       A     I don't know.  The last couple years or the last

12    year.  I'd say mostly in the last year.

13       Q     And has your depression, your anxiety, interfered

14    with your marriage?

15       A     Sometimes.

16       Q     In what way?

17       A     Grouchy old man.

18       Q     Has your depression interfered with any of the

19    relationships you have with your kids?

20       A     I don't have a relationship with my kids.  They are

21    all in other states and they have nothing to do with me.

22       Q     Okay.  Mr. Thompson, have you ever been convicted of

23    a crime?

24       A     Yes.

1    Q    What crime?

2    A    Burglary when I was very, very young and stupid.

3    Q    How old were you?

4    A    Eighteen.

5    Q    And did you go to jail for your conviction?

6    A    Yes, I did.

7    Q    How long were you in jail for?

8    A    One to ten.

9    Q    One to ten years, I assume you mean?

10   A    Yeah.  I spent ten years.

11   Q    You spent ten years in there?

12   A    Yes.

13   Q    So you got out when you were with 28 years old?

14   A    Yes, ma'am.

15   Q    What state did you live in at the time?

16   A    Indiana.

17   Q    And what jail did you serve in?

18   A    Pardon?

19   Q    What jail did you serve in?

20   A    Pendleton.

21   Q    And where is that located, Pendleton?

22   A    Pendleton, Indiana.

23   Q    Besides the burglary conviction, have you ever been

24   convicted of any other crimes?

1       A      Just burglaries.

2       Q      Just that one burglary?

3       A      Well, there was more than one.  But it was

4    burglaries that I was convicted of.  I mean there was

5    burglaries that I was locked up for.

6       Q      So besides the burglary that we just went over when

7    you were convicted when you were 18 and served ten years in

8    jail, was there any other time after that that you were

9    convicted?

10      A      Yeah, there was other times.

11      Q      Tell me about those other convictions?

12      A      It was the same thing, burglary.

13      Q      And when was that conviction?

14      A      I got out in 1980.

15      Q      And when did you start serving that sentence?

16      A      About eight years before that.

17      Q      So around 1972?

18      A      '72.

19      Q      What state were you living in at that time?

20      A      Missouri.

21      Q      So your jail was in Missouri?

22      A      (Indicates yes.)

23      Q      Besides those two burglary convictions, any other

24    convictions?

1  A    No.  I have had a lot of convictions but nothing

2  convicted.  You know, I have been in trouble a lot.  Put it

3  that way.

4  Q    Any other convictions besides these burglaries?

5  Let's start with convictions.  Any other convictions besides

6  these two burglaries?

7  A    No.

8  Q    Any other time you served in prison besides these

9  two burglaries?

10  A    No.  That was enough.

11  Q    Beside these two burglary convictions, have you been

12  arrested before?

13  A    I have been arrested but not -- no.

14  Q    You have never been arrested besides these two

15  burglary convictions?

16  A    Like I say, there was a few times I was arrested,

17  yeah, but I can't remember them, what all it was.

18  Q    Were you ever arrested for getting in a fight with

19  police officers?

20  A    No.  They beat me up.

21  Q    You allege the police officers beat you up?

22  A    Yeah.

23  Q    When?

24  A    When I got arrested.

1      Q    And that's one of the convictions we have already

2   gone over?

3      A    Yeah.

4      Q    Do you have any tattoos on your body?

5      A    All over.

6      Q    Okay.  Do you have any tattoos from one of the

7   prisons you have been in?

8      A    All over.

9      Q    You have prison tattoos on your body?

10      A    Yes.

11      Q    What do the tattoos say?

12      A    Hands.  Nothing in words.  It's just tattoos.

13      Q    What makes them prison tattoos?

14      A    Because the way they are made.

15      Q    Okay.  Tell me how --

16      A    They are not to color, you know.

17      Q    How do you make a prison tattoo?

18      A    With one needle and thread dipped in and one poke at

19   a time.

20      Q    Did you ever commit murder?

21      A    No.

22      Q    Did you ever attempt murder?

23      A    No.

24      Q    Did you ever tell any employees at Dover Downs that

1    you murdered someone?

2        A    No.

3        Q    Did you ever tell anyone at Dover Downs that you

4    were arrested for assaulting someone?

5        A    No.

6        Q    Let's go back to Exhibit 1, your job application.

7        A    Okay.

8        Q    The first page, the second to the last paragraph, it

9    says, other than minor traffic violations, have you ever

10   been convicted of any criminal or disorderly person's

11   offense.

12            Do you see that?

13       A    Um-hmm.

14       Q    And what was your answer to that?

15       A    No.

16       Q    You checked no there?

17       A    Because I was told to say no by the officer that

18   approved me to go to work there.

19       Q    Who was the officer that approved you?

20       A    You have to go over to -- well, you can get your

21   fingerprints first.  Then you go over to the police

22   barracks.  Not the police barracks but the police station.

23   And they do a check on you.  And he approves you, you know,

24   approves you for the job if he thinks that you're capable of

1    doing the job.  Put it that way.  And I spoke to him and

2    everything and he agreed about my past being as bad as it

3    was and everything and I needed a chance.  So he said, just

4    put no.

5         Q    I'm sorry.  Did you say it was a police officer?

6         A    Yeah.  When I got hired.

7         Q    Was it a Dover Downs employee that you spoke to?

8         A    No.  No.  No.  Because once you get these, then you

9    take it back to Dover Downs.

10        Q    Once you get what?  I'm sorry.

11        A    Your application signed and everything, then you

12   take it back to Dover Downs.

13        Q    Okay.  But sitting here today, your answer, no, to

14   this question that we just went over is inaccurate, isn't

15   it?

16        A    Yes, it is inaccurate in the application.

17        Q    And it's a misrepresentation, isn't it?

18        A    It's what I was told to do, yes.

19        Q    I'm asking you, is it a misrepresentation of the

20   facts?

21        A    Yes.

22        Q    And we had already gone over this earlier today.

23   But turn to the second page.  Above your signature, it says,

24   the second sentence, I understand that misrepresentation or

1    omission of facts called for is cause for dismissal.

2        A    Correct.

3              MR. WILSON:  Objection.

4    BY MS. FRIEL:

5        Q    So you already testified that this, where you

6    answered no to any convictions, was a misrepresentation, is

7    that correct?

8        A    Yes.

9        Q    So wasn't it your understanding that you could be

10   terminated for making this misrepresentation on your job

11   application?

12       A    They could have done that a long time ago when they

13   first hired me.  But they didn't.  They didn't do it.

14       Q    Do you know that Dover Downs has fired employees in

15   the past for lying on their job applications?

16       A    No, ma'am, I don't.

17       Q    Do you believe that Dover Downs could fire you today

18   for lying on your job application?

19       A    They would fire me in a heartbeat on anything

20   because of this here suit that I put against them.

21       Q    But you already testified that you misrepresented

22   facts on your job application, isn't that correct?

23       A    Yeah, and I also stated that they would fire me

24   anyway.

1      Q    Okay.  That's not my question.

2      A    Because of this.

3      Q    That's not my question.

4      A    Okay.  You're right.

5      Q    And the job application also says, any

6   misrepresentation on your job application can be cause for

7   dismissal, isn't that correct?

8             MR. WILSON:  Objection.  We have already been

9   over this two or three times.

10             THE WITNESS:  Yes.

11             MS. FRIEL:  Just answer my question.

12   BY MS. FRIEL:

13      Q    Okay.  Mr. Thompson, have you ever been fired from a

14   job?

15      A    No.

16      Q    Have you ever been disciplined by any employer other

17   than Dover Downs?

18      A    No.

19      Q    Do you believe that any other employees were

20   discriminated against because of their age at Dover Downs?

21      A    Yes.  I seen it in the newspaper.

22      Q    And who do you believe was discriminated against?

23      A    I don't know their names, ma'am.

24      Q    And you believe this just because of something you

1    read in the newspaper, is that correct?

2       A    Yes, it was in the newspaper.

3       Q    So you have no firsthand knowledge of these

4    discriminations against these people?

5       A    No, I don't.

6       Q    Let's go over just a couple more questions.

7            Let's go back to your complaint, Exhibit 6.

8    Look at paragraph 27.

9       A    Okay.

10      Q    It says, Mr. Thompson did apply for the job.  But

11   upon information and belief, the position had already been

12   awarded to Jim Shreves on March 4th, 2004, the day the job

13   was posted.

14           Is that what that says?

15      A    Yes, ma'am.

16      Q    Now, go to Exhibit 4, your answers to defendant's

17   interrogatories.  It is probably around page nine again.

18   Interrogatory number four we are going to focus on again.

19   Going down to answer number four, part three.  And go to the

20   next page where it's 3. D).  On the fourth line there, it

21   says, claimant found out later that same day that a position

22   had been filled by Jim Shreves on March 2nd, 2004.

23           Do you see that?

24      A    Yeah.

1     Q   So in your interrogatory responses, you said, Jim

2    Shreves got the position on March 2nd, 2004, but in your

3    complaint, you said that Jim Shreves got the position on

4    March 4th, 2004.

5    A   No, I never did say that. I said March 2nd.

6    Q   Okay. Let's go back, then. I just read to you your

7    complaint paragraph 27. We just went over this.

8    A   I said he was awarded the job on the 2nd because of

9    the guy that put him in the computer. I said it wasn't

10   posted until the 4th.

11   Q   Okay. Go back to the complaint again, Exhibit 6,

12   paragraph 27.

13   A   Okay.

14   Q   Do you see where it says, Mr. Thompson did apply for

15   the job, but upon information and belief, the position had

16   already been awarded to Jim Shreves on March 4th, 2004.

17            Do you see that?

18   A   Yes, ma'am. And we went through that before. And I

19   said that I talked to Mr. Duncan concerning this job. At

20   that time, I did not make the application out. I was told

21   to make the application.

22   Q   That's not my question. I know we have been over

23   this before but this question we haven't.

24            My question is, in your complaint, say that Jim

1    Shreves received this position on March 4th, 2004.  Do you

2    see that?

3        A    Yes, ma'am.

4        Q    And then in your answers to interrogatories, you say

5    that Jim Shreves received it on March 2nd, 2004.

6             My question to you is, which one is accurate?

7    Because they both can't be accurate.

8        A    One says he was -- that he received the job on the

9    4th.  But I was told that he received the job on the 2nd.

10   So they both are accurate.

11       Q    Okay.  Let's focus on the interrogatory responses,

12   then.  You said, the position had already been filled by Jim

13   Shreves on March 2nd.

14            Okay.  So you believe he filled the position on

15   March 2nd, 2004?

16       A    Yes.

17       Q    Okay.  Let's go to the complaint.  The position had

18   already been awarded to Jim Shreves on March 4, 2004.

19            How can he fill the position before he is

20   awarded the position?

21       A    The dates are turned around.

22       Q    Okay.  So there are inaccuracies.

23            When did Mr. Shreves, according to you, receive

24   this position?

1      A    It was either the 4th or after the 4th that he

2    received it from Mr. Duncan.  But I was told that on the

3    2nd, he was already awarded the job.

4      Q    So it's your testimony you don't know when

5    Mr. Shreves received the position?

6      A    It had to be on the 4th.

7      Q    Why did it have to be on the 4th?

8      A    Well, when the posting was put up.  That's all I

9    know.

10              MS. FRIEL:  That's all the questions I have.

11              MR. WILSON:  I just got a couple.

12                      EXAMINATION

13   BY MR. WILSON:

14     Q    Regarding your job application.  Did anybody at

15   Dover Downs have any knowledge of the convictions?

16     A    Just -- yeah.

17     Q    Do you know who had knowledge?

18     A    Just Nate Whitcomb and people that I talked to, they

19   knew.

20     Q    So you told them about that stuff?

21     A    Yes.

22     Q    Did you try to hide it?

23     A    No.

24     Q    Okay.  You were asked some questions about Eric

1    Daniels and about him going back to work in the maintenance

2    department.

3              Was Eric Daniels offered a job that conformed

4    with his light duty restrictions?

5    A    Yes.

6    Q    Okay.  And what job was that?

7    A    A job in human resources.  But he refused it.

8    Q    Were you offered a job to conform with your light

9    duty restrictions?

10   A    No.

11   Q    You also testified early on that Bob Morrison

12   treated you fairly?

13   A    Yes.

14   Q    Did he treat you fairly the whole time you worked at

15   Dover Downs?

16   A    Not -- no.  Because right at the last was when he

17   didn't.  When I put in for the transfer for outside

18   maintenance of the plumbing job.

19   Q    Were there times that he treated you unfairly?

20   A    Other than that, no.

21   Q    What about Mr. Duncan?  You testified that he

22   treated you fairly?

23   A    Yes.

24   Q    Was there ever a time that he didn't treat you

1    fairly?

2        A    Yes.  After I took Bob Morrison to human resources,

3    then I was given these disciplinary actions.

4        Q    You also testified that Steve Homlish treated you

5    fairly, correct?

6        A    That's correct.

7        Q    Was there ever a time that he didn't treat you

8    fairly?

9        A    Not outside of just being -- writing me up for these

10   disciplinary actions.

11                MR. WILSON:  Okay.  I have nothing further.

12                MS. FRIEL:  Okay.  Let me just ask a couple

13   questions on your questions.

14                        EXAMINATION

15   BY MS. FRIEL:

16       Q    Your attorney asked you if anyone at Dover Downs had

17   knowledge of your convictions?

18       A    Yes, ma'am.

19       Q    And you said you told Nate Whitcomb?

20       A    Yes, ma'am.

21       Q    What position was Nate in?

22       A    II.

23       Q    He was a Maintenance Mechanic II?

24       A    But he was old enough to understand.  Whatever you

1    tell Nate, he goes and tells Mr. Duncan or somebody.

2        Q    Okay.  Do you know if Mr. Duncan knew about your

3    convictions?

4        A    I don't know that, ma'am.

5        Q    Do you know if anyone at human resources knew about

6    your convictions?

7        A    I don't know that.

8        Q    Did you ever tell anyone at human resources about

9    your convictions?

10       A    No.

11       Q    Did you ever tell Mr. Duncan about your convictions?

12       A    No.

13       Q    Did Bob Morrison know about your convictions?

14       A    No.

15       Q    Did you ever tell Mr. Morrison about your

16   convictions?

17       A    No.

18       Q    Did Steve Homlish know about your convictions?

19       A    No.  I would say no.

20       Q    Did you ever tell Mr. Homlish about your

21   convictions?

22       A    No.

23       Q    Did Mr. Wertz know about your convictions?

24       A    No.

1      Q     Did you ever tell Mr. Wertz about your convictions?

2      A     No.

3      Q     Besides Nate Whitcomb, who at Dover Downs did you

4   tell about your convictions?

5      A     Donald Straw, Wally Graham, Daniels, Eric Daniels.

6   I mentioned it to other people but I just don't remember

7   their names.

8      Q     And what position was Donald Straw in?

9      A     Another thing, if I was trying to hide it, I

10  wouldn't tell nobody.  I wasn't trying to hide it.

11     Q     Okay.  If you weren't trying to hide it, why didn't

12  you check off yes on your job application for prior

13  convictions?

14     A     I think I explained that to you earlier, that the

15  police officer told me not to put yes.  Put no in order for

16  me to go to work.

17     Q     So by putting no on the job application, would you

18  agree you were trying to hide your prior convictions?

19     A     I'm not agreeing with it.

20     Q     Well, if you didn't have anything to hide, you would

21  have answered the question correctly and put, yes, you had

22  prior convictions?

23     A     I just stated that what I was told to put on there,

24  that's what I put on there.

1    Q    So you just listened to whatever the police officer

2    told you to write?

3    A    No.  But I'm listening to you.

4    Q    I'm sorry?

5    A    And it's getting me very aggravated.

6    Q    Mr. Duncan, I'm here to --

7    A    No, you're not.  You keep trying to twist me around

8    and stuff.

9    Q    I'm just trying to get at the facts today,

10   Mr. Thompson.  And I'm asking you, a document you submitted

11   to Dover Downs that had a misrepresentation.  And I'm asking

12   you about that misrepresentation.

13          Now, you testified also that Eric Daniels was

14   offered a position in human resources?

15   A    Yes.

16   Q    How do you know Mr. Daniels was offered a position

17   in human resources?

18   A    That's what he said.

19   Q    Mr. Daniels told you that?

20   A    Yes.

21   Q    When did Mr. Daniels tell you he was offered another

22   position in human resources?

23   A    Because I talked to -- talked to him quite a bit.

24   Q    My question to you is, when did Mr. Daniels tell you

1    he was offered --

2        A    When?  I don't know, ma'am.

3        Q    If Dover Downs offered you a position to human

4    resources, would you come back to Dover Downs and work in

5    human resources?

6        A    If they offered me another job, yes, I'd go back to

7    work for them.

8                MS. FRIEL:  That's all I got.

9                MR. WILSON:  Okay.

10               (Deposition concluded at 3:37 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,            )
                                   )
          Plaintiff,               )
                                   )
v.                                 )    Civil Action No.
                                   )     05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS )
GAMING & ENTERTAINMENT INC.,       )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC. )
and DOVER DOWNS PROPERTIES,        )
INC.,                              )
                                   )
          Defendants.              )

          Deposition of RICHARD R. DUNCAN taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 9:30 a.m. on Tuesday, April 11, 2006, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware  19899
            for the Plaintiff

          EDWARD T. ELLIS, ESQUIRE
          MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
            123 South Broad Street
            Philadelphia, Pennsylvania  19109
            for the Defendants

-------------------------------------------------------
                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

                                                          B-0227

Page 2

1   ALSO PRESENT:
2
            BRANCE F. THOMPSON, SR.
3
            NICOLE L. ROMANO,
4           Human Resources Manager, Dover Downs
5                 - - - - -
6           RICHARD R. DUNCAN,
7           the witness herein, having first been
8           duly sworn on oath, was examined and
9           testified as follows:
10  BY MR. WILSON:
11      Q.  Good morning, Mr. Duncan.  My name is Tim
12  Wilson.
13      **A.  Good morning.**
14      Q.  I represent Brance Thompson in this case against
15  Dover Downs.  I would just like to give you a couple
16  instructions prior to the beginning of the deposition.
17          First I'm going to be asking you questions
18  pertaining to this lawsuit.  And when you respond, you
19  must do so verbally.  That's for the benefit of the court
20  reporter.  She can't take down head nods and nonverbal
21  communications.
22      **A.  Right.  I understand.  Okay.**
23      Q.  As you know, your testimony is under oath, so
24  you must answer truthfully just as if you were in court.

Page 3

1           If you don't hear a question or don't
2   understand it, let me know and I will repeat it or ask it
3   a different way so that you can understand it.
4       **A.  I understand.**
5       Q.  Please let me finish asking the question before
6   you answer, that way the transcript will be clear.  I
7   will try to do the same for you.  I will try to wait
8   until you finish answering before I ask another question.
9           If at any time you come to realize that a
10  statement that you made was incorrect or inaccurate, let
11  me know and you'll be able to clarify the record.
12      **A.  Okay.**
13      Q.  In Delaware you cannot talk or confer with your
14  attorney until the deposition is complete unless it
15  pertains to a matter of privilege.
16          If at any time you need a break to go to
17  the rest room or smoke a cigarette or whatever you need,
18  just let me know and we'll take a break.
19      **A.  Sure.**
20      Q.  I plan on taking some breaks throughout the
21  deposition.  For your deposition, it will probably last
22  more than an hour, so we'll probably take a break at some
23  point.
24      **A.  Sure.**

Page 4

1       Q.  But if I don't get to it, just let me know.
2       **A.  Sure.**
3       Q.  Do you understand these instructions?
4       **A.  Oh, yes.**
5       Q.  Where were you born and what is your birth date?
6       **A.  My birth date is April 28, 1948.  And I was born**
7   **in Harlan, Kentucky, H-a-r-l-a-n.**
8       Q.  What is your Social Security number?
9           MR. ELLIS:  No, he's not going to answer
10  that.  You don't have any need for that.
11          MR. WILSON:  Okay.
12  BY MR. WILSON:
13      Q.  What is your address?
14      **A.  26 Bayard Avenue, B-a-y-a-r-d, in Dover,**
15  **Delaware.**
16      Q.  How long have you lived there?
17      **A.  Oh, since 1994, so 12 years.**
18      Q.  Have you ever been arrested?
19      **A.  No.**
20      Q.  Did you serve in the military?
21      **A.  Yes, I did.**
22      Q.  When did you serve in the military?
23      **A.  From 1968 until 1993.**
24      Q.  In what branch?

Page 5

1       **A.  Coast Guard.**
2       Q.  Are you taking any medications today that would
3   impair your ability to provide your testimony and give
4   truthful answers?
5       **A.  Not that I'm aware of.  I take vitamins.  That's**
6   **all.**
7       Q.  Did you graduate from high school?
8       **A.  Yes, I did.**
9       Q.  What year?
10      **A.  Oh, my God.  1967.**
11      Q.  Was that in Kentucky, as well?
12      **A.  No, it was not.  It was no Alexander, Virginia.**
13      Q.  Did you go to college?
14      **A.  No, I did not.**
15      Q.  Are you presently employed by Dover Downs?
16      **A.  Yes, I am.**
17      Q.  In what capacity?
18      **A.  I'm the director of facilities.**
19      Q.  How long have you held that title?
20      **A.  Approximately three months.**
21      Q.  What did you do prior to that?  What was your
22  job title?
23      **A.  I was the manager prior to that.**
24      Q.  Manager of what?

**B-0228**

2 (Pages 2 to 5)

Thompson
Richard R. Duncan

v.
C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 6

1    A. **Facilities.**
2    Q. Can you give me just a brief description of what
3    the manager of facilities does?
4    A. **Directs the daily maintenance operation of the**
5    **facility, the hotel, grandstand area, casino. I got 22**
6    **people working for me, three supervisors. It's running**
7    **the hotel. What can you say?**
8    Q. How long did you hold that position?
9    A. **Oh, boy. I don't know exactly, but I'm pretty**
10   **sure it was about five years.**
11   Q. How long in total have you worked for Dover
12   Downs?
13   A. **I started with Dover Downs May 5th of 1997,**
14   **Cinco de Mayo day.**
15   Q. What did you do to prepare for today's
16   deposition?
17   A. **Spoke with the lawyer, I guess.**
18   Q. Who did you meet with?
19   A. **Mr. Ellis.**
20   Q. When did you meet with him?
21   A. **Yesterday.**
22   Q. How long?
23   A. **An hour, hour and 15 minutes. I'm not really**
24   **sure.**

Page 7

1    Q. Did you review any documents?
2    A. **Yes, I did.**
3    Q. Do you recall what documents you reviewed?
4    A. **Discrepancy documents. And that's all I can**
5    **recall reviewing was the discrepancy documents.**
6    Q. What is a discrepancy document?
7    A. **The ones that are -- the ones that Mr. -- that**
8    **Mickey had.**
9    Q. What did they pertain to?
10   A. **Oh, sick time, absenteeism and that sort of**
11   **thing.**
12   Q. Why did you refer to them as "discrepancy
13   documents"?
14   A. **Right now I can't think of the right name for**
15   **them. I just can't remember what they were. I can't**
16   **think of the name of it.**
17   Q. By "discrepancy" do you contend that they are
18   inaccurate documents?
19   A. **Oh, no, no, not at all.**
20   Q. Did you talk to anybody other than your attorney
21   to prepare for the deposition?
22   A. **No.**
23   Q. Have you talked to anybody, in general, about
24   this lawsuit, not necessarily in preparation for the

Page 8

1    lawsuit?
2         MR. ELLIS: I object to the form of the
3    question.
4         You can answer.
5    A. **There's rumors floating around, you know, but I**
6    **don't discuss anything.**
7    Q. What rumors have you heard?
8    A. **Just that there was a lawsuit and that type of**
9    **thing.**
10   Q. You've had no formal discussion with anybody
11   else in management regarding this lawsuit?
12   A. **Oh, no, not at all. No. No.**
13   Q. What is your understanding of this lawsuit?
14   A. **Actually, I don't know. I don't know. I**
15   **understand it's -- I really don't know.**
16   Q. Are you aware that it's an age discrimination
17   claim?
18   A. **I -- well, really, no, no. I thought it was**
19   **about not getting a job on the outside maintenance or**
20   **something. I don't know.**
21   Q. Mr. Duncan, when you were the manager of
22   facilities, did you approve performance appraisals for
23   Dover Downs' maintenance department?
24   A. **Yes, I do.**

Page 9

1    Q. When you did those, approved those performance
2    appraisals, you signed them; correct?
3    A. **Yes.**
4    Q. When you signed them, does that mean that you're
5    approving the appraisal that's in the document?
6    A. **It means, yes, it's submitted to me by the**
7    **supervisor and I approve it, yes.**
8    Q. Does it mean that you are agreeing with what's
9    in the performance appraisal?
10   A. **Yes.**
11   Q. I would like to show you a document and have it
12   marked as Duncan Number 1.
13        (Duncan Exhibit 1 was marked for
14   identification.)
15   BY MR. WILSON:
16   Q. Take your time and look at that document and let
17   me know when you're done reviewing it.
18   A. **(The witness reviews the document.) Okay.**
19   Q. Is that your signature in the lower middle
20   portion?
21   A. **Yes, it appears to be, yes.**
22   Q. So based on your previous answers, does that
23   mean that you approve the contents of this performance
24   appraisal?

Thompson                                            v.                                    Dover Downs
Richard R. Duncan                          C.A. # 05-274 (GMS)                           April 11, 2006

Page 10

1    A.  Yes.
2    Q.  It states that Steven Homlish was the person who
3  prepared this appraisal?
4    A.  Yes.
5    Q.  Are you familiar with his signature?
6    A.  Yes.
7    Q.  Is that his signature?
8    A.  It looks like it, yes.
9    Q.  The document was prepared on May 15th, 2004;
10  correct?
11   A.  (No response.)
12   Q.  That's when --
13   A.  Yes, that's what it looks like.
14   Q.  That's when you signed it?
15   A.  Yes.
16   Q.  On the bottom there's an overall score of
17  92.2 percent; correct?
18   A.  Mm-hmm.
19   Q.  Would you consider that a good score?
20   A.  Oh, yes.  Absolutely.
21   Q.  I would like to refer you to the fifth page
22  that's marked D 0038 on the bottom, and there's a box
23  there for comments; correct?
24   A.  Mm-hmm.

Page 11

1    Q.  In the "Comments" it says:  "Mickey is reliable
2  shows up to work on time returns from breaks on time"; is
3  that correct?
4    A.  I have to go with Mr. Homlish's evaluation.  I
5  assume it was, yes.
6    Q.  You agreed with that evaluation?
7    A.  I go with Mr. Homlish.  He said -- yes.
8    Q.  Was that Mr. Homlish's job, to make that type of
9  evaluation?
10   A.  Oh, yes.
11   Q.  What was Mr. Homlish's position at this time?
12   A.  He is -- at that time he was Mickey's direct
13  supervisor.  So as a supervisor, I review them and I go
14  over them.
15   Q.  Are you aware that at some point in 2002
16  Mr. Thompson was put on the third shift, the 11-to-7:30
17  shift?
18   A.  He was -- I don't know the exact date, but he
19  was on that shift, yes.
20   Q.  He had no supervisor working on that shift with
21  him; correct?
22   A.  No.  He worked alone.
23   Q.  Did he have any employees working with him?
24   A.  Not at that time.  When he first started, no, he

Page 12

1  did not.
2    Q.  At some point did he have --
3    A.  Yes.
4    Q.  Do you recall who the other employees were?
5    A.  Nate Whitecomb I'm pretty -- Nate Whitecomb I'm
6  thinking, yes.
7    Q.  What about Kevin Gorlich?
8    A.  I think later on we did put Kevin on that shift.
9    Q.  He ran that shift by himself; correct?
10   A.  Well, not entirely.  The way it was to work was
11  Bob Morrison, the second supervisor, would tell them what
12  to do there.  They came in and they would take their
13  orders from him and he did the evaluations for all of
14  them.  So he was responsible for them.  He answered for
15  their actions.
16   Q.  Once Nate Whitecomb and Kevin Gorlich started
17  working on the shift with Mr. Thompson, was Mr. Thompson
18  the person on that shift who was responsible for getting
19  the work done?
20   A.  Well, it says in our employee hand -- or job
21  description that, yes, Mechanic I would be in charge.
22   Q.  I'd like to show you a couple more exhibits.
23        MR. WILSON:  I would like to have this
24  marked as Duncan 2.

Page 13

1        (Duncan Exhibit 2 was marked for
2  identification.)
3  BY MR. WILSON:
4    Q.  Can you tell me what this document is?
5    A.  That appears to be Bob Morrison as the
6  supervisor wrote up at least the order of the shift.
7    Q.  What does it mean -- if you'll see beside
8  "Mickey Thompson," it has his phone number and then it
9  says "Nights."  "Nights," what is that indicative of?
10   A.  That was from 11 to 7:30 in the morning.
11   Q.  So that's just indicative of the shift he
12  worked?
13   A.  Yes.
14   Q.  Next to Dean --
15   A.  He worked from 3:30 to 11, and so that's the
16  swing shift as we call it.
17   Q.  What about the individuals listed below, why is
18  there no shift --
19   A.  Well, they're Mechanic II's and III's, so, you
20  know, there's no -- they're not expected to take any
21  lead, so to speak.
22   Q.  Mechanic I's are expected to take a lead?
23   A.  Yes.  By the job description, yes, they are.
24   Q.  Are they expected to have some supervisory

4 (Pages 10 to 13)

Thompson
Richard R. Duncan

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 14

1  capacity over the Mechanic II's and Mechanic III's?
2  **A. Well, if Mechanic I would be your technical**
3  **person and if he needed help, he would say I need help.**
4  **And if the supervisor wasn't there at night, he would**
5  **have expected to take over and take care of the log and**
6  **all that. We do a log, daily and nightly log, so --**
7  Q.  So he would essentially do the supervisory
8  functions if there was no official supervisor on that
9  shift?
10  **A. Yes.**
11  Q.  You said he would do the, I believe you said,
12  technical functions on the shift? What does that mean?
13  **A. Well, in Mickey's case, he was the faux painter**
14  **and he knew faux painting and that's why he was on that**
15  **shift at night, because the casino was closed and he was**
16  **to teach the other guys how to faux paint.**
17  Q.  That was his primary responsibility?
18  **A. Primary responsibility, yes. That's one of the**
19  **reasons I hired him, is because of his painting**
20  **abilities.**
21  Q.  Did he have any other maintenance-type
22  responsibilities other than the faux painting on third
23  shift?
24  **A. Not that I wanted him to do, no. Well, if you**

Page 15

1  **had a leak somewhere, he would take care of that or if --**
2  **something of that nature, but no. Primarily he was to**
3  **paint. Something always pops up, clogged toilet or**
4  **something like that, light out.**
5  Q.  He was capable of addressing those issues?
6  **A. Oh, yes.**
7       MR. WILSON: Okay. I'd like to have
8  another document marked. This would be Duncan 3.
9       (Duncan Exhibit 3 was marked for
10  identification.)
11  **A. (The witness reviews the document.) Yeah, I**
12  **remember this.**
13  BY MR. WILSON:
14  Q.  For the record, can you state what this is?
15  **A. It's a letter that I had to write to get Mickey**
16  **a pay increase above the normal pay increase. He had**
17  **said that we had promised him more money than it was, and**
18  **to do that we had to write this letter to justify to the**
19  **president of the company for final approval.**
20  Q.  In the third sentence it states: "He ran the
21  2300-0730 shift completely by himself for at least
22  9 months of that time." Is that a true statement?
23  **A. If that was the time he was on there by himself,**
24  **I don't know. It could be. It is a true statement, but**

Page 16

1  **I don't know if that was when he was there by himself or**
2  **not. I don't know without looking at the dates.**
3  Q.  Okay.
4  **A. He was on the shift by himself for a while. I**
5  **don't know how long.**
6  Q.  In this letter you requested a total of an
7  8.5 percent pay increase?
8  **A. Un-huh.**
9  Q.  Yes?
10  **A. Yes.**
11  Q.  Is that higher than is normally given at Dover
12  Downs for --
13  **A. Oh, yes, very much, very much.**
14  Q.  Can you give an indication as to what a normal
15  pay increase is for a maintenance mechanic, or a range?
16  **A. The normal would be about 3 percent, what he got**
17  **on -- yes, 3 percent is normal.**
18  Q.  So what you requested was at least two times and
19  close to three times what a normal pay increase would be?
20  **A. Yeah.**
21  Q.  I'd like to show you a series of documents.
22       MR. WILSON: Can we go off the record for a
23  second?
24       (Discussion off the record.)

Page 17

1       (Duncan Exhibit 4 was marked for
2  identification.)
3  BY MR. WILSON:
4  Q.  Mr. Duncan, can you identify what these
5  documents are?
6  **A. Yes. These are disciplinary warnings.**
7  Q.  Are these what you referred to earlier as
8  discrepancy reports?
9  **A. Yes. I do apologize for that. I lost my train**
10  **of thought there.**
11  Q.  For the record, they are dated August 17th,
12  2004; August 11th, 2004; June 11th, 2004; and
13  February 4th, 2004; is that correct?
14  **A. Yes, that's correct.**
15  Q.  According to a signature on the bottom of the
16  page, Steven Homlish prepared this document; is that
17  correct?
18  **A. Yes. The coaching ones he prepares, yes.**
19  Q.  What does "coaching" mean?
20  **A. Coaching is just a document we put in the**
21  **individual's file as a -- to refer back to. You don't**
22  **need -- according to company policy, you don't need to**
23  **inform the individual of coaching. If he's late for**
24  **work, then he should know it by the company handbook. So**

5 (Pages 14 to 17)

Page 18

1   you just put a little note, little thing in his file.
2   And after it hits the fourth one, a verbal warning, then
3   you get with the individual and tell him he has a verbal
4   warning. That's the way it works.
5       Q.  Is this a disciplinary action?
6       A.  If he understands it to be a disciplinary
7   action, yes, it is.
8       Q.  Okay.
9       A.  Some people don't take it that way.
10      Q.  At the top it says "Warning Notice"; correct?
11      A.  Yes.
12      Q.  I believe you just testified that sometimes they
13  get no notice of this?
14      A.  A coaching -- according to company policy, if
15  it's a coaching, we don't tell them. The first three is
16  a coaching. There's seven of them.
17      Q.  Why don't you tell them?
18      A.  Company policy. We don't tell them. We figure
19  if a man knows he's late, then he's responsible enough to
20  know he's late and it will be a coaching or a warning.
21  So we don't --
22      Q.  But if you don't communicate it to him, how can
23  it be a coaching or a warning?
24      A.  Well, we expect the person -- he goes through

Page 19

1   the -- his employee handbook, that it's in the employee
2   handbook that he would know it was a coaching. It says
3   it in the employee handbook. I don't know if you have a
4   copy of that.
5       Q.  I would like you to look at the line immediately
6   above the box where Steve Homlish's signature is located.
7   I believe it says there: "The undersigned
8   manager/supervisor has discussed this Notice and the
9   action taken with the employee." Is that correct?
10      A.  Yes. It says that, yes.
11      Q.  So do you still maintain that the employee is
12  not supposed to get any notice of the warning?
13      A.  I'm just going by company policy. It's a
14  coaching by the company policy.
15      Q.  The box at the top that says "To Employee," I
16  guess the box is in the middle of the document, can you
17  read the first two bullet points there?
18      A.  "Please read this entire disciplinary warning
19  notice carefully before signing below."
20      Q.  Is that what you mean?
21      A.  Yes.
22      Q.  The next one?
23      A.  "You are being issued this Notice to make you
24  aware of the severity of this situation." Is that it?

Page 20

1       Q.  Yes.
2           And you still maintain there is supposed to
3   be no notice given to the employee?
4       A.  By the policy -- by the employee handbook, no.
5       Q.  Do you know if Mr. Thompson was given notice of
6   these?
7       A.  If Mr. Thompson -- oh, no, I don't know.
8       Q.  Okay.
9       A.  Steve Homlish may have gave him. I don't know
10  that for sure, no.
11      Q.  In the box right above the one to the employee
12  it says "Nature of Incident". It says:  "Did not report
13  to work on 8/16/04 and had no doctors excuse."
14      A.  Which one are we talking about?
15      Q.  Right here, "Nature of Incident."
16          MR. ELLIS:  Just identify which page you
17  are looking at.
18          MR. WILSON:  It's the first page.
19      A.  107.
20  BY MR. WILSON:
21      Q.  "Section 6.04 of the employee handbook has been
22  explained that this is an occurrence."
23          Doesn't that imply that Mr. Homlish met
24  with Mr. Thompson and discussed this with him?

Page 21

1       A.  I -- I can't answer that. I don't know.
2       Q.  On the notice of 8/11/04, which is marked
3   D 0111, where it says "Nature of Incident," there's that
4   same language that this has been explained as an
5   occurrence; correct?
6       A.  Yes.
7       Q.  For the notice 6/17, "Nature of Incident," does
8   it have that same language that it has been explained as
9   an occurrence?
10      A.  You're losing me here.
11      Q.  The date of the notice is June 17th, 2004. This
12  one here.
13      A.  Okay. And what about this?
14      Q.  Is that same language in that box?
15      A.  Yes, I see it there, yes.
16      Q.  Then the last one, February 4th, 2004, that's
17  also indicative that it's been explained as an
18  occurrence; correct?
19      A.  Mm-hmm.
20      Q.  Back on the 8/17/04 warning notice, there's at
21  the top below the employee's name and department it says
22  "Action Taken. Depending on type of offense, the Company
23  may bypass any of these steps."
24      A.  Mm-hmm.

6 (Pages 18 to 21)

Thompson
Richard R. Duncan

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 22

1  Q.  There's no checkmark in any of these steps, is
2  there?
3  A.  No, because it's coaching.
4  Q.  Why isn't there a line for coaching?
5  A.  I can't answer that. That's up to the company.
6  I mean, I don't know.
7  Q.  So does this mean that no action was taken?
8  A.  This --
9  MR. ELLIS:  What are you referring to
10  again? What page?
11  MR. WILSON:  The first page, 8/17/04 where
12  it says "Action Taken."
13  MR. ELLIS:  Page D 107?
14  MR. WILSON:  Yes.
15  MR. ELLIS:  I'm sorry. I still don't
16  follow you.
17  MR. WILSON:  The first page of that exhibit
18  at the top in bold capital letters it says "Action
19  Taken."
20  MR. ELLIS:  Right. Okay.
21  MR. WILSON:  And there's four selections.
22  MR. ELLIS:  Right. Okay. I'm following
23  you now.
24  MR. WILSON:  I don't know if he answered my

Page 23

1  last question. Could you read that back to me?
2  (The reporter read from the record as
3  requested.)
4  A.  Could you ask me that again? I'm confused here.
5  BY MR. WILSON:
6  Q.  Well, it gives four types of actions that can be
7  taken; correct?
8  A.  Correct, yes.
9  Q.  None of those is checked?
10  A.  No, no, they're not.
11  Q.  So does that mean that no action was taken?
12  A.  That -- it's a coaching, yes. None of those
13  actions were taken, though, no verbal warning, no -- it
14  was coaching.
15  Q.  So other actions can be taken?
16  A.  If it becomes to that stage, yes, verbal or
17  written warning, yes.
18  Q.  So other actions can be taken prior to a verbal
19  warning?
20  A.  Usually on a coaching, no. We assume that the
21  person knows he was late and it's just a note put in his
22  file. And after a year it drops off.
23  Q.  In any four of these disciplinary warning
24  notices, there is no checkmark or any type of other

Page 24

1  indication that any action was taken; correct?
2  A.  No. They're all coachings.
3  Q.  In the box where it says "Employee's Printed
4  Name" and "Employee's Signature," it indicates the
5  employee's signature is not required; correct?
6  A.  Exactly.
7  Q.  Then there's an asterisk next to that employee's
8  signature; correct?
9  A.  Mm-hmm.
10  Q.  Below that box are two asterisks. One states:
11  "Signing this Notice does not imply that you agree with
12  the action taken, only that you acknowledge receipt of
13  this Notice."
14  The second is:  "Check here if Employee
15  refuses to acknowledge receipt of this Notice."
16  A.  Right.
17  Q.  Are there any other asterisks there?
18  A.  You mean --
19  Q.  That would indicate that the employee doesn't
20  have to have notice or that he doesn't have to sign or
21  refuse to sign?
22  MR. ELLIS:  Object to the form of the
23  question.
24  Q.  You can answer if you understand.

Page 25

1  A.  I don't understand what you're asking me.
2  Q.  It appears to give two possible scenarios for
3  the employee's signature. One is that he signs, but that
4  doesn't mean that he agrees with it?
5  A.  Exactly.
6  Q.  Number 2, he refuses to sign?
7  A.  Right.
8  Q.  Okay.
9  A.  Mm-hmm.
10  Q.  It appears that with these disciplinary warning
11  notices, neither of those has occurred?
12  A.  Well, he's not required to sign a coaching by
13  the company policy.
14  Q.  Okay.
15  A.  He's not required to do that.
16  Q.  Why is that not an asterisk'd, then?
17  MR. ELLIS:  Object to the form of the
18  question.
19  Q.  Do you know why there would not be the third
20  option that would say this is a coaching, so there's
21  nothing required?
22  A.  No.
23  MR. ELLIS:  Object to the form of the
24  question to the extent that's a question.

B-0233

7 (Pages 22 to 25)

Page 26

1    Q.  In the box "Date Signed" next to Mr. Homlish's
2  name, is that indicative of the date he signed this
3  document?
4    **A.  It should be.  I assume.**
5    Q.  Do you know if Mr. Homlish signed these
6  documents on these dates?
7    **A.  It looks like to me he did.**
8    Q.  But you don't have any knowledge?
9    **A.  I don't have any knowledge of him not signing**
10   **them.**
11   Q.  Mr. Duncan, did you ever tell the maintenance
12 employees that they could use their vacation time to
13 cover for a day that they were out sick?
14   **A.  No, they can't do that.  Company policy.**
15   Q.  Did you ever tell them that they could?
16   **A.  I don't remember that, no.**
17   Q.  Have any employees ever been permitted to cover
18 sick time with vacation time?
19   **A.  If they apply in advance, yes, they can.**
20   Q.  Can you explain how that would work?
21   **A.  Well, for instance, if you know you're going to**
22 **have an operation, you would say I want to use my**
23 **vacation time instead of my sick time.  That's the way it**
24 **would work.**

Page 27

1    Q.  Has there ever been an instance where somebody
2  has just called off on the day they were scheduled to
3  work or called off the night before and they would be
4  permitted to use vacation time to cover the illness?
5        MR. ELLIS:  Object to the form of the
6  question.
7        You can answer.
8    **A.  I don't remember, no.**
9    Q.  When a job opening occurs at Dover Downs in the
10 maintenance department, is that posted anywhere?
11   **A.  Yes.**
12   Q.  Where is it posted?
13   **A.  It's posted in the employee break room and in**
14 **the employee locker room on the bulletin boards.**
15   Q.  Is it Dover Downs' customer policy to consider
16 current Dover Downs employees for the posting prior to
17 offering it to somebody who is not a current Dover Downs
18 employee?
19   **A.  Yes.  We post it for five days.**
20   Q.  What does a supervisor of building maintenance
21 do?
22   **A.  He supervises one of the three shifts, whether**
23 **it be day, swing, or midnights, through the normal**
24 **routine of the day-to-day operation.**

Page 28

1    Q.  Would this be analogous to what Mr. Thompson did
2  when he worked on third shift?
3        MR. ELLIS:  Object to the form of the
4  question.
5        You can answer.
6    **A.  There's more to being a supervisor because you**
7  **have more people to answer for and you have to do**
8  **evaluations and you have to do budgeting and all that.**
9  **As a Mechanic I, you don't do evaluations and you don't**
10 **do budgeting and you are just -- I don't know if that**
11 **answers your question.**
12   Q.  Besides budgeting and evaluations, is there
13 anything else that a supervisor of building maintenance
14 does that Mr. Thompson didn't do on third shift?
15   **A.  You have to interact with the other departments**
16 **and see what they would want, ordering stuff for your**
17 **department if you needed it, directing people to go to**
18 **the supply, that sort of stuff.  They would have to go**
19 **pick up supplies and that sort of thing.**
20        **The supervisor also trains each department**
21 **and trains his staff, make sure the staffs are up-to-date**
22 **on the training.  And he's required to know the**
23 **procedures manual and all that for each shift.**
24   Q.  Do you believe Mr. Thompson was capable of

Page 29

1  performing these functions?
2    **A.  No.**
3    Q.  In particular, what functions that you
4  identified don't you think he was capable of performing?
5    **A.  Well, you have to do evaluations.  I don't think**
6  **he could do the evaluations or the budgeting or being**
7  **able to train the guys except for the faux painting.**
8    Q.  Why don't you think he could do the evaluations?
9    **A.  Well, you have to be -- know how to do verbal**
10 **and that kind of thing and get it correct.  And basically**
11 **you have to know your stuff.**
12   Q.  What do you mean by know how to do verbiage?
13   **A.  Oh, how to formulate sentences and that kind of**
14 **stuff.**
15   Q.  You don't think he knows how to do that?
16   **A.  I didn't see any indication of it.  Maybe he**
17 **does.  I don't know.**
18   Q.  What about budgeting, why do you think he
19 couldn't do budgeting?
20   **A.  Well, budgeting, you have to work with the other**
21 **departments and the other managers and know what you need**
22 **to prepare a budget.  I don't think he could.  Maybe he**
23 **can.  You're asking my opinion.  I don't think he can.**
24   Q.  What's your opinion based on?

8 (Pages 26 to 29)

Thompson                                        v.                          Dover Downs
Richard R. Duncan                     C.A. # 05-274 (GMS)                   April 11, 2006

Page 30

1    A.  Oh, just his attitude and some of the things he
2    said over the course of the time I knew him.
3       Q.  Can you explain his attitude?
4    A.  Mickey gets mad easily and that would be hard to
5    control if you're doing evaluations.
6       Q.  What about training, what made you believe that
7    he couldn't conduct the training?
8    A.  Well, you got to know the boilers and the
9    chillers. It's a lot of technical stuff. He could train
10   to do the faux painting, he could train that easily. But
11   you have to know boilers, chillers, air handlers, air
12   condition -- computer, you have to be able to adjust the
13   computer and that sort of thing. We have an
14   air-conditioning system that controls the whole building,
15   how to start it and stop it, how to troubleshoot it.
16      Q.  In your opinion, he couldn't do that?
17   A.  No.
18      Q.  In October 2001 a job posting for supervisor of
19   building maintenance was issued; correct?
20   A.  If you say so. I don't know the correct date.
21         MR. ELLIS:  Either the answer is yes or no
22   or you don't know, but you are not supposed to take
23   testimony from the guy asking the questions.
24         THE WITNESS:  Okay.

Page 31

1    A.  No, I don't know.
2          MR. WILSON:  I would like to have that
3    marked.
4          (Duncan Exhibit 5 was marked for
5    identification.)
6    A.  It was an in-house posting.
7    BY MR. WILSON:
8       Q.  Are you saying that's what this is?
9    A.  That's what it is, yeah.
10      Q.  The date on this posting was from October 19th,
11   2001, to October 24th, 2001; correct?
12   A.  Correct.
13      Q.  Do you know how much this job paid?
14   A.  No, I don't.
15      Q.  Does it pay more than a Maintenance Mechanic I?
16   A.  Yes, it should, yes.
17      Q.  Do you have any idea approximately how much
18   more?
19   A.  No, not without looking at the records to be
20   accurate, no, I don't.
21      Q.  Why was this job posting issued?
22   A.  We needed a supervisor on the third shift. We
23   were going to beef it up a bit because of the amount of
24   work that was coming on the third shift.

Page 32

1       Q.  Mr. Thompson applied for this job; correct?
2    A.  I don't know.
3       Q.  Do you know if anybody applied for this
4    position?
5    A.  I don't remember right offhand. I think it was
6    Al Baldwin got the position, but I don't know how many
7    applied. I don't remember.
8       Q.  Do you know if Al Baldwin applied?
9    A.  Yes, he did apply.
10      Q.  Did he apply during this time frame,
11   October 19th through October 24th?
12   A.  Yes.
13      Q.  Did somebody from Dover Downs management
14   approach Mr. Baldwin about applying?
15         MR. ELLIS:  Object to the form of the
16   question.
17         You can answer.
18   A.  If they did, I don't know of it.
19      Q.  You didn't approach Mr. Baldwin?
20   A.  I don't remember approaching him, no. No, I do
21   not.
22      Q.  Did Al Baldwin possess all of the necessary
23   requirements or qualifications for this job?
24   A.  Yes.

Page 33

1       Q.  Did he have a high school diploma?
2    A.  Yes.
3       Q.  Did he have six to ten years experience as an
4    electrician, plumber, HVAC, mechanic, ground support,
5    maintenance and/or machinist?
6    A.  Yes, he did, yes.
7       Q.  How long had he worked at Dover Downs prior to
8    his promotion?
9    A.  I don't know. I don't know.
10      Q.  Prior to being promoted, was he a Maintenance
11   Mechanic I?
12   A.  Yes, he was. Yes.
13      Q.  Do you know how long he had been a Maintenance
14   Mechanic I?
15   A.  No, I do not.
16      Q.  Did he have any trade school training?
17   A.  I do not remember.
18      Q.  Is Mr. Baldwin a supervisor at Dover Downs
19   today?
20   A.  No, he is not.
21      Q.  Why isn't he?
22   A.  He had some personal problems that was
23   interfering with his ability to do the job and I had to
24   remove him from the job.

Thompson
Richard R. Duncan

v.
C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

---

Page 38

1    Q.  Is it abnormal for an individual to go from
2  being a Mechanic III to a Mechanic I to a supervisor in
3  two years?
4          MR. ELLIS:  Object to the form of the
5  question.
6    **A.  No, no.**
7    Q.  Did Mr. Shreves have trade school training, do
8  you know?
9    **A.  I do not know.  He came to me from the Wyndham**
10 **Hotel in Wilmington.**
11   Q.  What did he do there?
12   **A.  He was a maintenance man.**
13   Q.  Was he a maintenance supervisor?
14   **A.  I do not know.**
15   Q.  Are you aware of where Mr. Thompson worked prior
16 to going to Dover Downs?
17   **A.  I don't remember.  I don't remember.  It's been**
18 **so long.**
19   Q.  Does it jog your memory if I would say the
20 Ramada Inn?
21   **A.  (No response.)**
22   Q.  Do you know if he was in hotel maintenance prior
23 to Dover Downs?
24   **A.  Yes, I think he was.**

---

Page 39

1    Q.  As a maintenance man?
2    **A.  Yes.**
3    Q.  Is there a computer system at Dover Downs where
4  an individual and his job title are listed?
5    **A.  (No response.)**
6    Q.  In other words, let's see if I can explain it
7  better.
8          Is there a place or a list where you can go
9  on the computer and punch in an employee's name and find
10 out what his job title is?
11   **A.  Not that I know of.**
12   Q.  Would that information be kept with people that
13 do payroll?
14   **A.  I would assume that or HR.**
15   Q.  Do you know the identity of the person that
16 would keep track of that information?
17   **A.  No.**
18          MR. WILSON:  All right.  Do you want to
19 take a break, Ed?
20          MR. ELLIS:  Yes.
21          (A recess was taken at this time.)
22 BY MR. WILSON:
23   Q.  Mr. Duncan, getting back to when we were talking
24 about Mr. Thompson's qualifications for the supervisors'

---

Page 40

1  positions, you indicated that he didn't have enough
2  knowledge with respect to the boilers and the chillers
3  and things of that nature; correct?
4    **A.  Right.**
5    Q.  Doesn't Dover Downs provide the maintenance
6  mechanics with training on these issues?
7    **A.  To some extent, yes.**
8    Q.  Are you aware of Mr. Thompson going to trade
9  school while he was employed at Dover Downs?
10   **A.  I don't remember that, no.**
11   Q.  If you knew that he had gone to trade school for
12 boilers and heaters at Poly Tech while he was at Dover
13 Downs, would that have changed your evaluation of his
14 qualifications for a supervisor's position?
15   **A.  No, because I know the course at Poly Tech.**
16   Q.  What's wrong with the course at Poly Tech?
17   **A.  Not very good.**
18   Q.  How so?
19   **A.  Most of the people that are teaching the course**
20 **down there are for the paycheck and it's guys that are**
21 **working during the day and they're teaching at night and**
22 **they want to go home.**
23   Q.  Is there another trade school that you do
24 respect in Dover?

---

Page 41

1    **A.  No.**
2    Q.  Getting back to the disciplinary warnings, it
3  was your testimony that an employee was entitled to three
4  coachings; correct?
5    **A.  Yes.**
6    Q.  There are four coachings here, are there not?
7    **A.  Yes, three for one and one for another incident.**
8    Q.  There's three coachings for one incident?
9    **A.  There's three coachings for the doctor's excuse**
10 **and there's one coaching for being late for work.  At**
11 **Dover Downs they are separated into categories.**
12   Q.  So the categories are lateness versus absences?
13   **A.  Absenteeism, sick time without a doctor's excuse**
14 **or sick time with no -- or being sick with no sick time.**
15   Q.  I don't recall your testimony, and actually, I
16 don't even recall if I asked you this.
17          Is this a form of discipline, these
18 coachings?
19   **A.  Yes, it is.**
20   Q.  Are you aware in June of 2004 if a job was
21 posted for a Maintenance Mechanic I on the first shift?
22   **A.  I don't recall, no.**
23          MR. WILSON:  If I can have that marked,
24 please.

---

11 (Pages 38 to 41)

Page 42

1    (Duncan Exhibit 6 was marked for
2 identification.)
3    **A.  (The witness reviews the document.)  What are**
4 **you asking me about this?**
5 **BY MR. WILSON:**
6    Q.  I was just waiting for you to review it.
7    **A.  I'm fine.**
8    Q.  Does this appear to be a job posting for a
9 maintenance mechanic in June of 2004?
10    **A.  Yes, it does, for grounds.**
11    Q.  What does "grounds" mean?
12    **A.  Outside maintenance.**
13    Q.  Do you know if Mr. Thompson applied for this
14 job?
15    **A.  No, I do not.**
16    Q.  You do not know whether he did or didn't, or you
17 know that he did not apply?
18    **A.  I don't know if he did or didn't.  I would not**
19 **get that information.**
20    Q.  Do you have any knowledge of a conversation that
21 Mr. Thompson had with Bob Morrison regarding this
22 position?
23    **A.  No, no.**
24    Q.  Are you aware that Mr. Morrison discouraged

Page 43

1 Mr. Thompson from bidding on the job?
2    **A.  No.**
3    Q.  Is there a specific craft that you were looking
4 for when this job was posted?
5    MR. ELLIS:  Object to the form of the
6 question.  This isn't his area.
7    THE WITNESS:  I didn't post it.
8    MR. WILSON:  Well, I'm just asking if he
9 has knowledge.
10    MR. ELLIS:  You asked him about what he was
11 looking for.  He didn't post it, so I object to the form
12 of the question.
13    MR. WILSON:  Okay.
14 BY MR. WILSON:
15    Q.  Do you know what Dover Downs was looking for?
16    **A.  No, because it was posted by Bob.  I don't know**
17 **what he was looking for, no.**
18    Q.  Are you aware that at some point in August of
19 2004 Mr. Thompson had a meeting with Mr. Morrison and
20 Mrs. Isenberg regarding his not being promoted?
21    **A.  Yes, I'm aware of the meeting.**
22    Q.  Are you aware that he complained that he was
23 being discriminated against because of his age?
24    **A.  No, I'm not.**

Page 44

1    Q.  Did Mr. Thompson ever tell you that he was being
2 discriminated against because of his age?
3    **A.  No.**
4    Q.  Do you know when the meeting with Mr. Morrison,
5 Mr. Thompson, and Mrs. Isenberg occurred?
6    **A.  No, I don't.**
7    Q.  In August of 2004, you gave Mr. Thompson
8 disciplinary notice for four violations; correct?
9    **A.  I don't remember.**
10    Q.  Okay.  I'll show you.
11    MR. WILSON:  Can I have that marked,
12 please?
13    (Duncan Exhibit 7 was marked for
14 identification.)
15 BY MR. WILSON:
16    Q.  Just let me know when you're done reviewing
17 that, sir.
18    MR. ELLIS:  Is this Duncan 7?
19    MR. WILSON:  Yes.
20    **A.  (The witness reviews the document.)  Okay.**
21 BY MR. WILSON:
22    Q.  Mr. Duncan, is this your signature --
23    **A.  Yes.**
24    Q.  -- in the box at the bottom?

Page 45

1    **A.  Yes.**
2    Q.  Did you meet with Mr. Thompson regarding this?
3    **A.  Yes.**
4    Q.  Did Mr. Thompson object to this document based
5 upon the 72-hour rule?
6    **A.  If he did, I don't remember that.**
7    Q.  Do you know what the 72-hour rule is?
8    **A.  No, not right off the top of my head I don't.**
9    Q.  Do you have any recollection as to what --
10    **A.  There is a rule in the employee handbook, I**
11 **think, but I'm not -- I don't remember what it was, how**
12 **it reads.**
13    Q.  Does it have something to do with the timing as
14 to when a violation occurs in relation to when the
15 employee is spoken to about it?
16    **A.  Yes, I think it does, yes.  Again, I don't**
17 **remember how it reads.**
18    Q.  This document that's been marked Duncan
19 Number 7, is this in Mr. Thompson's file?
20    MR. ELLIS:  I object to the form of the
21 question.
22    **A.  I -- I don't know.**
23    Q.  Did you tear this document up?
24    **A.  I don't remember tearing it up, no, no.**

Thompson
Richard R. Duncan

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 46

```
1    Q.  Is it possible you tore it up?
2    A.  Yes, it's possible.
3    Q.  Why would you have torn it up?
4    A.  There were some discrepancies about his
5    disciplinary warnings.  I had them bunched together and I
6    shouldn't have done that.  As you can see, we had
7    categories and I called Mickey in and I said, "I messed
8    up.  I put the doctor's notices and lateness together and
9    I couldn't do that."
10   Q.  Okay.
11   A.  So I told him that I had to -- I had separated
12   them.  I don't remember the exact number, how many there
13   was, but I did separate them and it was -- and I think I
14   did tell him, yeah, I tore them up, destroyed them.  That
15   was what I remember.
16   Q.  Were the other warnings that are contained in
17   Duncan Exhibit 4, the disciplinary notices/coachings
18   signed by Steve Homlish, were they written up to replace
19   the disciplinary warning Duncan Number 7?
20   A.  I can't answer that.  I don't know.  I don't
21   remember.
22   Q.  Is it possible that they were written up to
23   replace this, that warning that is Duncan Number 7?
24       MR. ELLIS:  Object to the form of the
```

Page 47

```
1    question.
2    Q.  You can answer.
3        MR. ELLIS:  You can answer the question if
4    you understand it.
5    A.  Could you repeat it again?  Is it --
6    Q.  Is it possible that Duncan Number 4, the four
7    coachings, were written up to replace the warnings that
8    are referred to in Duncan Number 7?
9        MR. ELLIS:  Objection for the reasons
10   stated before.
11   A.  It's possible, yes.  It's possible.
12   Q.  When you met with Mr. Thompson on August 20th at
13   this disciplinary warning notice, did you show him these
14   documents that are in Duncan Number 4?
15   A.  I don't remember.
16   Q.  Do you know if the documents that are in Duncan
17   Number 4 were completed in August of 2004?
18   A.  Which one are we calling that?
19       MR. ELLIS:  One of the problems is that the
20   witness is not being given the documents that have the
21   exhibit tabs on them.
22       MR. WILSON:  Okay.
23       MR. ELLIS:  So he probably doesn't know
24   which exhibit you're referring to.
```

Page 48

```
1        MR. WILSON:  You can refer to those as long
2    as you try to keep them in order.  That might help you.
3        I'll tell you what.  I'll stop giving him
4    his own and he can use the ones that are marked.
5        MR. ELLIS:  All right.
6    A.  Number 4?
7    BY MR. WILSON:
8    Q.  Yes.
9    A.  Okay.  What was your question again, sir?
10       MR. WILSON:  Could you read the question
11   back, ma'am?
12       (The reporter read the following question
13   from the record as requested:
14       "QUESTION:  Do you know if the documents
15       that are in Duncan Number 4 were completed in
16       August of 2004?")
17       MR. ELLIS:  I'm going to object to the form
18   of the question.
19       THE WITNESS:  Can I answer?
20       MR. ELLIS:  You can answer, sure.
21   A.  Yes.  That's when they're dated.
22   BY MR. WILSON:
23   Q.  But to your personal knowledge, were they
24   completed in August of 2004?
```

Page 49

```
1    A.  Yes, I'm sure they were, yes.
2    Q.  They were completed in 2004, in August of 2004?
3    A.  Well, they're all different.  Yes.
4        MR. ELLIS:  Look at all of them, please.
5        THE WITNESS:  (The witness reviews the
6    document.)
7    A.  They got different dates on them.  They weren't
8    all completed in 2004, no.
9    BY MR. WILSON:
10   Q.  You know that for a fact?
11       MR. ELLIS:  Object to the form of the
12   question.  When you say does he know it for a fact, are
13   you asking him whether he saw the guy fill them out in
14   August 2004?
15       MR. WILSON:  To his own personal knowledge,
16   however he has his personal knowledge.
17       MR. ELLIS:  All right.  I object to the
18   form of the question.
19       You can answer.
20   A.  I do not know if they were all -- no, I'm sure
21   they weren't all filled out in August.  There's different
22   dates on them.  There's August.  There's February on
23   here.
24       MR. WILSON:  Can you mark that, please?
```

B-0239

13 (Pages 46 to 49)

Thompson                                              v.                          Dover Downs
Richard R. Duncan                          C.A. # 05-274 (GMS)                    April 11, 2006

Page 50

1      (Duncan Exhibit 8 was marked for
2  identification.)
3  BY MR. WILSON:
4      Q.  The court reporter has shown you what has been
5  marked as Duncan Number 8.  Take your time and read
6  through that and let me know when you're done, please.
7          MR. ELLIS:  Just for the record, I think
8  the record should reflect that this is Bates pages
9  D 0072, 0073, 101, 102, 103, 104, 105, 106, 109, and 110.
10         MR. WILSON:  Yes.  They are several
11 different documents that I've put together for ease of
12 questioning.
13     A.  (The witness reviews the document.)  Okay.
14 BY MR. WILSON:
15     Q.  Are these disciplinary warning notices?
16     A.  Yes, they are.
17     Q.  I'd like you to look at the signature boxes in
18 the bottom of these different documents, and for the
19 record one is dated November 16th, 2004; January 12th,
20 2005; January 4th, 2005; November 29th, 2004;
21 November 16th, 2004; and August 30th, 2004.  I apologize
22 for them not being in order.
23     A.  Okay.
24     Q.  But in reference to the --

Page 51

1          MR. ELLIS:  Excuse me.  Two of them are the
2  same thing; right?  They are different Bates numbers
3  because one probably came out of a different file from
4  the other, but both of them deal with the plaintiff's
5  spreading of information about an employee that was
6  confidential.
7          MR. WILSON:  Okay.  Do they have the same
8  dates on them?
9          MR. ELLIS:  They have the same dates.  They
10 have different Bates numbers, and I'm assuming that is
11 because they came from different files that were
12 produced.
13         MR. WILSON:  The November 16th one?
14         MR. ELLIS:  Yes.
15         MR. WILSON:  How about if we just pull that
16 one out?
17         MR. ELLIS:  Which one do you want to pull?
18         MR. WILSON:  The top one.
19         MR. ELLIS:  Okay.
20         MR. WILSON:  The first two pages.
21         MR. ELLIS:  So D 72 and D 73 will be gone.
22         MR. WILSON:  Yes.
23         MR. WILSON:  So Duncan 8 now begins with
24 D 101.

Page 52

1          MR. WILSON:  My apologize.
2          MR. ELLIS:  No problem.
3  BY MR. WILSON:
4      Q.  The manager and HR representatives' signature
5  lines in these disciplinary warnings, are there
6  signatures in both of those boxes?
7      A.  Yes.
8      Q.  With the exception of the one dated 8/30/04;
9  correct?
10         MR. ELLIS:  The very bottom?
11         MR. WILSON:  Yes.
12     A.  Yes.
13 BY MR. WILSON:
14     Q.  Why is it at this point there are signatures in
15 the box for HR representative's signature?
16     A.  Because it went from a coaching to a verbal
17 written warning.  They have to have final approval.
18     Q.  In this series of documents, did Mr. Thompson
19 either sign the documents or is the box checked that he
20 refused to sign?
21     A.  Yes.
22     Q.  Why is that?
23     A.  I'm sorry.
24     Q.  Why --

Page 53

1          MR. ELLIS:  Excuse me.  Are you referring
2  to the top one or are you referring to all of them?
3          MR. WILSON:  All of them.
4          MR. ELLIS:  Okay.  Then I would ask you,
5  please, to take a look at all of them because they're not
6  all the same.
7          THE WITNESS:  And what was your question
8  again, sir?
9          MR. WILSON:  Can you read it back to him,
10 please?
11         MR. ELLIS:  I think the question was
12 whether all of them have either the plaintiff's signature
13 or the box checked that says he refused to sign it.
14     A.  Yes.
15 BY MR. WILSON:
16     Q.  Why is that?
17     A.  Why did he refuse to sign it?
18     Q.  No.  Why is it now that either the box is
19 checked or there's a signature, whereas before there was
20 neither in Duncan Exhibit Number 4?
21     A.  Because in number 4 they're coachings.  He's not
22 required to sign it.
23     Q.  Do you know why Mr. Thompson received so many
24 disciplinary warnings in 2004 and 2005?

14 (Pages 50 to 53)

Thompson                                     v.                              Dover Downs
Richard R. Duncan                    C.A. # 05-274 (GMS)                     April 11, 2006

Page 54

1    **A. Yes. He was either late or he was sick without**
2    **a doctor's excuse or without sick time by the company**
3    **policy.**
4    Q. Was his attendance worse during this year and
5    his lateness worse during this year than it had been in
6    previous years?
7    **A. Yes, I believe so.**
8    Q. Has Dover Downs scrutinized Mr. Thompson's
9    conduct tighter since he has filed a charge of
10   discrimination than it did prior to his filing of a
11   charge of discrimination?
12           MR. ELLIS: Object to the form of the
13   question.
14           You can answer.
15   **A. No. He hadn't been with the company for a year.**
16   Q. Excuse me?
17   **A. He's not been at Dover Downs for the last year**
18   **or so.**
19   Q. Right.
20   **A. So what are you asking me?**
21   Q. He made a complaint of discrimination in August
22   of 2004?
23   **A. Un-huh.**
24   Q. In the time since then, has he been scrutinized

Page 55

1    higher, at a higher level than he was prior to his charge
2    of discrimination?
3           MR. ELLIS: I'm going to object to the form
4    of the question because this witness said that he didn't
5    know anything about him making a complaint of
6    discrimination. Maybe he did, maybe he didn't, but this
7    witness doesn't have knowledge of that. But he can
8    answer the question.
9    **A. No.**
10   Q. Do you have any knowledge of Mr. Thompson
11   accusing anybody of age discrimination?
12   **A. No, no.**
13   Q. Does the human resources department keep track
14   of all attendance and disciplinary actions and warnings?
15   **A. Yes. They are required to send them up.**
16   Q. If somebody is given a disciplinary warning or
17   coaching, is that warning or coaching forwarded to human
18   resources?
19   **A. Not the coachings.**
20   Q. Why is that?
21   **A. Because he's not required to sign it. You just**
22   **put it in his record in the office and you refer back to**
23   **that if you will be doing evaluations or if you are doing**
24   **another coaching or something of that nature.**

Page 56

1    Q. If a person is absent due to illness, is he
2    permitted to use his personal day to cover that illness?
3    **A. No. Company policy, no.**
4    Q. Has anybody ever been able, ever been permitted
5    to use their personal day to cover an illness?
6    **A. Not to my knowledge, no.**
7    Q. In February 2005, did Mr. Thompson approach you
8    regarding a bonus check that he didn't receive?
9    **A. Yes, he did.**
10   Q. What did he say?
11   **A. He wanted to know why he didn't get a bonus**
12   **check.**
13   Q. What did you tell him?
14   **A. I told him he had a final written warning and**
15   **was not eligible for a bonus check. That's per the**
16   **directions from the director.**
17   Q. Were there other employees who did not receive a
18   bonus check in February 2005?
19   **A. I don't remember. I believe so, but I do not**
20   **remember.**
21   Q. What about in prior years?
22   **A. Oh, yes.**
23   Q. Was it for the same reason?
24   **A. For final written warning, yes.**

Page 57

1    Q. In 2004, do you remember who that person was or
2    those persons were?
3    **A. Previously it was Sam Tatman.**
4           MR. ELLIS: Do you want to spell that?
5           THE WITNESS: T-a-t-m-a-n.
6    BY MR. WILSON:
7    Q. Anybody else?
8    **A. Recently I've had one gentleman.**
9    Q. Was that in 2006?
10   **A. It was in 2006 for 2005, yes. It was for 2005.**
11   Q. Who was that?
12   **A. Kevin Gorlich.**
13   Q. Was it for that same reason, the final
14   written --
15   **A. Final written warning, yes.**
16   Q. Anybody in 2006?
17   **A. 2006 is not over yet.**
18   Q. Don't they come out in February?
19           MR. ELLIS: He just said Gorlich was this
20   year for the 2005 bonus.
21           MR. WILSON: Oh, okay. I understand.
22   Okay.
23   BY MR. WILSON:
24   Q. Has an employee ever received a bonus check even

15 (Pages 54 to 57)

Thompson
Richard R. Duncan

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 58

1  though they had a final written warning?
2  **A. Not to my knowledge.**
3  Q. What about somebody who had been suspended that
4  year?
5  **A. I don't know.**
6  Q. Do you recall in 2003 Mr. Thompson was out of
7  work for a period of time due to being in an automobile
8  accident?
9  **A. Yes.**
10  Q. Do you recall that in approximately September
11  2003 that he returned to work on light duty?
12  **A. Yes.**
13  Q. Do you recall what his light-duty limitations
14  were?
15  **A. No, I do not.**
16  Q. Was he given a job that conformed to those
17  light-duty limitations?
18  **A. To my knowledge, yes, he was, yes.**
19  Q. Do you remember what job he was assigned?
20  **A. Yes, I do.**
21  Q. What was that?
22  **A. He was assigned to security and the out radios.**
23  Q. How long was he in that position?
24  **A. A short time.**

Page 59

1  Q. Did he return to full duty?
2  **A. He returned to full duty if he had a doctor's
3  slip saying he could, yes.**
4  Q. Are there times when employees are refused light
5  duty?
6  **A. No.**
7  Q. So any time an employee comes in with a doctor's
8  note that says he can perform light duty, he's given a
9  job?
10  **A. He's either given a job or the company let's him
11  go home if we can't find a job for him, yes.**
12  Q. So there are some times when the employee is not
13  given a light-duty job?
14  **A. He's never given a job he's not eligible to do,
15  no. Is that what you're asking me?**
16  Q. I'm asking you: Are there times when an
17  employee comes to Dover Downs with a return-to-work note
18  from a doctor saying he's able to perform light duty, are
19  there times when Dover Downs says, no, we don't have
20  anything for you?
21  **A. Yes.**
22  Q. How are those decisions made as to whether or
23  not a light-duty job is given to an employee that's been
24  given restrictions?

Page 60

1  **A. HR will call down to the various departments and
2  ask us if we have any light duty.**
3  Q. Are you aware that Mr. Thompson has been
4  released to return to work on light duty?
5  **A. No.**
6  Q. Would you be in a position to know this?
7  **A. No.**
8  Q. Has anybody called your department to ask if
9  there's light duty for Mr. Thompson?
10  **A. No.**
11  **(Duncan Exhibit 9 was marked for
12  identification.)**
13  BY MR. WILSON:
14  Q. You've been handed what's been marked as Duncan
15  Exhibit 9. Just let me know when you're done looking at
16  that, please.
17  **A. (The witness reviews the document.) Okay.**
18  Q. Do you know what this document is?
19  **A. No, I do not.**
20  Q. Does it appear to be a document from a doctor
21  returning Mr. Thompson to light duty?
22  **A. It appears to be, yes.**
23  Q. Have you ever seen this document?
24  **A. No, I have not.**

Page 61

1  MR. WILSON: I would like to have that
2  marked, as well.
3  (Duncan Exhibit 10 was marked for
4  identification.)
5  BY MR. WILSON:
6  Q. Before we get to this document, I have another
7  question regarding the last one.
8  Who at Dover Downs would a report like this
9  be given to?
10  **A. This one here?**
11  Q. Yes, sir.
12  **A. It would -- it would go to HR.**
13  Q. Do you know who in HR?
14  **A. I'm not positive, but I think it goes to Larry
15  Schilling. I don't know. Or Fred Downs. One of those
16  two. I don't know.**
17  Q. That kind of leads us into the next document.
18  So could you take a look at that one, the one that's been
19  marked Duncan Exhibit 10?
20  **A. (The witness reviews the document.) Okay, yes.**
21  Q. Did you receive this e-mail?
22  **A. Yes.**
23  Q. Does it indicate that Mr. Thompson has been
24  released for light duty?

16 (Pages 58 to 61)

Thompson                                    v.                    Dover Downs
Richard R. Duncan              C.A. # 05-274 (GMS)              April 11, 2006

Page 62

1    A. Yes.
2    Q. When it says "To follow up on this mornings
3  discussion," what is that about? It also says "I realize
4  that this is a tough situation." Can you explain what
5  that is about?
6           MR. ELLIS: Object to the form of the
7  question.
8    Q. Does the first sentence in this say "To follow
9  up on this mornings discussion, I realize this is a tough
10  situation." Can you explain what the discussion is
11  about? "To follow up on this mornings discussion, I
12  realize that this is a tough situation." Does the
13  document say that?
14    A. Yes.
15    Q. Can you explain what "this mornings discussion"
16  was about?
17           MR. ELLIS: I object to the form of the
18  question.
19    A. I really don't remember the full -- the full
20  gist of the conversation. To my recollection, it was
21  that I needed someone to work full time. That's my
22  recollection. But that's it.
23    Q. What about the "tough situation"? What does
24  that refer to?

Page 63

1    A. That we was down -- we were short people.
2    Q. Does Dover Downs employ a gentleman named Eric
3  Daniels?
4    A. Yes, we do.
5    Q. Is he on light duty currently?
6    A. No. No, he is not.
7    Q. Was he on light duty at one time?
8    A. Yes, he was.
9    Q. What position was he doing on light duty?
10    A. He was monitoring the computer system and what
11  he could do and his restrictions.
12    Q. What were his restrictions?
13    A. To my knowledge, if I remember correctly, he
14  couldn't lift more than 25 pounds.
15    Q. When was he on light duty?
16    A. I don't remember. I don't remember the dates.
17    Q. The job that Mr. Daniels was performing, is that
18  available now?
19    A. He's -- yes. He's off light duty now.
20    Q. Yes, but the job that he was performing when he
21  was on light duty, is that job available now?
22    A. He was doing what he was -- we didn't pull him
23  out of the job. We just restricted what he could do in a
24  job. We put somebody with him to carry a ladder or what

Page 64

1  not. He would go adjust air-conditioners and that kind
2  of stuff.
3    Q. Could similar accommodations be made for
4  Mr. Thompson?
5           MR. ELLIS: Object to the form of the
6  question.
7    A. I don't know.
8    Q. Has that been considered?
9    A. I didn't know he was on light duty.
10    Q. Duncan Exhibit 10 states that he was on light
11  duty and that you were carbon copied on this e-mail,
12  April 5th, 2005.
13    A. And they asked me if I had any light duty for
14  him and I said no.
15    Q. So you were aware he was on light duty?
16    A. Oh, yes. Yes, sir.
17    Q. Does Dover Downs evaluate people who are
18  eligible for light duty on a continual basis to see if
19  they can put them back to work?
20    A. I don't know.
21    Q. So it's your testimony that an accommodation was
22  made for Mr. Daniels to continue in his position?
23    A. To what he could do, yes, which was very
24  limited.

Page 65

1    Q. But no such accommodation was given to
2  Mr. Thompson?
3           MR. ELLIS: Object to the form of the
4  question.
5    A. No, no.
6    Q. Do you know why that is?
7    A. No.
8           MR. WILSON: I think I'm just about done.
9  I would like to talk to Mickey real quick.
10           MR. ELLIS: That's fine.
11           MR. WILSON: If we don't come up with
12  anything, then we'll be done.
13           (A recess was taken at this time.)
14  BY MR. WILSON:
15    Q. Just one or two more quick questions.
16    A. Sure.
17    Q. Hopefully just one.
18      Do you know how old Eric Daniels is?
19    A. No, I don't.
20    Q. Approximately how old?
21    A. I think he was in his mid or late forties. I'm
22  not sure.
23    Q. Okay.
24           MR. WILSON: I have nothing further. Your

17 (Pages 62 to 65)

Thompson                              v.                    Dover Downs
Richard R. Duncan              C.A. # 05-274 (GMS)          April 11, 2006

Page 66

1   attorney may have some questions for you.
2          MR. ELLIS:  No questions.
3          MR. WILSON:  If not, you are excused.
4          THE WITNESS:  Thank you.
5          (The deposition was then concluded at
6   11:30 a.m.)
7              - - - - -
8          INDEX TO TESTIMONY
9
10
    RICHARD R. DUNCAN              PAGE
11
12  Examination by Mr. Wilson          2
13
              - - - - -
14
15         INDEX TO EXHIBITS
16
    DUNCAN EXHIBIT NO.:            PAGE
17
18  1  A seven-page copy of a Dover Downs Employee
       and Supervisor Performance Appraisal    9
19
    2  A one-page copy of a memo dated 2 April 2002
20     from Bob Morrison to Members of the Swing
       and Night Shifts, Dover Downs Maintenance    13
21
    3  A one-page copy of a memo dated June 20,
22     2002, to Robin Roberts from Rich Duncan    15
23  4  An eight-page copy of four Disciplinary
       Warning Notices            17
24

Page 67

1   DUNCAN EXHIBIT NO. (Continued):      PAGE
2
3   5  A one-page copy of an In-house Posting dated
       October 19, 2001            31
4   6  A one-page copy of an Approved In House
       Position Posting dated June 11, 2004    42
5
    7  A one-page copy of a Disciplinary Warning
6      Notice dated 8/20/04          44
7   8  A multipage copy of Disciplinary Warning
       Notices            50
8
    9  A two-page copy of a Functional Baseline
9      Re-evaluation            60
10  10 A one-page copy of an e-mail string, the
       first dated Tuesday, April 5, 2005, from
11     Fred Downs to Rich Wertz          61
12
              - - - - -
13
14
15
16
17
18
19
20
21
22
23
24

Page 68

1
2
3
4
5
6
7
8     REPLACE THIS PAGE
9
10    WITH THE ERRATA SHEET
11
12    AFTER IT HAS BEEN
13
14    COMPLETED AND SIGNED
15
16    BY THE DEPONENT.
17
18
19
20
21
22
23
24

Page 69

1   State of Delaware )
2                   )
3   New Castle County )
4
5        CERTIFICATE OF REPORTER
6
7        I, Kathleen White Palmer, Registered Merit
    Reporter and Notary Public, do hereby certify that there
8   came before me on the 11th day of April, 2006, the
    deponent herein, RICHARD R. DUNCAN, who was duly sworn by
9   me and thereafter examined by counsel for the respective
    parties; that the questions asked of said deponent and
10  the answers given were taken down by me in Stenotype
    notes and thereafter transcribed into typewriting under
11  my direction.
12       I further certify that the foregoing is a
    true and correct transcript of the testimony given at
13  said examination of said witness.
14       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17
18
19           Kathleen White Palmer, RPR, RMR
             Certification No. 149-RPR
20           (Expires January 31, 2008)
21
    DATED:  April 12, 2006
22
23
24

18 (Pages 66 to 69)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,        )
                                )
          Plaintiff,            )
                                )
v.                              )   Civil Action No.
                                )   05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS) 
GAMING & ENTERTAINMENT INC.,    )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,     )
INC.,                           )
                                )
          Defendants.           )

          Deposition of KEVIN EDWARD GORLICH taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 11:40 a.m. on Tuesday, April 11, 2006,
before Kathleen White Palmer, Registered Merit Reporter
and Notary Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware   19899
             for the Plaintiff

          EDWARD T. ELLIS, ESQUIRE
          MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
             123 South Broad Street
             Philadelphia, Pennsylvania   19109
             for the Defendants

_____
                WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                   (302) 655-0477

                                                    B-0245

Page 2

1  ALSO PRESENT:
2        BRANCE F. THOMPSON, SR.
3        - - - - -
4        KEVIN EDWARD GORLICH,
5        the witness herein, having first been
6        duly sworn on oath, was examined and
7        testified as follows:
8  BY MR. WILSON:
9     Q.  Good morning, Mr. Gorlich. We met a couple
10  minutes ago, but for the record, my name is Tim Wilson
11  and I represent Brance Thompson in his lawsuit against
12  Dover Downs.
13           Typically in a deposition we give some
14  instructions as to how the deposition is going to go and
15  this is of that nature. First I'm going to be asking you
16  questions pertaining to the lawsuit. When you respond to
17  me, you need to do so verbally because, as you can see,
18  we have a court reporter here and she can't take down
19  head nods and other forms of nonverbal communication.
20           You've just been sworn, so as you know,
21  your testimony is under oath, so you must answer
22  truthfully just as if you are in a court.
23           If you don't hear a question I ask you or
24  you don't understand it, please let me know and I will

Page 3

1  rephrase it or ask the question again.
2           Please let me finish asking my questions
3  before you answer and I will attempt to wait for you to
4  finish answering before I ask another question. The
5  reason I ask that is so we can make the transcript clear.
6           If at any time you come to realize that a
7  statement you made is incorrect or inaccurate, please let
8  me know and you'll be permitted to clarify the record.
9           You cannot talk or confer with your
10  attorney during the deposition either in here or during
11  breaks unless it pertains to a matter of privilege.
12           MR. ELLIS: I'm not his attorney. He's not
13  a management employee.
14           MR. WILSON: Okay.
15           MR. ELLIS: The last witness was a
16  management employee.
17           MR. WILSON: Okay.
18  BY MR. WILSON:
19     Q.  If at any time you should need a break to go to
20  the rest room or for any other reason, just let me know
21  and we'll take a break.
22           Do you understand these instructions?
23     A.  Yes.
24     Q.  Where were you born, Mr. Gorlich?

Page 4

1     A.  Milford Hospital.
2     Q.  That is in Milford, Delaware?
3     A.  Milford, Delaware, yes.
4     Q.  What year?
5     A.  1949.
6     Q.  What is your address?
7     A.  6972 Williamsville Road, Milford, 19963.
8     Q.  How long have you lived there?
9     A.  Twenty-two years.
10    Q.  Do you own or rent?
11    A.  Own.
12    Q.  Have you ever been arrested?
13    A.  No.
14    Q.  Did you serve in the military?
15    A.  Yes.
16    Q.  What branch of the military?
17    A.  Army.
18    Q.  What years?
19    A.  Between '70 and '76.
20    Q.  Did you graduate from high school?
21    A.  Yes.
22    Q.  Was that Milford High School?
23    A.  That was Georgetown High School.
24    Q.  Did you go to college?

Page 5

1     A.  Negative.
2     Q.  Any post high school education, trade school?
3     A.  Trade school.
4     Q.  Where?
5     A.  Georgetown Vocational Center.
6     Q.  When was that?
7     A.  Sir?
8     Q.  When did you go to Georgetown?
9     A.  I went through '68, '69, and '70. No, no. Let
10  me rephrase that.
11    Q.  Okay.
12    A.  '69, '68, '67.
13    Q.  What were you studying there?
14    A.  Auto, auto mechanics.
15    Q.  Did you get a degree or a certificate?
16    A.  Certificate.
17    Q.  In auto mechanics?
18    A.  Mm-hmm.
19    Q.  Any other education after that?
20    A.  No.
21    Q.  Are you presently employed by Dover Downs?
22    A.  Yes.
23    Q.  How long have you been with Dover Downs?
24    A.  Four years.

2 (Pages 2 to 5)

Page 6

1   Q. So you started working there in 2002?
2   A. Correct.
3   Q. What's your job title?
4   A. Mechanic II. Building maintenance, Mechanic II.
5   Q. What does "building maintenance" mean?
6   A. Keeping the building -- keeping the building up,
7   light bulbs, painting and --
8   Q. Is that also known as inside?
9   A. Yes. Everything is inside in my category. I'm
10  in the inside maintenance part of it.
11  Q. How long have you held the title Mechanic II?
12  A. Since I was hired four years.
13  Q. Where did you work prior to Dover Downs?
14  A. Nanticoke Homes, Greenwood, Delaware.
15  Q. What did you do for them?
16  A. Building maintenance, industrial maintenance.
17  Q. Is that in construction?
18  A. No. That's fixing their equipment that broke
19  down.
20  Q. Things like --
21  A. Tools, hand tools, you know, welding, cutting,
22  heater work.
23  Q. Did you go to Poly Tech?
24  A. Yes, I did.

Page 7

1   Q. What did you study at Poly Tech?
2   A. Heating, ventilation, air-conditioning.
3   Q. Did you go to Poly Tech when you were employed
4   by Dover Downs?
5   A. Yes.
6   Q. Did Dover Downs pay for it?
7   A. Yes.
8   Q. Was your education there subject to any approval
9   by anybody at Dover Downs?
10  A. Yes, they approved it.
11  Q. Who approved it?
12  A. I believe Rich Duncan did. Now, there was a
13  stipulation on that if I did not pass the test, I would
14  have to pay for it my own, out of my own pocket.
15  Q. Did you pass?
16  A. Yes.
17  Q. Congratulations.
18  A. Well, thank you.
19  Q. What did you do to prepare for today's
20  deposition?
21  A. Nothing.
22  Q. Did you meet with an attorney?
23  A. I met with --
24      MR. ELLIS: Mr. Ellis.

Page 8

1   A. -- Ed yesterday for about 15 minutes.
2   Q. What did you discuss?
3   A. What was going to go on here.
4   Q. Do you mean just how it would work or did you
5   discuss --
6   A. How it would work, how it would work in here.
7   Q. Did you discuss the substance of the case?
8   A. No.
9   Q. Did he show you any documents?
10  A. No.
11  Q. Did you talk to anybody other than Mr. Ellis to
12  prepare for this deposition?
13  A. A week ago a lady -- I talked to a lady. Beth
14  is her name.
15  Q. Beth Friel?
16  A. Yes. And it was the same thing as yesterday's
17  meeting, same procedures.
18  Q. You didn't discuss the case at all?
19  A. Mm-mmm.
20  Q. She needs you to say no instead of mm-mmm.
21  A. I'm sorry. No.
22  Q. Have you talked to anybody else about this
23  lawsuit?
24  A. No.

Page 9

1   Q. Nobody, no other employees at Dover Downs?
2   A. No.
3   Q. Were you even aware that Mr. Thompson had filed
4   this lawsuit?
5   A. Yes.
6   Q. How did you become aware of that?
7   A. Mr. Thompson told me.
8   Q. When did that occur?
9   A. When did that occur? Wow. Last year.
10  Q. Do you have an understanding as to what this
11  lawsuit is about?
12  A. Yes.
13  Q. According to your understanding, what's it
14  about?
15  A. Mr. Thompson is suing on age discrimination.
16  Q. Mr. Gorlich, did you work with Mr. Thompson on
17  the third shift at Dover Downs at some point?
18  A. Yes.
19  Q. Do you remember when that was?
20  A. That was April 1st, 2002, till around August and
21  September of that same year.
22      MR. ELLIS: 2002?
23      THE WITNESS: 2002, yes.

B-0247

3 (Pages 6 to 9)

Page 10

1  BY MR. WILSON:
2      Q.  How did it come that it ended in August of 2002?
3  Did one of you move off the shift?
4      **A.  I moved from third shift to first shift.**
5      Q.  When you were on third shift, were there other
6  employees who were working on that same shift with you
7  and Mr. Thompson?
8      **A.  In our department or as far as other people?**
9      Q.  In maintenance.
10     **A.  One other person.**
11     Q.  Who was that?
12     **A.  Mr. Whitecomb.**
13     Q.  Is that Nate Whitecomb?
14     **A.  Yes.**
15     Q.  What was the primary type of work done on third
16  shift during this time?
17     **A.  Painting.**
18     Q.  Was there anybody, a Dover Downs employee who
19  held a supervisor title working on this same shift as
20  you, Mr. Thompson, and Mr. Whitecomb?
21     **A.  Repeat that.**
22     Q.  Was there anybody on third shift that held the
23  title of supervisor during this time?
24     **A.  During the time I was on it?**

Page 11

1      Q.  Yes.
2      **A.  No.**
3      Q.  Did you work under Mr. Thompson's guidance and
4  supervision on this shift?
5      **A.  I reported to Bob Morrison, who was my**
6  **supervisor.  He was on second shift.  And I took**
7  **instructions from Mr. Thompson, also.**
8      Q.  Did Mr. Morrison tell you that Mr. Thompson was
9  in charge of the shift?
10         MR. WILSON:  Can we go off the record for a
11  second?
12         (Discussion off the record.)
13         MR. WILSON:  I think I asked a question and
14  I didn't get a response.
15         Could you read the question back, please?
16         (The reporter read from the record as
17  requested.)
18     **A.  Yes.**
19  BY MR. WILSON:
20     Q.  Did anybody else tell you that Mr. Thompson was
21  in charge of the shift?
22     **A.  Mickey.**
23     Q.  Did Mr. Duncan tell you?
24     **A.  No.**

Page 12

1      Q.  Anybody else?
2      **A.  No.**
3      Q.  Mr. Gorlich, have you ever been given any type
4  of disciplinary warning while you have been at Dover
5  Downs?
6      **A.  Yes.**
7      Q.  Were some of these disciplinary warnings known
8  as coachings?
9      **A.  Coaching?**
10     Q.  Yes.
11     **A.  Coaching?  I don't follow you.**
12     Q.  You're not familiar with the term "coaching"?
13     **A.  No.**
14     Q.  Just to back up for just a second, when you were
15  on third shift, did you do other things other than the --
16     **A.  Yes.**
17     Q.  -- the painting?
18     **A.  Yes.**
19     Q.  What other types of things did you do?
20     **A.  Plumbing, electrical repairs, anything that had**
21  **to be done.**
22     Q.  Okay.
23     **A.  In the casinos, some money drawers needed**
24  **repairing.**

Page 13

1      Q.  Can you give me an outline as far as the process
2  for getting a disciplinary warning?
3         MR. ELLIS:  Object to the form of that
4  question.
5         MR. WILSON:  Okay.  I'll ask it again
6  because it was confusing.
7  BY MR. WILSON:
8      Q.  What happens when you get a disciplinary
9  warning?  Are you given any type of document telling you
10  that you're being given the warning?
11         MR. ELLIS:  You're referring to a
12  disciplinary warning and not a coaching?
13         MR. WILSON:  I'm referring to any type of
14  disciplinary warning.
15         MR. ELLIS:  Object to the form of the
16  question.
17         Go ahead.  You can answer.
18         MR. WILSON:  He already stated he doesn't
19  know what a coaching is.
20         MR. ELLIS:  Then maybe he didn't get one.
21  BY MR. WILSON:
22     Q.  Are you given a document when you're given a
23  disciplinary warning?
24     **A.  On mine it was, yes.**

4 (Pages 10 to 13)

Thompson
Kevin Edward Gorlich

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 14

1   Q.   Are you required to sign the document?
2   **A.   I did not sign it.**
3   Q.   Did you refuse to sign it?
4   **A.   Yes.**
5   Q.   Did they check a box saying that you refused to
6   sign it?
7   **A.   I do not know.**
8   Q.   Did you meet with somebody?
9   **A.   Isenberg.**
10  Q.   Anybody else?
11  **A.   No.**
12  Q.   Was this for attendance-related issues?
13  **A.   Negative.**
14  Q.   What was it for?
15       THE WITNESS:  Do I have to answer that?  Is
16  it relative to this case right here?
17       MR. ELLIS:  It could be, yes, and I don't
18  think we are going to be able to tell that until you
19  answer the question.  So I think you should answer the
20  question.
21  **A.   What was the question?**
22  BY MR. WILSON:
23  Q.   What was the discipline for?
24  **A.   I made a racial slur, supposedly.  That's why I**

Page 15

1   **didn't sign the document.**
2   Q.   Understood.
3       When did this happen?
4   **A.   This happened in November of '05.**
5   Q.   Did you ever get any disciplinary warnings for
6   being tardy or for missing time?
7   **A.   I always had my excuses lined up.  No.**
8   Q.   To your knowledge, is there ever an instance
9   when you can get any form of discipline and somebody not
10  tell you about it?
11       MR. ELLIS:  Object to the form of the
12  question.
13       You can answer.
14  **A.   Please repeat.**
15  Q.   Is there ever an instance when you can receive
16  discipline from Dover Downs and not know about it?
17  **A.   Oh, no.**
18  Q.   Do you always get a document?
19  **A.   (No response.)**
20  Q.   Do you always get a document and/or speak to
21  somebody about it?
22  **A.   I'm not sure.  I don't know that.**
23  Q.   Is there some form of communication made to the
24  employee when he's disciplined?

Page 16

1   **A.   Yes.**
2   Q.   Are you aware of a rule or a custom at Dover
3   Downs where an employee's not considered late as long as
4   he's on the job at least seven minutes from when he's
5   supposed to start his shift?
6   **A.   No.**
7   Q.   So if an employee is scheduled to begin their
8   shift at 3:00 and they arrive at 3:05, are they
9   considered tardy?
10  **A.   I've never been, so I don't know.**
11       MR. ELLIS:  Objection.
12  **A.   I can't answer that.**
13  Q.   What about covering a day off for an illness
14  with vacation time, was that ever permitted?
15       MR. ELLIS:  Object to the form of the
16  question.
17  Q.   You can answer.
18  **A.   Please repeat it.**
19  Q.   Have employees in the maintenance department
20  ever been permitted to use vacation time to cover a day
21  where they called off sick?
22  **A.   No.**
23  Q.   That's never been the policy?
24  **A.   I don't think so.**

Page 17

1   Q.   Did Mr. Thompson ever tell you that he was being
2   discriminated against because of his age?
3   **A.   No.**
4   Q.   In October of 2001, are you aware of a job
5   posting for a supervisor of building maintenance for the
6   third shift?
7       MR. ELLIS:  That's before he worked there.
8       MR. WILSON:  Okay.
9   BY MR. WILSON:
10  Q.   In March of 2004, are you aware of a job posting
11  for a second shift supervisor?
12  **A.   Second shift?**
13  Q.   Yes.
14  **A.   No.**
15  Q.   Are you aware of Jim Shreves ever becoming the
16  second shift supervisor?
17  **A.   Yes.**
18  Q.   Was that job posted prior to Mr. Shreves?
19  **A.   I'm sure it was.**
20  Q.   Did you ever see the posting?
21  **A.   No.**
22  Q.   Did you ever hear anything about Mr. Thompson
23  applying for that job?
24  **A.   No.**

**B-0249**

5 (Pages 14 to 17)

Page 18

1    Q.   Have you ever heard that Jim Shreves had been
2    promised that job prior to it being posted?
3    A.   No.
4    Q.   Prior to his promotion, was Jim Shreves a
5    Maintenance Mechanic I?
6    A.   I think he was, yeah.
7    Q.   Do you know how long he had been a maintenance
8    mechanic for?
9    A.   No.
10   Q.   Was it a short period of time?
11   A.   Oh, I don't know.  Jim was there before I got
12   there, so I don't know what his title was.
13   Q.   Do you know what he did prior to working at
14   Dover Downs?
15   A.   No.
16   Q.   Do you have any knowledge of Mr. Shreves'
17   computer skills?
18   A.   No.
19   Q.   Is Mr. Shreves a supervisor today?
20   A.   Yes.
21   Q.   Is there a particular shift that he works on?
22   A.   He works the 3-to-11:30 shift.
23   Q.   Is that the supervisor of building maintenance?
24   A.   Yes.

Page 19

1    Q.   Is that inside maintenance?
2    A.   Yes.
3    Q.   Are you aware of an individual who works for
4    Dover Downs who enters information about employees into a
5    computer system?
6    A.   No.
7    Q.   In approximately June of 2004, are you aware of
8    a job posting for a first shift maintenance mechanic?
9    A.   No.
10   Q.   Are you aware of a time in 2004 when an
11   individual named Robert Knotts began working as a
12   maintenance mechanic on the first shift?
13   A.   Robert --
14   Q.   Knotts, K-n-o-t-t-s.
15   A.   I remember the Robert, yes.  I don't know his
16   last name.  He was on, I thought, the midnight shift.
17   Q.   At this time you worked on first shift; correct?
18   A.   Yes, I have.  I worked on the day shift since
19   '02, August '02.
20   Q.   Okay.
21   A.   No -- yeah, August '02.
22   Q.   So if Mr. Knotts worked the first shift, you
23   would probably be aware of that; correct?
24   A.   Yes.

Page 20

1    Q.   Did you ever hear anything about Mr. Thompson
2    wanting to move to first shift --
3    A.   No.
4    Q.   -- at approximately this time?
5         Are you aware that Mr. Thompson had a
6    meeting with Mr. Morrison and Mrs. Isenberg regarding
7    Dover Downs' refusal to promote him?
8    A.   No.
9    Q.   Have you ever heard of a rule called the 72-hour
10   rule?
11   A.   No.
12   Q.   Did you ever hear anything about Mr. Thompson
13   being written up for old infractions?
14   A.   What do you mean?  I don't follow you.  The age?
15   Q.   Have you ever been aware of Mr. Thompson being
16   written up, say, in August for infractions that happened
17   in February?
18   A.   No.
19   Q.   From your observations or knowledge, did Dover
20   Downs watch over Mr. Thompson tighter after he complained
21   of age discrimination?
22        MR. ELLIS:  Object to the form of the
23   question.
24        Go ahead.  You can answer.

Page 21

1    A.   No.
2    Q.   Mr. Gorlich, in February 2005, did you get a
3    bonus check from Dover Downs?
4    A.   When is it?  February 2005?
5    Q.   Yes.
6    A.   Yes, I did.
7    Q.   Pretty much everybody gets these; correct?
8    A.   Unless they're written up for things.
9    Q.   So in 2005, you had not been written up for
10   anything?
11   A.   No.
12   Q.   Do you know of anybody who has ever been written
13   up for something that has gotten the bonus check?
14   A.   Not to my knowledge, no.
15   Q.   Have you ever applied for a position for outside
16   maintenance?
17   A.   No.
18        MR. WILSON:  I think that's all I have for
19   you.
20        MR. ELLIS:  I don't have any questions.
21        (The deposition was then concluded at
22   12:10 p.m.)
23        - - - - -
24

6 (Pages 18 to 21)

Thompson                                              Dover Downs
Kevin Edward Gorlich          v.    C.A. # 05-274 (GMS)    April 11, 2006

Page 22

```
 1              INDEX TO TESTIMONY
 2
 3
    KEVIN EDWARD GORLICH              PAGE
 4
 5  Examination by Mr. Wilson           2
 6
                  - - - - -
 7
 8              INDEX TO EXHIBITS
 9
10  (There were no exhibits marked for identification.)
11
12                - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 24

```
 1  State of Delaware )
 2                   )
 3  New Castle County )
 4
 5       CERTIFICATE OF REPORTER
 6
 7       I, Kathleen White Palmer, Registered Merit
    Reporter and Notary Public, do hereby certify that there
 8  came before me on the 11th day of April, 2006, the
    deponent herein, KEVIN EDWARD GORLICH, who was duly sworn
 9  by me and thereafter examined by counsel for the
    respective parties; that the questions asked of said
10  deponent and the answers given were taken down by me in
    Stenotype notes and thereafter transcribed into
11  typewriting under my direction.
12       I further certify that the foregoing is a
    true and correct transcript of the testimony given at
13  said examination of said witness.
14       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17
18
19       Kathleen White Palmer, RPR, RMR
         Certification No. 149-RPR
20       (Expires January 31, 2008)
21
22
    DATED:  April 13, 2006
23
24
```

Page 23

```
 1
 2
 3
 4
 5
 6
 7
 8          REPLACE THIS PAGE
 9
10          WITH THE ERRATA SHEET
11
12          AFTER IT HAS BEEN
13
14          COMPLETED AND SIGNED
15
16          BY THE DEPONENT.
17
18
19
20
21
22
23
24
```

B-0251

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,          )
                                  )
            Plaintiff,            )
                                  )
v.                                )    Civil Action No.
                                  )    05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS)
GAMING & ENTERTAINMENT INC.,      )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,       )
INC.,                             )
                                  )
            Defendants.           )

            Deposition of ROBERT A. KNOTTS taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 12:10 p.m. on Tuesday, April 11, 2006,
before Kathleen White Palmer, Registered Merit Reporter
and Notary Public.

APPEARANCES:

            TIMOTHY J. WILSON, ESQUIRE
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware  19899
              for the Plaintiff

            EDWARD T. ELLIS, ESQUIRE
            MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
              123 South Broad Street
              Philadelphia, Pennsylvania  19109
              for the Defendants

------------------------------------------------------
                  WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                   (302) 655-0477

**B-0252**

Page 2

1  ALSO PRESENT:
2         BRANCE F. THOMPSON, SR.
3         - - - - -
4         ROBERT A. KNOTTS,
5      the witness herein, having first been
6      duly sworn on oath, was examined and
7      testified as follows:
8  BY MR. WILSON:
9   Q.  Good afternoon, Mr. Knotts. My name is Tim
10 Wilson and I'm Brance Thompson's attorney in his lawsuit
11 against Dover Downs.
12         I'd like to give you a couple instructions
13 as to how the deposition is going to proceed and things
14 of that nature.
15         First, I'm going to be asking you questions
16 pertaining to this lawsuit. When you respond, you must
17 do so verbally so the court reporter can take down your
18 responses and we have a clear transcript. It's difficult
19 for her to take down head nods and people saying mm-hmm
20 or un-huh. So if you mean no, say "no." If you mean
21 yes, say "yes." And any other nonverbal communications,
22 if you can verbalize it, it usually works out a lot
23 better.
24         You've just been sworn, so as you know,

Page 3

1  your testimony is under oath, so you must answer
2  truthfully just as if you were in court.
3         If you don't hear a question or don't
4  understand it, let me know and I will ask it again or
5  explain the question to you.
6         Please let me finish asking my questions
7  before you answer and I will permit you to finish
8  answering before I ask another question. That way the
9  transcript is clear and it will create fewer headaches
10 for our court reporter.
11         If at any time you come to realize that a
12 statement you made is incorrect or inaccurate, let me
13 know and you'll be permitted to clarify the record.
14         If at any time you should need a break to
15 go to the rest room or for whatever reason, let me know
16 and we will gladly oblige.
17         Do you understand these instructions?
18 A.  Yes.
19 Q.  Mr. Knotts, where were you born?
20 A.  I was born in Dover, Delaware.
21 Q.  What year?
22 A.  '61.
23 Q.  What's your address?
24 A.  1268 Cow Marsh Creek Road, Camden, Delaware.

Page 4

1  Q.  How long have you lived there?
2  A.  Eight years.
3  Q.  Do you own?
4  A.  Yes.
5  Q.  Have you ever been arrested?
6  A.  No.
7  Q.  Served in the military?
8  A.  No.
9  Q.  Did you graduate from high school?
10 A.  No.
11 Q.  Have you had any other education courses after
12 you were in high school, trade school, or any type of
13 school like that?
14 A.  No.
15 Q.  Are you presently employed by Dover Downs?
16 A.  Yes.
17 Q.  How long have you been employed by them?
18 A.  It will be two years August.
19 Q.  What's your job title?
20 A.  Mech I.
21 Q.  Is that Maintenance Mechanic I?
22 A.  Yes.
23 Q.  How long have you held that title?
24 A.  Since I started.

Page 5

1  Q.  Where did you work prior to working for Dover
2  Downs?
3  A.  I worked for John H. Miller Heating, Plumbing
4  and Air-conditioning.
5  Q.  What did you do there?
6  A.  Plumbing.
7  Q.  Did you have a job title?
8  A.  Plumber.
9  Q.  Are you a licensed plumber?
10 A.  Yes.
11 Q.  When did you get your license?
12 A.  November -- no. I'm sorry. February.
13 Q.  February of 2006?
14 A.  Yes.
15 Q.  What did you do to prepare for today's
16 deposition?
17 A.  I don't know what you mean.
18 Q.  Did you meet with Mr. Ellis?
19 A.  Yes.
20 Q.  When did you meet with him?
21 A.  Yesterday.
22 Q.  For how long?
23 A.  Twenty minutes.
24 Q.  What did you discuss?

2 (Pages 2 to 5)

Thompson
Robert A. Knotts

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 6

1   **A. Just discussed this case.**

2   Q. What about this case?

3   **A. Well, discussed my high school education,**

4   **discussed that.**

5   Q. Okay.

6   **A. And discussed my plumbing, my trade.**

7   Q. What about high school?

8   **A. That I didn't finish.**

9   Q. What about the plumbing?

10   **A. My experience.**

11   Q. Anything else?

12   **A. Not that I can recall.**

13   Q. Did you review any documents?

14   **A. No.**

15   Q. Did you talk to anybody else besides Mr. Ellis

16   to prepare for this deposition?

17   **A. I had spoken to Beth.**

18   Q. Beth Friel?

19   **A. Yes.**

20   Q. When did you talk to her?

21   **A. Just last week. I don't know what the date was.**

22   Q. Did you meet with her face-to-face?

23   **A. Yes.**

24   Q. For how long?

Page 7

1   **A. Probably ten, 15 minutes.**

2   Q. What did you discuss with her?

3   **A. Basically the same, the same things that we**

4   **discussed.**

5   Q. Anything different?

6   **A. No.**

7   Q. Did you review any documents with her?

8   **A. No.**

9   Q. Have you talked to anybody else about this

10   lawsuit, not necessarily preparing for the deposition,

11   but just in conversation?

12   **A. No.**

13   Q. Nobody who's employed at Dover Downs ever said

14   anything to you about it?

15   **A. No.**

16   Q. Are you aware of this lawsuit?

17   **A. Yes.**

18   Q. What is your understanding as to what this

19   lawsuit is about?

20   **A. That it was age discrimination, I guess.**

21   Q. What was age discrimination?

22   **A. Why Mickey didn't get the position that I got, I**

23   **guess.**

24   Q. Have you ever been given any type of

Page 8

1   disciplinary warning?

2   **A. No.**

3   Q. Do you know what a coaching is?

4   **A. No.**

5   Q. Have you ever been late for work?

6   **A. I don't think so, no.**

7   Q. Have you ever been absent without a doctor's

8   note?

9   **A. (No response.)**

10   Q. Absence for an illness without a doctor's note?

11   **A. I've been out sick without a doctor's note, but**

12   **it was within the sick day allowance that they give you.**

13   **I've never been out more than three days or whatever.**

14   Q. Well, how does that work?

15   **A. The way I understand it, is if you are over a**

16   **certain amount of days that you're allowed without a**

17   **doctor's note, you can have so many days without a**

18   **doctor's note, then after so many days you have to**

19   **produce it.**

20   Q. Are you aware of any rule or custom at Dover

21   Downs that permits you to be seven minutes late before

22   you are actually officially considered late?

23   **A. Yes.**

24   Q. Can you explain that to me?

Page 9

1   **A. I guess -- they have a thing in front of our**

2   **time clock that says so many minutes before and so many**

3   **minutes after the hour that you're allowed and you won't**

4   **be late.**

5   Q. Is that seven minutes?

6   **A. I believe it is, yes.**

7   Q. So if you're scheduled to start your shift at

8   3:00 and you come in at 3:06, you're not --

9   **A. You're still on time, I believe.**

10   Q. Okay.

11   **A. The way I understand it.**

12   Q. Have you ever been aware of a policy at Dover

13   Downs that you could cover an instance where you called

14   out sick with vacation time?

15   **A. Not that I know of.**

16   Q. Did Mr. Thompson ever tell you that he thought

17   he was being discriminated against because of his age?

18   **A. No, I don't think so.**

19   Q. In the summer of 2004 you were hired as a

20   maintenance mechanic on the first shift. You testified

21   to that; correct?

22   **A. Yes.**

23   Q. Do you know the exact date that you were hired?

24   **A. Yes.**

B-0254

3 (Pages 6 to 9)

Page 10

1   Q. What's that?
2   A. August 9th of -- would that be '04?
3   Q. Did you have an interview for this job?
4   A. Yes.
5   Q. With whom?
6   A. Bob Morrison.
7   Q. Do you remember when the interview was?
8   A. No, I don't remember the date.
9   Q. It was prior to August --
10  A. Prior to, yes.
11  Q. Within a week, perhaps?
12  A. I don't remember, to be honest with you.
13  Q. During that interview, did you discuss the types
14  of work that you would be doing?
15  A. Yes.
16  Q. What type of work is that?
17  A. Plumbing work and other general maintenance.
18  Q. What was your initial starting salary?
19  A. You know, I couldn't tell you. I don't know.
20  Q. Do you remember how much you made per hour?
21  A. That's -- 16 something. I can't remember
22  exactly.
23  Q. How much do you make per hour now?
24  A. It's -- I'd have to check the stub, to be honest

Page 11

1   with you. I don't know. I think it's 17 something, but
2   I could be mistaken.
3   Q. Do you get overtime on a regular basis?
4   A. No.
5   Q. Never?
6   A. Not often. Race weekend. That's usually it.
7   Q. By "race weekend" you mean when the Nextel cup
8   races are in Dover?
9   A. Yes.
10  Q. Did you interview with anybody else besides Bob
11  Morrison?
12  A. No.
13  Q. What did he tell you about the job when you
14  interviewed with him?
15  A. That they needed another plumber out there to
16  help out.
17  Q. Did he tell you that it would be hot?
18  A. Yes.
19  Q. Did he tell you that it was a heavy job?
20  A. Yes.
21  Q. Did he tell you that it was a hard job?
22  A. Yes.
23  Q. What did he say about it being heavy? How
24  would --

Page 12

1   A. Well, heavy lifting involved.
2   Q. Are you aware that Mr. Thompson wanted to move
3   to outside maintenance at the time you got the job?
4   A. No, I wasn't.
5   Q. Have you ever been made aware of a conversation
6   Mr. Thompson had with Mr. Morrison?
7   A. No.
8   Q. Are you aware that Mr. Morrison discouraged
9   Mr. Thompson from bidding on the job?
10          MR. ELLIS: Object to the form of the
11  question.
12  Q. You can answer.
13  A. No, I wasn't aware.
14  Q. I believe you testified Mr. Morrison told you he
15  was looking for a plumber?
16  A. Yes.
17  Q. He told you that at the interview?
18  A. Yes.
19  Q. At that time you were not a licensed plumber;
20  correct?
21  A. Correct.
22  Q. How much experience did you have at that time as
23  a plumber? How many years?
24  A. Twenty-five.

Page 13

1   Q. What was the reason that you weren't licensed at
2   that time with all that experience?
3   A. I just never took the time to go through the
4   procedure of getting it.
5   Q. After you were given this job, were you aware
6   that Mr. Thompson had a meeting with Mr. Morrison and
7   Mrs. Isenberg --
8   A. No.
9   Q. -- regarding not getting the job?
10  A. No.
11  Q. Are you aware of something called the 72-hour
12  rule?
13  A. No.
14  Q. Are you aware of any rule that requires Dover
15  Downs to meet with an employee within a certain amount of
16  time after the employee has committed some type of
17  infraction?
18  A. No.
19  Q. Did you hear anything about Mr. Duncan writing
20  Mr. Thompson up for infractions that had occurred months
21  prior?
22  A. No.
23  Q. To your knowledge, does the human resources
24  department keep track of all attendance and disciplinary

4 (Pages 10 to 13)

Thompson
Robert A. Knotts

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 14

```
 1   actions?
 2          MR. ELLIS:  Object to the form of the
 3   question.
 4          You can answer.
 5      A.  I didn't quite understand.
 6      Q.  To your knowledge, does human resources keep
 7   track of or keep copies of all disciplinary notices given
 8   to Dover Downs employees?
 9      A.  I don't know if they do or not.  I don't know.
10      Q.  Did you get a bonus check in 2005 from Dover
11   Downs?
12      A.  Yes.
13      Q.  To your knowledge, does everybody get these
14   bonus checks?
15      A.  The way I understand it, you have to be there a
16   certain -- a year before you receive a bonus check.
17      Q.  If you're there a year, are you entitled to a
18   check?
19      A.  The way I understand it.
20      Q.  Is there any circumstance where you would not
21   receive a bonus check?
22      A.  If you've been written up for anything.
23      Q.  Do you know of anybody who hasn't received a
24   bonus check?
```

Page 16

```
 1
 2
 3
 4
 5
 6
 7
 8          REPLACE THIS PAGE
 9
10          WITH THE ERRATA SHEET
11
12          AFTER IT HAS BEEN
13
14          COMPLETED AND SIGNED
15
16          BY THE DEPONENT.
17
18
19
20
21
22
23
24
```

Page 15

```
 1      A.  No.
 2      Q.  Do you know anybody that has received a bonus
 3   check even though they have been written up?
 4      A.  No.
 5          MR. WILSON:  I think that's all I have.
 6          MR. ELLIS:  I have no questions.
 7          (The deposition was then concluded at
 8   12:30 p.m.)
 9              - - - - -
10          INDEX TO TESTIMONY
11
12
13   ROBERT ALLEN KNOTTS                      PAGE
14   Examination by Mr. Wilson                  2
15
16              - - - - -
17          INDEX TO EXHIBITS
18
19   (There were no exhibits marked for identification.)
20
21              - - - - -
22
23
24
```

Page 17

```
 1   State of Delaware  )
 2                      )
 3   New Castle County  )
 4
 5          CERTIFICATE OF REPORTER
 6
 7          I, Kathleen White Palmer, Registered Merit
     Reporter and Notary Public, do hereby certify that there
 8   came before me on the 11th day of April, 2006, the
     deponent herein, ROBERT ALLEN KNOTTS, who was duly sworn
 9   by me and thereafter examined by counsel for the
     respective parties; that the questions asked of said
10   deponent and the answers given were taken down by me in
     Stenotype notes and thereafter transcribed into
11   typewriting under my direction.
12          I further certify that the foregoing is a
     true and correct transcript of the testimony given at
13   said examination of said witness.
14          I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
15   interested in the event of this suit.
16
17
18
19          Kathleen White Palmer, RPR, RMR
                Certification No. 149-RPR
20              (Expires January 31, 2008)
21
     DATED:  April 13, 2006
22
23
24
```

**B-0256**

5 (Pages 14 to 17)