IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,           )
                                   )
            Plaintiff,             )
                                   )
v.                                 )   Civil Action No.
                                   )    05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS)
GAMING & ENTERTAINMENT INC.,   )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,     )
INC.,                              )
                                   )
            Defendants.            )


        Deposition of WILLIAM ROBERT MORRISON taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 1:15 p.m. on Tuesday, April 11, 2006, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.

APPEARANCES:

            TIMOTHY J. WILSON, ESQUIRE
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware  19899
              for the Plaintiff

            EDWARD T. ELLIS, ESQUIRE
            MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
              123 South Broad Street
              Philadelphia, Pennsylvania  19109
              for the Defendants

    -------------------------------------------------
            WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477

B-0257

Thompson
William Robert Morrison

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 2

1  ALSO PRESENT:
2      BRANCE F. THOMPSON, SR.
3          - - - - -
4          WILLIAM ROBERT MORRISON,
5      the witness herein, having first been
6      duly sworn on oath, was examined and
7      testified as follows:
8  BY MR. WILSON:
9      Q.  Good afternoon, Mr. Morrison.  We met earlier,
10  but my name is Tim Wilson.  I'll just introduce myself
11  again.
12      **A.  Hello, Tim.**
13      Q.  I'm Brance Thompson's attorney in this case
14  against Dover Downs.
15          I would just like to give you a couple
16  instructions about the deposition before we start.
17          I'm going to be asking you questions
18  pertaining to the lawsuit.  When you respond, you must do
19  so verbally so the court reporter can take down your
20  responses.  It's difficult for her to take down head nods
21  and things such as un-huhs and mm-hmms.  So if you could
22  try to do that, that would be appreciated.
23          As you know, your testimony is under oath,
24  so you must answer truthfully just as if you were in

Page 3

1  court.
2          If you don't hear a question or don't
3  understand it, let me know and I will ask it again or
4  explain it.
5          Please let me finish asking the question
6  before you answer and I will attempt to let you finish
7  your answer before I ask another question.  That way we
8  can make the transcript clear.
9          If at any time you come to realize that a
10  statement you made is incorrect or inaccurate, just let
11  me know and you will be permitted to clarify the record.
12          You cannot talk or confer with your
13  attorney during the deposition, either in here or during
14  breaks.
15          If at any time you should need a break,
16  just let me know and we will accommodate you.
17          Do you understand these instructions?
18      **A.  Yes, sir.**
19      Q.  Where were you born, Mr. Morrison?
20      **A.  I was born in Kingwood, West Virginia.**
21      Q.  I'm a West Virginian, myself.
22          Kingwood.  That's by --
23      **A.  Preston County, out from Morgantown.**
24      Q.  Oh, okay.

Page 4

1      **A.  Hazelton.**
2      Q.  That's where I went to school.
3      **A.  I'm from central West Virginia, Sutton.**
4      Q.  What's your birth date?
5      **A.  11 May 1957.**
6      Q.  Your address?
7      **A.  1076 Brownville Road, Harrington, Delaware,**
8  **19952.**
9      Q.  How long have you lived there?
10      **A.  I've lived there since 1994.**
11      Q.  Do you own?
12      **A.  Yes.**
13      Q.  Have you ever been arrested?
14      **A.  No.**
15      Q.  Did you serve in the military?
16      **A.  Yes.**
17      Q.  What branch?
18      **A.  Army.**
19      Q.  How long were you in there?
20      **A.  Twenty-one years.**
21      Q.  What was your final rank?
22      **A.  I was a master sergeant, E-8.**
23      Q.  When did you get out of the military?
24      **A.  I retired 1 April 1996.**

Page 5

1      Q.  Did you graduate from high school?
2      **A.  Yes.**
3      Q.  Was that in West Virginia?
4      **A.  Yes.**
5      Q.  What was the high school?
6      **A.  Braxton County Senior High School.**
7      Q.  What year?
8      **A.  1975.**
9      Q.  Did you go to college?
10      **A.  I've taken college courses.  I've not finished**
11  **college courses to receive a degree.**
12      Q.  Where did you take college courses?
13      **A.  Northern Virginia Community College, and also**
14  **Park University.  Both of those had satellites at**
15  **Fort Myer, Virginia.**
16      Q.  Is that Park University?
17      **A.  Yes.  Used to be Park College, is now Park**
18  **University.**
19      Q.  P-a-r-k?
20      **A.  Yes.**
21      Q.  What type of courses did you take?
22      **A.  Criminal justice administration.**
23      Q.  Do you know how many credit hours you took?
24      **A.  Thirty, approximately.**

2 (Pages 2 to 5)

B-0258

Thompson                                                              Dover Downs
William Robert Morrison              v.                               April 11, 2006
                              C.A. # 05-274 (GMS)

Page 6

1   Q.  Were you working towards a degree?
2   A.  Yes.
3   Q.  An associate's degree?
4   A.  Yes.
5   Q.  Any other education beyond that?
6   A.  Other than military, United States Army, the
7   different courses they sent me to to -- I've also been to
8   drill sergeant school which teaches you different aspects
9   of training instructor.
10  Q.  That was in the Army?
11  A.  Yes.
12  Q.  When did you take the college courses?  Was that
13  prior to entering the Army or after?
14  A.  After entering the Army.
15  Q.  While you were in the Army?
16  A.  Yes.
17  Q.  Are you taking any medications today that would
18  impair your ability to provide your testimony and give
19  truthful answers?
20  A.  No.
21  Q.  Have you given a deposition before?
22  A.  Yes.
23  Q.  Do you recall what the case was?
24  A.  Wrongful discharge, I guess, of work.

Page 7

1   Q.  Do you recall the title of the case?
2   A.  It was the Williams Peters case.
3   Q.  Was that against Dover Downs?
4   A.  Yes.
5   Q.  How long ago was your deposition?
6   A.  Long in time?
7   Q.  No.  How long ago did you give your deposition?
8   A.  It's probably been a month, a couple months.
9   Q.  What type of case is Williams Peters?  It's a
10  wrongful discharge.  Okay.  My apologies.
11      Are you presently employed by Dover Downs?
12  A.  Yes.
13  Q.  What's your job title?
14  A.  My job title is facility grounds maintenance
15  manager.
16  Q.  What does a facility grounds maintenance manager
17  do?
18  A.  He basically oversees the outside areas of the
19  physical main structure, which is the hotel, casino,
20  enclosed grandstand, and harness.  We also take care of
21  the NASCAR track.  We take care of all the grounds areas
22  such as the roadways, all exterior structures of Dover
23  Downs, Dover International Speedway property.
24  Q.  Pretty much everything outside?

Page 8

1   A.  Yes.
2   Q.  How long have you held that position?
3   A.  I went into that position November of 2003.
4   Q.  What did you do prior to that?
5   A.  I used to be the building maintenance supervisor
6   for the swing shift.
7   Q.  The swing shift is 3:00 to 11:30?
8   A.  That's correct, sir.
9   Q.  Is that for inside maintenance or outside
10  maintenance?
11  A.  That was for inside maintenance.  And if I can
12  clarify, during that period of time we did extend
13  personnel into the night shift, also, while I was there.
14  But initially it started off swing shift and then moved
15  on.  We had people working on the actual night shift
16  which reported to me.
17  Q.  Were you the initial supervisor when they
18  started the swing shift?
19  A.  Yes.
20  Q.  When did the swing shift start?
21  A.  I came on board with building maintenance in
22  March of 2001, at which time I become the swing shift
23  supervisor.
24  Q.  How many employees did you have working under

Page 9

1   you on the swing shift?
2   A.  At that time?
3   Q.  Yes.
4   A.  One.
5   Q.  Did that grow?
6   A.  Yes.
7   Q.  What's the most employees you had working for
8   you on the swing shift?
9   A.  Five.
10  Q.  How many employees do you currently have working
11  for you?
12  A.  I have 12.
13  Q.  Does that include the building maintenance
14  supervisors?
15  A.  No.
16  Q.  These are just -- go ahead.  Finish your answer.
17  A.  These personnel work for me in the outside
18  maintenance division.
19  Q.  So is it fair to say that you don't supervise
20  the inside maintenance managers?
21  A.  Maintenance managers or maintenance supervisors?
22  Q.  Maintenance supervisors.
23  A.  Not in my present position unless I was called
24  in there if at the time if the manager, Mr. Duncan, was

B-0259

3 (Pages 6 to 9)

Thompson
William Robert Morrison

v.
C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 10

1  gone or for some reason. I have been in there on
2  occasion and assisted when I think they went to a funeral
3  to continue to have things running while they went to a
4  funeral.
5      Q.  When did you begin working at Dover Downs?
6      A.  I started working at Dover Downs 3 March 1997.
7      Q.  What did you do then?
8      A.  I was a security officer.
9      Q.  Did you hold that position until you became the
10 swing shift supervisor?
11     A.  No.
12     Q.  What did you do after the security --
13     A.  I worked in security and then I became a
14 surveillance operator in the -- it's also under the
15 security division, but it's a different section.
16     Q.  Any other positions with Dover Downs?
17     A.  Yes. While also working in the surveillance
18 division, I become their maintenance technician and moved
19 more toward the maintenance side installing cameras,
20 fixing equipment.
21     Q.  What did you do to prepare for today's
22 deposition?
23     A.  I had an interview with my lawyer and that was
24 about it.

Page 11

1      Q.  Do you mean Mr. Ellis here?
2      A.  Yes.
3      Q.  Did Mr. Ellis show you any documents?
4      A.  Yes.
5      Q.  Do you recall what documents they were?
6          MR. ELLIS: I'm going to object and
7  instruct him not to answer. What I showed him is my work
8  product, and under the Third Circuit law you can't
9  inquire as to what I selected to show him.
10         MR. WILSON: If they are documents that are
11 produced, it's not work product, though.
12         MR. ELLIS: What I selected, regardless of
13 whether it's produced or not, is my work product. If
14 there are 100 documents and I select three to give him,
15 that's my work product. You're not entitled to that.
16         MR. WILSON: Okay. I'm not going to make a
17 big deal out of it.
18 BY MR. WILSON:
19     Q.  Did you talk to anybody other than your attorney
20 to prepare for this deposition?
21     A.  No.
22     Q.  Have you talked to anybody about this lawsuit
23 even though it wasn't in preparation for the deposition?
24     A.  No.

Page 12

1      Q.  No employees at Dover Downs you haven't spoke of
2  the lawsuit?
3      A.  In reference to this case?
4      Q.  Yes.
5      A.  No.
6      Q.  Are you aware of Mr. Thompson's lawsuit?
7      A.  Yes.
8      Q.  How did you come to become aware of the lawsuit?
9      A.  Earlier last year, I believe it was last year
10 sometime, a Miss Hankinson contacted me and was asking
11 me -- I guess she's a company lawyer, also -- asking
12 questions about Mr. Thompson's employment.
13     Q.  What is your understanding of this lawsuit?
14     A.  My understanding is that Mr. Thompson, at least
15 on my part, thought he should have gotten a job that he
16 didn't.
17     Q.  Do you have an understanding as to what the base
18 of his claim is?
19     A.  Not really.
20     Q.  Are you aware that this is an age discrimination
21 case?
22     A.  I am now.
23     Q.  Were you prior to me saying that?
24     A.  Not really. I thought it was because he didn't

Page 13

1  get a certain job that was posted in our division.
2      Q.  When you were the swing shift supervisor, you
3  said that at some point individuals were put on the third
4  shift?
5      A.  Yes.
6      Q.  Correct?
7      A.  Yes.
8      Q.  Is that shift from 11:00 to 7:30?
9      A.  Yes.
10     Q.  Was Mr. Thompson one of those individuals?
11     A.  Yes, he was.
12     Q.  Were you his immediate supervisor when he was on
13 that shift?
14     A.  I was.
15     Q.  But you continued to work second shift; correct?
16     A.  That's correct.
17     Q.  Was there any layover between your shift, the
18 ending of your shift and the beginning of the third
19 shift?
20     A.  Yes.
21     Q.  How much time?
22     A.  About 30 minutes.
23     Q.  Besides Mr. Thompson, who else was working on
24 the shift when it initially started?

4 (Pages 10 to 13)

Thompson                                    v.                              Dover Downs
William Robert Morrison            C.A. # 05-274 (GMS)                      April 11, 2006

Page 14

1    A. Initially it was Mr. Thompson by hisself and
2    then we was able to get more people in and Kevin Gorlich
3    was assigned over there and a Nate Whitecomb.
4    Q. When there was the overlap between the ending of
5    your shift and the beginning of the third shift, did you
6    have conversations with Mr. Thompson?
7    A. I did.
8    Q. What did these conversations consist of?
9    A. Of what his work assignments would be that night
10   and what the people that would be working with him would
11   be doing.
12   Q. When Mr. Gorlich and Mr. Whitecomb started on
13   third shift, did you have the same discussions with them?
14   A. Well, we talked as a group normally.
15   Mr. Thompson was a Mechanic I. The other two individuals
16   were Mechanic II and III, whereas Mr. Thompson would have
17   the ability to direct them or, you know, have them assist
18   him in his job.
19   Q. Is that by virtue of his capacity as a
20   Mechanic I?
21   A. That is correct.
22   Q. So Mechanic I is a higher position than a
23   Mechanic II or Mechanic III?
24   A. Correct. At our location Mechanic III is the

Page 15

1    entry level. Mechanic I is the highest level in the
2    mechanic levels.
3    Q. Is there anything higher than a Mechanic I?
4    A. Supervisor.
5    Q. That's what you were?
6    A. Yes.
7    Q. Did you tell Mr. Whitecomb and Mr. Gorlich that
8    they were under Mr. Thompson's supervision at this time?
9    A. I would say yes because as a Mechanic I, he
10   would be able to lead them, supervise them.
11   Q. How specific was your direction to Mr. Thompson
12   as to the tasks that he was to complete?
13        MR. ELLIS: Objection to the form of the
14   question.
15        MR. WILSON: Let me see if I can ask it a
16   different way.
17   BY MR. WILSON:
18   Q. In the half hour that you had with Mr. Thompson,
19   did you walk around and show him exactly what had to be
20   done, or would you just communicate and say, hey, we need
21   to take care of this area and things of that nature?
22   A. Due to Mr. Thompson's knowledge of the property
23   and the area and the casino, we did it both ways. We
24   went out and looked at different areas such as columns,

Page 16

1    or if it was in a cage area, secure area, we'd go out and
2    look at it. On most occasions after we initially did
3    that, I didn't really have to take Mr. Thompson out. He
4    knew what had to be done. He had a good idea of the
5    areas that we were trying to renovate as far as the faux
6    painting.
7    Q. Is that primarily what they did on third shift,
8    was the faux painting?
9    A. Yes.
10   Q. Did they do anything else besides --
11   A. Yes.
12   Q. What else did they do?
13   A. Well, since the casino stayed open until 2:00,
14   they would be responsible to any maintenance calls that
15   might come in. If the kitchen was still open, they would
16   respond to those calls. If there was trouble on the
17   floor such as a casino machine, hopper, or something with
18   a door or something off on the storage cabinets, they
19   would repair those. Any other type maintenance calls
20   that might come up that they might be able to assist in.
21   Q. If one of those maintenance calls came up, would
22   somebody contact Mr. Thompson and ask him to address it?
23   A. They wouldn't probably contact Mr. Thompson
24   directly. They would probably do a general maintenance

Page 17

1    call. We have communication via radio. And if it came
2    in, it would either come in a couple ways. It would come
3    in face-to-face or it would come into either the radio or
4    come in telephonically.
5        And once you received what the problem was,
6    then a decision would be made of who would go out and do
7    it. I mean, with Mr. Thompson being the Mechanic I, if
8    it was something a Mechanic II or III could do, he could
9    tell them to go out and do it, yes.
10   Q. Would it be fair to say that it was at his
11   discretion as to how to handle these instances that
12   happened on third shift?
13   A. To a certain point. If it was something out of
14   his scope as a Mechanic I, he would be required to
15   contact myself or Mr. Duncan.
16   Q. When a job opening occurs in the maintenance
17   department, the job is posted; correct?
18   A. Internally, yes.
19   Q. What do you mean by "internally"?
20   A. Well, any job positions that normally get posted
21   at Dover Downs normally get posted internally for
22   internal employees to apply for. That's usually posted
23   for five days, working days.
24   Q. Is this so the internal employees have an

B-0261

5 (Pages 14 to 17)

Thompson
William Robert Morrison

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 18

1    opportunity to bid on a job or apply for a job prior to
2    people who are not employees applying for the job?
3    **A. That's correct.**
4        Q.  If a qualified applicant that's a current Dover
5    Downs employee applies, is he given preference over the
6    person who is not a Dover Downs employee?
7    **A. Say that again, please.**
8        Q.  If a current Dover Downs employee bids on a job
9    posting, is he given preference as to getting that job
10   over somebody who is not a current Dover Downs employee?
11   **A. He does if he has the job requirements that**
12   **you're looking for, yes.**
13       Q.  This policy or whatever you call it to give
14   preference to the inside applicants, is that in any type
15   of written material, or is that just a custom or policy
16   at Dover Downs?
17   **A. Evidently it's something in HR. Any postings we**
18   **have has to be posted inside normally to give the**
19   **opportunity for growth within the company. And again, if**
20   **the individual has the, you know, qualifications that**
21   **you're looking for, then he has first shot at the**
22   **position.**
23       Q.  So is that the purpose of the inside posting, is
24   to provide growth for the Dover Downs employees?

Page 19

1    **A. Growth and advancement to the internal**
2    **employees, yes.**
3        Q.  Have you ever communicated this policy to Dover
4    Downs employees?
5    **A. Yes. I encourage all employees to apply for**
6    **positions that are above what they work at.**
7        Q.  In 2001, what were the minimum requirements to
8    qualify for a job as a supervisor in building
9    maintenance?
10   **A. In 2001?**
11       Q.  Yes.
12   **A. I believe it was six to ten years either working**
13   **in the different trades, high school diploma to cap it**
14   **off. There's a number of other ones, but I don't recall**
15   **right now.**
16       Q.  Are those the major ones?
17   **A. Yes.**
18       Q.  When you say six to ten years in the trade, do
19   you mean the trades that practice at Dover Downs?
20   **A. We have a number of trades. Either it could be**
21   **landscaping, it could be machinist, it could be**
22   **carpentry, it could be electrical, it could be plumbing.**
23       Q.  Say, for instance, you had two years in at one
24   particular trade, two years in another particular trade,

Page 20

1    and three years in another particular trade.  Would those
2    be combined to meet the six to ten years experience in
3    the trades?
4    **A. Well, it could, but it most likely is looked at**
5    **that way. Depends on what you're looking for. I mean,**
6    **you mentioned the supervisor. The supervisor would have**
7    **to be normally well -- you know, well-versed in different**
8    **trades. So though he doesn't have to be the expert in**
9    **the trades, but he does need to be able to know that, and**
10   **also perceive quality of work.**
11       Q.  I would like to show you a document that has
12   been previously marked as Duncan Exhibit 5.  If you could
13   take a look at that and let me know when you're done.
14   **A. (The witness reviews the document.) Okay.**
15       Q.  At this time you were the supervisor for the
16   swing shift; correct?
17   **A. That's correct.**
18       Q.  Do you recall this job posting being put up?
19   **A. For what particular time?**
20           MR. ELLIS:  Look at the bottom.
21           MR. WILSON:  Yes.
22   BY MR. WILSON:
23       Q.  The posting date is October 19th, 2001, to
24   October 24th, 2001.

Page 21

1            MR. ELLIS:  The question is does he
2    remember this posting?  Is that the question pending?
3            MR. WILSON:  Yes.
4    **A. If this is -- if this is possibly for the night**
5    **shift -- yes, I know we did post for a supervisor for**
6    **night shift.**
7    **BY MR. WILSON:**
8        Q.  If you look at the top where it says
9    "Hours/Shift," it says 11 p.m. to 7:30 a.m., that is --
10   **A. The night shift, yes.**
11       Q.  Does this outline the qualifications of an
12   employee who would be considered for this position?
13   **A. Yes.**
14       Q.  Do you know what salary this job paid?
15   **A. At that time?**
16       Q.  Yes.
17   **A. 2001, that's about the time I started, I think**
18   **it was like 32,000.**
19       Q.  Do you know how much that position would pay
20   today?
21   **A. It starts at 36,000, I believe, today. 35 or**
22   **36,000.**
23       Q.  A person who would have been in this position
24   for approximately four and a half years, would they be at

6 (Pages 18 to 21)

Thompson                                            v.                                          Dover Downs
William Robert Morrison                      C.A. # 05-274 (GMS)                        April 11, 2006

Page 22

1    $36,000 or would they be higher than that?
2              MR. ELLIS: Object to the form of the
3    question.
4         Q. You can answer.
5         A. Depends on their evaluations. Their yearly
6    increases is based on performance and evaluations.
7         Q. Okay.
8         A. And it depends on whether it's 0 percent or at
9    the time the highest we're at is possibly 4 percent with
10   a letter going to the president of the company.
11        Q. So if a person got no raises, they would be
12   making $36,000 now?
13        A. He would be -- now they would, yes.
14        Q. Okay.
15        A. At the present time because the base pay for a
16   supervisor has increased.
17        Q. Do you know why this job was posted?
18        A. We had approval, my understanding is, from HR in
19   manning and staffing to hire a supervisor, a third
20   supervisor.
21        Q. Mr. Thompson applied for this position; correct?
22        A. At one time I encouraged him to apply for it and
23   my understanding, I think he did apply, but I think he
24   also withdrew, my conversations with him.

Page 23

1         Q. Why did you encourage him to apply?
2         A. Because as a Mech I, his next level would be to
3    move up if he's qualified.
4         Q. Did you think he was qualified?
5         A. With his painting skills, I thought he was, yes.
6    And with being able to lead a work force on the night
7    shift as he did, I didn't feel that he'd have a problem.
8         Q. Did he do a good job leading the work force on
9    night shift?
10        A. When he worked for me, yes, he did a good job.
11        Q. Do you believe he met the requirements that are
12   on this job posting that's marked Duncan Exhibit 5?
13        A. In the -- as it's stated there with the
14   requirements, I thought he did, yes.
15        Q. Did you indicate to Mr. Thompson that you
16   thought he would get the job --
17        A. No.
18        Q. -- if he put in for it?
19        A. Well, he was already working on the night shift.
20   He had a good shot at it. But I can't guarantee, you
21   know, what the decision maker is going to do, and the
22   decision maker is Mr. Duncan. I can give my
23   recommendations.
24        Q. Did Mr. Duncan ask you for your recommendations?

Page 24

1         A. I believe he probably did.
2         Q. Did you recommend Mr. Thompson for the job?
3         A. If I was asked, I would have recommended
4    Mr. Thompson, yes.
5         Q. Was anybody awarded the job at this time
6    following this job posting?
7         A. I believe a Mr. Cheshack, I think he took that
8    job.
9         Q. Who is he?
10        A. Mr. Cheshack is also another Mech I who started
11   out on the swing shift with me when it started in March
12   of 2001.
13        Q. Did you supervise Mr. Thompson on the third
14   shift?
15        A. He would have if he'd been over there as a
16   supervisor, yes.
17        Q. Was he over there as a supervisor?
18        A. I believe he was, yes.
19        Q. What does Mr. Cheshack do now?
20        A. Mr. Cheshack is no longer with the company.
21        Q. Why is that?
22        A. He was -- my understanding, he received or went
23   out and got another job which paid more money.
24        Q. Do you know how long he was on third shift?

Page 25

1         A. I'm not sure of the exact dates. I believe he
2    was still there when I left to go outside, to outside
3    maintenance in November of 2003. His exact departure,
4    I'm not really sure on the date.
5         Q. When Mr. Cheshack was awarded the job, did
6    Mr. Thompson ever ask you why he didn't get the job?
7         A. I think Mr. -- he might have and, as I recall,
8    Mr. Thompson withdrew his application. I don't even
9    believe he was interviewed. He withdrew his application
10   before that process.
11        Q. Do you know why he withdrew his application?
12        A. He had his reasons. I'm not really sure.
13        Q. Was Al Baldwin ever made the supervisor for the
14   third shift?
15        A. Mr. Baldwin was for a period of time, yes.
16        Q. In relation to the 2001 job posting, do you know
17   approximately how much after the 2001 job posting there
18   was before Mr. Baldwin began as a third shift supervisor?
19        A. I don't recall.
20        Q. When Mr. Baldwin got the job, had it been
21   posted?
22        A. I believe it was, yes.
23        Q. Do you have a recollection of it being posted?
24        A. By virtue of him getting the job, there had to

B-0263

7 (Pages 22 to 25)

Thompson                                      v.                          Dover Downs
William Robert Morrison            C.A. # 05-274 (GMS)                  April 11, 2006

Page 26

1  be some type of posting, I would say.
2      Q.  But you don't have a specific recollection of
3  it?
4      A.  No, sir.
5      Q.  Do you know of anybody else who applied for the
6  job at the same time as Al Baldwin?
7      A.  Did we have a date on that when Mr. Baldwin
8  applied for this job?
9      Q.  No.
10     A.  I don't even know -- well, I do.  I believe I
11 was still there when Mr. Baldwin was supervisor, and I'm
12 not really sure who all applied for that position.
13 Mr. Duncan would know that.  I probably would not be
14 privy to that information of everybody that had applied.
15     Q.  Were you familiar with Mr. Baldwin's
16 qualifications for the job?
17     A.  I know he was our carpenter and had worked in
18 the trade for a number of years.
19     Q.  Did he have the six to ten years' experience?
20     A.  I did not see his qualifications, so I couldn't
21 tell you if he had had that much time, but I know he had
22 a period of time by virtue of him being a Mechanic I in
23 different trades.
24     Q.  Do you know how long he had been a Mechanic I

Page 27

1  before his promotion?
2      A.  I had understood that he had worked for
3  Mr. Duncan before I had come over there, I believe either
4  Mech II or Mech I.  For the time frame, I'm not really
5  sure.
6      Q.  Do you know if he had a high school diploma or
7  equivalent?
8      A.  I do not.
9      Q.  Do you know where Mr. Baldwin worked prior to
10 working at Dover Downs?
11     A.  I do not.
12     Q.  Do you know if he had any trade school training?
13     A.  Formal training?
14     Q.  Yes.
15     A.  I do not.
16     Q.  Is Mr. Baldwin a Dover Downs employee today?
17     A.  I believe he is.  I haven't been inside lately.
18 I haven't seen him recently, but I believe he's still
19 employed with Dover Downs.
20     Q.  Is he a supervisor?
21     A.  No.
22     Q.  Do you know why?
23     A.  My understanding presently, I know the three
24 supervisors are in place now, so my understanding there

Page 28

1  was only three authorized positions for inside in their
2  field right now.
3      Q.  So you don't know why he's no longer a
4  supervisor other than the positions are already filled?
5      A.  That would be a question probably needed to be
6  directed to Mr. Duncan who was the manager at the time.
7      Q.  Who are the current supervisors?
8      A.  First shift you got Mr. Steven Homlish, second
9  shift you got a Mr. Jimmy Shreves, and then third shift
10 you got a Mr. Bill Carlisle.
11     Q.  Were all of these three gentlemen supervisors
12 before Mr. Baldwin?
13     A.  Mr. Homlish was.  I believe that was the only
14 one it was.  I'm not sure -- like I said, I don't recall
15 the time frame.  They might have been.
16     Q.  Did you ever have any discussions with Al
17 Baldwin about this position?
18     A.  What position?
19     Q.  The third shift supervisor job prior to him
20 being awarded that job.
21     A.  I don't recall, no.
22     Q.  I'd like to switch gears to a different
23 position.
24         MR. ELLIS:  Excuse me.

Page 29

1         (Discussion off the record.)
2  BY MR. WILSON:
3      Q.  Are you aware of a job posting in 2004 for a
4  shift supervisor for the second shift?
5      A.  I'm probably vaguely aware of it.  Other than
6  maybe encouraging my people to apply for it, I -- it
7  wouldn't impact me that much if it was posted there.
8      Q.  But that was a position that you had held;
9  correct?
10     A.  2004?
11     Q.  Prior to 2004.
12     A.  When prior to 2004?
13     Q.  I believe you testified that you went outside in
14 2003; right?
15     A.  November, correct.
16     Q.  So prior to November 2001, that was your
17 position?
18     A.  Say the question again.
19     Q.  Prior to November 2003, you were the second
20 shift supervisor?
21     A.  That's correct.
22     Q.  Who succeeded you in that position in November
23 2003?
24     A.  I think Dean Cheshack did.

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

B-0264

Thompson                                    v.                        Dover Downs
William Robert Morrison              C.A. # 05-274 (GMS)              April 11, 2006

Page 30

1    Q.  Do you recall if this job was posted for five
2    days?
3        A.  I would say yes, it was.
4        Q.  Do you have knowledge of that or are you just
5    assuming that because that's the policy?
6        A.  Well, that was the policy.  Once I went out to
7    outside maintenance, basically, you know, I kind of
8    detached myself a little bit about the internal workings
9    of the inside maintenance division.
10       Q.  Did Mr. Thompson approach you and talk to you
11   about him applying for the job?
12       A.  Supervisor?
13       Q.  Yes.
14       A.  I don't recall, but he might have.
15       Q.  Do you recall that the job had been promised to
16   a gentleman named Jim Shreves?
17       A.  To my recollection, no jobs were promised to
18   anyone.  There was a process that had to be gone through,
19   interviews and qualifications, experience on the job.  As
20   far as your terminology of promise, no.
21       Q.  Did Mr. Shreves get the job?
22       A.  And which position is this again?
23       Q.  This is the second shift supervisor in March of
24   2004.

Page 31

1        A.  I know he's the present -- like I said, I
2    believe Dean Cheshack got the job.  I think.  It's been
3    so long I forgot.
4        Q.  After you?
5        A.  Yes.
6        Q.  Then this job posting would have been sometime
7    later; correct?
8        A.  Yes.
9        Q.  In the interviewing process, does it ever happen
10   that a candidate is told that he is getting the job prior
11   to the posting period ending?
12           MR. ELLIS:  Object to the form of the
13   question.
14       A.  I would not think so, especially if interviews
15   are still ongoing.  I just don't think it would be, no.
16       Q.  Do you have any knowledge of anybody
17   communicating to Jim Shreves that he got this job before
18   the posting was over?
19       A.  No.
20       Q.  Would the job requirements have changed
21   significantly for a shift supervisor from the posting we
22   looked at from 2001 that is Duncan Exhibit 5 to March of
23   2004?
24       A.  Is that the exhibit I got in front of me?

Page 32

1        Q.  Yes.
2        A.  I wouldn't think so.
3        Q.  You wouldn't think so meaning they wouldn't have
4    changed significantly?
5        A.  I do not believe they did change significantly,
6    if they did.
7        Q.  Did Jim Shreves possess all the necessary
8    requirements?
9            MR. ELLIS:  Object to the form of the
10   question.
11       Q.  If you applied them to the 2001 job posting.
12       A.  I know Mr. Shreves worked in a housing complex
13   and was a maintenance person for that complex.  The exact
14   number of years and so forth, I don't recall.  Without
15   seeing his -- at the time or seeing any further
16   documentation, I couldn't tell you exact what his
17   qualifications were.
18       Q.  Do you know if he had a high school diploma or
19   equivalent?
20       A.  I believe he did, yes.
21       Q.  Was he currently working at Dover Downs when he
22   applied for this job?
23           MR. ELLIS:  Object to the form of the
24   question.

Page 33

1        A.  Which job?
2        Q.  Mr. Shreves.
3        A.  Which job are we -- the supervisor?
4        Q.  Yes, the supervisor job.
5        A.  Yes.  If he applied for a supervisor position,
6    yes, he would have already been working at Dover Downs.
7        Q.  Do you recall what his job title was at that
8    time?
9        A.  When applying for the supervisor --
10       Q.  Yes.
11       A.  I would say he'd have been a Mechanic I
12   probably.
13       Q.  Do you know how long he had been a Mechanic I?
14       A.  What was the date again?
15       Q.  This was March of 2004.
16       A.  I'm not sure.  I can't recall his promotion
17   record.
18       Q.  Would you say more than a year?
19           MR. ELLIS:  Object to the form of the
20   question.
21       A.  I can't recall.
22       Q.  Do you know if Mr. Shreves had trade school
23   training?
24       A.  I believe he did.  In West Virginia he did some

B-0265

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Thompson
William Robert Morrison

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 34

1  trade school, I understood.
2     Q.  Is there an individual at Dover Downs who is
3  responsible for entering information regarding employees
4  specifically when an employee changes one job title to
5  another, a person who's responsible for changing that
6  information in a computer system?
7     A.  I'm not sure who the exact person is, but I
8  would say if anyone would, it would be the HR department,
9  which would also impact payroll.
10    Q.  I'm going to shift a little bit again here.
11       Are you aware of a job posting for a
12 Maintenance Mechanic I on first shift in 2004?
13       MR. ELLIS:  You are talking about for
14 outside maintenance now?
15       MR. WILSON:  Yes.
16    A.  What was the position?  Mechanic I?
17 BY MR. WILSON:
18    Q.  Yes.
19    A.  Probably so.  I ended up losing some mechanics,
20 yes.
21    Q.  Do you recall Mr. Thompson applying for a
22 Maintenance Mechanic I job outside in 2004?
23    A.  Maintenance Mechanic I?  I don't recall one.
24 I think a II he was looking at at one time.  2004, March.

Page 35

1     Q.  I don't know if this was March.  This may have
2  been later in 2004.
3     A.  I don't recall in March him applying for a job
4  at outside maintenance?
5        MR. ELLIS:  Are you talking about Duncan 6?
6        MR. WILSON:  Yes.
7  BY MR. WILSON:
8     Q.  Can you look at Exhibit 6, entitled Duncan 6?
9     A.  That would be in this pile?
10    Q.  Yes.
11    A.  (The witness reviews the document.)  Okay, yes.
12    Q.  Do you recall Mr. Thompson applying for this
13 job?
14    A.  Yes.
15    Q.  Did you have a conversation with Mr. Thompson
16 regarding this job?
17    A.  I had an interview with Mr. Thompson, yes.
18    Q.  What was said at the interview?
19    A.  We did the interview process going down all the
20 jobs and also his experiences.
21    Q.  Did you think Mr. Thompson could handle the job?
22    A.  The only weak spot I thought with Mr. Thompson
23 was the plumbing, which at the time I was looking for a
24 plumber who was working in the trade more and with more

Page 36

1  experience.  With the amount of time, I got the
2  experience and observed Mr. Thompson inside, he did do
3  light plumbing on a number of things, water coolers,
4  steamers and so forth.
5        But the responsibility of the different
6  systems that we had in the plumbing out at the outside
7  maintenance, I did not feel that he met those
8  requirements.  And one of those, again, was being able to
9  multitask, which if you're not aware, we winterize all
10 our plumbing fixtures in the outside maintenance division
11 area, NASCAR and so forth, and also bring them back up in
12 the springtime.
13    Q.  Did you think that physically Mr. Thompson could
14 handle the job?
15    A.  Yes.
16    Q.  Did you tell Mr. Thompson that it was a hot,
17 heavy job?
18    A.  I explained to Mr. Thompson that I have worked
19 in the building for a number of years and come outside
20 and it was a different experience for me from being in
21 HVAC all the time.  And I did briefly talk to
22 Mr. Thompson about the extremes of weather out there,
23 yes.
24    Q.  What about the heaviness of the job?

Page 37

1     A.  Heaviness --
2     Q.  Did you tell him that it was a heavy job?
3     A.  When you say "heavy," can you give me a
4  definition of "heavy"?
5     Q.  Did you say that to Mr. Thompson, that it was a
6  heavy job?
7     A.  I conveyed to Mr. Thompson that it entailed
8  several different taskings to get the job done, yes.
9     Q.  Such as?
10    A.  The different water systems we had such as the
11 water valves, the different pumps that we maybe had out
12 there that would have to be reenergized or basically
13 brought back online every year.  I probably touched base
14 on the number of toilets, hoppers, and stuff that we had.
15    Q.  Did you indicate that it would involve heavy
16 lifting?
17    A.  If I did, it would be basically what's on the
18 job description.
19    Q.  Is it your testimony that the main reason
20 Mr. Thompson did not get the job is because he didn't
21 have the requisite plumbing skills?
22    A.  That's correct.
23    Q.  I would like to refer you to a couple documents.
24       MR. WILSON:  I would like to have this

10 (Pages 34 to 37)

Thompson                                       v.                              Dover Downs
William Robert Morrison              C.A. # 05-274 (GMS)              April 11, 2006

Page 38

1   marked as Morrison Number 1.
2          (Morrison Exhibit 1 was marked for
3   identification.)
4   BY MR. WILSON:
5      Q.  Take your time and look at that document and let
6   me know when you're done.
7      A.  (The witness reviews the document.)  Okay.
8      Q.  What is this, Mr. Morrison?
9      A.  It's a recommendation for Employee of the Month
10  for Mr. Thompson.
11     Q.  Did you prepare this?
12     A.  I did.
13     Q.  Is that your signature on the last page?
14     A.  It is.
15     Q.  In the first paragraph it appears you wrote,
16  referring to Mr. Thompson, "He is also our primary
17  plumber, carpenter, and electrician, on the midnight
18  shift."
19     A.  That's correct.
20     Q.  Did you write that?
21     A.  Yes.
22     Q.  So did Mr. Thompson have plumbing skills?
23     A.  He was able to do light plumbing, yes.
24     Q.  Who eventually received this job, this outside

Page 39

1   maintenance job?
2      A.  The one that was posted previously?
3      Q.  Yes.
4      A.  It was Mr. Bob Knotts.
5      Q.  Mr. Knotts was not a plumber, was he?
6      A.  Yes, he was.
7      Q.  What type of plumbing did he do?
8      A.  My understanding he did residential, commercial.
9      Q.  Would this be considered light plumbing?
10     A.  The position posted?
11     Q.  No.  What Mr. Knotts did prior to his being
12  awarded this position.
13     A.  No.  I would say doing it day in, day out, new
14  construction and also commercial, I would say that would
15  be heavier plumbing.
16     Q.  Explain to me the difference between light
17  plumbing and heavy plumbing.
18     A.  Well, one of the differences would be that you
19  do plumbing all the time.  Mr. Thompson basically fixed
20  leaks, stuff like that that would pop up.
21         By virtue of me making this statement here,
22  one is inside maintenance didn't have a plumber.  Okay?
23  And the outside plumber, basically his shift was during
24  the day.  So, in essence, by me writing this, him being

Page 40

1   the primary plumber on that shift, that would be a
2   correct statement.  He had light plumbing skills and
3   would be able to fix, you know, minor leaks and stuff
4   like that.
5      Q.  Were you aware that prior to coming to Dover
6   Downs that Mr. Thompson did all the plumbing at the
7   Ramada Inn and Howard Johnson in Dover?
8      A.  He did indicate that he did work down there and
9   he was, I guess, their fix-it man down there, yes.
10     Q.  So would you have considered that heavy
11  plumbing?
12     A.  Since he did other chores or other taskings down
13  there such as from drywall to painting and other things,
14  I would say no whereas Mr. Knotts, plumbing is all he
15  did.
16     Q.  So if somebody does other tasks, then it becomes
17  light plumbing regardless of the type of plumbing that
18  they do?
19     A.  Well, the definition -- the way I look at it,
20  the definition may not be the same as maybe you look at
21  it.  The way I look at it, someone that spends time in
22  the field every day, and basically this guy's hand's in
23  it pretty much eight hours a day.  Mr. Thompson did not
24  have his hands in plumbing eight hours a day at the job

Page 41

1   he did.
2      Q.  Did Mr. Knotts?
3      A.  Yes.
4      Q.  Does Mr. Knotts do heavy plumbing now presently?
5      A.  Plumbing what?
6      Q.  Heavy plumbing presently.
7      A.  Yes.  He's -- he's one of our main plumbers.  I
8   have two plumbers now.
9      Q.  When you hired Mr. Knotts, was he a licensed
10  plumber?
11     A.  No.
12     Q.  What is the difference between a licensed
13  plumber and a plumber?
14     A.  A licensed plumber is recognized by the State of
15  Delaware to go out and basically run his own business as
16  a plumber.  A regular plumber, if he does any plumbing,
17  basically he would have to have a licensed plumber come
18  in and inspect his work to ensure that it met codes.
19     Q.  Did Mr. Knotts meet the minimum qualification
20  for the job Maintenance Mechanic I?
21     A.  In retrospect, looking at it, I thought he did,
22  but evidently some things were overlooked.
23     Q.  Such as?
24     A.  Mr. Knotts did not have a high school diploma.   B-0267

11 (Pages 38 to 41)

Thompson                                    v.                        Dover Downs
William Robert Morrison          C.A. # 05-274 (GMS)               April 11, 2006

Page 42

1  Q. How was that overlooked?
2  A. I'd have to say the buck stops here with me. I
3  received the application from HR and I thought it had
4  already been screened. By virtue -- I was looking for
5  experience in the field, I was looking for, which was
6  plumbing, which Mr. Knotts did have and had plenty of.
7  Q. So is it your testimony that at the time you
8  hired Mr. Knotts, you weren't aware that he did not have
9  a high school diploma?
10  A. I did not concentrate on that sheet. And I
11  would say that if I did, I thought it was -- since I
12  received the application from HR, I evidently thought we
13  was okay, which was a mistake on my part.
14  Q. Did you receive an application for Mr. Thompson
15  for this job?
16  A. For that posting? Yes.
17  Q. So did you assume the same thing with regard to
18  his plumbing skills, that it had passed HR and,
19  therefore --
20      MR. ELLIS: Object to the form of the
21  question.
22  A. I did, but then you get into the conversation
23  phase, the interview phase where you get to learn more
24  about what the individual has done and what he's doing

Page 43

1  every day now.
2      And currently -- or when the interviews
3  were done with Mr. Thompson, again, he was not working in
4  plumbing every day and did not have the experience in
5  plumbing that I was looking for to fill with the taskings
6  that I had at hand to get fulfilled.
7  Q. Did you have a conversation about Mr. Knotts
8  about his education?
9  A. I did.
10  Q. So you were aware that he did not have a high
11  school diploma?
12  A. Yes.
13  Q. You just decided to overlook that?
14  A. It was a mistake on my part, evidently, yes. I
15  had -- I had an impending race coming up on me that I
16  needed to -- I had a plumber that I had presently. The
17  plumber had indicated that he may quit at any time. I
18  had to have someone who basically could, one, get the job
19  done for me, and with the skills that Mr. Knotts had, I
20  proceeded with hiring paperwork.
21  Q. Was Mr. Knotts an internal employee when he got
22  this job?
23  A. He was not.
24  Q. When you talked to Mr. Thompson about this job,

Page 44

1  did you indicate to him that you'd like to fill this job
2  with a plumber and then you would post another job for a
3  maintenance mechanic that Mr. Thompson could bid on?
4  A. I would not have had that conversation. I
5  wouldn't have knew what positions I had open unless I had
6  someone vacate those positions. I have a limited number
7  of positions that I can post for. I couldn't indicate to
8  him that I got a position coming open if I didn't know
9  that.
10  Q. Did Mr. Thompson withdraw his application for
11  this job?
12  A. Not to my knowledge.
13  Q. After Mr. Knotts was hired, was Mr. Thompson
14  upset?
15  A. Yes.
16  Q. Did he come to talk to you?
17  A. I don't believe he came to the office. I can't
18  recall. We did have conversation, a conversation, I do
19  recall one, which was down in the building maintenance's
20  operation office.
21  Q. Can you tell me what happened there?
22  A. It was for prep up for the September race. I
23  was down there. It was probably close to maybe after
24  hours or something, after normal, the daylight -- or

Page 45

1  during the day hours.
2      Mr. Thompson came in on doing his job,
3  might have been opening a safe or something, and he made
4  indication to me that he was done wrong. And I told him
5  that Mr. Knotts had more experience in the plumbing I was
6  looking for. And he wanted to engage in some heavier
7  conversation and I declined to do that.
8  Q. Did he indicate to you at that time that he
9  thought it was age discrimination?
10  A. I don't recall.
11  Q. Did you and Mr. Thompson have a meeting with
12  Mrs. Isenberg?
13  A. There was a meeting called by Mrs. Isenberg with
14  myself and Mr. Thompson, yes.
15  Q. Where did that occur?
16  A. Where?
17  Q. Yes.
18  A. In Mrs. Isenberg's office, in HR.
19  Q. You don't recall the date that that happened, do
20  you?
21  A. I do not.
22  Q. Was it in August of 2004?
23  A. Could have been. Like I said, I don't recall
24  the dates on that.

12 (Pages 42 to 45)

Thompson                                          v.                              Dover Downs
William Robert Morrison              C.A. # 05-274 (GMS)                          April 11, 2006

Page 46

1    Q.  At that meeting, what did Mr. Thompson say?
2    A.  I was already seated in the room. Mrs. Isenberg
3    was already in the room. I think he was -- Mr. Thompson
4    was brought in by one of the office coordinators. He was
5    asked to sit down so we could talk about the -- by
6    Mrs. Isenberg, talk about, you know, what was going on
7    and so forth. Mr. Thompson declined to sit down, was
8    quite upset at this meeting, and there was an exchange.
9    Q.  Well, what type of exchange?
10   A.  Something about that he didn't get the job and
11   he was upset about not getting the job. Exact wording, I
12   don't recall.
13   Q.  Did Mr. Thompson ever indicate that he thought
14   that he was not given the job because of his age?
15   A.  He might have. I don't recall exactly. And it
16   might have been at that meeting.
17   Q.  Had Mr. Knotts already been given the position
18   prior to you interviewing Mr. Thompson?
19   A.  No.
20   Q.  Are you certain of that?
21   A.  Yes.
22   Q.  Did Mr. Thompson ever tell you any other time
23   that he thought he was being discriminated against?
24   A.  I don't recall.

Page 47

1    Q.  You don't recall any times or you don't recall
2    whether he did or not?
3    A.  I don't recall if he did or additional times he
4    might have.
5    Q.  Are you familiar with the 72-hour rule?
6    A.  72-hour rule? In what respect?
7    Q.  In terms of time that Dover Downs must have some
8    type of discussion with an employee regarding a
9    disciplinary action.
10   A.  No.
11   Q.  Does Dover Downs have any similar policy?
12         MR. ELLIS:  Object to the form of the
13   question.
14   A.  Go ahead and answer?
15   Q.  Yes.
16   A.  I'm not sure. I -- I don't recall seeing that
17   policy.
18   Q.  Are you aware that the day following your
19   meeting with Mrs. Isenberg and Mr. Thompson that
20   Mr. Thompson was given a disciplinary notice for four
21   different violations?
22   A.  My -- do I have knowledge of that?
23   Q.  Yes.
24   A.  No.

Page 48

1    Q.  Did you have any communications with Mr. Duncan
2    around this time regarding imposing discipline on
3    Mr. Thompson?
4    A.  No. And I guess for what reason? I don't
5    recall. I don't know. Mr. Thompson did not work for me.
6    Q.  I would like to show you what's been marked as
7    Duncan Number 4.
8    A.  (The witness reviews the document.) Okay.
9    Q.  Have you ever seen these before?
10   A.  The disciplinary warning notices?
11   Q.  Yes.
12   A.  Yes.
13   Q.  When did you see them?
14   A.  This particular one or the form itself?
15   Q.  These particular ones.
16   A.  I haven't seen these.
17   Q.  So all you've seen is a blank form or ones that
18   you filled out personally; correct?
19   A.  That's correct.
20   Q.  Are you aware that Mr. Thompson was given these
21   disciplinary warnings?
22   A.  No.
23   Q.  In the box at the bottom on the first page,
24   Steven Homlish's signature is there; correct?

Page 49

1    A.  That is correct.
2    Q.  The box to the right of that says "Date Signed."
3    A.  Okay.
4    Q.  As a supervisor, are you to put the day that you
5    actually signed the document in that box?
6    A.  I would say yes.
7    Q.  As a supervisor at Dover Downs, would it be
8    improper to put a different date in that box?
9    A.  I would say yes unless it was mutually agreed by
10   all parties.
11   Q.  To be mutually agreed, you would probably need
12   an employee's signature; correct?
13   A.  On an actual Disciplinary Warning Notice, which
14   this is on the same form, it also says "Coaching" up
15   there, wouldn't necessarily require a signature, but at
16   least a conversation with. They elected to put
17   "Coaching" on this form.
18        I know in our division basically we have a
19   different form that we use as a mentoring coaching tool.
20   They elected to put it on actually the Disciplinary
21   Warning Notice. But basically we sat down with our
22   employees who are getting in what we call danger zones,
23   basically doing stuff that they shouldn't be doing, to
24   keep them from further going into those areas.

B-0269

13 (Pages 46 to 49)

Thompson
William Robert Morrison

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 50

1    Evidently by this being a coaching, it's a
2  do not or did not report to work. It doesn't say
3  anything about whether he called in or not. Again, if it
4  was a no call/no show, he could be basically let loose on
5  the first notice.
6        In this case here they're doing coaching is
7  a good thing to try to keep your employee from further
8  escalating into a danger zone. Normally in this case we
9  indicate on their time card that it's an event, basically
10 first, second, third.
11       After a third, we go into a verbal, which
12 basically it will be written down on this. And when it's
13 written down on this, then it will go up to HR to be put
14 in his HR folder. I don't see those indicated there
15 other than it's saying "Coaching" on them, so they
16 elected to use this form as a coaching tool.
17       Whether he was consulted on it, I'm not
18 sure. It could have been at the time clock, just a
19 virtue of saying, Hey, Mickey, you need to watch out.
20 You're getting in a danger zone here for being late. We
21 have to annotate on our time card.
22       This here is just a record for the
23 supervisor that, yeah, he did something. It is one of
24 his events. Okay?

Page 51

1        But the book says that you indicate it on
2  the time card. But this here, again, is a tool for the
3  supervisor manager to be aware that we have an
4  individual, if he was to look at his folder that he was
5  possibly getting into trouble and, you know, we made note
6  of it. Though this normally stays in the file, that
7  doesn't go up to HR until he gets into the position where
8  it turns into a verbal, which is your fourth event.
9     Q.  Does coaching or mentoring imply that there is
10 some form of communication made from the supervisor to
11 the employee?
12    A.  I would say yes. Whether it's -- like I said,
13 hey, if a guy come in late, say in my area, I say, Hey,
14 guy, this is your first time. You know, you got to watch
15 out for that. That could be virtually just that much
16 conversation right there. And, yeah, or maybe some
17 acknowledgment from the individual. And it's annotated
18 on his time card. And that's as far as it goes. It
19 don't have -- it don't need to be drawn out or anything.
20    Q.  What do you mean by "annotated on his time
21 card"?
22    A.  There's actually written on his time card
23 "tardy" or "late" or whatever the event might have been,
24 and normally I know I signed mine. I make an indication

Page 52

1  on the time card and I initial it. First event, tardy,
2  whatever it might have been, second event.
3        And only way to really keep track of these,
4  since you don't have your time cards sitting right in
5  front of you, unless you make copies of that time card
6  and put it in his file, do something like this here,
7  which basically keeps you on track how many times maybe
8  an individual has been tardy.
9     Q.  Have you ever dated a disciplinary notice for a
10 date different than that which you signed it?
11    A.  There was -- there was another case which I
12 believe I was asked the same question, and the dates were
13 a number of dates from the actual event. Okay? But the
14 date basically signed on there was the date that I
15 basically talked to the individual.
16    Q.  So in the box where it said "Date Signed" was
17 the date that you actually talked to the individual?
18    A.  Yes.
19    Q.  But there was other dates referenced on the
20 disciplinary sheet?
21    A.  It could be up in -- like here it says 8/16 is
22 when the event took place. Well, one, he was not there
23 that day, so you couldn't talk to him that day, so I
24 would say probably referenced -- this was the next day.

Page 53

1  Maybe he come in, a conversation maybe was had, say, hey,
2  you know, you was late yesterday. Let's see if we can
3  keep from having that happen anymore. Or maybe even it
4  could have been drawn out to where, you know, what caused
5  this to happen. Are you having problems? I normally try
6  and engage with my people to try to find out if there are
7  problems that's going to cause additional occurrences.
8        I can't speak for Mr. Homlish, but he might
9  have had that conversation. I don't know.
10       MR. WILSON:  Let's take a short break.
11       (A recess was taken at this time.)
12 BY MR. WILSON:
13    Q.  I'd like to go back to the questions about the
14 outside maintenance job and the plumbing work for a
15 second.
16       You said that you were aware that
17 Mr. Thompson worked for Ramada Inn and Howard Johnson;
18 correct?
19    A.  He worked down there. I know he used to talk
20 about working for the individual down there a few times.
21 The length of the -- the period that he did work down
22 there, I don't recall right offhand.
23       But as an individual maintenance guy, I
24 knew that basically he was kind of a jack-of-all-trades,

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

B-0270

Thompson
William Robert Morrison

v.
C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 54

1 whether he was formally trained or not, and basically had
2 to take care of, you know, the different damages that
3 would occur in a motel/hotel operation there.
4    Q. But you also testified that he was the only one
5 down there; right?
6    A. Where at?
7    Q. At the Ramada Inn, at the Howard Johnson's.
8    A. I'm not aware how many employees they had, no.
9    Q. So you didn't testify that he was the only guy
10 down there?
11    A. Did I?
12    Q. Yes.
13    A. That I knew that he was the only one at Ramada?
14    Q. Yes.
15    A. No, I did not.
16    Q. By working at Ramada and Howard Johnson's, is
17 any of the plumbing that would be associated with the
18 hotel or motel like that industrial plumbing?
19    A. Would it be? I would say yes.
20    Q. So by virtue of him working there, it's possible
21 that he did have industrial plumbing experience; correct?
22    A. Yes and no, depending on exactly how much he did
23 with that. In a typically -- I know from experience in
24 our hotel, there's not a lot of plumbing breaks. There

Page 55

1 may be some leaks or something of plumbing underneath a
2 sink or something or unclogging a hopper or something
3 like that.
4        But actually getting into -- and I know
5 from our being out to where I'm at now, we actually have
6 pipe breaks, we have major pipe breaks. I mean, stuff
7 that's up 80 foot, numerous stuff, eight-inch stuff that
8 we have to go in and try to repair. It's a little bit
9 different than fixing maybe a leak underneath a sink or
10 maybe a shower that's leaking or something like that,
11 which by virtue of also my experience with the hotel,
12 that maybe he was exposed to and was doing.
13    Q. When you interviewed him, did you question him
14 as to the extent of his plumbing experience at the Ramada
15 Inn at the Howard Johnson's?
16    A. I believe I did.
17    Q. Do you recall what he told you?
18    A. Not right off. That he did work down there, and
19 I guess he had on and off maybe for a few years.
20    Q. Had you ever observed Mr. Thompson doing
21 plumbing work?
22    A. I did or have.
23    Q. Did he do a good job?
24    A. Yes, he did.

Page 56

1    Q. Prior to hiring Mr. Knotts, had you ever
2 observed him doing plumbing work?
3    A. No.
4    Q. Did you give him any type of plumbing test prior
5 to hiring?
6    A. Basically what I did -- in fact, one of the
7 sheets there, I looked at his company he was working for,
8 which I don't recall exactly who it was, but it was a
9 prominent plumbing contractor in town and that he had
10 been with them for 12 years, and all aspects of what I
11 heard, they were reputable and I had not heard any bad
12 complaints about their plumbing work.
13    Q. Did you confirm that he actually worked for
14 them?
15    A. I did not actually call the company, no.
16    Q. Duncan Number 6, I believe it's right there, did
17 Mr. Thompson meet the minimum requirements of this job
18 posting?
19    A. In the trade that he had, yes.
20    Q. You testified earlier that internal employees
21 were given preference over external individuals in
22 hiring; correct?
23    A. Yes. And by me making the -- or answering yes,
24 he met it in the painting section there.

Page 57

1    Q. But he did meet the essential functions and the
2 requirements/educations?
3    A. Yes.
4    Q. So Mr. Thompson was not given preference in this
5 one instance; correct?
6    A. Because the experience in plumbing, yes, which
7 was the position level that I was trying to get filled at
8 that time.
9    Q. I'd like to switch gears here again.
10        Are you aware in 2003 that Mr. Thompson was
11 out work for a period of time due to being involved in an
12 automobile accident?
13    A. Yes.
14    Q. When he was recovering from that accident, he
15 returned to work on light duty; correct?
16    A. I believe so, yes. What was the time frame
17 there when he come back?
18    Q. Fall of 2003, I believe September.
19    A. September? Okay.
20    Q. Do you have any recollections as to what his
21 light-duty limitations were?
22    A. I believe it might have entailed lifting, and I
23 don't recall what the other was.
24    Q. Do you recall what position he was given?

B-0271

15 (Pages 54 to 57)

Thompson
William Robert Morrison

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 58

1   A. Position?
2   Q. What job was he given to do when he returned on
3   light duty?
4   A. It would have been probably light fix-it-type
5   stuff. Nothing entailing any lifting or anything like
6   that. It's been so long, I don't recall exactly what he
7   was given.
8   Q. Do you know how decisions are made as to whether
9   or not to provide light-duty assignments to employees
10  that have light-duty restrictions?
11  A. Say the question again.
12  Q. When employees at Dover Downs come back with
13  light-duty restrictions, do you have knowledge as to how
14  the decision is made whether or not to give them a
15  light-duty assignment?
16  A. Basically it's from HR to the doctor, from the
17  doctor to the HR. HR advises the supervisory chain,
18  whether it be management or a supervisor, that you have
19  an employee returning to you and he has limitations.
20  Because of HIPPA and other things, we don't -- a lot of
21  times don't even know what the problem is with the
22  individual other than he has certain limitations.
23  Q. So are light-duty assignments always given to
24  employees when they're released to work light duty?

Page 59

1   A. If they have light duty, are you saying --
2   you're asking me are they always given light duty?
3   Q. Yes.
4   A. As far as I know, because the objective is to
5   get the employee back to work and gradually have him move
6   through his light-duty phase and get him back to
7   full-time job work.
8   Q. Are you aware that Mr. Thompson has been
9   released to return to work on light duty?
10  A. No. As of right now or when?
11  Q. As of right now.
12  A. No.
13  Q. Do you know a gentleman named Eric Daniels?
14  A. Yes.
15  Q. Is Mr. Daniels an employee at Dover Downs?
16  A. Yes.
17  Q. What is his job title?
18  A. I believe he is a Mechanic I.
19  Q. Was Mr. Daniels on light duty at any period in
20  time?
21  A. I do not know. He does not work for me.
22  Q. Does he work inside?
23  A. Yes.
24  Q. Has anybody contacted you to determine if you

Page 60

1   have any light-duty positions available for somebody with
2   restrictions?
3   A. I believe HR put out a general bulletin to all
4   the managers/supervisors if they had any light-duty
5   positions, to notify them, yes.
6   Q. When was that?
7   A. When?
8   Q. Yes.
9   A. It was in the last year sometime.
10  Q. Did you have any light-duty positions?
11  A. No.
12  Q. If somebody is released to work light duty in
13  your particular area that you supervise and there's no
14  light-duty positions in another area, do you create a
15  light-duty position for the employee?
16      MR. ELLIS: Object to the form of the
17  question.
18  A. I'd have to talk to HR to see if it's within my
19  realm to reduce the requirements of a certain position.
20  I have a limited number of positions that I have filled.
21  Right now there's none light duty, but I am -- I'm very
22  ample to try to get someone back to their full scope of
23  work, I mean getting them working.
24      If it was approved through HR, I would

Page 61

1   gladly bring someone on because basically I'm without an
2   individual. Whether he is doing a little bit or whether
3   he's up to full snuff would help me any way possible.
4       So in answering your question, I guess,
5   yes, if it was okay with HR.
6   Q. Are you aware of a rule or policy or custom at
7   Dover Downs that permits an employee to report for work
8   seven minutes after the beginning of his shift and still
9   not be considered officially late?
10  A. After seven minutes?
11  Q. Seven minutes or before.
12  A. Well, basically at Dover Downs we do -- you
13  don't clock in before seven minutes and you're tardy if
14  you clock in after seven minutes of your reporting time.
15  If you are supposed to be there at seven, if you are
16  able -- you clock in before seven minutes after, you're
17  still okay.
18      Again, that's monitored to see if it's a
19  norm, whether you're clocking in seven minutes after and
20  clocking in seven minutes prior to your clock-out time to
21  see if you are taking advantage of the situation. But
22  the company allows it, at least my understanding of it,
23  and it is utilized at my location that we give a little
24  grace period there.

16 (Pages 58 to 61)

Thompson
William Robert Morrison

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 62

1    But again, no clocking in before seven
2  minutes because it puts us into an overtime position and
3  has to be approved by a manager.
4    Q.  So essentially you are given a 14-minute window
5  to clock in and clock out; correct?
6    A.  Yes.
7    Q.  In the maintenance department, have employees
8  ever been allowed to cover an instance of illness with
9  vacation time?
10    A.  At one time that was allowed, but HR has put out
11  new guidelines on that that you can't do that.  If the
12  individual is sick, he has to take sick time.
13    Q.  Do you recall when the new guidelines came out?
14    A.  It's been a year, probably a year or more,
15  probably.
16    Q.  Prior to the new guidelines, do you recall a
17  time when that wasn't the policy or that wasn't what you
18  were allowed to do?
19    A.  Well, again, it was -- either way you had to
20  have a doctor's note whether you took out -- the
21  requirement is you took a doctor's note back with you
22  when you were out for an illness so it would not become
23  an incident.
24    So do I remember whether there was a time

Page 63

1  that it was ever allowed or --
2    Q.  Well, prior to the new guidelines, was it always
3  allowed in your experience?
4    MR. ELLIS:  Object to the form of the
5  question.
6    A.  I guess it was kind of just overlooked a little
7  bit.  It maybe not was ever allowed if you was to look at
8  it on the books, but it was probably -- it was probably
9  done, though.  And of course it's been brought to light
10  and more stringent guidelines have been incorporated to
11  keep that from happening.
12    Q.  Have you ever permitted anybody under your
13  supervision to use vacation time to cover an illness?
14    A.  If -- I would say, yes, I probably did, if they
15  gave me enough notice and it didn't cause a, you know, a
16  situation with the work that we were doing.  But like I
17  said, we've received notice that that's not allowed, so
18  it hasn't been happening anymore.
19    And this is basically, if I can elaborate,
20  it was basically for employees who didn't have sick time
21  but still had families out there and still needed a
22  paycheck and -- but like I said, it's been corrected.
23    Q.  At Dover Downs, are employees given a personal
24  day?

Page 64

1    A.  Yes.
2    Q.  Are they allowed to use this for an illness?
3    A.  They can use it for any reason, as far as I
4  understand.
5    Q.  Do they have to give notice prior to using the
6  personal day?
7    A.  The book says you should give at least 30 days'
8  notice on a personal day.  Because of schedules and so
9  forth, I've never held none of my people to that.  If
10  they have a personal day coming to them and they come to
11  me and say, hey, I'd like to take my personal day, if the
12  schedule, with my work tasking that I have, if I can get
13  them off on their personal day, I have done it.
14    Q.  Just briefly getting back to the meeting between
15  you, Mrs. Isenberg and Mr. Thompson, do you remember
16  Mr. Thompson indicating that Mr. Knotts was much younger
17  than he was?
18    A.  He might have said that at that time.  I don't
19  recall.
20    MR. WILSON:  I have nothing further.
21    MR. ELLIS:  No questions.
22    MR. WILSON:  Thank you very much.
23    THE WITNESS:  Yes, sir.
24    (The deposition was then concluded at

Page 65

1  3:00 p.m.)
2    - - - - -
3    INDEX TO TESTIMONY
4
5
   WILLIAM ROBERT MORRISON                    PAGE
6
7  Examination by Mr. Wilson                    2
8
9    - - - - -
10
11    INDEX TO EXHIBITS
12
   (There were no exhibits marked for identification.)
13
14
15    - - - - -
16
17
18
19
20
21
22
23
24

B-0273

17 (Pages 62 to 65)

                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,          )
                                  )
            Plaintiff,            )
                                  )
v.                                )   Civil Action No.
                                  )    05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS)
GAMING & ENTERTAINMENT INC.,  )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,    )
Inc.,                          )
                                  )
            Defendants.           )


            Deposition of NATHAN R. WHITECOMB taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 3:05 p.m. on Tuesday, April 11, 2006, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.

APPEARANCES:

            TIMOTHY J. WILSON, ESQUIRE
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware  19899
              for the Plaintiff

            EDWARD T. ELLIS, ESQUIRE
            MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
              123 South Broad Street
              Philadelphia, Pennsylvania  19109
              for the Defendants

--------------------------------------------------
                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

                                                    **B-0274**

Thompson
Nathan R. Whitecomb

v.
C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

---

Page 2

1  ALSO PRESENT:
2      BRANCE F. THOMPSON, SR.
3      - - - - -
4          NATHAN R. WHITECOMB,
5      the witness herein, having first been
6      duly sworn on oath, was examined and
7      testified as follows:
8  BY MR. WILSON:
9     Q.  Good afternoon, Mr. Whitecomb.  Am I pronouncing
10 your name correctly?
11    **A.  Yes, sir, you are.**
12    Q.  I'd like to give you a couple instructions for
13 the deposition.
14         First and foremost, it's important that you
15 give verbal responses to my questions.  That's so, as you
16 can see, we have a court reporter here, so she can take
17 your answers down.  Obviously she can't take down head
18 nods and things of that nature.
19    **A.  Yes, sir.**
20    Q.  So please answer verbally.
21         As you know, your testimony is under oath.
22 You've just been sworn.  So you must answer truthfully
23 just as if you were in court.
24         If you don't hear a question or don't

---

Page 3

1  understand it, please let me know and I will ask it again
2  or explain it to you.
3         Please let me finish asking the question
4  before you begin the answer and I will let you complete
5  your answer before I begin questioning you again.
6         If at any time you come to realize that a
7  statement that you made is incorrect or inaccurate, let
8  me know and you will be permitted to clarify the record.
9         If at any time you should need a break to
10 go to the rest room or any type of break whatsoever,
11 please let me know.  This deposition shouldn't take too
12 long, so hopefully we can get through it without the
13 break.  But like I said, if you need one, let me know.
14         Do you understand these instructions?
15    **A.  Yes, sir, I do.**
16    Q.  Can you tell me where you were born and what
17 your birth date is?
18    **A.  Yes, sir.  I was born in York, Pennsylvania.
19 The birth date is September 9th of 1976.**
20    Q.  What is your current address?
21    **A.  My current address is 10 Caroline Place, Dover,
22 Delaware, 19904.**
23    Q.  How long have you lived there?
24    **A.  I've lived there for the past two years.**

---

Page 4

1     Q.  Do you own or rent?
2     **A.  I rent.**
3     Q.  Have you ever been arrested?
4     **A.  No, sir, I have not.**
5     Q.  Have you ever served in the military?
6     **A.  No, sir, I have not.**
7     Q.  Are you taking any medication that could impair
8  your ability to give truthful testimony today?
9     **A.  No, sir, I am not.**
10    Q.  Did you graduate from high school?
11    **A.  Yes, sir, I did.**
12    Q.  What year?
13    **A.  1994.**
14    Q.  From what high school?
15    **A.  Poly Tech Adult.  I'm sorry.  Poly Tech High
16 School.**
17    Q.  Is that in Dover?
18    **A.  It's in Woodside, Delaware, sir.**
19    Q.  Did you go to college?
20    **A.  No, sir, I did not.**
21    Q.  Have you had any education beyond high school?
22    **A.  Yes, sir, I have.**
23    Q.  Can you outline that for me?
24    **A.  Yes, sir.  I've had -- I gained my**

---

Page 5

1  **journeymanship in building maintenance journeyman for two
2  years.  I've also --**
3     Q.  Before you go on, how does one go about being a
4  journeyman in maintenance?
5     **A.  One has to not only work for a company as an
6  apprentice for two years, but has to take four separate
7  classes, a journeymanship in carpentry, one marking
8  period in plumbing, one in HVAC or heating ventilation
9  and air-conditioning, and one in electrical.**
10    Q.  Where did you take the courses?
11    **A.  I went back to Poly Tech for those, Poly Tech
12 adult courses, sir.**
13    Q.  Do you have a degree or a certificate?
14    **A.  Yes, sir, I do.  I have a journeyman's
15 certificate.**
16    Q.  Did you graduate with honors?
17    **A.  I graduated fourth in my class, sir, and
18 National Honor Society.**
19    Q.  Congratulations.
20    **A.  Thank you.**
21    Q.  Any other education?
22    **A.  Other training that they've given me, I have my
23 certification as a pool technician for the State of
24 Delaware.**

---

2 (Pages 2 to 5)

Thompson
Nathan R. Whitecomb

v.

C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 6

1    Q.  Do you mean swimming pools?

2    A.  Yes, sir.

3        I am also a certified man lift operator and

4    a boom lift operator.

5    Q.  Are you presently employed by Dover Downs?

6    A.  Yes, sir, I am.

7    Q.  What's your job title?

8    A.  I'm a surveillance technician.

9    Q.  What does a surveillance technician do?

10   A.  I maintain and repair the equipment used for

11   surveillance of basically their cameras and anything that

12   helps get the visual from the camera back to the

13   surveillance officer.

14   Q.  How long have you been in that position?

15   A.  Sir, I have been in that position for a little

16   less than a year, June of 2005.

17   Q.  What did you do prior to that?

18   A.  I was in maintenance.

19   Q.  At Dover Downs?

20   A.  Yes, sir.

21   Q.  What was your job title?

22   A.  At the time I left I was a Maintenance

23   Mechanic II.

24   Q.  What shift did you work?

Page 7

1    A.  At the time I left I worked day shift.

2    Q.  Were you inside maintenance or outside?

3    A.  I was inside maintenance.

4    Q.  In total, how long have you worked for Dover

5    Downs?

6    A.  I have worked for Dover Downs just over seven

7    years.

8    Q.  What was your first position at Dover Downs?

9    A.  My first position held was an event set-up

10   person.

11   Q.  Anything after that?

12   A.  Yes.  After that I became a Mechanic III and

13   then a Mechanic II.

14   Q.  When you were a Mechanic III, what shifts did

15   you work?

16   A.  As a Mechanic III, I worked day shift.

17   Q.  What about a Mechanic II?

18   A.  That began on third shift and then on to day

19   shift after that.

20   Q.  Did you work with Mr. Thompson on third shift?

21   A.  Yes, sir, I did.

22   Q.  What did you do to prepare for today's

23   deposition?

24   A.  Nothing, really.

Page 8

1    Q.  Did you meet with an attorney?

2    A.  Yes, I did, sir.

3    Q.  Was it Mr. Ellis?

4    A.  Yes, sir.

5    Q.  Was it yesterday?

6    A.  Yes, sir, it was.

7    Q.  About how long did you meet with him?

8    A.  Half an hour.

9    Q.  Did you review any documents?

10   A.  No, sir, we did not.

11   Q.  Did you talk to anybody other than Mr. Ellis to

12   prepare for this deposition?

13   A.  Beth.  I don't remember her last name.  I'm

14   sorry.

15   Q.  Was it Beth Friel?

16   A.  Yes.

17   Q.  When did you talk to her?

18   A.  Last week.

19   Q.  Was that face-to-face or by telephone?

20   A.  Face-to-face.

21   Q.  How long did you meet with her?

22   A.  Approximately the same, half an hour.

23   Q.  What did you discuss?

24   A.  We discussed basically what we just have where

Page 9

1    I've been through the company and a little bit about

2    Mr. Thompson's stance on where he may be feeling his need

3    to pursue this.

4    Q.  So did you discuss the lawsuit?

5    A.  Would you please...

6    Q.  Did you discuss Mr. Thompson's claims against

7    Dover Downs?

8    A.  Some, yes.

9    Q.  Are you aware that he's bringing a claim of age

10   discrimination against Dover Downs?

11   A.  Yes, sir, I most certainly am.

12   Q.  Have you talked to anybody else about the

13   lawsuit, just in general conversation, not in preparation

14   for the deposition?

15   A.  The suit itself, other than trying to get

16   everybody together to come here, no.

17   Q.  What about the background information, the

18   background facts of the lawsuit, have you discussed that

19   with anybody?

20       MR. ELLIS:  Object to the form of the

21   question.

22   Q.  What I'm asking you is not necessarily the

23   lawsuit itself, but the things that happened that led to

24   the lawsuit.

**B-0276**

3 (Pages 6 to 9)

Thompson                                                              Dover Downs
Nathan R. Whitecomb          v.          C.A. # 05-274 (GMS)          April 11, 2006

Page 10

1    A.  Yes, sir.
2         MR. ELLIS:  I still object to the form of
3    the question, but go ahead.
4         You can answer.  I'm not telling you not to
5    answer the question.
6         THE WITNESS:  Okay.
7    BY MR. WILSON:
8    Q.  Who did you discuss this with?
9    A.  Jim Shreves.
10   Q.  What did you and Jim discuss?
11   A.  Basically it was not so much as into why we had
12   to be here as much as it was everything that had
13   happened.  Basically not everything that had happened,
14   but -- it's hard to explain.
15   Q.  Did you discuss the events that led to this?
16   A.  Not really, just that we both knew that we were
17   going to have to come here and we knew this was going to
18   happen, that we knew this was going to happen, and that
19   was about the extent of the conversation.
20   Q.  Why did you know it was going to happen?
21   A.  Because I was told.
22   Q.  Who told you?
23   A.  Mr. Thompson.
24   Q.  Did you talk to anybody else besides

Page 11

1    Mr. Shreves?
2    A.  Outside of preparation, no.
3    Q.  You stated earlier that you worked on third
4    shift with Mr. Thompson at some point; correct?
5    A.  Yes, sir.
6    Q.  Can you give me a time frame as to when that
7    was?
8    A.  February -- the same.  The year, I am so
9    terrible with the years.  It was the first night that the
10   hotel opened.  It was my first night with third shift.
11   As a matter of fact, it was the same night, I believe
12   October 15th of the year the hotel opened.
13   Q.  2001?
14   A.  I believe so, yes.  Sounds about right.
15   Q.  Okay.  Go ahead.
16   A.  And that lasted till about two years ago.  I
17   couldn't give you an exact month.  I don't really
18   remember.
19   Q.  How long were you on that shift with
20   Mr. Thompson?  Do you recall?
21   A.  Better part of a year.
22   Q.  So that would have been your first year on third
23   shift?
24   A.  Yes, sir.

Page 12

1    Q.  Were there other employees on third shift?
2    A.  At the time I came on, no, sir.
3    Q.  Eventually did other employees get added?
4    A.  Yes, sir.
5    Q.  Who were they?
6    A.  Kevin Gorlich.
7    Q.  Anybody else?
8    A.  And eventually supervisor Al Baldwin, Bill
9    Carlisle.  And there was another gentleman, he only
10   lasted a month.  I really don't recall his name at all.
11   Q.  Was Mr. Baldwin on the shift when Mr. Thompson
12   was there?
13   A.  I don't recall at first if he was or not.  I
14   know -- I believe he was, but I'm not 100 percent sure on
15   that.
16   Q.  At some point it was three employees:  you,
17   Kevin Gorlich, and Mr. Thompson; correct?
18   A.  Yes, sir.
19   Q.  Let's just focus on that period of time for
20   right now.  Okay?
21   A.  Yes, sir.
22   Q.  During that period of time, what type of work
23   did you do on third shift?
24   A.  I was basically a runner.

Page 13

1    Q.  What's a runner?
2    A.  Basically I made sure that all the parts are in
3    place and small duties are taken care of so that
4    high-ranking mechanics can do their job without
5    interference.
6    Q.  Were you a Maintenance Mechanic III at this
7    time?
8    A.  No, sir, I was not.  I was a Maintenance
9    Mechanic II at this time.
10   Q.  What about Kevin Gorlich, do you recall what he
11   was?
12   A.  He came on at a Mechanic II.
13   Q.  Was Mr. Thompson a Mechanic I?
14   A.  Yes, sir.
15   Q.  At this time when it was just you three, there
16   was nobody on the third shift that held the title
17   supervisor; correct?
18   A.  No, sir, there was not.
19   Q.  Was Mr. Morrison the official supervisor for
20   this shift?
21   A.  Yes.  Officially, yes.
22   Q.  But he worked second shift; correct?
23   A.  Yes.
24   Q.  Was there an overlap between second shift and

4 (Pages 10 to 13)

Thompson
Nathan R. Whitecomb

v.
C.A. # 05-274 (GMS)

Dover Downs
April 11, 2006

Page 14

1 third shift?

2    **A. About a half an hour.**

3    Q. During that overlap, did Mr. Morrison ever have

4 discussions with you regarding the work that had to be

5 done?

6    **A. Pretty much only when he wasn't there. I mean**

7 **when Mickey wasn't there.**

8    Q. Did he primarily speak to Mickey, being

9 Mr. Thompson; correct?

10    **A. Yes, sir, yes.**

11    Q. Did he primarily talk to Mickey about what

12 needed to be done on third shift?

13    **A. Yes.**

14    Q. Did you work under Mr. Thompson's supervision?

15    **A. Yes, sir, I did.**

16    Q. Did anybody ever tell you that Mr. Thompson was

17 in charge of the shift?

18    **A. Yes, sir.**

19    Q. Who told you that?

20    **A. That came to me by Bob Morrison and Rich Duncan.**

21    Q. Was Mr. Gorlich under Mr. Thompson's

22 supervision, as well?

23    **A. Yes, sir, most certainly he had to have been.**

24    Q. Have you ever been given any type of

Page 15

1 disciplinary warning while you've been at Dover Downs?

2    **A. Yes, sir, a few.**

3    Q. Have any of these disciplinary warnings also

4 been known as coachings?

5    **A. One that I'm aware.**

6    Q. Can you tell me what a coaching is?

7    **A. Basically a coaching is when they take you to**

8 **the side and basically it's a slap on the wrist. This is**

9 **what you did wrong. Don't let it happen again or it will**

10 **be a write-up.**

11    Q. But they communicate that to you?

12    **A. They conveyed that, yes, that -- yes.**

13    Q. When you had a coaching, who did you have the

14 coaching with?

15    **A. I was given a coaching by -- well, I was given a**

16 **few coachings. One I remember, if I may go back, I know**

17 **I got one from Steven Homlish and I got one from Al**

18 **Baldwin.**

19    Q. The one from Steven Homlish, what was the issue

20 there?

21    **A. Tardiness.**

22    Q. What about Mr. Baldwin? Do you recall?

23    **A. Insubordination.**

24    Q. Did you have conversations with both Mr. Baldwin

Page 16

1 and Mr. Homlish or just one of the two?

2    **A. I had a conversation, actually, with both. They**

3 **both pulled me to the side at the time.**

4    Q. To your knowledge, is there an instance where

5 you can get a disciplinary warning or write-up and not

6 have somebody talk to you about it?

7    **A. According to the code of Dover Downs, no, there**

8 **is not.**

9    Q. To your knowledge, is an employee required to

10 sign a disciplinary write-up document?

11    **A. Yes, sir, they are.**

12    Q. Are they entitled to refuse to sign it?

13    **A. Yes, sir, they are.**

14    Q. If they refuse, is a box checked indicating that

15 they have refused?

16    **A. I believe so.**

17    Q. Do you know what the seven-minute rule is

18 regarding reporting for work?

19    **A. The seven-minute rule, tardiness. The**

20 **seven-minute rule is a seven-minute window before and/or**

21 **after the time that an employee is to be at work. We are**

22 **not allowed to clock in seven minutes early. However, if**

23 **we clock in more than seven minutes late, we are also**

24 **assumed late.**

Page 17

1    Q. If you clock in six minutes after the time you

2 are to report to work, are you considered late?

3    **A. As best of my knowledge, no, sir, you are not.**

4    Q. How are you aware of that policy?

5    **A. Write-up with Steve Homlish, coaching with Steve**

6 **Homlish.**

7    Q. When was that? Do you recall?

8    **A. No, sir. I do know it was after I came back to**

9 **day shift after my stint on third.**

10    Q. Was it prior to 2004?

11    **A. I believe it was.**

12    Q. What about covering an instance of illness with

13 vacation time, was that ever permitted?

14    **A. We were told that, yes, for a while it was**

15 **allowed.**

16    Q. How did you find out about that?

17    **A. We were told that by -- I honestly have to say I**

18 **don't recall. I know it was supervisors that came down.**

19 **I don't know if it was Steve Homlish, Rich Duncan, one of**

20 **those, but we were told at some point if you were out of**

21 **sick time and you ran out, you could use a vacation day.**

22    Q. When you say "we were told," was this

23 communicated at some type of a meeting?

24    **A. I believe there was one meeting it was**

**B-0278**

5 (Pages 14 to 17)

Thompson                                          v.                              Dover Downs
Nathan R. Whitecomb                    C.A. # 05-274 (GMS)                        April 11, 2006

Page 18

1  communicated to, yes.
2      Q.  If you covered a sick day with vacation time,
3  were you still required to have a doctor's note?
4      A.  Honestly, I don't recall.
5      Q.  Did Mr. Thompson ever tell you that he thought
6  he was being discriminated against because of his age?
7      A.  Yes, sir.
8      Q.  Do you recall when he told you that?
9      A.  A good couple of months before he told me he was
10  making the suit, the lawsuit.
11     Q.  Did he ever communicate that to you when he was
12  working on third shift with you?
13     A.  He really didn't have a chance to communicate
14  that with me.  After his accident, I didn't get a chance
15  to speak to him until he came back to day shift.
16     Q.  Whenever he made this communication to you, what
17  did he say?
18     A.  Basically -- he and I took a lot of breaks
19  together.  We spent a lot of time together.  Basically he
20  would just shake his head, laugh, and go, "This is what
21  they've done" and basically run through the gauntlet of
22  what they did and how he felt it was wrong and -- you
23  know.
24     Q.  When you say "run through the gauntlet," do you

Page 19

1  have any recollection of what the gauntlet consisted of?
2      A.  It depended.  Some days it would just be him
3  receiving write-ups.  Other days it would be -- mostly it
4  was write-ups.  Sick days that they were giving him a
5  hard time about being gone, things like that.
6      Q.  Did he indicate that he was being unfairly
7  treated?
8      A.  Yes, sir, he did.
9          MR. WILSON:  Can we go off the record for
10  just a second?
11         (Discussion off the record.)
12  BY MR. WILSON:
13     Q.  Did he ever indicate that he thought he was
14  being discriminated against because he didn't get certain
15  promotions or certain transfers?
16     A.  Yes, sir, he did.
17     Q.  Do you recall what these jobs were?
18     A.  Most specifically in my head, one was a third
19  shift supervisor position that he mentioned to me and one
20  was the outside plumbing position, outside plumber.
21     Q.  To your knowledge, when a job opening occurs at
22  Dover Downs, is it Dover Downs' custom or policy to post
23  that job and offer it to a Dover Downs employee before
24  it's offered to outside employees?

Page 20

1      A.  Yes, sir, that is the way it is to be done.
2      Q.  You stated a couple minutes ago that
3  Mr. Thompson felt he was discriminated against for a
4  third shift supervisor position.  Would this be a
5  supervisor building maintenance position?
6      A.  Yes, sir.
7      Q.  Was that job posting in 2001?
8      A.  I honestly have to say I do not recall.
9      Q.  I would just like to show you a document real
10  quick.  It's been marked Duncan Number 5.  Take a look at
11  that real quick and let me know when you're take.
12     A.  (The witness reviews the document.)  I'm
13  familiar with the form.
14     Q.  You believe that's the job opening that
15  Mr. Thompson was speaking of?
16     A.  Yes, sir.
17     Q.  To your knowledge, did Mr. Thompson apply for
18  that position?
19         MR. ELLIS:  Object to the form of the
20  question.
21     Q.  You can answer.
22     A.  To the best of my knowledge, I was told he did
23  by him.  I did not see him hand in anything or --
24  anything, but I was told he did.

Page 21

1      Q.  To your knowledge, did anybody else apply for
2  that position?
3      A.  Not that I'm aware of.
4      Q.  Was anybody awarded this position at this time?
5      A.  Not at that time.
6      Q.  Do you know why?
7      A.  No, sir.
8      Q.  When Mr. Thompson applied the job, did you
9  think he would get the job?
10     A.  Most certainly I did.
11     Q.  Why is that?
12     A.  Because basically for the better part of a year
13  he had done the job.  I mean...
14     Q.  He had done all the essential functions of the
15  job?
16         MR. ELLIS:  Object to the form of the
17  question.
18     A.  He had taken what job duties we were given and
19  split them among us and he made sure they were done.
20     Q.  Eventually Al Baldwin was made the supervisor
21  for third shift; correct?
22     A.  Yes, sir.
23     Q.  Do you know how long it was after Mr. Thompson
24  applied for the job and was turned down?

6 (Pages 18 to 21)

Thompson                                                v.                          Dover Downs
Nathan R. Whitecomb                    C.A. # 05-274 (GMS)              April 11, 2006

Page 22

1   A.   No, I do not, no.
2   Q.   Was it several months?
3   A.   Yes.
4   Q.   When Mr. Baldwin got the job, had the job been
5   reposted?
6           MR. WILSON:  Object to the form of the
7   question.
8   A.   I'm not certain.
9   Q.   Do you know of anybody else who applied for the
10  job?
11  A.   No.
12  Q.   In March of 2004, are you aware of an opening
13  for a second shift supervisor position?
14  A.   Yes.
15  Q.   Was that job posted?
16  A.   I believe it was.
17  Q.   Do you know if it was posted for five days?
18  A.   No, I do not.
19  Q.   Are the postings required to be posted for five
20  days?
21  A.   I'm not sure, but I believe they are.
22  Q.   Do you know if Mr. Thompson applied for the job?
23          MR. ELLIS:  I'm going to object to the form
24  of the question.

Page 23

1   Q.   Had you heard that Mr. Thompson applied for the
2   job?
3   A.   I believe I had, yes.
4   Q.   Had you heard that a gentleman named Jim Shreves
5   had applied for the job, as well?
6   A.   Yes, sir.
7   Q.   Had you heard that Mr. Shreves had been promised
8   the job prior to it being posted?
9   A.   No, I had not.
10  Q.   Jim Shreves did get the job; correct?
11  A.   Yes, he did, and still has it.
12  Q.   When a change in personnel was made and that
13  information is entered into a computer system, is there a
14  person at Dover Downs that does that?
15          MR. ELLIS:  Object to the form of the
16  question.
17  A.   A change in personnel?  I believe there is.
18  Q.   In other words, if somebody changes position
19  from one job title to another, to your knowledge, is it
20  entered into a computer system?
21  A.   I'm not sure.
22  Q.   Do you have any knowledge of who the individual
23  would be that would enter that type of information?
24  A.   No, no.

Page 24

1   Q.   You also indicated that Mr. Thompson spoke of an
2   outside mechanic's job or a plumber's job?
3   A.   Yes, sir.
4   Q.   Was that for first shift?
5   A.   I believe it was, yes.
6   Q.   Outside maintenance?
7   A.   Yes.
8   Q.   He indicated he applied for that job?
9   A.   He did indicate that.
10  Q.   Are you aware that Mr. Thompson had a meeting
11  with Bob Morrison regarding filling this position?
12          MR. ELLIS:  Object to the form of the
13  question.
14  A.   I believe he did speak with him.
15  Q.   Did you and Mr. Thompson have conversations
16  about that discussion?
17  A.   No.
18  Q.   Did you hear from any source that Mr. Morrison
19  discouraged Mr. Thompson from bidding on the job?
20  A.   I do not recall.
21  Q.   Are you aware from any source that Mr. Morrison
22  told Mr. Thompson to let him fill this position with a
23  plumber and then he would post another position for
24  Mr. Thompson to fill?

Page 25

1   A.   It's been so long ago.  I believe I had heard
2   that.
3   Q.   Do you remember who you heard it from?
4   A.   I believe it was from Mr. Thompson.
5   Q.   Are you aware that Robert Knotts was hired to
6   fill that position?
7   A.   Yes, sir, I am.
8   Q.   Are you aware that Mr. Thompson was upset about
9   Robert Knotts being hired for this position?
10  A.   I most certainly am.
11  Q.   Can you tell me why he was upset?
12  A.   He felt that he could have done the job.  He
13  didn't understand why he didn't get the job.  He felt he
14  had met the criteria, and that was basically his words
15  that I recall, was that he was younger and that he was
16  also related to someone else that worked there.
17  Q.   Are you aware of a meeting that occurred between
18  Mr. Thompson, Mr. Morrison, and Mrs. Isenberg?
19  A.   I believe I am.  I know it took place.
20  Q.   What took place?
21  A.   The meeting.
22  Q.   Do you have any knowledge as to what was
23  discussed?
24          MR. ELLIS:  Object to the form of the

B-0280

7 (Pages 22 to 25)

Thompson                                                    Dover Downs
Nathan R. Whitecomb                v.                       April 11, 2006
                          C.A. # 05-274 (GMS)

Page 26

1  question.
2      A.  I just recall that it was a very negative
3  experience for Mr. Thompson.
4      Q.  Did Mr. Thompson indicate to you that during
5  this meeting he complained of discrimination on the basis
6  of age?
7      A.  I do not recall.
8      Q.  Do you recall the day after the meeting that
9  Mr. Thompson was written up for four separate
10 disciplinary violations?
11     A.  Yes.  Yes, I do remember that.
12     Q.  Do you recall what the violations were for?
13     A.  No, sir, I do not.
14     Q.  Did Mr. Thompson tell you about these?
15     A.  Yes, sir.
16     Q.  What did he tell you?
17     A.  He just came to me smiling and shook his head
18 and he said, "Look," and he showed me four individual
19 write-ups.  He showed me the forms he had.  Because we
20 are to get a copy of them for our own records.
21     Q.  Did he indicate that he had never gotten a copy
22 of it?
23     A.  As far as I knew, he did get a copy.  I know I
24 was told that he got one.

Page 27

1      Q.  Do you know what the 72-hour rule is?
2      A.  If I'm not mistaken, now, as it was explained to
3  me, the 72-hour rule is after someone takes a sick day
4  without getting a doctor's note, if it's not written up
5  within that 72 hours, it does not get written up because
6  they allowed it to go.
7      Q.  Who explained that to you?
8      A.  Mr. Thompson.
9      Q.  Anybody else?
10     A.  No, sir.
11     Q.  Did Mr. Thompson indicate that the four
12 violations that he got that day were in violation of the
13 72-hour rule?
14     A.  Yes, sir.
15     Q.  Did Mr. Thompson indicate that Mr. Duncan wrote
16 him up for these violations and then tore that write-up
17 up and had Mr. Homlish fill out new violation forms?
18     A.  I believe he did tell me that.
19     Q.  Did he indicate that Mr. Homlish backdated these
20 violation notices?
21     A.  I believe he did.
22     Q.  From your observations after this point in time,
23 did Dover Downs begin to scrutinize Mr. Thompson's
24 conduct closer than it had previously?

Page 28

1          MR. ELLIS:  Object to the form of the
2  question.
3      A.  I believe they did.
4      Q.  Do you believe they scrutinized his conduct
5  closer than they did younger employees?
6          MR. ELLIS:  Object to the form of the
7  question.
8      A.  Yes, sir, I believe they did.
9      Q.  Mr. Whitecomb, in February of 2005, did you get
10 a bonus check from Dover Downs?
11     A.  Yes, sir, I did.
12     Q.  During the previous year, had you had any
13 disciplinary write-ups?
14     A.  I believe that was the year I had the coaching
15 and the write-up, yes, about tardiness.  I'm not certain,
16 but I believe so.
17     Q.  The other write-up you had the following year,
18 did you receive a bonus?
19     A.  Yes.  The coaching, yes.
20     Q.  It was a coaching.
21     A.  That was a coaching.
22     Q.  Pretty much everybody gets these bonuses every
23 year; correct?
24         MR. ELLIS:  Object to the form of the

Page 29

1  question.
2      A.  Depending on the amount -- it's basically
3  depending on the disciplinaries, but yes.
4      Q.  Are you aware of anybody that has gotten
5  disciplinary warnings that has still received the bonus
6  check?
7      A.  Not off the top of my head, no.
8      Q.  Have you ever applied for a position for outside
9  maintenance?
10     A.  No, sir.
11         MR. WILSON:  I have nothing further.
12         MR. ELLIS:  No questions.
13         (The deposition was then concluded at
14 3:45 p.m.)
15         - - - - -
16
17
18
19
20
21
22
23
24

8 (Pages 26 to 29)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,          )
                                  )
              Plaintiff,          )
                                  )
v.                                )  Civil Action No.
                                  )    05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS)
GAMING & ENTERTAINMENT INC.,  )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,    )
INC.,                             )
                                  )
              Defendants.         )

          Deposition of STEVEN T. HOMLISH taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 9:05 a.m. on Tuesday, April 12, 2006, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.

APPEARANCES:

          TIMOTHY J. WILSON, ESQUIRE
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware  19899
            for the Plaintiff

          BETH A. FRIEL, ESQUIRE
          MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
            123 South Broad Street
            Philadelphia, Pennsylvania  19109
            for the Defendants

------------------------------------------------------
                   WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

B-0282

Thompson
Steven T. Homlish

v.
C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 2

1  ALSO PRESENT:
2       BRANCE F. THOMPSON, SR.
3       - - - - -
4       STEVEN T. HOMLISH,
5       the witness herein, having first been
6       duly sworn on oath, was examined and
7       testified as follows:
8  BY MR. WILSON:
9    Q.  Good morning, Mr. Homlish.  My name is Tim
10  Wilson.  I'm Brance Thompson's attorney in his lawsuit
11  against Dover Downs.
12    **A.  Good morning.**
13    Q.  I just want to give you a couple instructions
14  before the deposition starts.
15       I'm going to be asking you questions
16  pertaining to the lawsuit.  When you respond, I ask that
17  you do so verbally.  This is because the court reporter
18  can't take down nonverbal head nods and other nonverbal
19  communication.
20       As you know, your testimony is under oath.
21  You've just been sworn, so you must answer truthfully
22  just as if you were in court.
23       If you don't hear a question or don't
24  understand it, let me know and I will ask it again or

Page 3

1  explain it.
2       I ask that you please let me finish asking
3  my question before you begin to answer, and I will
4  attempt to let you finish your answer before I ask
5  another question.  This is so the transcript can be
6  clean.
7       If at any time you come to realize that a
8  statement that you made is incorrect or inaccurate, let
9  me know and you'll be permitted to clarify the record.
10       If at any time I should need a break or go
11  to the rest room, you just let me know and we'll be glad
12  to oblige you.
13       Do you understand these instructions?
14    **A.  Yes.**
15    Q.  Can you tell me where you were born and what
16  your birth date is?
17    **A.  Dover, Delaware.  12/31/59 is my birth date.**
18    Q.  What's your address?
19    **A.  107 Graystone Road, Hartly, Delaware, 19953.**
20    Q.  How long have you lived there?
21    **A.  I've lived there for four years.**
22    Q.  Do you own or rent?
23    **A.  Own.**
24    Q.  Have you ever been arrested?

Page 4

1    **A.  Yes.**
2    Q.  When was that?
3    **A.  Oh, approximately 20 years ago.**
4    Q.  What was the charge?
5    **A.  It was for burglary, second degree.**
6    Q.  Were you convicted?
7    **A.  Yes.**
8    Q.  Is that a felony?
9    **A.  Yes.**
10    Q.  Any other arrests?
11    **A.  No.**
12    Q.  Did you serve in the military?
13    **A.  No.**
14    Q.  Are you taking any medications today that would
15  impair your ability to provide testimony and give
16  truthful answers?
17    **A.  No.**
18    Q.  Did you graduate from high school?
19    **A.  Yes.**
20    Q.  What year?
21    **A.  In '79.**
22    Q.  What high school?
23    **A.  Caesar Rodney.**
24    Q.  That's in Dover?

Page 5

1    **A.  Yes.  Camden, Delaware.**
2    Q.  Did you go to college?
3    **A.  No.**
4    Q.  Did you have any other form of education after
5  high school, trade schools or anything like that?
6    **A.  Trade schools.**
7    Q.  Where did you go to trade school?
8    **A.  It's formerly -- now -- it was Kent Vo-Tech.**
9  **Now it's Poly Tech.**
10    Q.  What did you study there?
11    **A.  Carpentry, industrial mechanics.**
12    Q.  Did you get a degree or a certificate or
13  anything?
14    **A.  Certificates.**
15    Q.  When was that?
16    **A.  I don't remember exactly.**
17    Q.  Shortly after you graduated from high school?
18    **A.  Yes, yes.**
19    Q.  Any other type of education after high school?
20    **A.  No.  Seminars.  That's all.**
21    Q.  Is that seminars that you participated in with
22  Dover Downs?
23    **A.  And other -- yes, yes.**
24    Q.  Are you presently employed by Dover Downs?

2 (Pages 2 to 5)

Thompson                  v.                  Dover Downs
Steven T. Homlish         C.A. # 05-274 (GMS)        April 12, 2006

Page 6

1   **A.  Yes.**
2   Q.  What is your job title?
3   **A.  I'm day shift supervisor.**
4   Q.  Is Bob Morrison your boss?
5   **A.  No.**
6   Q.  Who is your boss?
7   **A.  Rich Duncan.**
8   Q.  How long have you been the day shift supervisor?
9   **A.  Approximately three years.**
10  Q.  So you started that job in -- what? 2003?
11  **A.  Yes, that's correct.**
12  Q.  What position did you hold prior to that?
13  **A.  A Mechanic I position.**
14  Q.  That's with Dover Downs, too?
15  **A.  Yes.**
16  Q.  What shift were you on?
17  **A.  I was on day shift. That was the only shift**
18  **there was.**
19  Q.  Were you inside maintenance or outside
20  maintenance?
21  **A.  Inside maintenance.**
22  Q.  What was your primary duty as a maintenance
23  mechanic?
24  **A.  Can you clarify what you want to --**

Page 7

1   Q.  Well, from what I've gathered in some of these
2  depositions, some maintenance mechanics are geared
3  towards, one guy is maybe geared towards plumbing,
4  another guy towards painting, and that's what they do
5  primarily, even though they do other stuff, as well.
6      Is there a primary craft that you were kind
7  of geared towards and that you spent most of your time
8  working on?
9   **A.  I was required to do all of those crafts, but**
10  **I -- I can't answer that as I primarily -- I always spent**
11  **my time doing all of those things, so I didn't primarily**
12  **spend my time doing one thing.**
13  Q.  How long have you worked for Dover Downs?
14  **A.  It will be almost ten years.**
15  Q.  Did you start out as a Maintenance Mechanic I?
16  **A.  We didn't have classifications as Mech I's when**
17  **I first started. I was just a maintenance man, building**
18  **maintenance.**
19  Q.  The job you had right before Dover Downs, what
20  was that?
21  **A.  I was an apartment maintenance supervisor.**
22  Q.  For an apartment complex?
23  **A.  Yes.**
24  Q.  What was the name of that apartment complex?

Page 8

1   **A.  WNY Management.**
2   Q.  That's one of my clients. Okay.
3      What did you do to prepare for today's
4  deposition?
5   **A.  I did nothing, actually, to prepare. I was**
6  **prepared to answer the questions, so --**
7   Q.  Did you meet with an attorney?
8   **A.  No, no.**
9   Q.  Did you review any documents?
10  **A.  No.**
11  Q.  Did you talk to anybody at all to prepare for
12  the deposition?
13  **A.  No, except for the attorney for Dover Downs.**
14      MS. FRIEL: I believe he was confused. I
15  think he thought you meant individual attorney. He did
16  meet with me, Dover Downs' attorney.
17      THE WITNESS: Yes, yes.
18      MR. WILSON: All right.
19  BY MR. WILSON:
20  Q.  When did you meet with Ms. Friel?
21  **A.  Yesterday.**
22  Q.  How long did you meet with her?
23  **A.  For approximately 15, 20 minutes.**
24  Q.  What did you discuss?

Page 9

1      MS. FRIEL: Objection. Attorney/client
2  privilege.
3      MR. WILSON: He's your client?
4      MS. FRIEL: Yes.
5      MR. WILSON: Is he management?
6      MS. FRIEL: He's a supervisor.
7      MR. WILSON: I'm sorry. I was confused. I
8  thought he was a worker. Okay. I won't go there.
9  BY MR. WILSON:
10  Q.  Have you talked to anybody in general about this
11  lawsuit?
12  **A.  No.**
13  Q.  You talked to nobody at Dover Downs just in
14  passing?
15  **A.  No. I don't -- no, because I don't know what**
16  **it's about. I didn't even know it's really a lawsuit, to**
17  **be honest with you.**
18  Q.  So when did you become aware that there was a
19  lawsuit?
20  **A.  I was aware that there was -- there's a**
21  **proceeding going on, but I wasn't aware that there's a**
22  **lawsuit that Mickey's suing anybody.**
23  Q.  What is your understanding of the proceeding?
24  **A.  I really don't have an understanding of it, to**

B-0284

Thompson
Steven T. Homlish

v.
C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 10

1  be honest with you.
2      Q.  Are you aware that he is alleging age
3  discrimination against Dover Downs?
4      A.  I do, in part.
5      Q.  Can you explain that?
6      A.  Well, because I'm being asked -- the questions
7  that I'm going to be asked and prepared for from my
8  attorneys --
9          MS. FRIEL:  Objection.  You can't talk
10  about privileged stuff that we talked about.
11          THE WITNESS:  Okay.  Okay.
12          MR. WILSON:  Okay.
13          THE WITNESS:  Okay.
14  BY MR. WILSON:
15      Q.  Mr. Homlish, am I saying your name correctly?
16      A.  Yes.
17      Q.  You evaluate performance of the maintenance
18  personnel under your supervision; correct?
19      A.  Yes.
20      Q.  I'd like to show you a document that has been
21  previously marked as Duncan Exhibit 1.
22          MR. WILSON:  Here is a copy for you, Beth.
23          MS. FRIEL:  Thanks.  We are just keeping it
24  Duncan 1; right?

Page 11

1          MR. WILSON:  Yes.
2          MS. FRIEL:  All right.
3  BY MR. WILSON:
4      Q.  Can you review that document and let me know
5  when you are finished?
6      A.  Sure.  (The witness reviews the document.)
7  Okay.
8      Q.  Can you look at the first page, roughly slightly
9  below the middle of the first page, there's a box there
10  that says "Prepared By:  Steven T. Homlish."
11      A.  Yes.
12      Q.  Is that your signature there?
13      A.  Yes.
14      Q.  That's dated 5/15/04; correct?
15      A.  Yes.
16      Q.  On the bottom of that first page it says
17  "Overall Score."  What does the overall score represent?
18      A.  It represents what the rating is for his overall
19  performance.
20      Q.  It says 92.2 percent there; right?
21      A.  Yes.
22      Q.  Is 92.2 percent a good score?
23      A.  In my opinion, yes.
24      Q.  Do you do these performance evaluations for all

Page 12

1  of the employees that you supervise?
2      A.  Yes, ones under my supervision.
3      Q.  In comparison to those employees, is
4  92.2 percent a good score?  Above average?
5      A.  It's -- yeah.  It's basically that's about --
6  yeah, that's about the same.  Well, it varies.  I mean,
7  they're not all the same.  It's an evaluation, so it's my
8  opinion on what the person has done for the entire year.
9      Q.  But if you looked at all the performance
10  evaluations as a group, as you sit here today, your
11  recollection today, would you say that the 92.2 percent
12  is above the average of the employees that you supervise?
13      A.  I can't look at it as a group, though.  I have
14  to look at it individually.
15      Q.  I'd like to refer you to the fifth page.  It has
16  the number D 0038 on it and there's a box there for
17  comments.
18      A.  Am I on the right page?
19          MS. FRIEL:  No.  Turn back one.
20          THE WITNESS:  Okay.
21  BY MR. WILSON:
22      Q.  There's a box there for comments.
23      A.  Yes.
24      Q.  In "Comments" it says:  "Mickey is reliable

Page 13

1  shows up to work on time and returns from break on time."
2          Did you enter that information in that box?
3      A.  Yes, I did.
4      Q.  Is that information accurate?
5      A.  It should be, yes.  If I entered it, yes, it
6  should be.
7      Q.  So as of 5/15/04, you had no issues with
8  Mr. Thompson's attendance and his showing up for work on
9  time?
10          MS. FRIEL:  Objection to form.
11      Q.  You can answer.
12      A.  I -- yes -- or no, I didn't have any problem.
13  I'm sorry.
14      Q.  So at this time overall did you consider Mickey
15  a good performer?
16      A.  On this evaluation?
17      Q.  Yes.
18      A.  On this evaluation he was a good performer, yes.
19      Q.  Mr. Homlish, do you have any knowledge of at
20  some point in 2002 Mr. Thompson being put on the
21  11:00 p.m. to 7:30 a.m. shift?
22      A.  Yes.  The -- it's very vague to me.  I was not
23  familiar with the evening shifts.  I was only familiar
24  with the day shift, so I don't recollect a lot.

4 (Pages 10 to 13)

Thompson                                    v.                              Dover Downs
Steven T. Homlish                    C.A. # 05-274 (GMS)                    April 12, 2006

Page 14

1   Q. But you knew he was on that shift?
2   A. **Yes.**
3   Q. Did you know there was no Dover Downs employee
4   that had the title of supervisor working on that shift?
5   A. **At one point there was no supervisor, yes.**
6   Q. Were there other employees on that shift?
7   A. **Yes.**
8   Q. Do you know who?
9   A. **I -- no, I can't recollect who was on that.**
10  Q. Did Mr. Thompson supervise these employees?
11      MS. FRIEL: Objection to form.
12  Q. You can answer.
13  A. **I don't recollect who was supervisor, to be**
14  **honest with you.**
15  Q. I'd like to show you what's been previously
16  marked as Duncan Exhibit Number 4.
17      MR. WILSON: Let me see if I have one for
18  you, Beth. There you go.
19      MS. FRIEL: Thanks. Are all these one
20  exhibit?
21      MR. WILSON: Yes. I put them all in one
22  exhibit just for ease in examination.
23      MS. FRIEL: That's fine.
24  A. **(The witness reviews the document.) Okay.**

Page 15

1   **BY MR. WILSON:**
2   Q. Can you tell me what these documents are?
3   A. **These are called coachings.**
4   Q. Just for the record, there's four separate
5   incidents in this one exhibit; correct?
6   A. **Mm-hmm.**
7   Q. The top one is dated 8/17/04, the second one is
8   8/11/04, the third one is 6/17/04, and it the last one is
9   2/4/04; correct?
10  A. **That's correct.**
11  Q. Did you prepare these documents?
12  A. **Yes, I did.**
13  Q. Is that your signature where it says
14  "Manager/Supervisor's Signature"?
15  A. **Yes, that's my signature.**
16  Q. Mr. Homlish, what is the purpose of one of these
17  Disciplinary Warning Notices?
18      MS. FRIEL: Objection to form. He referred
19  to them as "coachings."
20      MR. WILSON: Well, they say "Disciplinary
21  Warning Notices."
22  BY MR. WILSON:
23  Q. Disciplinary Warning Notices or coachings?
24  A. **That's why we put on there "Coaching."**

Page 16

1   Q. Can you explain that?
2   A. **A coaching is a warning. It's not given as a --**
3   **a coaching is a coaching. It's not verbal. It's not a**
4   **verbal action. It's not a written action. It's not a**
5   **final written warning and it's not a termination. It's**
6   **just, you know, we are letting the person -- you know, we**
7   **are giving the person a -- a -- how do I explain it? We**
8   **let the person observe that he has -- we are observing**
9   **that the person has been late. Let me put it that way.**
10  Q. Is this a form of discipline?
11  A. **No.**
12  Q. Why does it say "Disciplinary Warning Notice" at
13  the top?
14  A. **It's not my form. It's the standard company**
15  **form.**
16  Q. Is the employee supposed to receive some form of
17  communication from you or anybody as to what he did
18  wrong?
19  A. **I was instructed it's not required and that's**
20  **why I put down there by "Employee's Signature," "Not**
21  **Required."**
22  Q. Have you ever given a coaching when you did give
23  notice to the employee?
24  A. **Have I given a coaching? I let -- I let the**

Page 17

1   **person know, like if the person has -- like, for**
2   **instance, if you've been late, you came in and you were**
3   **late or you didn't have a doctor's excuse, I explain to**
4   **you, You do realize that this is a coaching.**
5   Q. Okay.
6   A. **And the person, if the person says yes, that**
7   **tells me they understand. If the person says no, then I**
8   **explain to them, this is a coaching and you have so many**
9   **coachings and then you will be written up for a warning,**
10  **you know.**
11  Q. So you do meet with the employee and explain
12  this to them?
13  A. **Yes, but I do not have to. It is not required.**
14  Q. So how is the employee supposed to know this if
15  you don't communicate to him?
16  A. **Because they have an employee handbook.**
17  Q. Okay.
18  A. **Okay?**
19  Q. What does the employee handbook say?
20  A. **I don't know. I don't know exactly the**
21  **employee -- I didn't go through the employee handbook and**
22  **read the employee handbook, but we have regular meetings.**
23  **In these regular meetings, this is brought up in our**
24  **regular meetings about coachings. We bring this up in**

B-0286

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Thompson                                    Dover Downs
v.
Steven T. Homlish            C.A. # 05-274 (GMS)        April 12, 2006

Page 18

1  meetings.
2      Q.  I'd like you to look at the line immediately
3  above the box where your signature is.  There's a line
4  there that says:  "The undersigned manager/supervisor has
5  discussed this Notice and the action taken with the
6  employee."  Does it say that?
7      A.  Yes, it does.
8      Q.  You signed your name; right?
9      A.  Yes, I did.
10     Q.  Did you speak to Mr. Thompson about these?
11     A.  Truthfully, I can't answer if I spoke with him
12  on each and every one of those, but I tried to speak to
13  them on them.
14     Q.  You have no recollection of whether on any of
15  these you spoke to Mr. Thompson?
16     A.  No.  I don't make a record on here that I spoke
17  to this person because this is a coaching.  It's not a
18  verbal warning.
19     Q.  You stated that you're not required to talk to
20  the employee.  Where do you get that understanding from?
21     A.  This was verbally told to me.
22     Q.  By whom?
23     A.  By my supervisor.
24     Q.  Mr. Duncan?

Page 19

1      A.  Yes.
2      Q.  When did he tell you that?
3      A.  In our conversation when I was told I had to
4  write these coachings up for employees.
5      Q.  Do you know what year that was?
6      A.  No, no, I don't -- I don't know what year that
7  was.
8      Q.  Was it when you first started your job as
9  supervisor?
10     A.  It could have been.  It could have been when I
11  first started writing coachings.  I don't know.
12     Q.  When did you first start writing coachings?
13     A.  I have no idea.
14     Q.  Could that communication between Mr. Duncan and
15  yourself have taken place in August of 2004?
16     A.  I have no idea.
17     Q.  Could that conversation have taken place after
18  these coachings were dated?
19     A.  Oh, no, no, no.  This -- this conversation takes
20  place between HR, Rich Duncan, and the supervisors that
21  have to write these coachings, so I -- no.  It has
22  nothing to do with a verbal or coaching or anything else.
23  It has to do with, you know, each department at Dover
24  Downs.

Page 20

1      Q.  Is there anything in writing anywhere that says
2  that you don't have to discuss it with the employee?
3      A.  To my knowledge, I don't know.  I don't know.
4      Q.  There's a box there that says in the middle
5  there "To Employee.  Please read this entire disciplinary
6  warning notice carefully before signing below.  You are
7  being issued this notice to make you aware of the
8  severity of the situation."  Is that correct?
9      A.  Yes, yes, that's correct, but let me clarify
10  something.  These warnings, these disciplinary warnings,
11  these coachings, every one of these warnings, these
12  coachings on here I had to print this "Coaching" on here.
13  This is not a standard "Coaching" printed, so -- but this
14  is what Dover Downs uses as a standard form, but they are
15  not giving them any verbal -- up here at the top, "Action
16  Taken," they are not giving them any verbal, written,
17  final, or termination.  That's why we put up here
18  "Coaching."
19     Q.  But doesn't "Coaching" imply some form of
20  instruction?
21     A.  Because we have to have some kind of form of
22  document that says that, you know, this is how many you
23  have.
24     Q.  But if it's not communicated to the employee,

Page 21

1  what good does it do to them?
2      A.  Because it will be communicated by their
3  attendance record and also these.
4      Q.  On the first page of each of these where it says
5  "Nature of Incident," if you could just read the second
6  line on each of them.  I believe each says "Section 6.04
7  of the employee handbook has been explained that this is
8  an occurrence."
9      A.  Yes.
10     Q.  Does each of those say that?
11     A.  Yes.
12     Q.  All right.  Did you type that information in
13  there?
14     A.  Yes, I did.
15     Q.  Does that indicate that you explained this to
16  Mr. Thompson?
17     A.  Yes, that does.
18     Q.  So you did meet with him on these?
19     A.  Yes, but like I said, I'm telling you
20  truthfully, I cannot recollect every person that I coach,
21  if I actually talk to that person.  So I'm telling you
22  truthfully, I cannot recollect if I spoke to
23  Mr. Thompson.
24     Q.  Okay, but this line here is indicative that you

6 (Pages 18 to 21)

Thompson
Steven T. Homlish

v.
C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 22

1  did; correct?
2  **A. Right.**
3  Q. Is there any reason why you used the exact same
4  words on all four?
5  **A. Because in the section of the handbook, that's**
6  **what it implies for that occurrence.**
7  Q. So throughout a period of six months you just
8  happened to use the exact same words in each instance?
9  **A. Yes.**
10  Q. If you met with Mr. Thompson on these, why
11  didn't you ask him to sign the warning notice?
12  **A. Because it's not required.**
13  Q. But wouldn't that make you have better records
14  as to whether you met with him or not?
15  **A. That's my only answer. It's not required.**
16  Q. You indicated that at the top where it says
17  "Action Taken" there's nothing checked here.
18  **A. I'm sorry. What?**
19  Q. Up at the top where it says "Action Taken" and
20  below it says "Verbal Warning, Written Warning,"
21  et cetera --
22  **A. Yes.**
23  Q. So none of these actions was taken on any of
24  these coachings; correct?

Page 23

1  **A. On my sheets, correct, that's correct.**
2  Q. Can any of these actions be taken with a
3  coaching?
4  **A. With a coaching?**
5  Q. Yes, when you do a coaching.
6  **A. No. You're going beyond the coaching if**
7  **you're -- if you're using -- if it's not a coaching,**
8  **that's beyond the coaching form then. If it's a**
9  **verbal -- if it's verbal, it's gone beyond coaching.**
10  Q. In the box beside your signature where it says
11  "Date Signed" --
12  **A. Yes.**
13  Q. -- the first one says 8/17/04, the second one
14  says 8/11/04, the third one is 6/17/04 --
15  **A. Right.**
16  Q. -- and the last one 2/4/04.
17      Is that the date that you signed these
18  Disciplinary Warning Notices?
19  **A. Yes.**
20  Q. Are you certain you didn't sign these documents
21  on or about August 24th, 2004?
22  **A. No.**
23  Q. All right. I would like to show you a new
24  document. This is actually going to be a new exhibit.

Page 24

1      (Homlish Exhibit 1 was marked for
2  identification.)
3  BY MR. WILSON:
4  Q. You've been handed what has been marked as
5  Homlish 1. Can you just take your time and look at that
6  and let me know when you're done?
7  **A. (The witness reviews the document.) Okay.**
8  Q. Do you know what this document is?
9  **A. It's the first time I've seen it. It's an**
10  **attendance record.**
11  Q. Are you not responsible for the attendance
12  records?
13  **A. No, I'm not.**
14  Q. Do you have any knowledge as to what these, the
15  different letters and numbers in the different dates
16  would mean?
17  **A. No, I don't.**
18  Q. Okay. All right. Well, then, we'll just put
19  that off until later.
20      Mr. Homlish, were the maintenance employees
21  ever told that they could use their vacation time to
22  cover a day that they were out sick?
23      MS. FRIEL: Objection to form.
24  **A. I don't know to be honest to answer that because**

Page 25

1  **I was never under that understanding. The only time I**
2  **knew -- the only understanding I was under was you had to**
3  **use your sick time. If you had sick time, you had to use**
4  **sick time.**
5  Q. Right.
6  **A. Now, if there were any other special cases, you**
7  **know, I was not aware of them.**
8  Q. So after you used your sick time, are you ever
9  aware of any instance where an employee was permitted to
10  use vacation time to cover an illness?
11  **A. I'm not aware of it because I didn't -- like I**
12  **said, I didn't handle the attendance, you know, records**
13  **of them.**
14  Q. Did you ever hear Mr. Duncan say that employees
15  could use vacation to cover an illness?
16  **A. I know he tried with HR to help guys out, but I**
17  **don't know if they actually were able to do it.**
18  Q. Were you ever aware of any communications from
19  HR or anybody else stating that you could no longer use
20  vacation to cover for an illness?
21  **A. Well, that I wouldn't know. I don't know**
22  **because all I knew is you had to use your sick time, and**
23  **once your sick time was up, you had to use short-term --**
24  **there was short-term disability available, long-term**

B-0288

7 (Pages 22 to 25)

Thompson
Steven T. Homlish

v.
C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 26

1  disability available, and those things from Dover Downs
2  to use.
3      Q.  Dover Downs employees were given a personal day
4  every year; right?
5      A.  Yes.
6      Q.  Could you use a personal day to cover for an
7  illness?
8      A.  Not that I know of.
9      Q.  What could you use a personal day for?
10     A.  We would use a personal day in place of a
11  vacation day.
12     Q.  So are you saying that a personal day had to be
13  requested in advance?
14     A.  Yes.
15     Q.  With respect to job openings at Dover Downs, is
16  it Dover Downs' custom or policy to open up the job to
17  current Dover Downs employees prior to offering it to
18  somebody who is not a Dover Downs employee?
19     A.  Yes.
20     Q.  Is that policy written anywhere?
21     A.  As far as I know, it's not written.
22     Q.  Have you ever told employees this, that that's
23  what the policy is?
24     A.  It's not really considered a policy, so it's

Page 27

1  just something Dover Downs will do.  They can post it
2  first.
3      Q.  Have you ever communicated that to employees
4  under your supervision?
5      A.  That the job will be posted?
6      Q.  No.  That Dover Downs follows this policy, for
7  lack of a better word, or custom that they offer it to
8  the in-house people first.
9      A.  No.  I usually don't communicate that because
10  I'm not aware of a posting until it's already posted.
11     Q.  I know you already answered this, but just so I
12  don't have to go back and look, were you a building
13  maintenance supervisor in 2001?
14     A.  No, it wouldn't be 2001.
15     Q.  Do you recall when Al Baldwin was made the third
16  shift supervisor?
17     A.  Yes.
18     Q.  Do you have any recollection as to the time
19  period?
20     A.  No, I don't.
21     Q.  You believe it was in 2001?
22     A.  I honestly don't remember.
23     Q.  Were you still a maintenance mechanic?
24     A.  No.  I was a -- I think I was a supervisor then,

Page 28

1  yeah.  Yes, I was a supervisor then.  I'm sorry.
2      Q.  Do you recall what your salary was at that time?
3      A.  No, I don't.
4      Q.  Approximately?
5      A.  No, I don't.
6      Q.  Are you aware that there was a job posting for
7  the third shift supervisor job?
8          MS. FRIEL:  Objection.  Can we get a time
9  period?
10         MR. WILSON:  2001.
11     A.  There was a -- well, there was always a job
12  posting, but I didn't follow it, so I wasn't really
13  keeping aware of it.
14  BY MR. WILSON:
15     Q.  Do you know if anybody was ever awarded that job
16  pursuant to the posting?
17     A.  Yeah, but my recollection of who got third shift
18  and who applied, I don't recall.
19     Q.  Who do you recollect got the job?
20     A.  I don't recollect.  The only recollection I have
21  on third shift who was supervisor at one point was -- Al
22  Baldwin was supervisor at one point and then Bill
23  Carlisle was acting supervisor right now.  I remember
24  that.

Page 29

1      Q.  Do you know if Al Baldwin got the job pursuant
2  to a job posting?
3      A.  I'm sure he did.  I'm sure it had to have been
4  posted.  I just can't recall the dates and times and how
5  it was posted.
6      Q.  Why are you sure it had to be posted?
7      A.  Because that's -- normally -- that's the norm.
8  They post, they give all the mechanics a chance to apply
9  for it.
10     Q.  In March of 2004, are you aware of a job posting
11  for a second shift supervisor?
12     A.  I don't recall.  Oh, I'm sorry.  Second shift?
13     Q.  Yes.
14     A.  2004?
15     Q.  Yes.  March of 2004.
16     A.  To be honest, I don't recall who got -- I don't
17  recall that one, but I'm going to guess that's probably
18  Jim Shreves got that one.
19     Q.  Do you recall if that job was posted?
20     A.  Like I answered the other one, I'm sure it was
21  posted.  I don't remember -- remember it being posted
22  because I didn't follow it because I wasn't looking for
23  the job.  That's my answer.  I didn't follow the postings
24  because I wasn't looking for the job.

8 (Pages 26 to 29)

Thompson                                    v.                          Dover Downs
Steven T. Homlish              C.A. # 05-274 (GMS)                      April 12, 2006

Page 30

1   Q.   When we're talking about posting --
2   A.   Right.
3   Q.   -- can you explain that to me?
4   A.   Well, posting is an in-house -- it's an
5   in-house -- you know, this is an in-house job description
6   of a job that's available for Dover Downs.
7   Q.   Is it actually posted somewhere?
8   A.   Yes.
9   Q.   Where is it posted?
10  A.   Normally it's posted in the break room, on our
11  department bulletin board, if at the time we had a
12  department bulletin board.  I don't know if we had one at
13  the time.  And then it's also posted on the computer
14  Internet -- or not Internet.  The computer e-mail.
15  Q.   So everybody in maintenance would get an e-mail?
16  A.   Anybody that has access to the e-mail.
17  Q.   Do you know who sent out the e-mail?
18  A.   That would be HR.
19  Q.   Anybody in particular in HR?
20  A.   No, I don't know at that time.
21  Q.   How long would these postings stay up?
22  A.   I think they stay up for seven days.
23  Q.   You said that the posting gives an in-house job
24  description of the job.  To your understanding, does that

Page 31

1   mean that if there is a current Dover Downs employee that
2   meets those qualifications, that employee will get the
3   job before they go look outside?
4   A.   To my understanding, yes.
5   Q.   Do you have any knowledge that Mr. Shreves had
6   already been promised this job prior to the end of the
7   posting period, the March 2004 second shift supervisor
8   job?
9   A.   No, I don't.
10  Q.   With regard to the computer e-mail information,
11  is there somebody in HR who would be responsible for
12  changing a person's job position in the computer system,
13  say when they did get a promotion?
14  A.   I don't know.  I mean, I'm just saying that's a
15  part of communication through Dover Downs on a posting,
16  so I don't know how they do it.  That's just a part of
17  communication that they do.
18  Q.   In June 2004, I think you testified that at that
19  time you would have been the outside supervisor; correct,
20  in June of 2004?
21  A.   Outside supervisor?  No.
22  Q.   You were inside supervisor?
23  A.   Inside.
24  Q.   At that time are you aware that Mr. Thompson bid

Page 32

1   on a job to go outside?
2   A.   He was looking for a job outside, yes.
3   Q.   Do you know why he was looking for a job
4   outside?
5   A.   He was unhappy inside.
6   Q.   Why was he unhappy?
7   A.   He felt he wasn't being treated fairly.
8   Q.   How so?
9   A.   He just felt he wasn't being treated fairly.  I
10  think there were a lot of reasons.  But I didn't get
11  involved in his personal reasons.  I just felt he was
12  unhappy, you know.
13  Q.   Did he ever tell you what the reasons were?
14  A.   No.  Mickey kept things to himself a lot, you
15  know.
16  Q.   Are you aware from any source a conversation
17  that Mr. Thompson had with Bob Morrison regarding this
18  position?
19  A.   No.
20  Q.   Are you aware that Mr. Morrison discouraged
21  Mr. Thompson from bidding on the job?
22  A.   No, I'm not.
23  Q.   Were you aware that after Mr. Thompson didn't
24  receive this job that he was upset?

Page 33

1   A.   Yeah, yeah.
2   Q.   Do you know why he was upset?
3   A.   Because he didn't get the job.
4   Q.   Do you know why he didn't get the job?
5   A.   No, I don't know all the reasons why he didn't
6   get it.
7   Q.   You never had a conversation with Mr. Morrison
8   or anybody regarding why Mickey didn't get the job?
9   A.   No.
10  Q.   Are you aware that Mr. Thompson had a meeting
11  with Mr. Morrison and Mrs. Isenberg regarding this issue?
12  A.   I vaguely -- yeah, I remember him having
13  meetings.  I think there were even more than one meeting
14  he might have had with outside maintenance and HR.
15  Q.   Do you recall this being in August of 2004?
16  A.   I don't recall the dates.
17  Q.   Are you aware from any source that during one of
18  these meetings he complained that he was being
19  discriminated against because of his age?
20  A.   I -- no, I don't know the specifics of what, you
21  know, what he was -- what he was looking for.  Or not
22  looking for, but what he was discussing.
23  Q.   Following this meeting, did you have any
24  meetings with Mr. Morrison or Mr. Duncan discussing

B-0290

9 (Pages 30 to 33)

Thompson
Steven T. Homlish

v.

C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 34

1  Mr. Thompson?
2  **A. I'm sorry. Did I have any meetings?**
3  Q.  Yes.
4  **A. No.**
5  Q.  Any communications at all?
6  **A. No.**
7  Q.  Did Mr. Thompson ever tell you that he thought
8  he was being discriminated against?
9  **A. Truthfully, I don't recall.**
10  Q.  I would like to show you a document that's been
11  previously marked as Duncan Exhibit 7.
12  **A. (The witness reviews the document.)**
13        MR. WILSON:  Let's take a break and then
14  we'll get to this document.
15        (A recess was taken at this time.)
16  BY MR. WILSON:
17  Q.  Are you done reviewing the document?
18  **A. Yes.**
19  Q.  Have you ever seen this document before?
20  **A. Yes.**
21  Q.  When did you see it?
22  **A. I saw it, actually, most recent, with our**
23  **attorney.**
24  Q.  Did you see it prior to that?

Page 35

1  **A. I don't recollect.**
2  Q.  Do you know if this document is in
3  Mr. Thompson's personnel file?
4  **A. I don't know.**
5  Q.  Do you know if this document was torn up?
6  **A. I don't know.**
7  Q.  Were any of the write-ups that were in Duncan
8  Number 4 that had your signature on, are they referenced
9  in this disciplinary warning?
10  **A. (No response.)**
11  Q.  This is just a pile of extras here.
12        MS. FRIEL:  You can refer to that.
13        THE WITNESS:  Oh, okay.
14  **A. 6/16/04 is referenced in here. That's all I see**
15  **referenced right now. And -- wait a minute. 8/16 is**
16  **referenced and 6/16. 8/10 is referenced. So we got**
17  **8/16, 8/10, 6/16 and I don't see 2/15.**
18  BY MR. WILSON:
19  Q.  Is it your testimony that the forms in Duncan
20  Number 4 were not written up by you to replace the
21  incidents referenced in Duncan Number 7?
22  **A. No, no. No, they were not ripped up.**
23  Q.  Did you complete the one in Duncan Number 4 at
24  the request of Mr. Duncan to replace these?

Page 36

1  **A. No. Well, ask that question again.**
2  Q.  Did you complete the forms in Duncan Number 4 at
3  the request of Mr. Duncan to replace the references in
4  Duncan Number 7?
5  **A. No.**
6  Q.  It's your sworn testimony that you completed
7  these prior to 8/24/04?
8  **A. Yes.**
9  Q.  Mr. Homlish, do you know why Mr. Thompson was
10  written up for so many incidents on 8/24/04 as referenced
11  in Duncan Number 7?
12        MS. FRIEL:  I'm sorry. Can you repeat that
13  question?
14        MR. WILSON:  I'm asking him does he know
15  why there were so many incidents included in this one
16  warning notice on August 24th, 2004.
17        MS. FRIEL:  Objection to form.
18  **A. Are you asking me why this was -- why this**
19  **notice was written?**
20  BY MR. WILSON:
21  Q.  Why there were so many referenced in this
22  notice.
23  **A. I don't know. I don't know.**
24  Q.  Is that normally the way it's done?

Page 37

1  **A. I don't know that, either. I didn't see this.**
2  Q.  Does the human resources department keep track
3  of all attendance and disciplinary actions and warnings?
4  **A. To my understanding they do.**
5  Q.  If somebody is given a disciplinary warning,
6  that warning is forwarded to the human resources
7  department?
8  **A. To my understanding they do.**
9  Q.  Do you know how that occurs?
10  **A. No, I don't.**
11  Q.  Do you know how long it takes before it gets to
12  HR?
13  **A. No, I don't.**
14  Q.  If somebody was written up in February, do you
15  believe that HR would have notice by June?
16  **A. I would assume.**
17  Q.  Do the maintenance employees receive a yearly
18  bonus at Dover Downs?
19  **A. Yes, they do.**
20  Q.  Do most of the employees get these bonus checks?
21  **A. To my knowledge, most of them do.**
22  Q.  Why would somebody not receive a bonus check?
23  **A. The only time -- the only knowledge I have is**
24  **when you get a final written warning is when you may not**

10 (Pages 34 to 37)

Thompson
Steven T. Homlish

v.
C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 38

1  get a bonus. And there could be other incidents that I'm
2  not aware of that you may not get one.
3     Q.  You say "may not get one." Does that mean that
4  you could have a final written warning and you may still
5  get one?
6     A.  Not to my -- not to my knowledge. To my
7  knowledge, you do not get one.
8     Q.  Do they normally come out in February?
9     A.  It's sometime after January. I know that.
10    Q.  Do you know of anybody that did not get a bonus
11  check in 2006?
12    A.  This past year. Kevin Gorlich did not get one.
13    Q.  Do you know why Kevin Gorlich did not get one?
14    A.  Yes.
15    Q.  Why is that?
16       THE WITNESS: Should I answer that?
17       MS. FRIEL: Yes, you can answer.
18       THE WITNESS: Okay.
19    A.  Because of discrimination charges.
20  BY MR. WILSON:
21    Q.  Had anybody to your knowledge that works under
22  your supervision been given any final written warnings?
23  I guess it would be when you receive a check in 2006, is
24  it for the year 2005?

Page 39

1     A.  That's correct.
2     Q.  Did anybody that you know of have a final
3  written warning in 2005 yet still received a bonus check
4  in 2006?
5     A.  You are asking the same -- ask the question
6  again.
7     Q.  To your knowledge, did anybody that you know of
8  have a final written warning in 2005?
9     A.  No, not to my knowledge.
10    Q.  To your knowledge, did anybody in maintenance
11  have a final written warning in 2004?
12    A.  I know Mickey did one year, but I don't know
13  what year that was.
14    Q.  Okay.
15    A.  I can't remember what year it was.
16    Q.  Anybody else?
17    A.  Not to my knowledge.
18    Q.  Do you have any involvement with employees
19  returning to work on light duty?
20    A.  Do I have any involvement?
21    Q.  Yes.
22    A.  No. The only involvement I have is I'm told
23  they will be on light duty or they will not be returning.
24  The only involvement I have is whether they are going to

Page 40

1  be there at work or not.
2     Q.  Does anybody from HR ever call you and say do
3  you have any light-duty assignments?
4     A.  No, not me.
5     Q.  If you have an employee in your group that is
6  out for a period of time and then is given restrictions,
7  is that employee given a job that conforms to those
8  restrictions?
9        MS. FRIEL: Objection to form.
10       You can answer if you understand.
11    A.  We try to accommodate if we can, but 99 percent
12  of the time we can't accommodate in maintenance because
13  of injury, because a person can get injured.
14    Q.  Can you explain that?
15    A.  A lot of times a person returns to work under a
16  doctor's restrictions, so we -- Rich Duncan accepts the
17  person back under a doctor's restrictions because that is
18  the company way. They accept them back under doctor's
19  restrictions. Then they figure out what -- how to handle
20  it from there, through HR. And that's how it -- how the
21  process begins and I'm not involved in that.
22    Q.  Are you aware of anybody that has ever been
23  returned to work on restriction, yet has not been given a
24  position?

Page 41

1     A.  Explain what you mean, "given a position."
2     Q.  That they have said, that Dover Downs has said
3  we have nothing for you, you have to stay home.
4     A.  I'm not aware of the details for anybody.
5     Q.  Do you know a gentleman named Eric Daniels?
6     A.  Yes.
7     Q.  Was he on light duty at one time?
8     A.  Yes.
9     Q.  Do you know what his restrictions were?
10    A.  He was -- he was on light duty from his doctor
11  at one point, but like I said, I don't know -- you'd have
12  to talk to Rich Duncan on his restrictions and how long
13  it was because I don't -- because my -- my whole thing
14  was, you know, is he going to stay with the company, is
15  he staying with the department. I don't know. I didn't
16  get involved in that.
17    Q.  The employees that are under your supervision,
18  do you sign their time cards?
19    A.  No.
20    Q.  If an employee's illness is covered by a
21  vacation, would that be represented on their pay stub?
22    A.  I don't know how it's represented.
23    Q.  Have you ever heard a rumor that Mr. Thompson
24  has a criminal conviction?

B-0292

11 (Pages 38 to 41)

Thompson                          v.                          Dover Downs
Steven T. Homlish          C.A. # 05-274 (GMS)               April 12, 2006

Page 42

1    A.  I -- no, I haven't heard a rumor.  I just
2  assumed myself that he, with his tattoos, that he might
3  have been in jail at one time.
4    Q.  The tattoos is the reason that you assumed that?
5    A.  Yeah, myself.  I mean, I just do.
6    Q.  Did you ever have a conversation with anybody
7  about that?
8    A.  No, not...
9    Q.  On your application for employment, did you
10  disclose your criminal conviction?
11    A.  Not on my application, no.
12    Q.  Why not?
13    A.  I was not being truthful.
14    Q.  Did you have to go to the police station for a
15  background check?
16    A.  Yes, I did.
17    Q.  Did the police officer there tell you to mark
18  the box "no" when it said, "Do you have any criminal
19  convictions?"
20    A.  No.  When I went for a background check, I told
21  them everything and was truthful.
22    Q.  So the police officer said go ahead and check
23  the box "yes"?
24    A.  I don't know what boxes you're saying about

Page 43

1  checking.  It just said, "Did you have any criminal
2  background?" and I answered everything truthfully.
3    Q.  Does Dover Downs do their own independent
4  background check that you know of?
5    A.  I don't know.
6    Q.  When you were hired, were you sent to a police
7  station?
8    A.  No, I wasn't.
9    Q.  So all that was required when you were hired was
10  to just either check the box yes or no?
11    A.  That's correct.
12        MR. WILSON:  Let me just talk with my
13  client for a second and I may be finished.  Okay?
14        (A recess was taken at this time.)
15        MR. WILSON:  We have no further questions.
16        MS. FRIEL:  I just have one question
17  because one question wasn't clear, I think.
18  BY MS. FRIEL:
19    Q.  Going back to Duncan Exhibit 4, the coachings,
20  Mr. Wilson questioned you about these coachings and I
21  just want to make sure your testimony is clear.
22        Is it your testimony that you signed all of
23  these coachings on the date indicated on the coachings?
24    A.  Yes.

Page 44

1    Q.  And that you did not sign these coachings on
2  August 24, 2004; is that correct?
3    A.  That's correct.
4        MS. FRIEL:  That's all I have.
5        MR. WILSON:  Okay.
6        MS. FRIEL:  Read and sign.
7        MR. WILSON:  I have nothing further.
8        (The deposition was then concluded at
9  10:26 a.m.)
10
11        INDEX TO TESTIMONY
12
13
        STEVEN T. HOMLISH                    PAGE
14
15  Examination by Mr. Wilson              2
    Examination by Ms. Friel              43
16
17          - - - - -
18
        INDEX TO EXHIBITS
19
20  HOMLISH EXHIBIT NO.:                    PAGE
21
    1  A one-page copy of an Attendance Record for
22     the year 2004                        24
23
          - - - - -
24

Page 45

1
2
3
4
5
6
7
8        REPLACE THIS PAGE
9
10       WITH THE ERRATA SHEET
11
12       AFTER IT HAS BEEN
13
14       COMPLETED AND SIGNED
15
16       BY THE DEPONENT.
17
18
19
20
21
22
23
24

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477    B-0293

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,          )
                                  )
                Plaintiff,        )
                                  )
v.                                )    Civil Action No.
                                  )     05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS)
GAMING & ENTERTAINMENT INC.,  )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,   )
INC.,                             )
                                  )
                Defendants.       )

            Deposition of JAMES M. SHREVES, SR., taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 10:35 a.m. on Tuesday, April 12, 2006,
before Kathleen White Palmer, Registered Merit Reporter
and Notary Public.

APPEARANCES:

            TIMOTHY J. WILSON, ESQUIRE
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware  19899
              for the Plaintiff

            BETH A. FRIEL, ESQUIRE
            MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
              123 South Broad Street
              Philadelphia, Pennsylvania  19109
              for the Defendants

----------------------------------------------------
                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

B-0294

Page 2

1   ALSO PRESENT:
2       BRANCE F. THOMPSON, SR.
3           - - - - -
4       JAMES M. SHREVES, SR.,
5       the witness herein, having first been
6       duly sworn on oath, was examined and
7       testified as follows:
8   BY MR. WILSON:
9   Q.  Good morning, Mr. Shreves. My name is Tim
10  Wilson. We met a minute ago, but for the record, I am
11  Brance Thompson's attorney in his case against Dover
12  Downs.
13      I would just like to give you a couple of
14  instructions before we start.
15      First I'm going to be asking you questions
16  pertaining to this lawsuit. When you respond, I need you
17  to do so verbally. That's because we are having this
18  transcribed by the court reporter and she can't take down
19  head nods and things like un-huh and mm-hmm and things of
20  that nature. So if you mean no, say no. Don't shake
21  your head.
22  A.  Correct.
23  Q.  You've been sworn, and as you know, your
24  testimony is under oath, so you must answer truthfully

Page 3

1   just as if you were in court.
2       If you don't hear a question or don't
3   understand it, just let me know and I'll attempt to
4   explain it to you or ask you the question again.
5       Please let me finish asking the question
6   before you answer and I will attempt to let you finish
7   answering before I ask you another question. That way we
8   get a clean transcript from the court reporter. There's
9   a clear end of the question and a clear beginning of the
10  answer.
11      If at any time you come to realize that a
12  statement you made is incorrect or inaccurate, let me
13  know and you can clarify the record.
14      You cannot talk or confer with your
15  attorney during the deposition, either in here or during
16  breaks unless it pertains to a matter of privilege, and
17  Ms. Friel will jump in if that comes up.
18  A.  Okay.
19  Q.  I will endeavor to not ask those questions.
20      MS. FRIEL: Thank you.
21  Q.  If at any time you should need a break to go to
22  the rest room or whatever, just let me know and we'll
23  take one.
24  A.  Okay.

Page 4

1   Q.  Do you understand these instructions?
2   A.  Yes.
3   Q.  Can you tell me where you were born and what
4   your birth date is, please, sir?
5   A.  Fairmont, West Virginia, 10/23/64.
6   Q.  I'm a West Virginian, too. Seems to be a lot of
7   them coming through these depositions. Was it Bob
8   Morrison yesterday?
9       MR. THOMPSON: Bob Morrison.
10  Q.  What is your address, sir?
11  A.  Right now the new address is 2844 Kitts-Hummock
12  Road in Dover, Delaware.
13  Q.  How long have you lived there?
14  A.  Three months.
15  Q.  Do you own or rent?
16  A.  Own.
17  Q.  Did you serve in the military?
18  A.  Yes.
19  Q.  What branch?
20  A.  Marine Corps.
21  Q.  What years?
22  A.  '81 to '84.
23  Q.  Did you graduate from high school?
24  A.  No.

Page 5

1   Q.  What was the highest level you went in school,
2   what grade?
3   A.  Tenth.
4   Q.  Where did you go to tenth grade?
5   A.  East Fairmont High School.
6   Q.  Have you had any other education past tenth
7   grade, any type of trade school education or anything
8   like that?
9   A.  GED and electrician's helper.
10  Q.  The electrician's helper, was that just with an
11  electrician that you worked with?
12  A.  Yes, yes.
13  Q.  The GED, where did you get that from?
14  A.  East Fairmont.
15  Q.  What year?
16  A.  '84 -- '86, right after I got out of the Marine
17  Corps.
18  Q.  Are you presently employed by Dover Downs?
19  A.  Yes.
20  Q.  In what position?
21  A.  As of Monday, manager, building maintenance.
22  Q.  What does a manager, building maintenance do?
23  A.  Manages a lot of the -- well, all three shifts,
24  maintenance shifts, produces the work orders, deals with

2 (Pages 2 to 5)

Thompson
James M. Shreves, Sr.

v.

C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 6

1  contractors, does the budgets.
2  Q.  Is that the same position that Bob Morrison
3  does?
4  A.  Yes.
5  Q.  So there's two of you?
6  A.  There's three, really:  inside maintenance,
7  outside maintenance, and grounds.
8  Q.  So by building maintenance, you mean inside?
9  A.  Inside, yes.
10  Q.  You say you just got that job on Monday?
11  A.  Yes.
12  Q.  Congratulations.
13  A.  Thank you.
14  Q.  What did you do prior to that?
15  A.  Supervisor, second shift.
16  Q.  How long had you held that position?
17  A.  Almost two years.
18  Q.  Would that have been approximately March of
19  2004?  April of 2004?
20  A.  I believe it was April.  I believe.  I'm not
21  good on dates, but somewhere around there.
22  Q.  Prior to that, what was your position?
23  A.  Mechanic I, second shift.
24  Q.  How long did you hold that position?

Page 7

1  A.  About six months, I believe.
2  Q.  Were you a Mechanic II prior to that?
3  A.  Yes.
4  Q.  For how long?
5  A.  Eight months.
6  Q.  Mechanic III?
7  A.  Yes, started out.
8  Q.  For how long were you a Mechanic III?
9  A.  I --
10  Q.  Let's just establish when you started at Dover
11  Downs.
12  A.  Started November 9th, '01.
13  Q.  Where did you work immediately before that?
14  A.  Before that, Wyndham Hotel.
15  Q.  In what capacity?
16  A.  General engineering maintenance.
17  Q.  Was that in Dover?
18  A.  Yes -- no.  Wilmington.
19  Q.  Wilmington?
20  A.  Yes.
21  Q.  Can you tell me what you did to prepare for
22  today's deposition?
23  A.  Just tried to remember things that happened.
24  Q.  Did you meet with Miss Friel?

Page 8

1  A.  Yes.
2  Q.  Did you review any documents?
3  A.  No.
4  Q.  When did you meet with Ms. Friel?
5  A.  What was it?  Last week?
6  Q.  For approximately how long was the meeting?
7  A.  About 20 minutes to half an hour.
8  Q.  Was it face-to-face or by the telephone?
9  A.  Face-to-face.
10  Q.  Did you talk to anybody else other than
11  Miss Friel to prepare for this deposition?
12  A.  No.
13  Q.  Have you talked to anybody in general about this
14  lawsuit?
15  A.  No.
16  Q.  You haven't talked to anybody at Dover Downs --
17  A.  No.
18  Q.  -- just in general about the lawsuit?
19  A.  No.  The only thing was I asked who was coming
20  up to the deposition and who was coming up close to my
21  time.
22  Q.  So you could share a ride?
23  A.  Right.
24  Q.  You are aware of this lawsuit, though, are you

Page 9

1  not?
2  A.  Yes.
3  Q.  What's your understanding of what Mr. Thompson's
4  claims are?
5  A.  I know it's supposed to be about age
6  discrimination.  That's, you know, basics.
7  Q.  You stated that you became the second shift
8  supervisor in approximately March or April of 2004;
9  correct?
10  A.  Yes.
11  Q.  Was this position posted?
12  A.  Yes.
13  Q.  Can you briefly outline what Dover Downs posting
14  policy is with respect to open jobs?
15  A.  They post it for five working days, and before
16  they were posting it in the maintenance shop on the
17  bulletin board.
18  Q.  During this five days, is that when the
19  employees are supposed to submit their applications for
20  the job?
21  A.  Yes.
22  Q.  Did you submit your application for the job?
23  A.  Yes.
24  Q.  When did you submit your application?

B-0296

Page 10

1    A.  Same day it came out.  It was on a Thursday, I
2    believe.
3        Q.  Do you if this job was actually posted for five
4    days?
5    A.  Yes.
6        Q.  Did you know that this job was going to be
7    posted prior to the posting actually going up?
8    A.  Yes.
9        Q.  How did you know?
10   A.  The supervisor that I had then was leaving for a
11   new job, so if he left, it had to be posted.
12       Q.  Who was that?
13   A.  Dean Cheshack.
14       Q.  Do you have any idea how to spell his last name?
15   A.  C-h-e-s-h-e-a-k.  Something like that.
16           MS. FRIEL:  I believe it's C-h-e-s-n-i-c-k.
17   Chesnick, I think.
18       Q.  How did you find out that Mr. Cheshack was
19   leaving?
20   A.  He told me.
21       Q.  When did he tell you, approximately?
22   A.  About a week before.
23       Q.  Did you speak to anybody else besides
24   Mr. Cheshack about the job being open prior to it being

Page 11

1    posted?
2    A.  I don't recall talking to anybody about it.
3        Q.  Were you interviewed for the job?
4    A.  Yes.
5        Q.  Do you recall when you were interviewed?
6    A.  Somewhere around the 15th.
7        Q.  The 15th of April or March?
8    A.  Whenever it was posted.  Like I say, I'm not
9    good with the date on it.
10       Q.  Do you have any recollection as to, was it
11   within the posting period?
12   A.  After the posting was over.
13       Q.  Who did you interview with?
14   A.  Rich Duncan.
15       Q.  What did you and Rich Duncan talk about?
16   A.  The responsibilities of being the supervisor,
17   how to treat some of the guys, you know, treat them with
18   respect, stuff like that.
19       Q.  Do you know if Dean Cheshack talked to Rich
20   Duncan on your behalf?
21   A.  He sent in a letter of recommendation, yes.
22       Q.  During your interview, did Mr. Duncan give you
23   any indication as to whether or not you would get the
24   job?

Page 12

1    A.  No.  He said -- no.
2        Q.  When were you officially awarded the job?
3    A.  Somewhere around the 17th.
4        Q.  Who told you you had the job?
5    A.  Mr. Duncan.
6        Q.  Did he tell you prior to it being announced?
7    A.  He told me the day before he announced it.
8        Q.  Did you interview with anybody else besides
9    Mr. Duncan?
10   A.  Mr. Wertz was in there.
11       Q.  Mr. Mertz?
12   A.  Wertz.
13       Q.  Wertz.  What did Mr. Wertz say during the
14   interview?
15   A.  He didn't say anything.  He was just there to be
16   as a witness or whatever.
17       Q.  How long did the interview last?
18   A.  About 25 minutes.
19       Q.  Did you talk about anything else other than the
20   responsibilities of a shift supervisor?
21   A.  No.
22       Q.  When you worked at the Wyndham Hotel, how long
23   did you work for them?
24   A.  A little over three years.

Page 13

1        Q.  Mr. Shreves, have you been given an employee
2    discipline warning while you've been at Dover Downs?
3    A.  Have I?
4        Q.  Yes.
5    A.  Yes.
6        Q.  Have you either as a supervisor or as an
7    employee?
8    A.  Both.
9        Q.  Both?
10           Is there a difference between a
11   disciplinary warning and a coaching?
12   A.  Yes.
13       Q.  Can you explain that difference to me?
14   A.  A coaching just goes into the employee's file.
15   Doesn't have to be notified.  Disciplinary has to go up
16   to HR with like a consultation with the employee that's
17   getting wrote up.
18       Q.  When you say "consultation," is that a
19   consultation with HR?
20   A.  Most of the time it's just with a supervisor or
21   a manager.  The only way it goes farther than that is if
22   it's a bigger discretion.
23       Q.  The coaching, is there notice given to the
24   employee regarding the coaching?

4 (Pages 10 to 13)

Thompson                                                      Dover Downs
James M. Shreves, Sr.           v.                           April 12, 2006
                          C.A. # 05-274 (GMS)

Page 14

1    A.  I was informed when I became supervisor that you
2    do not have to.  It just goes into their permanent record
3    for a year.
4        Q.  Who told you that?
5    A.  Mr. Duncan.
6        Q.  Is that written anywhere that you don't have to
7    inform them?
8    A.  I don't know.
9        Q.  What's the purpose of a coaching if the employee
10   is given no notice of it?
11   A.  Just notification in his file.
12       Q.  Notices to whom?
13   A.  Just goes into his file so the supervisor or
14   manager know that there was a problem at one time.
15       Q.  Are you aware of a concept known as the
16   seven-minute rule?
17   A.  Yes.
18       Q.  What is that?
19   A.  After -- if you don't punch in seven minutes
20   after you're supposed to, it's declared a tardy, which is
21   a coaching.
22       Q.  So you can punch in six minutes after you are
23   supposed to and you're not tardy?
24   A.  Right.

Page 15

1        Q.  Is that still the policy?
2    A.  Yes.
3        Q.  Has that always been the policy since you've
4    worked at Dover Downs?
5    A.  Yes.
6        Q.  What about covering an illness with vacation
7    time, is that ever permitted?
8    A.  When I first started there was a mention of it,
9    but I don't know details.
10       Q.  Do you ever recall Mr. Duncan saying at a
11   maintenance meeting that employees could do that?
12   A.  I remember he said that we can't do it now.
13       Q.  When did he say that?
14   A.  About a year or so ago.
15       Q.  So it's possible that prior to that you could do
16   it?
17   A.  It's possible, yes.
18       Q.  Did anybody else give any indication that
19   employees could do this besides Mr. Duncan?
20   A.  He's the only one I deal with, really.
21       Q.  When Mr. Thompson was still actively working at
22   Dover Downs, did he ever tell you that he thought he was
23   being discriminated against because of his age?
24   A.  Yes.

Page 16

1        Q.  Do you recall when?
2    A.  When he put in for the outside position for
3    outside maintenance.
4        Q.  What did he say to you?
5    A.  He said -- I don't know the exact words, but
6    something to the effect that he was asked if he could
7    deal with the adverse weather outside at his age.
8        Q.  Who asked him that?
9    A.  Mr. Morrison.
10       Q.  Was this during Mr. Thompson's interview with
11   Mr. Morrison?
12   A.  I believe.
13       Q.  What else did Mr. Thompson tell you?
14   A.  About...
15       Q.  About the discrimination, anything that had to
16   do with being discriminated against.
17   A.  When he wasn't awarded the position out there,
18   it was awarded to a younger guy.
19       Q.  Did Mr. Thompson make the communication about
20   Mr. Morrison's comments prior to the award being given
21   out?
22   A.  Yes.
23       Q.  Then obviously when it was awarded to a younger
24   guy, this was after the award was given out?

Page 17

1    A.  Yes.
2        Q.  Is it your understanding that when a job is
3    posted, that priority is to be given to current Dover
4    Downs employees over outside candidates?
5    A.  Depends on the posting.  If it's an in-house
6    posting, yes.
7        Q.  By "priority," does that mean that qualified
8    in-house candidates would get the job --
9    A.  Yes.
10       Q.  -- given if they are qualified; correct?
11   A.  Yes.
12       Q.  The employee that got the outside maintenance
13   job, was that Robert Knotts?
14   A.  I believe so.
15       Q.  Are you aware of whether or not Mr. Knotts has a
16   high school diploma or equivalent?
17   A.  No.
18       Q.  You're not aware?
19   A.  No.
20       Q.  Were you aware of whether or not Mr. Knotts was
21   a licensed plumber when he was given that job?
22   A.  No.  I don't deal with outside maintenance too
23   much.
24       Q.  Following the award of this outside maintenance

5 (Pages 14 to 17)

Page 18

1  job, are you aware that Mr. Thompson had a meeting with
2  Mr. Morrison and Mrs. Isenberg regarding the award of the
3  job to Mr. Knotts?
4      A.  I don't know if he had a meeting or not.  I know
5  he was talking about it.
6      Q.  Are you aware that shortly after the award was
7  given out that Mr. Thompson was given a disciplinary
8  warning for four different violations?
9      A.  I remember Mickey saying something about it,
10  yes.
11      Q.  Can you tell me what he said?
12      A.  He told me that they gave him four or five
13  write-ups on one paper dating back a few months.
14      Q.  Did he indicate that he had ever been aware of
15  any of these --
16      A.  No.
17      Q.  -- infractions?
18      A.  No.
19      Q.  He didn't say one way or the other?
20      A.  He said he didn't know anything about them.
21      Q.  Did he give you any indication that he thought
22  this was in response to his complaining of age
23  discrimination?
24      A.  Yes.

Page 19

1      Q.  What did he say?
2      A.  He said, "It was probably because I'm so old and
3  I gave them a hard time with" -- I guess the meeting he
4  had, if he had it.
5      Q.  Did you ever hear from any source a story about
6  Mr. Duncan writing up Mr. Thompson for old infractions
7  and then tearing the notice up?
8      A.  Yes.
9      Q.  Did you ever hear anything about Mr. Duncan
10  instructing Mr. Homlish to write out separate incident
11  reports and backdate those reports?
12      A.  Yes.
13      Q.  Who did you hear that from?
14      A.  First was from Mickey and then Steve said
15  something about it.
16      Q.  "Steve" being Mr. Homlish?
17      A.  Yes.
18      Q.  He said that to you?
19      A.  Yes.
20      Q.  What did he say?
21      A.  He just said he had to do some write-ups.  He
22  didn't say what it was about or anything like that.  Just
23  said it was for Mickey.
24      Q.  Did he indicate that he had to backdate them?

Page 20

1      A.  No.
2      Q.  Based on your observations, did management at
3  Dover Downs tend to watch over or scrutinize Mr. Thompson
4  a little tighter after the incident with the outside
5  maintenance position?
6          MS. FRIEL:  Objection to form.
7      Q.  You can answer if you understand.
8      A.  In my opinion?
9      Q.  Yes.
10      A.  Yes.
11      Q.  Can you give me an example as to what they might
12  have done as far as their tighter scrutinization of him?
13          MS. FRIEL:  Objection.
14      Q.  You can answer.
15      A.  He was painting out in the casino and they would
16  check on him a lot more than what they used to.
17      Q.  Anything else?
18      A.  No.
19      Q.  Are you aware that he was written up on several
20  occasions after this happened?
21      A.  I heard about it, yes.
22      Q.  Had you heard about him being written up prior
23  to this?
24      A.  Just the ones that were all on one notice.

Page 21

1      Q.  Prior to that you hadn't heard anything about
2  Mickey being written up?
3      A.  No.
4      Q.  In your position as a supervisor, do you know if
5  the human resources department keeps track of all
6  attendance and disciplinary actions?
7      A.  Only if it's a verbal or higher.  The coaching
8  they don't.
9      Q.  Why not?
10      A.  I don't know.
11      Q.  Do the maintenance employees receive a bonus
12  check every year from Dover Downs?
13      A.  Most of them, yes.
14      Q.  The ones that don't, why don't they receive a
15  bonus check?
16      A.  Too many written warnings or final warnings.
17      Q.  Would the bonus checks have been given out in
18  2006?
19      A.  Yes.
20      Q.  Are those bonus checks based upon an employee's
21  conduct during 2005?
22      A.  Yes.
23      Q.  Are you aware of anybody that did not receive a
24  bonus check in 2006?

6 (Pages 18 to 21)

Thompson                                                v.                          Dover Downs
James M. Shreves, Sr.                      C.A. # 05-274 (GMS)                      April 12, 2006

Page 22

1    A.  I've heard one guy didn't, yes.
2    Q.  Who was that?
3    A.  Kevin Gorlich.
4    Q.  Why didn't Mr. Gorlich?
5    A.  Because he received a final written warning.
6    Q.  What about the previous year?
7    A.  Don't know.
8    Q.  Are you aware of any employees who did receive a
9    bonus check even though they had a written warning?
10   A.  I don't know because I don't get into that.  If
11   it's on my shift, I know.  If not, I don't.
12        MR. WILSON:  Again, I would just like to
13   take a minute with Mickey and we should be done.
14        (A recess was taken at this time.)
15        MR. WILSON:  We have no further questions.
16        MS. FRIEL:  Okay.  I just have a couple to
17   clarify the record.
18   BY MS. FRIEL:
19   Q.  Mr. Shreves, are you aware that Mr. Homlish ever
20   backdated any coachings or warning notices for
21   Mr. Thompson?
22   A.  Only after it was done when Mickey told me.
23   Q.  Mickey told you?
24   A.  Yes.

Page 23

1    Q.  Do you remember when Mr. Thompson told you?
2    A.  No.
3         MS. FRIEL:  That's all the questions I
4    have.
5         MR. WILSON:  Okay.
6         (The deposition was then concluded at
7    11:10 a.m.)
8              - - - - -
9            INDEX TO TESTIMONY
10
11
     JAMES M. SHREVES, SR.              PAGE
12
13   Examination by Mr. Wilson            2
     Examination by Ms. Friel            22
14
15           - - - - -
16
           INDEX TO EXHIBITS
17
18
     (There were no exhibits marked for identification.)
19
20           - - - - -
21
22
23
24

Page 24

7
8         REPLACE THIS PAGE
9
10        WITH THE ERRATA SHEET
11
12        AFTER IT HAS BEEN
13
14        COMPLETED AND SIGNED
15
16        BY THE DEPONENT.
17
18
19
20
21
22
23
24

Page 25

1    State of Delaware )
2                      )
3    New Castle County )
4
5         CERTIFICATE OF REPORTER
6
7         I, Kathleen White Palmer, Registered Merit
     Reporter and Notary Public, do hereby certify that there
8    came before me on the 12th day of April, 2006, the
     deponent herein, JAMES M. SHREVES, SR., who was duly
9    sworn by me and thereafter examined by counsel for the
     respective parties; that the questions asked of said
10   deponent and the answers given were taken down by me in
     Stenotype notes and thereafter transcribed into
11   typewriting under my direction.
12        I further certify that the foregoing is a
     true and correct transcript of the testimony given at
13   said examination of said witness.
14        I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
15   interested in the event of this suit.
16
17
18
19        Kathleen White Palmer, RPR, RMR
          Certification No. 149-RPR
20        (Expires January 31, 2008)
21
     DATED:  April 14, 2006
22
23
24

B-0300

7 (Pages 22 to 25)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,          )
                                  )
            Plaintiff,            )
                                  )
v.                                )   Civil Action No.
                                  )    05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS)
GAMING & ENTERTAINMENT INC.,   )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,    )
INC.,                             )
                                  )
            Defendants.           )

        Deposition of MARIE A. ISENBERG taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 11:40 a.m. on Tuesday, April 12, 2006,
before Kathleen White Palmer, Registered Merit Reporter
and Notary Public.

APPEARANCES:

        TIMOTHY J. WILSON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19899
          for the Plaintiff

        BETH A. FRIEL, ESQUIRE
        MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
          123 South Broad Street
          Philadelphia, Pennsylvania   19109
          for the Defendants

------------------------------------------------------
                WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

B-0301

Thompson
Marie A. Isenberg

v.

C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 2

1  ALSO PRESENT:
2      BRANCE F. THOMPSON, SR.
3          - - - - -
4      MARIE A. ISENBERG,
5      the witness herein, having first been
6      duly sworn on oath, was examined and
7      testified as follows:
8  BY MR. WILSON:
9      Q.  Good morning, Miss Isenberg.  Am I saying your
10 name correctly?
11     **A.  You are.**
12     Q.  My name is Tim Wilson.  We met a minute ago.  I
13 am Brance Thompson's attorney in his case against Dover
14 Downs.
15         I would like to give you a couple
16 instructions prior to the beginning of the deposition.
17         First, I'm going to be asking you questions
18 pertaining to this lawsuit and the factual circumstances
19 surrounding it.  When you respond, you must do so
20 verbally.  The court reporter can't take down nonverbal
21 head shakes or anything like that.  She also can't take
22 down sounds such as mm-hmm or un-huh whenever you are
23 responding in the affirmative or negative.  This is just
24 to help her out and to make the transcript clear.

Page 3

1          As you know, your testimony is under oath,
2  so you must answer truthfully just as if you were in
3  court.  Any failure to do so would have the same
4  repercussions as if you would have failed to answer
5  truthfully in court.
6          If you don't hear a question or don't
7  understand it, let me know and I will rephrase the
8  question or ask it again.
9          Please let me finish asking the question
10 before you answer and I will let you finish answering
11 before I begin asking you another question.  Again,
12 that's for the court reporter's benefit and so we can
13 have a clean transcript.
14         If at any time you come to realize that a
15 statement that you made previously is incorrect or
16 inaccurate, just let me know and you'll be able to
17 correct the record.
18         You cannot talk or confer with your
19 attorney during the deposition, either in here or during
20 breaks unless it pertains to a matter of privilege.  I
21 will do my best not to ask you questions pertaining to
22 privilege.
23         If at any time during the deposition you
24 need a break to use the rest room or for any other

Page 4

1  reason, please let me know and we can do that.  Hopefully
2  this won't take too long, so hopefully we can get right
3  through it.
4          Do you understand these instructions?
5      **A.  I do.**
6      Q.  Can you tell me where you were born and what is
7  your birth date?
8      **A.  Yes.  My birth date is February 9th, 1941.  And
9  I was born in Philadelphia, Pennsylvania.**
10     Q.  What's your address?
11     **A.  96 Orchard Avenue, Dover, Delaware, 19901.**
12     Q.  How long have you lived there?
13     **A.  Forty-one years.**
14     Q.  Wow.
15     **A.  Yes.**
16     Q.  I assume you own?
17     **A.  I own.**
18     Q.  Have you ever been arrested?
19     **A.  No.**
20     Q.  Did you serve in the military?
21     **A.  No.**
22     Q.  Are you taking any medications today that would
23 impair your ability to provide your testimony and give
24 truthful answers?

Page 5

1      **A.  No.**
2      Q.  Did you graduate from high school?
3      **A.  I did.**
4      Q.  When did you graduate from high school?
5      **A.  1959.**
6      Q.  What high school did you graduate from?
7      **A.  Saint Boniface in Philadelphia.**
8      Q.  Did you go to college?
9      **A.  No.**
10     Q.  Did you have any other education past high
11 school, any trade schools or vocational schools or --
12     **A.  No.  Just courses that I've taken.**
13     Q.  Have you taken any college courses?
14     **A.  Yes, but not toward a degree.**
15     Q.  Where did you take those?
16     **A.  Delaware State University, DelTech, Wilmington
17 College.**
18     Q.  What was the focus of those courses?
19     **A.  HR.**
20     Q.  Did you receive any type of certificate or
21 anything short of a degree?
22     **A.  A degree?**
23     Q.  No.  Anything short of a degree.
24     **A.  Not an associate's or anything like that.  I**

2 (Pages 2 to 5)

Thompson
Marie A. Isenberg

v.
C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 6

1  have course completion, that kind of thing.
2    Q.  Are you presently employed by Dover Downs?
3    **A.  I am.**
4    Q.  What is your position?
5    **A.  I'm a human resource manager in the human**
6  **resource department.**
7    Q.  How long have you held that position?
8    **A.  Six and a half years.**
9    Q.  What did you do prior to that?
10   **A.  I was director of human resources at Burris**
11 **Foods in Milford, Delaware.**
12   Q.  What does a human resource manager do at Dover
13 Downs?
14   **A.  My responsibilities are recruitment.**
15   Q.  Can you explain what "recruitment" means?
16   **A.  Hiring -- recruiting and hiring and furnishing**
17 **applicants to hiring managers.**
18   Q.  Does that include current Dover Downs employees?
19   **A.  Yes.**
20   Q.  As well as incoming employees; correct?
21   **A.  Yes.**
22   Q.  Can you tell me what you did to prepare for
23 today's deposition?
24   **A.  What I did to prepare for today's deposition?**

Page 7

1    Q.  Yes.  Did you meet with Miss Friel?
2    **A.  I did on Monday.**
3    Q.  For how long?
4    **A.  An hour, I think.**
5    Q.  Was there anybody else there?
6    **A.  No.**
7    Q.  Did you review documents?
8    **A.  We talked about --**
9    MS. FRIEL:  Objection.  Don't get into
10 privileged communications.
11   THE WITNESS:  Okay.
12   **A.  We reviewed documents, yes.**
13 BY MR. WILSON:
14   Q.  What documents did you reviewed?
15   MS. FRIEL:  Objection.  Privileged.
16   Q.  Did you talk to anybody other than Miss Friel to
17 prepare for today's deposition?
18   **A.  No.**
19   Q.  Have you talked to anybody in general about this
20 lawsuit or the factual circumstances surrounding this
21 lawsuit?
22   **A.  Other than our attorneys?**
23   Q.  Yes.
24   **A.  Other than my --**

Page 8

1    MS. FRIEL:  Objection.  Don't divulge work
2  product or attorney/client privilege.
3    Q.  Anybody other than your attorneys?  Anybody at
4  Dover Downs?
5    **A.  My boss.**
6    Q.  Who is your boss?
7    **A.  Robin Roberts.**
8    Q.  What did you discuss with Ms. Roberts?
9    **A.  When I needed to be here.**
10   Q.  Anything regarding the substance of the lawsuit?
11   MS. FRIEL:  Objection.  She might have been
12 talking to Ms. Robbins on my behalf.
13   So just make clear that you are not
14 divulging information regarding privilege again.
15   **A.  I can't answer that because I think that I would**
16 **be divulging privilege.**
17   MR. WILSON:  Is there any way you could
18 consult with her, she could tell you what she was going
19 to answer and see if that information is privileged?
20   MS. FRIEL:  Sure.  We can take a break.
21   (A recess was taken at this time.)
22 BY MR. WILSON:
23   Q.  Have you had discussions on your own with other
24 employees of Dover Downs, in particular discussions that

Page 9

1  were not initiated by your attorney?
2    **A.  No.**
3    Q.  Have you talked to Mr. Duncan about the case?
4    **A.  Only in relationship to what I had to gather for**
5  **our attorney.**
6    Q.  What is your understanding of this lawsuit?
7    **A.  I understand that Mr. Thompson is bringing suit**
8  **against us charging age discrimination.**
9    Q.  Have you ever been deposed before?
10   **A.  Yes.**
11   Q.  When was that?
12   **A.  Oh, my.  Maybe 20 years ago.**
13   Q.  Was that in a lawsuit involving Dover Downs?
14   **A.  No.**
15   Q.  I would like to show you an exhibit previously
16 marked as Duncan Number 4.  It is a series of documents
17 and I just ask that you look at them and let me know when
18 you're done.
19   **A.  (The witness reviews the document.)  Okay.**
20   Q.  What are these documents?
21   **A.  They appear to be coachings.**
22   Q.  Can you tell me what a coaching is?
23   **A.  Are you asking for my understanding of a**
24 **coaching?**

B-0303

3 (Pages 6 to 9)

Thompson                          v.                        Dover Downs
Marie A. Isenberg          C.A. # 05-274 (GMS)              April 12, 2006

Page 10

1    Q.   Yes.
2    A.   My understanding is it is a communication
3    between the supervisor and an employee for some violation
4    of policy.
5    Q.   Just for the record, these are four separate
6    coachings; correct?
7    A.   That's correct.
8    Q.   One is dated 8/17/04?
9    A.   Are you looking at the 8/16/04, the date of
10   incident?
11   Q.   No.  The date --
12   A.   The signature?
13   Q.   Date of notice.
14   A.   Okay, date of notice, yes.
15   Q.   8/11/04?
16   A.   Yes.
17   Q.   6/17/04?
18   A.   Correct.
19   Q.   And 2/4/04?
20   A.   Yes.
21   Q.   Can you tell who prepared these documents?
22   A.   I couldn't tell who prepared it.  I can tell who
23   signed it.
24   Q.   Who signed it?

Page 11

1    A.   It's signed by Steve Homlish.
2    Q.   Are you familiar with his signature?
3    A.   No.
4    Q.   So you have no recollection as to whether that's
5    his signature or not?
6    A.   I couldn't swear to it.
7    Q.   You stated that the purpose of a coaching is
8    communication between a supervisor and the employee --
9    A.   Correct.
10   Q.   -- as to what the employee did wrong; correct?
11   A.   Correct.
12   Q.   What would be the implications if there was no
13   communication made?  In other words, if only the document
14   was filled out but no communication was made between the
15   supervisor and the employee.
16   A.   According to our handbook, the first three
17   occurrences/events that would happen in regard to an
18   absence or a lateness would be noted in the file and
19   there really would not be a need for a coaching.
20   Q.   But the coaching implies that there is
21   communication; correct?
22   A.   I would believe that that would be the case.
23   Q.   Based on these four documents that are titled
24   "Coaching," would you assume that Mr. Thompson received

Page 12

1    notice of the incidents?
2         MS. FRIEL:  Objection to form.
3         You can answer.
4         THE WITNESS:  I can answer?
5         MS. FRIEL:  You can answer.
6    A.   I would not assume anything.
7    BY MR. WILSON:
8    Q.   But you just said that coachings were to be
9    communicated?
10   A.   You asked me my definition of "coaching," and I
11   said that in my definition, in my personal definition,
12   it's a communication between a supervisor and an
13   employee.  I would not assume that it was discussed
14   unless I was told.
15   Q.   If there was no communication, would that make
16   the coachings invalid?
17   A.   No.
18   Q.   Why not?
19        MS. FRIEL:  Objection.  She already
20   answered this.  She answered it five minutes ago.
21        MR. WILSON:  I don't recall the answer.
22   BY MR. WILSON:
23   Q.   You can answer.
24        THE WITNESS:  I can answer?

Page 13

1         MS. FRIEL:  Yes.
2    A.   In the case -- in case of a discipline, prior to
3    the discipline, this is a noted in the file type of,
4    according to our policy, so I've never -- prior to this,
5    I've never seen these before, did not -- they don't exist
6    in his permanent file, so I would have no idea whether or
7    not his supervisor talked to Mr. Thompson.  And would I
8    assume that this was a coaching in the sense that it was
9    a discussion?  I wouldn't assume that because it wasn't
10   really necessary.
11   BY MR. WILSON:
12   Q.   Why do you say they are not put in his file?
13   A.   The only -- in his permanent personnel file in
14   the human resource office starts with a verbal.
15   Q.   Okay.
16   A.   Anything prior to that we never see.
17   Q.   You said that there is something in the employee
18   handbook?
19   A.   No, I didn't say that.
20   Q.   That refers to coaching?
21   A.   I didn't say that.  You asked me a definition of
22   "coaching."
23        MS. FRIEL:  She referred to occurrences in
24   the employee handbook.

4 (Pages 10 to 13)

Thompson
Marie A. Isenberg

v.

C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 14

1    A. I talked about -- our occurrence system in the
2  handbook talks about three notations in a file before a
3  verbal.
4    Q. If I gave you a copy of the handbook, could you
5  identify that section for me?
6    A. Sure.
7       MR. WILSON: I guess this would be Isenberg
8  Number 1.
9       (Isenberg Exhibit 1 was marked for
10 identification.)
11   A. (The witness reviews the document.) On page --
12      MS. FRIEL: Just tell him the section
13 number because the page numbers are cut off.
14   A. 6.04.
15 BY MR. WILSON:
16   Q. Okay.
17   A. The system that we follow for disciplines is one
18 to three occurrences noted on the attendance card.
19   Q. Okay.
20   A. The fourth occurrence is verbal and that's the
21 first one that gets put in his file.
22   Q. So these documents we're looking at here, Duncan
23 Number 4, is that an attendance card?
24   A. The disciplines?

Page 15

1    Q. Yes.
2    A. These warnings are written on a disciplinary
3  warning. No, that's not his attendance card.
4    Q. So where does it provide for these in this --
5    A. It does not.
6    Q. -- in the employee handbook?
7    A. It does not.
8    Q. It does not?
9    A. No.
10   Q. So it's an unwritten rule that you are to
11 receive these coaching documents and they are put in the
12 file?
13   A. It's not a rule at all. The first three
14 occurrences, as shown on our personnel handbook, are
15 noted on his attendance card.
16   Q. I would like to show you what has been marked
17 Homlish Number 1 previously. Is that an attendance card?
18   A. It is.
19   Q. So if you look at the attendance card, what are
20 the first three occurrences according to the handbook?
21   A. It looks to me -- it's a little blurred, but I
22 believe February 2nd and February 3rd and February 7th.
23   Q. Are those the boxes that --
24   A. I see illness, so I'm assuming that...

Page 16

1    Q. In looking at the date that looks like it's
2  February 7th, there's a number that looks like 1.5 above
3  the "I." Do you know what that means?
4    A. I don't.
5    Q. Who fills these time cards out? Do you know?
6    A. I couldn't tell you in that department.
7    Q. Is there a difference, is there a distinction
8  between an excused illness and an unexcused illness?
9    A. Yes.
10   Q. Can you tell me what that is?
11   A. Our policy is that you must have the accumulated
12 sick time accrued and you must have a doctor's note to
13 have an excused absence for illness.
14   Q. So sick time alone does not cover it? You have
15 to --
16   A. That's correct.
17   Q. How do you accumulate sick time?
18   A. It's accrued each payroll period. Oh, goodness.
19 I can't -- so many hours per pay period.
20   Q. Okay.
21   A. Whatever I tell you is not going to be right, so
22 I don't want to take a guess because it's done through
23 the payroll system.
24   Q. Now, can you carry over sick time from year to

Page 17

1  year?
2    A. Yes.
3    Q. If an employee has a doctor's note but not
4  enough sick time, it's still considered an occurrence?
5    A. Yes.
6    Q. If an employee has a doctor's note and wants to
7  cover it with vacation time, is that an incident?
8    A. (No response.)
9    Q. Let me back up.
10      Are employees allowed to cover illnesses
11 with vacation?
12   A. I'm not -- I'm not sure that we have a policy on
13 that, and I'm really not positive what all departments
14 do.
15   Q. So it's essentially up to the department? Is
16 that what you're saying?
17   A. Well, I would think in some cases it's
18 circumstances. I know that if you're out on disability,
19 you can use vacation time for -- until, you know, until
20 disability kicks in. So maybe an arranged-type thing. I
21 can't tell you that there is a firm policy on that.
22   Q. Can an employee, if he has a doctor's note, use
23 a personal day to cover an illness?
24   A. I don't know that the departments are doing

B-0305

5 (Pages 14 to 17)

Thompson
Marie A. Isenberg

v.
C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 18

1  that.
2     Q.  So again, you believe that that is department to
3  department?
4     A.  Yes.
5     Q.  They make their own decision in that regard?
6     A.  Yes.
7     Q.  So it's your opinion that these coachings are
8  the first three occurrences as noted in 6.04 of the
9  employee handbook based upon what you've seen?
10    A.  I believe that might be correct.
11    Q.  In the box in the bottom right-hand corner on
12  the first page of each of these documents that says "Date
13  Signed," is that indicative of the date that Mr. Homlish
14  purports to have signed these documents?  I'm not asking
15  you if you know if he signed them on those dates or not,
16  but is that what the box is for?
17    A.  Yes.
18    Q.  Why is it, if you know, there are four separate
19  instances of coachings here, yet the employee handbook
20  says three occurrences?
21    A.  One is a late.
22    Q.  Okay.
23    A.  Which are handled separately from absences.
24    Q.  So you're allowed to be late three times before

Page 19

1  you get a verbal?
2     A.  Correct.
3     Q.  And you're allowed to be absent?
4     A.  Absent.
5     Q.  If Mr. Homlish signed these on a date different
6  than that which is on the form itself, would that be
7  improper?
8     A.  I don't know what you mean.
9     Q.  Assuming Mr. Homlish filled this form out, the
10  first one on 8/17/04, would it be improper for him to,
11  say, date it for June 2nd, 2004?
12        MS. FRIEL:  Objection to form.
13        You can answer if you understand it.
14    A.  Well, I'm not sure.  You're saying -- I'm asking
15  the question.  If someone wrote it on 8/17 and he signed
16  it on June 4?  I mean, tell me what you mean.
17    Q.  If he filled this out on 8/17 but when he came
18  to the box where it says "Date Signed" he put in a
19  different date, would that be improper?
20    A.  No.  My assumption would be you would sign it on
21  the date -- you date it the day you signed it.
22    Q.  Right.  What if he dated it on a different date,
23  would that be improper?
24        MS. FRIEL:  Objection to form.

Page 20

1     A.  I don't think so.  I mean, I would have -- you
2  would have to tell me what you mean by that.
3     Q.  Well, the box says "Date Signed."  Should you
4  put the actual date you signed the document in the box
5  that says "Date Signed"?
6     A.  I would assume you would.
7     Q.  Would it be improper to put a different date in
8  there?
9        MS. FRIEL:  Objection.
10    A.  I don't know.
11    Q.  Do you know if Mr. Homlish signed these
12  documents on the particular dates noted?
13    A.  I have no way of knowing that.
14    Q.  I would like to show you another document.
15        (Isenberg Exhibit 2 was marked for
16  identification.)
17  BY MR. WILSON:
18    Q.  Ma'am, you've been handed what has been marked
19  as Isenberg 2.  If you would just take a look at that and
20  let me know when you're done.
21    A.  (The witness reviews the document.)  Okay.
22    Q.  Can you identify this document?
23    A.  It's an upgrade transfer form.
24    Q.  Is that your signature in the "Human Resources

Page 21

1  Signature" line?
2     A.  It is.
3     Q.  Did you sign this document on June 22nd, 2004?
4     A.  I did.
5     Q.  Where it says "Attendance" above your name, what
6  is "Attendance" indicative of?
7     A.  It means are there any disciplines for
8  attendance in his file.
9     Q.  There were none; correct?
10    A.  Correct.
11    Q.  Is that your handwriting there --
12    A.  No.
13    Q.  -- where it says "None on file"?
14    A.  No.
15    Q.  Whose handwriting is that?
16    A.  It was probably our intern who goes into the
17  files.
18    Q.  Where it says "Disciplinary Action," what is
19  that indicative of?
20    A.  There were no disciplines other than attendance
21  in his file.
22    Q.  So they are two separate categories?  Is that
23  what you are --
24    A.  It is.

6 (Pages 18 to 21)

Thompson
Marie A. Isenberg

v.
C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 22

1  Q.  How far back does this go?  For his entire
2  career at Dover Downs?
3  **A.  Our discipline is a rolling 12 months.**
4  Q.  Same with attendance?
5  **A.  Yes.**
6  Q.  So at this point on June 22nd, 2004, there were
7  no attendance issues with Mr. Thompson?
8  **A.  That's correct.**
9  Q.  There were no disciplinary actions taken against
10  him?
11  **A.  Correct.**
12  Q.  Now, in Duncan Number 4, not the first two, but
13  the last two warnings are dated 6/17/04 and 2/4/04;
14  correct?
15  **A.  Yes.**
16  Q.  Whenever you checked the file, these were not in
17  the file; correct?
18  **A.  And they would never be.**
19  Q.  Tell me again why they would never be in his
20  file.
21  **A.  Anything that is below a verbal never is part of**
22  **their file.**
23  Q.  So where do these stay?  Do you know?
24  **A.  In the department.  I'm assuming that they were**

Page 23

1  **in the department.**
2  Q.  So it's your testimony that a coaching form is
3  not supposed to be forwarded to human resources to be
4  included in the personnel file?
5  **A.  That's correct.**
6  Q.  So when we received the personnel files of the
7  employees that we've asked for, there should be no
8  coachings in those files?
9  **A.  The official file in the human resource office**
10  **would not have coachings.**
11  Q.  Are you aware that there's a coaching dated
12  August 30th, 2004, in Mr. Thompson's personnel file?
13  **A.  I'm not -- I can't say I'm aware or not aware.**
14  **I would -- I don't know.**
15  Q.  Well, I'll represent to you that included in his
16  human resources personnel file was a coaching dated
17  August 30th, 2004.
18       Can you explain how that could have
19  possibly gotten into his personnel file?
20  **A.  Not without seeing it.**
21       MS. FRIEL:  Can you give me the Bates
22  number of that?
23       MR. WILSON:  Excuse me.  Let's go off the
24  record for a second.

Page 24

1       (Discussion off the record.)
2  BY MR. WILSON:
3  Q.  With respect to promotions, is it Dover Downs'
4  custom or policy to post job openings to current Dover
5  Downs employees prior to opening it up to outside
6  potential employees?
7  **A.  All of our jobs are posted internally for five**
8  **days.**
9  Q.  Is that an official policy?
10  **A.  I don't believe it's in the handbook, but it's a**
11  **practice.**
12  Q.  Is that practice followed in all instances?
13  **A.  Yeah, I believe it is, yes.**
14  Q.  If a job is posted and a current Dover Downs
15  employee meets all the qualifications needed for the
16  position, will they be given the position?
17       MS. FRIEL:  Objection to form.
18       You can answer if you are able to answer.
19  **A.  No.**
20  Q.  Why wouldn't they be given the position?
21  **A.  Well, there's an interview process.**
22  Q.  Right.
23  **A.  And like if you were hired from outside --**
24  **everyone that meets the qualifications doesn't**

Page 25

1  **necessarily get hired.**
2  Q.  So a job could be posted, a current Dover Downs
3  employee could have all the qualifications, go in for an
4  interview, and then it be decided that person doesn't get
5  the job and then you move outside?
6  **A.  Correct.**
7  Q.  Are you aware that in June of 2004 a job was
8  posted for a first shift maintenance mechanic?
9  **A.  This position?**
10  Q.  Yes, I believe that is the position.  I have the
11  notice if you would like to see that, I believe.
12  **A.  Please.**
13  Q.  It's Duncan 6.
14  **A.  This is our posting.**
15  Q.  Did Mr. Thompson apply for that job?
16  **A.  Mr. Thompson put an upgrade transfer form for**
17  **that position and we have it logged in as June 21st,**
18  **2004, which was five days after the close of the posting.**
19  Q.  Do you know who got that job?
20  **A.  I do, and let me think of his name.**
21  Q.  Was it Robert Knotts?
22  **A.  Robert Knotts.**
23  Q.  Did Mr. Knotts meet all the minimum
24  qualifications based on the job posting?

**B-0307**

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Thompson
Marie A. Isenberg

v.

C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 26

1    A.  **More than met them.**
2    Q.  Did he have a high school diploma or equivalent?
3    A.  **I don't recall.**
4    Q.  If he didn't have a high school diploma or
5    equivaient, should he have been considered for the job?
6    A.  **I believe the position calls for a high school**
7    **diploma.**
8         MR. WILSON:  I would like to have this
9    marked.
10        (Isenberg Exhibit 3 was marked for
11   identification.)
12   A.  **(The witness reviews the document.)**
13   BY MR. WILSON:
14   Q.  Have you had a chance to look at that?
15   A.  **I did.**
16   Q.  Do you see on the second page the box titled
17   "Education"?
18   A.  **I do.**
19   Q.  What does it say in the column that says "Circle
20   Highest Grade"?
21   A.  **It says "No."**
22   Q.  So he didn't graduate from high school?
23   A.  **Apparently not.**
24   Q.  Is there any indication that he received a GED

Page 27

1    or any other type of equivalent?
2    A.  **It's not indicated here.**
3    Q.  So based on this, should he have been considered
4    for the position?
5    A.  **Am I missing a page of this?  This isn't his**
6    **entire application.  We are missing his experience, work**
7    **experience.**
8    Q.  Would the GED be indicated on the work
9    experience?
10   A.  **No, but I was just -- as I remember Mr. Knotts'**
11   **application, he had eleven years' experience with a**
12   **top-notch plumbing company.**
13   Q.  But his educational requirements don't meet the
14   job posting?
15   A.  **They don't.**
16   Q.  Did Mr. Thompson's qualifications meet all of
17   the essential functions and requirements/education listed
18   on the in-house posting?
19   A.  **Without his application in front of me, I would**
20   **not be able to answer that question.**
21   Q.  Let me ask you another question.  Referring back
22   to Isenberg Number 2, the Upgrade/Transfer Form, down in
23   the bottom where it says "Department Use," it says "Set
24   up interview on 25 June 2004 at 8:00."

Page 28

1    A.  **Mm-hmm.**
2    Q.  Then it says "Decline the applicant because
3    experience level in commercial plumbing, multitasking
4    abilities"; correct?
5    A.  **That's what it says.**
6    Q.  Mr. Morrison signed this on June 24th, 2004;
7    correct?
8    A.  **I don't know that.**
9    Q.  That's what it's dated; correct?
10   A.  **It's dated that, yes.**
11   Q.  So it appears that Mr. Morrison declined
12   Mr. Thompson even before he interviewed him; correct,
13   based upon the dates given?
14   A.  **Based upon the dates given.**
15   Q.  Yes?
16   A.  **Yes.**
17   Q.  Are you aware of any conversations that
18   Mr. Thompson had with Mr. Morrison regarding this
19   position prior to Mr. Knotts being awarded the position?
20   A.  **Am I aware of them?**
21   Q.  Yes.
22   A.  **Not really, no.**
23   Q.  Did you hear from any source that Mr. Morrison
24   indicated to Mr. Thompson that he'd like to hire a

Page 29

1    plumber, and once he did so, that he would post another
2    job for Mr. Thompson to bid on?
3    A.  **No.**
4    Q.  Did you hear from any source that Mr. Morrison
5    discouraged Mr. Thompson from bidding on this outside
6    maintenance job?
7    A.  **No.**
8    Q.  Do you know if Mr. Knotts was a licensed
9    plumber?
10   A.  **I don't remember.**
11   Q.  Following the awarding of the job to Mr. Knotts,
12   you had a meeting with Mr. Thompson and Mr. Morrison;
13   correct?
14   A.  **I attempted to have a meeting.**
15   Q.  Was that on August 23rd, 2004?
16   A.  **I don't recall the date.  I -- I did put**
17   **something in the file that we had a meeting set up, but I**
18   **don't recall the date of it.**
19   Q.  Can you tell me what happened at the meeting?
20   A.  **Mr. Thompson got up and left.**
21   Q.  He just walked in, sat down, got up, and left?
22   A.  **I asked him what he wanted to talk about and he**
23   **got up and left.**
24   Q.  That was all that was said?

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

B-0308

Thompson
Marie A. Isenberg

v.
C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 30

1    A. Yes.
2    Q. Did Mr. Thompson mention age discrimination?
3    A. No.
4    Q. Did Mr. Thompson make any statement to
5    Mr. Morrison?
6    A. No.
7    Q. Did Mr. Morrison make any statement to
8    Mr. Thompson?
9    A. No.
10   Q. So is it your testimony that this was a
11   one-sentence meeting?
12   A. The sentence was, "Mickey, what can we talk
13   about today?" And he got up and he said, "I'm leaving."
14   And I said, "We can't talk about anything unless you sit
15   down and talk." And he said, I'm out of here or, you
16   know, words to that effect.
17   Q. Are you aware that the very next day
18   Mr. Thompson was written up for various violations that
19   had happened previously?
20   MS. FRIEL: Objection to form.
21   A. I don't -- I don't know what you mean.
22   Q. I would like to refer you to what's been
23   previously marked as Duncan Exhibit 7.
24   A. (The witness reviews the document.)

Page 31

1    Q. Have you ever seen this document before?
2    A. No.
3    Q. What is this document?
4    A. This is a verbal warning.
5    Q. This document is not in Mr. Thompson's personnel
6    file, is it?
7    A. I -- I'm not sure. I'm not sure without the
8    file in front of me that I could absolutely say, but I
9    don't -- there's no HR signature on there.
10   Q. So is it your testimony that before it goes into
11   the personnel file, it has to have an HR signature?
12   A. Yes.
13   Q. But this is a verbal warning; correct?
14   A. It is.
15   Q. So under what circumstances wouldn't it be put
16   into the HR personnel file?
17   A. It was never sent to us, to human resources.
18   And I really can't answer that other than that might be a
19   circumstance.
20   Q. If you look at Exhibit Duncan Number 4, the
21   write-ups signed by Mr. Homlish, does Duncan Number 7
22   reference the write-ups in these coaching documents?
23   A. Doesn't appear to. Well, 2/15. No.
24   Q. It says the week of 2/15.

Page 32

1    A. 6/16 is noted on here and here.
2    Q. What about 8/16?
3    A. 8/16 is on here.
4    Q. What about 8/10?
5    A. That's the part of the coachings.
6    Q. It also references the first three were the week
7    of 2/15. I assume that would not include the date of
8    incident 2/3/04.
9    A. That would be my assumption.
10   Q. Do you have any knowledge that these coachings
11   were written up to replace the references to these
12   incidents in the box in Duncan Exhibit Number 7?
13   A. I have no knowledge.
14   Q. What's your understanding of Mr. Thompson's
15   attendance and disciplinary record prior to 2004?
16   A. Without everything in front of me, I don't have
17   total recall.
18   Q. Offhand, do you recall any problems with
19   Mr. Thompson?
20   A. Problems with him?
21   Q. Yes.
22   A. Attendance problems.
23   Q. Attendance problems or discipline problems --
24   A. No.

Page 33

1    Q. -- that were brought to your attention?
2    Then from 2004 on would it be fair to say
3    that there were many problems with Mr. Thompson?
4    A. No more than other employees that we deal with
5    every day.
6    Q. But more than Mr. Thompson's normal, his past
7    conduct?
8    MS. FRIEL: Objection.
9    Q. You can answer.
10   MS. FRIEL: Go ahead.
11   A. I still would say that his attendance was not
12   that different than a lot of other employees.
13   Q. But in comparison to his previous attendance
14   prior to 2004 --
15   A. Which I can't -- which I'm assuming you're
16   telling me was good. I really don't have a reference to
17   tell you that, yes, it's better or worse. I just don't
18   know.
19   Q. But you don't recall it being bad; correct?
20   A. We have 1,000 employees. I couldn't possibly
21   remember everybody's attendance, you know, year to year.
22   Q. Has Mr. Thompson been scrutinized tighter or
23   more closely since he complained of age discrimination?
24   A. Not to my knowledge.

B-0309

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Thompson
Marie A. Isenberg

v.
C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 34

1  Q.  Are you aware of Dover Downs maintenance
2  employees receiving bonus checks?
3     **A.  All of the employees who qualified received**
4  **bonus checks.**
5     Q.  What makes you qualify?
6     **A.  You have to be an employee for the entire**
7  **calendar year that the bonus is based on. You must have**
8  **a discipline record that does not include any final**
9  **written warnings during that year.**
10    Q.  That's a final written warning, not just a
11  written warning?
12    **A.  A final written warning.**
13    Q.  Is that policy followed with no exceptions?
14    **A.  To the best of my knowledge.**
15    Q.  Do you have any involvement with employees
16  returning to work on light duty?
17    **A.  No.**
18    Q.  When a potential employee applies for a job at
19  Dover Downs, does Dover Downs do a background check on
20  that employee?
21    **A.  How do you mean, "a background check"?**
22    Q.  Do you check references?
23    **A.  Not usually.**
24    Q.  Do you do a criminal background check?

Page 35

1     **A.  If the position requires it, they are given a**
2  **State Police background check through the video lottery**
3  **office.**
4     Q.  What positions would require a criminal
5  background check?
6     **A.  All financial positions, all human resource**
7  **positions, any officer of the company, and any employee**
8  **who has contact with the casino.**
9     Q.  Would maintenance employees be subject to a
10  background check?
11    **A.  Building maintenance employees are.**
12    Q.  That is inside maintenance?
13    **A.  Correct.**
14    Q.  How is that background check conducted?
15    **A.  By the State Police.**
16    Q.  Do you get a report back from the State Police?
17    **A.  There is a report. It goes to our security**
18  **office.**
19    Q.  Is that sent directly from the State Police --
20    **A.  To the security office. And I don't know what**
21  **kind of a report it is. I've never seen it.**
22    Q.  So if there was a criminal history, Dover Downs
23  would know about it through the background check with the
24  State Police; correct?

Page 36

1        MS. FRIEL: Objection.
2        THE WITNESS:  Can I answer that?
3        MS. FRIEL:  If you have knowledge, you can
4  answer.
5     **A.  I don't know.**
6  **BY MR. WILSON:**
7     Q.  Does Dover Downs take any other steps to do
8  background checks on employees?
9     **A.  No.**
10    Q.  There's no independent criminal background
11  check?
12    **A.  No.**
13    Q.  Was it ever brought to your attention that
14  Mr. Thompson may have a criminal conviction?
15    **A.  No.**
16    Q.  Never?
17    **A.  Never.**
18    Q.  Are you aware that Mr. Thompson --
19    **A.  Can I say not before this week?**
20        MS. FRIEL: Objection. Privileged
21  information obviously was excluded.
22        MR. WILSON:  Okay.
23  BY MR. WILSON:
24    Q.  Are you aware that Mr. Thompson has been

Page 37

1  terminated from his employment?
2     **A.  I am aware of it.**
3     Q.  Is it a policy of Dover Downs that when an
4  employee lies on his or her application, that that
5  employee will be terminated?
6     **A.  Yes.**
7     Q.  So if it comes to light in these depositions
8  that another employee has lied on their employment
9  application, will they be terminated?
10    **A.  If that is, indeed, true, it would be**
11  **investigated and whatever the right -- the right action**
12  **will be taken.**
13    Q.  So if it proves to be true, they will be
14  terminated?
15    **A.  Yes. Based on what we've done in the past, yes.**
16    Q.  What investigation was done into Mr. Thompson's
17  past?
18        MS. FRIEL: Objection. Calls for
19  privileged information. If it calls for privileged
20  information --
21        MR. WILSON:  She said they would do an
22  investigation. I would just like to know what type of
23  investigation they did. I don't think that's privileged.
24        MS. FRIEL:  It's something I told her came

10 (Pages 34 to 37)

Thompson
Marie A. Isenberg

v.

C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 38

1  up in his deposition, the conversation I've had with her.
2  Obviously the attorney wasn't involved in any termination
3  discussion. So I'm just putting out there --
4  BY MR. WILSON:
5  Q.  Anything other than privileged information?
6  **A.  No.**
7  Q.  Ms. Isenberg, are you responsible for keeping
8  track of doctors' notes to excused absences or anything
9  like that?
10  **A.  No.**
11  MR. WILSON:  Let me just meet with Mickey
12  real quick and we may be done.
13  (A recess was taken at this time.)
14  BY MR. WILSON:
15  Q.  One last question.
16  With regard to the meeting between you and
17  Mr. Thompson and Mr. Morrison, are you absolutely certain
18  that that was the extent of the conversation that took
19  place?
20  **A.  To the best of my knowledge, that's what I**
21  **remember.**
22  Q.  Okay.
23  MR. WILSON:  I have nothing further.
24  MS. FRIEL:  I have a couple questions.

Page 39

1  BY MS. FRIEL:
2  Q.  Ms. Isenberg, Mr. Wilson just asked you about
3  the meeting with Mr. Thompson that we believe to be on
4  August 23rd, 2004.
5  Did Mr. Thompson tell you that he wanted a
6  meeting regarding the outside maintenance mechanic
7  position?
8  **A.  I don't remember -- my assistant probably made**
9  **the appointment.  I would not have known what it was**
10  **about except that he came -- that I had a meeting with**
11  **Mickey Thompson.  So I would not have had information**
12  **prior to that.**
13  Q.  Were you aware at any point during the meeting
14  that that is why Mr. Thompson wanted the meeting
15  regarding the outside maintenance mechanic position?
16  **A.  Yes, because Bob Morrison was there.**
17  Q.  Mr. Morrison told you that during the meeting
18  that that's what Mr. Thompson was complaining about?
19  **A.  I don't -- I honestly don't remember.  Somehow**
20  **that it was going to be a meeting with Bob Morrison and**
21  **Mickey, and I also had Carolyn Rutkowsky in that meeting.**
22  Q.  Now, you also testified earlier that regarding
23  the background checks, that the State Police conducts
24  background checks for Dover Downs?

Page 40

1  **A.  Correct.**
2  Q.  You also stated that you believed the State
3  Police sent a report to Dover Downs; is that correct?
4  **A.  They sent something to Dover Downs because on**
5  **occasion I have gotten something from security that said**
6  **somebody didn't pass the background check.**
7  Q.  But have you ever seen a report?
8  **A.  No.**
9  Q.  Written report?
10  **A.  No.**
11  Q.  So you have no firsthand knowledge that the
12  State Police even sends Dover Downs a written report; is
13  that correct?
14  **A.  Yes, that's correct.**
15  Q.  Okay.
16  MS. FRIEL:  No further questions.
17  MR. WILSON:  Okay.
18  (The deposition was then concluded at
19  12:55 p.m.)
20  - - - - -
21
22
23
24

Page 41

1  INDEX TO TESTIMONY
2
3
MARIE A. ISENBERG                          PAGE
4
5  Examination by Mr. Wilson                    2
   Examination by Ms. Friel                    39
6
7  - - - - -
8
9  INDEX TO EXHIBITS
10  ISENBERG EXHIBIT NO.:                      PAGE
11
12  1  A multipage copy of an Employee Handbook    14
13  2  A one-page copy of an Upgrade/Transfer Form  20
14  3  A two-page copy of an Application for
      Employment with a one-page attachment      26
15
16  - - - - -
17
18
19
20
21
22
23
24

**B-0311**

11 (Pages 38 to 41)

Thompson
Linda M. Renninger

v.

C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BRANCE F. THOMPSON, SR.,        )
                                )
              Plaintiff,        )
                                )
v.                              )   Civil Action No.
                                )    05-274 (GMS)
DOVER DOWNS, INC., DOVER DOWNS)
GAMING & ENTERTAINMENT INC.,   )
DOVER DOWNS GAMING MANAGEMENT )
CORP., DOVER ENTERPRISES, INC.)
and DOVER DOWNS PROPERTIES,     )
INC.,                           )
                                )
              Defendants.       )


            Deposition of LINDA M. RENNINGER taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 1:40 p.m. on Tuesday, April 12, 2006, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.

APPEARANCES:

            TIMOTHY J. WILSON, ESQUIRE
            MARGOLIS EDELSTEIN
               1509 Gilpin Avenue
               Wilmington, Delaware  19899
               for the Plaintiff

            BETH A. FRIEL, ESQUIRE
            MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
               123 South Broad Street
               Philadelphia, Pennsylvania  19109
               for the Defendants

------------------------------------------------------

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

B-0312

Thompson                                    v.                    Dover Downs
Linda M. Renninger              C.A. # 05-274 (GMS)              April 12, 2006

Page 2

1  ALSO PRESENT:
2      BRANCE F. THOMPSON, SR.
3         - - - - -
4         LINDA M. RENNINGER,
5      the witness herein, having first been
6      duly sworn on oath, was examined and
7      testified as follows:
8  BY MR. WILSON:
9      Q.  Good afternoon, Ms. Renninger.
10     A.  Good afternoon.
11     Q.  My name is Tim Wilson and I'm Brance Thompson's
12 attorney in this case against Dover Downs.
13         I'd like to give you a couple instructions
14 before we start.
15         I'm going to be asking you some questions
16 about this lawsuit and the factual circumstances
17 surrounding it.  When you respond to my questions, I
18 would ask that you do so verbally.  That's so the court
19 reporter can take down the responses.
20     A.  Okay.
21     Q.  Obviously nonverbal communications she can't
22 take down.
23         You've just been sworn, so as you know,
24 your testimony is under oath, so you must answer

Page 3

1  truthfully just as if you were in court.
2         If you don't hear a question or don't
3  understand it, please let me know and I will attempt to
4  explain it to you or rephrase it.
5         Please let me finish asking the question
6  before you start your answer and I will attempt to let
7  you complete your answer before I start my next question.
8  That way it's easier on our court reporter and we get a
9  clean transcript.
10         If at any time you come to realize that a
11 statement that you made is incorrect or inaccurate,
12 please let me know and I'll give you the opportunity to
13 clarify the record.
14         If at any time you should need a break to
15 use the rest room or to get a breath of fresh air or for
16 whatever reason, just let me know and we'll accommodate
17 you.
18         Do you understand these instructions?
19     A.  Yes, I do.
20     Q.  I would just like to get some background
21 information first.
22         Can you tell me where you were born and
23 what your birth date is?
24     A.  I was born in Sunbury, Pennsylvania, and my

Page 4

1  birth date is May 2nd, 1947.
2      Q.  What is your address?
3      A.  134 Blue Spruce Drive, Magnolia, Delaware.
4  19962 if you need that.
5      Q.  How long have you lived there?
6      A.  Nine or ten years.
7      Q.  Do you own?
8      A.  '97 I think we moved there.
9      Q.  Do you own?
10     A.  Yes, we do.
11     Q.  Have you ever been arrested?
12     A.  No.
13     Q.  Did you serve in the military?
14     A.  No.
15     Q.  Are you taking any medications today that would
16 impair your ability to provide testimony and give
17 truthful answers?
18     A.  No.
19     Q.  Have you ever been deposed before?
20     A.  Does Monday when Beth --
21         MS. FRIEL:  No.
22     Q.  No.
23     A.  No, then I have never been.
24     Q.  Did you graduate from high school?

Page 5

1      A.  Yes, I did.
2      Q.  What high school?
3      A.  Kishacoquillas, K-i-s-h-a-c-o-q-u-i-l-l-a-s,
4  Kishacoquillas High School.
5      Q.  Where is that located?
6      A.  In Reedsville, Pennsylvania.
7      Q.  Did you go to college?
8      A.  No.
9      Q.  Do you have any education after high school?
10     A.  No.
11     Q.  Are you presently employed by Dover Downs?
12     A.  Yes, I am.
13     Q.  What's your job title?
14     A.  Office coordinator in the maintenance office.
15     Q.  Can you give me a brief outline of what you do?
16     A.  As an office coordinator, also I do payroll.  I
17 type correspondence for the manager and the director.  I
18 put in capital asset requests and -- just a lot of
19 paperwork besides -- I also do -- run the sign shop for
20 them.
21     Q.  Who is the manager?
22     A.  The manager, right now we are without -- well,
23 one was just named today.
24     Q.  Who is that?

2 (Pages 2 to 5)

Thompson
Linda M. Renninger

v.

C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 6

1   A.  That would be Jim Shreves.  He was named -- the
2   announcement was made today.
3       Q.  And the director?
4       A.  The director is Rich Duncan.
5       Q.  How long have you been in this position?
6       A.  In this position for -- since the end of '99.
7       Q.  How long have you worked for Dover Downs in
8   total?
9       A.  In total?  I started there April 4th of '98.
10      Q.  What did you do between 1998 and 1999?
11      A.  I worked in the ticket office for about nine
12  months, and before that I was part-time, ushered
13  concerts, ran the elevator when they had parties, just
14  anything.  Worked in the coat room sometimes for the
15  casino.  Whatever they needed.
16      Q.  You mentioned earlier that you met with
17  Ms. Friel.  Was that in preparation of today's
18  deposition?
19      A.  Yes.
20      Q.  What day was that?
21      A.  That was Monday.
22      Q.  How long did you meet with her?
23      A.  About 15 minutes, I think.
24      Q.  Did you review any documents?

Page 7

1           MS. FRIEL:  Objection.
2           You can answer.
3       A.  No, we didn't review any documents.
4       Q.  Did you talk to anybody other than Ms. Friel in
5   preparation for this deposition?
6       A.  No.
7       Q.  Have you talked to anybody, in general, about
8   Mr. Thompson's lawsuit or the factual circumstances
9   surrounding his lawsuit?
10      A.  No.
11      Q.  No other Dover Downs employees or anything?
12  Just in passing conversations?
13      A.  Probably back when -- my part was when it
14  happened and everything, but recently...
15      Q.  What was your part when it happened?
16      A.  Anything I've been asked about was when
17  Mr. Thompson was not feeling well, he was in the security
18  office and I went down there to see what was going on.
19      Q.  Can you tell us what happened?
20      A.  I went down to the security office.  There were
21  three or four people there besides Mr. Thompson.  He said
22  he wasn't feeling well.  And they had offered to call an
23  ambulance, but he didn't want an ambulance called.  And
24  security would not do it because that's their policy,

Page 8

1   would not take him to the hospital.
2           So I said I would do it.  I went back to my
3   office, got my coat on.  At that time the director came
4   in and the director and the part-time person in my office
5   both kept saying, "I don't think you should do it because
6   of liability, if something happened to Mr. Thompson while
7   you were -- he was in your car, you know, you could be
8   liable."  And then Mr. Wertz said he would go down and
9   talk to him and that was it.
10      Q.  When you say he was not feeling well, what was
11  wrong with him?
12      A.  When I got down there, they said he was acting
13  like he was kind of hyperventilating is what someone -- I
14  don't know if Ross said that or who.
15      Q.  Who else was down there?
16      A.  Ervin Ross, Mickey, me, and there was -- I think
17  it was Joe McNair, but I'm not sure.  There was one other
18  person there.
19      Q.  What was his name?
20      A.  McNair.
21      Q.  Joe McNair?
22      A.  Yes.  He was the one who called back to the
23  security office to see about getting a ride.
24      Q.  Had you ever taken anybody to the hospital on

Page 9

1   your own previously?
2       A.  No.
3       Q.  When you say the director said no because of
4   liability, was that Mr. Duncan?
5       A.  No.  The director -- I guess it was the director
6   of security on the phone said, no, that security wouldn't
7   do it because of liability, that they would always call
8   an ambulance.  The director in my office was Rich Wertz
9   at the time and he wouldn't tell me I couldn't do it.  He
10  just said, "If I were you, I wouldn't because of
11  liability."
12      Q.  So he did not forbid you to do it?
13      A.  No, he did not.
14      Q.  Do you have an understanding as to what the base
15  of Mr. Thompson's lawsuit is?
16      A.  No, I don't.
17      Q.  Are you aware it's an age discrimination case?
18      A.  I've heard that, but -- I heard it was age
19  discrimination.  I don't know anything about it.
20      Q.  I believe you stated that during your position
21  you had something to do with payroll?
22      A.  Mm-hmm.
23      Q.  Is this for maintenance exclusively?
24      A.  Yes.  Just for the maintenance department.

B-0314

3 (Pages 6 to 9)

Thompson
Linda M. Renninger

v.

C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 10

1    Q. Were maintenance employees ever permitted to use
2    their vacation time to cover for a day that they were out
3    sick?
4    **A. Yes.**
5    Q. Are they still permitted to do that?
6    **A. Are they still permitted to do that? No. HR**
7    **pretty much changed the rules and said no more.**
8    Q. When did that change?
9    **A. They have to put in -- oh, gosh. In the last**
10   **six months, I think.**
11   Q. So prior to that, had that been the policy or
12   the way that you did things your whole time that you were
13   doing payroll?
14   **A. Yes. The policy was always 72 hours, but each**
15   **department had flexibility of, okay, if somebody really**
16   **needed to use it, but that is what has changed in the**
17   **last six months to a year, I believe.**
18   Q. What do you mean by "really needed to use it"?
19   **A. If they didn't have sick time and they were**
20   **really sick, we had the flexibility of saying, okay, then**
21   **we'll grant you your vacation time if you have vacation**
22   **time.**
23   Q. Who made that decision?
24   **A. That decision was made in the office by -- at**

Page 11

1    **that time Rich Duncan.**
2    Q. Did he always say that an employee could use
3    their vacation time?
4    **A. Yes.**
5    Q. Were there ever times when he said you couldn't
6    use your vacation time?
7    **A. Not that I can remember.**
8    Q. Did he ever say that Mr. Thompson could not use
9    his vacation time?
10   **A. Not that I can remember.**
11   Q. Was this ever communicated to the maintenance
12   employees, "this" being that they could use their
13   vacation time to cover illnesses?
14   **A. I didn't communicate that. I don't know if**
15   **somebody else did that or not. It was just always kind**
16   **of flexible in the department if somebody was sick.**
17   Q. Was it your job to enter the vacation time
18   whenever an employee was sick and requested the vacation
19   time?
20   **A. Yes.**
21   Q. If an absence was covered with vacation time,
22   was an employee charged with an unexcused absence?
23   **A. Not that I know of.**
24   Q. I would like to show you a document that has

Page 12

1    been previously marked in this case as Homish 1. Have
2    you ever seen one of these before?
3    **A. Yes.**
4    Q. Do you fill these out?
5    **A. Yes.**
6    Q. What this?
7    **A. This is an attendance record one year at a time.**
8    Q. Are all maintenance employees given one of
9    these?
10   **A. Yes.**
11   Q. Am I correct in assuming that the months run
12   across the page and the days run in columns?
13   **A. Correct.**
14   Q. In the month of February 2004, are there several
15   days in that month that are shaded?
16   **A. Yes.**
17   Q. What does that shading stand for?
18   **A. That he was ill.**
19   Q. Okay.
20   **A. I mean, it shows that it was ill.**
21   Q. Is that what the "I" stands for?
22   **A. Yes.**
23   Q. Is the shading indicative of anything?
24   **A. No.**

Page 13

1    Q. Do you ever shade days like this?
2    **A. Usually I shade the personal days. They get a**
3    **personal day every year and I have that one highlighted**
4    **so it's easy to show that they did that.**
5    Q. On February 7th there's a day that has an "I"
6    there and then it also has "1.5."
7    **A. That's for an hour and a half.**
8    Q. Does that mean he was late?
9    **A. He was -- either come in late an hour and a half**
10   **or he left early. I would have to look at a time card to**
11   **find out.**
12   Q. Okay.
13   **A. Could be either way.**
14   Q. Does that mean it was covered with vacation or
15   sick time, or does that just mean that he was -- well,
16   does it mean he was covered with --
17   **A. If they have an "I," it was covered with sick**
18   **time unless there was no sick time available.**
19   Q. On February 25 and 28 there's a V there. Does
20   that stand for vacation?
21   **A. Yes.**
22   Q. The X's stand for accident off job?
23   **A. X's?**
24   Q. Yes.

4 (Pages 10 to 13)

Thompson
Linda M. Renninger

v.

C.A. # 05-274 (GMS)

Dover Downs
April 12, 2006

Page 14

1    A. Those are days -- like in February there aren't
2    30th and 31st.
3        Q. In March it appears there were five vacation
4    days?
5        A. Yes.
6        Q. In April a holiday?
7        A. Right.
8        Q. In May, on May 12th there's an "I" with a "3"
9    there. What does that stand for?
10       A. Again, three hours missed. Whether it was come
11   in late or left early, I don't know.
12       Q. Does this indicate that it was covered with sick
13   time or vacation time?
14       A. Sick time.
15       Q. Let me ask you: How do you know it was covered
16   with sick time?
17       A. Because of the "I." It means illness.
18       Q. Okay.
19       A. Again, I am just to put time in here where they
20   missed. If he had sick time, payroll would cover it with
21   that.
22       Q. Okay.
23       A. I would put it on the payroll sheet.
24       Q. Okay.

Page 15

1    A. If there was no sick time, I would still put
2    three hours on the payroll sheet, but they wouldn't pay
3    it because there was no sick time. That's up to payroll.
4        Q. Let's look at June 16th. There's an "I" with a
5    U above it. What does the U stand for?
6        A. Unexcused absence. Illness with no doctors or
7    anything.
8        Q. With no doctor's note or no sick and no doctor's
9    note?
10       A. Either way.
11       Q. Okay.
12       A. Yes.
13       Q. So if we go back to May 12th, there's not a U
14   there; correct?
15       A. Correct.
16       Q. So does that mean that it was covered with
17   either sick time or vacation time?
18       A. I don't quite understand.
19       Q. Let me see if I can put it another way.
20           There's no U there; correct?
21       A. Correct.
22       Q. So does that mean that it's not an unexcused
23   absence?
24       A. Not necessarily.

Page 16

1        Q. Why is it --
2        A. Sometimes I forget to put the U. I'll admit
3    that.
4        Q. Okay.
5        A. And other times if they leave early or if they
6    come in late, we just don't put that, the unexcused,
7    either way. And like I said before, it's up to payroll.
8    I just record whether he was out sick, out on vacation,
9    what hours or anything like that. If the sick time was
10   available, payroll would pay it. If sick time wasn't
11   available, it would just be -- that would show on his
12   time card, but that wouldn't show on here or I wouldn't
13   know, would not know.
14       Q. What about for August 16th? There's an "I"
15   there with no U. Does that mean that that's an excused
16   absence?
17       A. Unless I just forgot to put the U, yes, that
18   means it was an excused absence.
19       Q. Did the T's with the circles around them mean
20   tardy?
21       A. Tardy, yes.
22       Q. What is the difference between a tardy and, for
23   instance, on February 7th where there's an "I 1.5"?
24       A. Tardy is generally a matter of seven minutes to

Page 17

1    half hour, something like that. Or if they just showed
2    up, came in late but didn't say I was sick, I was --
3    anything. Then it just shows up as a tardy on the time
4    card that they punched in late.
5        Q. Okay.
6        A. Generally anything over a half hour I would talk
7    to a supervisor or manager.
8        Q. When an employee was out, did you attempt to
9    determine whether they had any vacation time or sick time
10   to use to cover their absence?
11       A. Do I attempt? Normally they'll just put "sick"
12   on the time card. I have to put "I" for illness because
13   if I put an S, it shows as a suspension.
14       Q. I'm just trying to figure out in the one
15   instance on June 16th why you put a U and there's no
16   other U's on any of the other dates where Mr. Thompson
17   was ill.
18       A. I can't honestly answer that.
19       Q. Okay.
20       A. I don't know.
21       Q. Were you aware of what coaching is?
22       A. Coaching, yeah.
23       Q. Can you explain that to me?
24       A. Yes. Coaching is showing somebody how to do

B-0316

5 (Pages 14 to 17)

Thompson                                v.                    Dover Downs
Linda M. Renninger          C.A. # 05-274 (GMS)              April 12, 2006

Page 18

1   something or --
2       Q.  In terms of Dover Downs, as that term pertains
3   to Dover Downs.
4       A.  Oh, getting a coaching?
5       Q.  Yes.
6       A.  I guess when somebody has an absence or
7   something or they do something, they get just talked to
8   and coach them to please not do it again or try not to do
9   it again.
10      Q.  Do you have any participation in employees who
11  are assigned to light duty in terms of taking in their
12  doctors' notes or things of that nature?
13      A.  They'll hand doctors' notes in.  I just put them
14  in the file.  I try not to read them, go in the files or
15  anything for that because it's actually not my business I
16  feel.
17      Q.  Were you aware that Mr. Thompson was returned to
18  work light duty?
19      A.  At one point, yes.
20      Q.  When was that?
21      A.  When?
22      Q.  Yes.
23      A.  I...
24      Q.  Can you give me a year?

Page 19

1       A.  Can I give you a year?  I think he come back on
2   light duty after his accident.
3       Q.  After his car accident?
4       A.  After the car accident.  I think.
5       Q.  Are you aware that he was released to light duty
6   in 2005?
7       A.  2005?  In regards -- was this after -- I know
8   the car accident -- can I ask a question?  Why was he
9   out?  That would be more --
10      Q.  It didn't pertain to the car accident.
11      A.  Okay.  In 2005.  He was out of work from March
12  on, so...
13      Q.  If you don't remember, that's fine.
14      A.  No, I don't remember.
15      Q.  Okay.
16      A.  Like I said, I can associate it with like the
17  car accident.
18      Q.  Do you recall a time when Mr. Thompson's wife
19  gave you a doctor's note for Mr. Thompson and you called
20  and you called her back and said you could not accept the
21  notes for Mr. Thompson any longer?
22      A.  I remember the incident, yes.
23      Q.  Who told you you couldn't receive these notes
24  anymore?

Page 20

1       A.  Rich Duncan said they were all supposed to go to
2   HR.
3       Q.  Was this just for Mr. Thompson or was it for all
4   maintenance employees?
5       A.  Just Mr. Thompson.
6       Q.  Do you remember when that was?
7       A.  No, I do not.
8       Q.  Was it within the past year?
9       A.  I don't think so because he hasn't been there
10  the past year, so it was before that.
11      Q.  Was it shortly before he went out?
12      A.  Probably.
13          MS. FRIEL:  Don't guess.
14      A.  I honestly don't know.  I just remember her
15  bringing the note in.
16      Q.  Did Mr. Duncan give a reason as to why you were
17  not allowed to accept Mr. Thompson's notes?
18      A.  I was told HR requested that.
19          MR. WILSON:  I believe that's all I have.
20  Just let me talk to Mickey.
21          (A recess was taken at this time.)
22  BY MR. WILSON:
23      Q.  Just a couple real brief things.
24          If one were to look back through

Page 21

1   Mr. Thompson's time cards, would it show the days that
2   were covered by sick time and vacation time?
3       A.  Again, it would say 8V, which is eight vacation
4   hours, 8I for eight illness hours or however many.
5       Q.  Is there an indication where the employee has no
6   vacation time or sick time to cover it, does it indicate
7   there in any way that there was no time to cover that?
8   Is there a way to determine on the pay stubs if an
9   employee's out sick but has no vacation or sick time to
10  cover that illness?
11      A.  On the pay stub?
12          MS. FRIEL:  You mean the time card?  You
13  said the pay stub.
14          MR. WILSON:  No.  I'm talking about the
15  employee's pay stub.
16      A.  On the pay stub each week it tells you how many
17  vacation, how many sick hours you have.  Now, if you ran
18  out, it would just show you short hours because they
19  wouldn't pay you for the sick hours if you didn't have
20  them.
21  BY MR. WILSON:
22      Q.  So you just wouldn't have your 40 hours?
23      A.  Right.
24      Q.  I may have already asked you this.

6 (Pages 18 to 21)

B-0317